Peter J. Schulz, Esq. (SBN 167646)
pjs@sbrlawsd.com
Tommy U. Schroeder, Esq. (SBN 317542)
ts@sbrlawsd.com
SCHULZ BRICK & ROGASKI
600 West Broadway, Suite 960
San Diego, California 92101
Tel:  (619) 234-3660
Fax:  (619) 234-0626

Attorneys for Plaintiffs AV BUILDER CORP,
RESTORCORP, and ANTONIO MADUREIRA

# UNITED STATED DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AV BUILDER CORP,<br>a California corporation;<br>RESTORCORP,<br>a California corporation; and<br>ANTONIO MADUREIRA,<br>an individual,<br><br>          Plaintiffs,<br><br>               v.<br><br>HOUSTON CASUALTY COMPANY,<br>a Texas corporation,<br><br>          Defendant. | Case No.:  3:20-cv-01679-W-KSC<br><br>**PLAINTIFFS' POINTS AND AUTHORITIES IN SUPPORT OF ITS MOTION FOR PARTIAL SUMMARY JUDGMENT REGARDING DEFENDANT HOUSTON CASUALTY COMPANY'S DUTY TO DEFEND**<br><br>**NO ORAL ARGUMENT PURSUANT TO LOCAL RULE 7.1(d)(1)**<br><br>**Judge:**          Thomas J. Whelan<br>**Mag. Judge:**   Karen S. Crawford<br>**Hearing Date:** October 18, 2021<br>**Courtroom:**    3C |

# <u>TABLE OF CONTENTS</u>

I.  INTRODUCTION ...................................................................................4

II. STATEMENT OF FACTS........................................................................7

  A.  Background of Underlying Facts ......................................................7

  B.  The Insurance Policies....................................................................11

  C.  The Insurance Dispute....................................................................15

III. LEGAL STANDARD .............................................................................18

IV. LEGAL ARGUMENT .............................................................................19

  A.  Plaintiffs Satisfied all Conditions to Trigger Coverage
      under the 2018 Policy and HCC owed Plaintiffs a
      Defense from the Underlying Action ...............................................19

      1.  Ms. Dusina's Claim Arose Under the 2018 Policy................................22

          i.   The July 23, 2018 Communications did not
               Constitute a "Claim"........................................................23

          ii.  The August 14, 2018 Communications did not
               Constitute a "Claim" ........................................................24

          iii. Ms. Dusina and the Parties Involved Confirmed a
               "Claim" was not Made Until September 13, 2018 ...........................25

V.  CONCLUSION ........................................................................................27

1
2

# <u>TABLE OF AUTHORITIES</u>

3

**<u>Federal Cases</u>**

4  Anthem Electronic, Inc. v. Pacific Employers Ins. Co.
5      302 F.3d 1049 (9th Cir. 2002)...................................................19

6  Celotex Corp. v. Catrett
       477 U.S. 317 (1986) .............................................................19
7
   Crosby Estate at Rancho Santa Fe Master Association v. Ironshore Specialty
8      Insurance Company
9      498 F.Supp.3d 1242 (2020)......................................................19

10 Milne v. USA Cycling, Inc.
       575 F. 3d 1120 (10th Cir. 2009)................................................19
11
   Taylor v. First Advantage Background Services Corp
12     207 F. Supp. 3d 1095 (N.D. Cal. 2016) .......................................18

13 **<u>State Cases</u>**

14 Aydin Corp. v. First State Ins. Co.
15     18 Cal. 4th 1183 (1998)..........................................................20

16 Cannizzo v. Guarantee Ins. Co.
       245 Cal. App. 2d 70 (1966)......................................................20
17
   Dart Industries, Inc. v. Commercial Union Ins. Co.
18     28 Cal. 4th 1059 (2002)..........................................................20
19
   Delgado v. Heritage Life Ins. Co.
20     157 Cal. App. 3d 262 (1984).....................................................20

21 Hays v. Pac. Indem. Grp.
       8 Cal. App. 3d 158 (1970)........................................................20
22
   KPFF v. California Union Ins. Co.
23     56 Cal. App. 4th 963 (1997).....................................................19

24 Montrose Chemical Corp. v. Superior Court
       6 Cal. 4th 287 (1993).............................................................19
25
   **<u>Federal Rules</u>**
26
   Federal Rule of Civil Procedure 56 ..............................................18, 19

27
28

Plaintiffs AV BUILDER CORP ("AVB"), RESTORCORP, and ANTONIO MADUREIRA (collectively referred to as the "Plaintiffs") hereby submit their Memorandum of Points and Authorities in Support of their <u>Motion for Partial Summary Judgment on the sole issue of Defendant HOUSTON CASUALTY COMPANY's ("HCC") legal duty to defend</u>.

## I.

## <u>INTRODUCTION</u>

This is an insurance coverage and bad faith action arising from HCC's bad faith investigation and breach of its duty to defend and indemnify Plaintiffs from a former AVB employee's (Laura Dusina) lawsuit involving claims of discrimination, harassment, and inappropriate employment conduct against Plaintiffs (the "Dusina Lawsuit"). The actual catalyst of this dispute stems from HCC's refusal to defend Plaintiffs in the Dusina Lawsuit because of the fortuitous time period in which one policy expired (the 2017 Employment Practices Liability Insurance Policy issued by HCC), and another policy commenced (the 2018 Employment Practices Liability Insurance Policy issued by HCC). Merely because of the time frame in which HCC summarily concluded that Ms. Dusina made her claims, HCC refused to defend the Plaintiffs under its "claims-made and reported" insurance policy.

This instant Motion for Partial Summary Judgment focuses on a very limited issue: Whether HCC had a legal duty to defend Plaintiffs from the Dusina Lawsuit under the 2018 Employment Practices Liability Policy (the "2018 Policy"). In other words, was a claim first made and reported within the 2018 Policy period triggering HCC's duty to defend?

The undisputed evidence demonstrates that a claim, as defined under the 2018 Policy, was first made and reported within the 2018 Policy's time period. Plaintiffs met their burden as an insured by establishing all the conditions of coverage under the 2018 policy, yet HCC has fabricated a "totality of the circumstances" argument

1   to conclude there was no coverage available to the Plaintiffs.  HCC's denial is based

2   on cherry-picked facts and biased presumptions developed through speculation.

3        Laura Dusina and ANTONIO MADUREIRA were in a consensual personal

4   and sexual relationship over the course Ms. Dusina's eight-year employment with

5   AVB.  The relationship ended in 2018 when Mr. MADUREIRA became involved

6   with another woman.  The issue HCC has failed to understand is that the end of the

7   relationship between Mr. MADUREIRA and Ms. Dusina was entirely unrelated to

8   Ms. Dusina's employment at AVB.

9        From the time the relationship ended (roughly February 2018) to the date of

10   Ms. Dusina last date of employment (August 6, 2018), Ms. Dusina never made any

11   demands or claims to the Plaintiffs relating to her *employment.*  To the contrary, Ms.

12   Dusina and Mr. MADUREIRA engaged in a series of discussions relating to the end

13   of their personal relationship which, in part, involved discussions about compensating

14   Ms. Dusina for the years of support and value she provided to Mr. MADUREIRA.

15   The single best way to explain the situation is to say it was akin to a "divorce."

16        As part of their separation, Ms. Dusina only sought compensation she

17   believed *she had earned* through her time and commitment to Mr. MADUREIRA,

18   and not compensation FOR "DAMAGES" because she believed, or was claiming,

19   he had done something *wrong.*

20        Through their direct discussions, Ms. Dusina and Mr. MADUREIRA reached

21   an agreement as to how much Mr. MADUREIRA would pay Ms. Dusina. Because

22   of the amount he agreed to pay, Mr. MADUREIRA retained attorney Dick

23   Semerdjian to prepare a legal document that would ensure a complete and total

24   separation from Ms. Dusina.  Mr. MADUREIRA repeatedly encouraged Ms.

25   Dusina to retain a lawyer to review the terms and advise her before signing.

26        After a few drafts were exchanged, the parties could not agree on terms

27   FINAL and on August 14, 2021, Ms. Dusina hired an attorney presumably to

28   negotiate final terms of the separation.  Much to everyone's surprise, however,

1   Ms. Dusina's attorney instead crafted allegations in a written demand for

2   damages claiming, on September 13, 2021, for the first time, acts of discrimination,

3   harassment, and inappropriate employment conduct.  Mr. MADUREIRA and his

4   counsel were "blown away" by the claims, as this was the first time Ms. Dusina ever

5   even suggested claims involving discrimination, harassment, and inappropriate

6   employment conduct.  Indeed, Ms. Dusina's testimony in this action confirmed,

7   under oath, that she never made a claim or demand for discrimination, harassment,

8   or inappropriate employment conduct until her lawyer sent the September 13, 2018

9   demand.

10          In its summary denial of coverage, HCC speculated and concluded,

11   erroneously, that Ms. Dusina made a claim prior to September 13, 2018.  HCC's

12   denial stemmed from its failure to fully investigate the claims and its refusal

13   to apply the undisputed facts to the actual terms of the 2018 Policy.  HCC, its

14   principals, employees, and outside counsel all predetermined their insured's fate

15   by making a decision to deny coverage and then conducted a biased and one-sided

16   investigation to support its decision.

17          The 2018 Policy came into effect on August 19, 2018.  The 2018 Policy's

18   Insuring Agreement provides that the 2018 Policy covers "discrimination,"

19   "harassment" and inappropriate employment conduct."  Under the Insuring

20   Agreement, HCC agrees to pay "Loss" that the insured is legally obligated to

21   pay because of an "insured event" to which the Policy Applies. An insured event

22   is defined as an actual or alleged acts of "discrimination," "harassment" and

23   inappropriate employment conduct" by an insured against an employee.  The 2018

24   Policy therefore only applies if a "claim" because of an "insured event" is first

25   made and reported in the policy period.  A "claim" is defined as a written demand

26   received by the insured alleging damages or the filing of a "suit."

27          As stated above, and will be more fleshed out below, the first "claim" because

28   of an "insured event" was made on September 13, 2018.  Plaintiffs reported the

claim to HCC on October 15, 2018.  Plaintiffs therefore, satisfied all conditions necessary to trigger coverage under the 2018 Policy, thus triggering HCC's legal duty to defend.

## II.

## STATEMENT OF FACTS

**A.**    **Background of Underlying Facts**

Laura Dusina was an employee of AVB from 2010 to 2018. (Ex. "3," at 34:3-7; 38:8-10.)[1]  Mr. MADUREIRA is, and at all times was, the President of AVB. (Ex. "4," at 17:17-25.)  Ms. Dusina and Mr. MADUREIRA were involved in a consensual personal and sexual relationship for many of those years. (Ex. "3," at 39:22-40:2.)  Ms. Dusina and Mr. MADUREIRA's personal relationship intermittently continued until approximately February 2018 when the personal and intimate relationship came to an end because Mr. MADUREIRA became serious with another woman. (Ex. "4," at 21:16-23.) Unfortunately, the termination of the *relationship* became a personal issue wholly unrelated to Ms. Dusina's employment at AVB. (Ex. "3," at 131:24-132:2, 132:11-19; Ex. "4," at 215:14-216:2.)  The employment relationship remained intact and despite Mr. MADUREIRA's desire to continue to employ Ms. Dusina at AVB, Ms. Dusina decided it would be best if she resigned from AVB on August 6, 2018. (Ex. "3," at 38:8-10; Ex. "4," at 85:2-14; 204:18-20.)

From February 2018 through August 2018, Ms. Dusina and Mr. MADUREIRA discussed the end of their relationship with each other, and Ms. Dusina never made any demands or claims of wrongful employment conduct on AVB relating to her employment from the spring of 2018 all the way up to September 2018. (Ex. "3," at 154:24-156:24, 157:2-10; Ex. "4," at 215:14-216:2.)

From February 2018 to September 2018, Ms. Dusina and Mr. MADUREIRA

---

[1]  Exhibit references are to the concurrently filed Appendix Exhibits and attached to the Declaration of Peter J. Schulz.

engaged in a series of discussions, via email, text message, telephone, etc. relating to their breakup.  (Ex. "3," at 154:24-156:24, 157:2-10; Ex. "4," at 215:14-216:2.)

These discussions included Ms. Dusina's request for money from Mr. MADUREIRA to compensate her for the years of support and value she provided Mr. MADUREIRA during their long-term relationship.  (Ex. "3," at 132:17-18, 157:2-10; Ex. "4," at 70:11-71:24.) These discussions regarding Ms. Dusina's compensation were completely unrelated to any alleged employment practices of AVB and/or claims of wrongful conduct.  (Ex. "3," at 121:20-122:18, 154:13-156:24, 215:14-216:2.)

During these discussions, Ms. Dusina never made any claims, demands, or allegations against AVB or Mr. MADUREIRA that in any way related to claims of sexual harassment, discrimination, or any other type of inappropriate employment conduct.  (Ex. "3," at 121:20-122:18, 134:22-24, 154:13-156:24, 157:2-10.) Their breakup was not about that.  (Ex. "3," at 134:22-24, 154:13-156:24, 157:2-10; Ex. "4," at 70:11-71:24.)  Her demands solely involved his paying her for what she believed she had brought to the relationship over the years and not "damages" for having been harmed in some way.  (Ex. "3," at 134:22-24, 154:13-156:24, 157:2-10; Ex. "4," at 70:11-71:24.)

In July 2018, Ms. Dusina and Mr. MADUREIRA seemed to have reached a mutual agreement – in principle – as to how much Ms. Dusina would be paid. (Ex. "3," at 86:2-7; Ex. "4," at 133:8-13; Ex. "10.")  As the employment relationship was intact, and Mr. MADUREIRA continued to offer Ms. Dusina the opportunity to stay on as an employee with AVB, Ms. Dusina stated her decision to also leave her employment with AVB and move on with her life.  (Ex. "3," at 123:2-17; Ex. "4," at 79:6-80:12.)   Given her decision and given the amount of money they had agreed to, Mr. MADUREIRA asked his attorney to prepare a global severance agreement to consummate the deal and ensure the finality of all possible aspects of Ms. Dusina's entire relationship with Mr. MADUREIRA and AVB, including her

1  personal claims, and any *possible* employment claims that could ever exist.  (Ex.

2  "4," at 178:20-179:7, 182:3-16.)   Mr. MADUREIRA repeatedly recommended to

3  Ms. Dusina that she have an attorney review the agreement.  (Ex. "10.")

4       The final agreement was prepared by Mr. MADUREIRA's attorney, Dick

5  Semerdjian, and sent to Ms. Dusina for signature. (Ex. "4," at 135:7-10,178:20-

6  179:7, 182:3-16; Ex. "10.")  As any good attorney would do, Mr. Semerdjian drafted

7  a broad agreement to protect Mr. MADUREIRA from anything and everything that

8  could possibly arise between the parties. (Ex. "4," at 135:7-10,178:20-179:7, 182:3-

9  16; 216:20-217:10; Ex. "5," at 30:11-31:11).  Although this agreement involved Ms.

10 Dusina's employment at AVB, it was not predicated in *response* to on any "claims"

11 arising out of her employment with AVB – nor did she request money damages

12 arising from her employment at AVB.  Ex. "4," at 127:3-17, 138:12-25.)  The

13 agreement was solely to pay Ms. Dusina the agreed amount and ensure Mr.

14 MADUREIRA would never have to pay her anything in the future. (Ex. "3," at

15 131:24-132:11-19, 154:24-156:24, 157:2-10; Ex. "4," at 79:6-80:12, 138:12-25;

16 Ex. "5," at 30:11-31:11) After exchanging a few drafts, Mr. MADUREIRA and Ms.

17 Dusina mutually were unable to agree on final terms. (Ex. "4," at 152:13-153:13,

18 173:4-17; Ex. "10.")

19      Ms. Dusina first hired her attorney Joshua Gruenberg after the deal fell apart,

20 on August 14, 2018, who had no information regarding the existence of any claims

21 having been made by Ms. Dusina.  (Ex. "3," at 115:18-116:12; Ex. "9;" Ex. "13.")

22 On August 14, 2018, Ms. Dusina's counsel, Joshua Gruenberg, sent a short email

23 letter of representation to Mr. MADUREIRA's attorney, Dick Semerdjian.  Mr.

24 Gruenberg explained that he had been retained by Ms. Dusina "relative to her claims

25 against MR. Madureira and AV Builders [sic]." (Ex. "9;" Ex. "13.")

26      Indeed, Mr. Semerdjian testified that when he was first notified that

27 Mr. Gruenberg was retained by Ms. Dusina "relative to her claims against" Mr.

28 MADUREIRA and AVB, it was Mr. Semerdjian's understanding that the claims

Mr. Gruenberg referenced in his August 14, 2018 email solely involved finalizing the terms of the proposed separation agreement. (Ex. "5," at 38:9-39:24.)  Mr. Semerdjian expected that Mr. Gruenberg would represent Ms. Dusina to try to negotiate a larger payout on her behalf. (Ex. "5," at 38:8-23.)  Mr. Semerdjian explained that based on Mr. Gruenberg's August 14, 2018 email, "there was nothing here at this point that would have put [him] in any way to believe there would be a lawsuit other than that." (Ex. "5," at 40:5-7.)

Then, unexpectedly, and for the first time, on September 13, 2018, Ms. Dusina's attorney, Joshua Gruenberg, communicated his intent to assert a demand on Dusina's behalf for money damages arising out of alleged inappropriate employment conduct by Mr. MADUREIRA. (Ex. "3," at 132:11-19; 134:22-24; 154:13-156:24; Ex. "5," at 52:4-12; Ex. "13;" Ex. "14.")  Included in Mr. Gruenberg's demand was a draft complaint listing numerous unasserted claims involving alleged inappropriate employment conduct of AVB and Mr. MADUREIRA.  (Ex. "3," at 132:11-19; 134:22-24, 154:13-156:24; Ex. "5," at 51:21-52:12; Ex. "14.")

These previously unidentified claims and allegations included in the draft complaint provided by Mr. Gruenberg on September 13, 2018, stunned Mr. Semerdjian and Mr. MADUREIRA.  (Ex. "5," at 51:21-52:12.)  As Mr. Semerdjian described it: "we were blown away, meaning Tony and I were blown away by the bombastic language and pleadings in that complaint.  It came out of left field.  It was like someone hit Tony right in the face.  It was filled with mistruths, in his opinion, lies and just over, over the top." (Ex. "5," at 52:4-9.)  Mr. Semerdjian explicitly confirmed that September 13, 2018, was the first day he and Mr. MADUREIRA became aware of the allegations of sexual harassment, discrimination, or inappropriate employment conduct. (Ex. "5," at 52:10-12.)

Ms. Dusina testified that all of her communications with Mr. MADUREIRA from April 2018 through August 2018 solely concerned what she believed she had

earned and her personal relationship with Mr. MADUREIRA.  (Ex. "3," at 157:2-10.) Specifically, according to Ms. Dusina, all of her discussions with Mr. MADUREIRA in July 2018 had nothing to do with claims for sexual harassment or discrimination. (Ex. "3," at 134:22-24, 154:13-156:24, 157:2-10.) Ms. Dusina stated that before September 13, 2018, her and Mr. MADUREIRA only talked about their personal relationship and the money she believed she was entitled to as a result of their relationship.  (Ex. "3," at 132:17-18.)  Ms. Dusina confirmed that the September 13, 2018 email with the draft complaint was "the first time she ever demanded damages relating to [her] employment." Ex. "3," at 132:11-19, 134:22-24, 154:13-23.)

The draft version of Ms. Dusina's complaint was given to Mr. MADUREIRA's counsel on September 13, 2018.  (Ex. "5," at 47:5-18; Ex. "13;" Ex. "14."   Ultimately, on November 21, 2018, Ms. Dusina filed her complaint, which was identical to the draft complaint provided to Plaintiffs on September 13, 2018, against Plaintiffs entitled Dusina v. Av Builder Corp, et al., in the Superior Court of the State of California, County of San Diego, Case No. 37-2018-00058998-CU-OE-CTL (the "Underlying Action").  (Ex. "12;" Ex. "14.") The Underlying Action levied the following causes of action against the AVB and Mr. MADUREIRA: (1) sexual harassment; (2) gender discrimination; (3) retaliation; (4) failure to prevent harassment and/or discrimination; (5) negligent supervision; (6) failure to pay wages upon termination; (7) failure to provide accurate and itemized wage statement; (8) breach of written contract; (9) breach of oral contract; (10) unlawful business practice; and (11) intention infliction of emotional distress.  (Ex. "12.")

**B.    The Insurance Policies**

HCC issued employment practices liability insurance policies providing coverage for AVB and Mr. MADUREIRA from 2003 through 2019. (Ex. "16.") Among others, HCC issued a renewal employment practices liability insurance policy number H717-917293 that provided coverage for AVB and Mr. MADUREIRA with a policy period from August 19, 2017 to August 19, 2018 (the "2017 Policy"),

and a renewal of the 2017 Policy in 2018, policy number H718-920263, which provided similar employment practices liability coverage to AVB and Mr. MADUREIRA with a policy period of August 19, 2018 to August 19, 2019 (the "2018 Policy") (the 2017 Policy and 2018 Policy are collectively referred to as the "Policy"). (Ex. "1;" Ex. "2;" Ex. "16.")

The 2017 Policy and 2018 Policies state that HCC has the right and duty to defend any 'claim' for an 'insured event' made or brought against any insured to which this Policy applies." (Ex. "1," at AVB000045; Ex. "2," at AVB000103.)

Insuring Agreement 1.a. states that the 2018 Policy "covers 'discrimination', 'harassment' and 'inappropriate employment conduct' liability . . . ." (Ex. "1," at AVB000045; Ex. "2," at AVB000103.) Insuring Agreement 1.b. states that HCC "will pay 'loss' that the insured is legally obligated to pay because of an 'insured event' to which this Policy applies. . . ." (Ex. "1," at AVB000045; Ex. "2," at AVB000103.) The term "claim" is defined in the 2017 Policy to mean "a *written* demand received by the insured *alleging damages* or the filing of a 'suit,' or any administrative proceeding . . . ." (Emphasis added.) (Ex. "1," at AVB000057.)

The 2018 Policy defines "discrimination" to mean: [T]ermination of the employment relationship, a demotion or failure or refusal to hire or promote or denial of an employment benefit or the taking of any adverse or differential employment action because of race, color, religion, age, sex, pregnancy, sexual orientation or preference, national origin, or disability including a disability resulting from human immunodeficiency virus (HIV) or acquired immune deficiency syndrome (AIDS), or any other basis prohibited by federal, state or local law. (Ex. "2," at AVB000116.)

The 2018 Policy defines "harassment" to mean: [U]nwelcome sexual or non-sexual advances, requests for sexual or non-sexual favors or other verbal, visual or physical conduct of a sexual or non-sexual nature that:

    a.    is explicitly or implicitly made a condition of employment,

1    b.    are used as a basis for employment decisions, or

2    c.    create a work environment that interferes with performance….

3    (Ex. "2," at AVB000116.)

4    The 2018 Policy defines "inappropriate employment conduct" to mean:

5    [A]ctual or constructive termination of an employment relationship in a manner

6    which is against the law and wrongful or in breach of an implied agreement to

7    continue employment, including allegations of breach of an implied employment

8    contract and breach of the covenant of good faith and fair dealings in the

9    employment contract, or an employment related incident resulting in one or

10   more of the following offenses:

11   a.    wrongful demotion or wrongful failure to employ or promote;

12   b.    wrongful discipline;

13   c.    wrongful denial of tenure or deprivation of career opportunity;

14   d.    negligent hiring, supervision or evaluation;

15   e.    "retaliation" [which is defined as "retaliatory treatment against an

16         'employee' of the insured on account of such 'employee's' exercise

17         or attempted exercise of his or her rights under the law"]

18   f.    misrepresentation or defamation;

19   g.    infliction of emotional distress, humiliation, mental injury or mental

20         anguish;

21   h.    false arrest, detention, or imprisonment; or

22   i.    libel, slander, defamation of character or any invasion of right of

23         privacy.

24   j.    employment terminations, disciplinary actions, demotions, or other

25         employment decisions which violate public policy of the Family

26         medical Leave Act or similar state law;

27   k.    violations of the Uniformed Services Employment and Reemployment

28         Rights Act. . . (Ex. "2," at AVB000116-AVB000117.)

Under the Insuring Agreement of both the 2017 Policy and the 2018 Policy, the Policy applies if: A "claim" **because of an "insured event"** is first made and reported in the policy period in accordance with Section VII; a potential "claim" is first reported in accordance with Section VII; the "claim" is first reported in accordance with Section VII; and the "insured event" does not arise from any potential "claim" or circumstances of which any "management or supervisory employee" had knowledge prior to the effective date of the first Employment Practices Liability Insurance policy issued by HCC to the insured and continuously renewed and maintained in effect to the inception date of the Policy.  (Ex. "1," at AVB000045; Ex. "2," at AVB000103.)

Section VII of the 2017 Policy and 2018 Policy states that a policy applies only to "claims" first made or brought against the insured while the Policy is in effect. (Ex. "1," at AVB000055; Ex. "2," at AVB000113.)  With respect to "claims," Section VII states that a "**claim" because of "one insured event"** will be considered to have been made or brought on the date that the first of **those** "claims" was first made or brought. (Ex. "1," at AVB000056; Ex. "2," at AVB000114.) "One insured event" is defined in the policy as an actual or alleged act of discrimination, harassment and/or inappropriate employment conduct by an Insured against an employee which is related by an unbroken chain of events or made or brought by the same claimant. (Ex. "1," at AVB000056 [modified by AVB000033]; Ex. "2," at AVB000111 [modified at AVB000091].)

Pursuant to section VI.2.(a) of the 2018 HCC Claims-Made Policy Form, AVB and Mr. MADUREIRA "must see to it that [HCC] or [HCC's] authorized representatives are notified within sixty (60) days or so as soon as practicable after a "claim" is made…"  (Ex. "2," at AVB000092.)   The 2018 HCC Claims-Made Policy Form included an endorsement EP 530 01/15 which added new reporting requirements. (Ex. "2," at AVB000091-AVB000092.)   This endorsement stated that "this Policy applies only to 'claims' first made or brought against you and reported to

1    us, in writing, within the Policy Period set forth on the Declarations page of this

2    Policy or any Limited or Extended Reporting Period (if applicable. . . .” (Ex. "2," at

3    AVB000091.)  Additionally, the endorsement changed section VI.2.(a) to state "you

4    must see to it that we receive written notice after your actual notice or receipt of the

5    'claim' as soon as practicable, but in no event later than sixty (60) days after your

6    actual notice or receipt of the 'claim,' or thirty (30) days after expiration, termination,

7    or cancellation of the Policy or any extended Reporting Period, whichever comes

8    first.. . ."  (Ex. "2," at AVB000092.)

9           With respect to a "potential claim," Section VII provides that if during the

10   Policy Period (here, August 14, 2018-August 14, 2019), any insured becomes aware

11   of an "insured event" which they reasonably believe may result in a future "claim"

12   and they or the Named Insured or any insured entity provides notice in writing to

13   HCC of such "insured event" prior to the end of the Policy Period, then any "claim"

14   subsequently arising from such "insured event" shall be "deemed to have been made

15   on the date notice of such 'insured event' was given to us." (Ex. "1," at AVB000056;

16   Ex. "2," at AVB000114.)

17   **C.   <u>The Insurance Dispute</u>**

18          On October 15, 2018, Plaintiffs, through their counsel, tendered the claim to

19   HCC. (Ex. "11.")  Originally, HCC issued a designated claim number that correctly

20   confirmed the claim was first made and reported under the 2018 policy period, but

21   then HCC quickly changed the claim number to erroneously assert that the claim

22   was first made in the 2017 policy period in order to deny coverage. (Ex. "7," at

23   67:16-68; 69:1-8.) On November 9, 2018, HCC issued a denial letter to Plaintiffs

24   rejecting coverage and refusing to defend Plaintiffs from the Underlying Action.

25   (Ex. "17.")  HCC's denial of Plaintiffs' tender came without HCC conducting a

26   full investigation or ever even obtaining a statement from its own insured. (Ex. "5,"

27   at 61:6-13, 62:1-5.)  Consequently, Plaintiffs had to defend themselves from the

28   Underlying Action and institute this separate action against HCC.  (Ex. "4," at

224:8-24; Ex. "5," at 60:1-61:15; Ex. "17.")

**There is no dispute that the September 13, 2018 correspondence, reported to HCC October 15, 2018, was a "claim" as that term is defined in the policy.** (Ex. "6," at 82:24-83:5; Ex. "7," at 135:2-12; Ex. "8," at 44:5-19.) The key dispute is whether a written claim for damages relating to harassment, discrimination, or inappropriate employment conduct was made by Ms. Dusina during the 2017 Policy period, which ended August 19, 2018.  This issue determines whether the 2017 Policy or the 2018 Policy applies.

HCC's position is that the 2017 Policy applies. (Ex. "15," at Special Interrogatory 1 and 2.) HCC's argument is that the July 23, 2018 e-mail communications between Ms. Dusina and Mr. MADUREIRA constitute a claim arising from an insured event. (Ex. "15," at Special Interrogatory 1 and 2.) HCC also contends that Ms. Dusina's counsel, Joshua Gruenberg, informing Plaintiffs' counsel, Dick Semerdjian, on August 14, 2018, that he had been retained by Ms. Dusina relative to her claims against Plaintiffs were a claim because of an insured event. (Ex. "15," at Special Interrogatory 1 and 2.)  However, these contentions are incorrect and not supported by the evidence.

When deposed, neither HCC nor its coverage counsel could identify a single communication or email – except for the September 13, 2018 email with the draft complaint – that constituted a written demand for damages relating to harassment, discrimination, or inappropriate employment conduct.  For example, HCC claim adjuster Kathryn Sherman was asked to explain which written communication on July 23, 2018, constituted a written demand alleging damages arising out of harassment, discrimination, or inappropriate employment at her deposition.

> Q:    And so – my question is looking at this one email,
>         July 23, 2018, 3:11 p.m., is there – is there anything
>         in this email which you interpret as a written demand
>         for damages because of an insured event:

A:   Ms. Sherman: There's a written demand for damages and if you take this completely out of context from every other document that I reviewed then ***there is no allegation*** of an insured event in this particular sentence from July 23, 2018, at 3:11 p.m. (Ex. "7," at 211:18-212:5.)

Similarly, HCC's coverage counsel could not identify a single communication on July 23, 2018, that shows a written demand for damages arising from an insured event, such as harassment, discrimination, or inappropriate employment conduct. (Ex. "8," at 148:8-150:2.) When asked to point to a communication on August 14, 2018, that illustrated a written demand for damages arising from an insured event, such as harassment, discrimination, or inappropriate employment conduct HCC nor its coverage counsel could do so. (Ex. "7," at 195-8-12; Ex. "8," at 75:10-76-3.) HCC's coverage counsel, Robert Cutbirth testified as follows:



To be clear, the only issue for this Motion Court is <u>when</u> was the first "claim," a written demand for damages, because of an "insured event" (harassment,

1   discrimination, or inappropriate employment conduct) was first made.  It

2   is undisputed that no written demand for damages relating to harassment,

3   discrimination, or inappropriate employment conduct was made in any

4   communication prior to September 13, 2018. (Ex. "6," at 82:24-83:5; Ex. "7," at

5   135:2-12; Ex. "8," at 44:5-19.) HCC admits the communication on September 13,

6   2018, constitutes a claim because of an insured event.  (Ex. "6," at 82:24-83:5;

7   Ex. "7," at 135:2-12; Ex. "8," at 44:5-19.)  However, HCC also seeks to rely on the

8   September 13, 2018 communication to allege that this communication arises from

9   the same claims being made on July 23, 2018 and August 14, 2018 – which is not

10  true and completely contrary to all of the evidence.  Indeed, HCC argues that the

11  "totality of the information" confirms that a claim because of an insured event was

12  made during the 2017 Policy period. (Ex. "7," at 195:8-12; Ex. "15," at Special

13  interrogatory No. 1 and 2.)

14        The "totality" of all information is not the stated condition of coverage.

15  Moreover, Ms. Dusina admitted the first written demand for damages relating to

16  harassment, discrimination, or inappropriate employment conduct was made on

17  September 13, 2018.  (Ex. "3," at 121:20-122:18, 134:22-24, 154:13-156:24, 157:2-

18  10.)   Thereafter, Plaintiffs reported the claim to HCC within the appropriate time

19  period thereby satisfying the condition for coverage. (Ex. "11.")  It is therefore

20  undisputed that Plaintiffs are entitled to coverage from HCC under the 2018 Policy,

21                                    **III.**

22                          **LEGAL STANDARD**

23        Federal Rule of Civil Procedure 56 sets forth the standard for the granting of

24  a motion or partial motion for summary judgment.  A party may move for summary

25  judgment as to a claim, or part of a claim.  Fed. R. Civ. P. 56(a).   "Where there

26  is no genuine dispute of material fact as to only a single claim or defense or as to

27  part of a claim or defense, the district court may enter partial summary judgment."

28  Taylor v. First Advantage Background Services Corp, 207 F. Supp. 3d 1095, 1099

(N.D. Cal. 2016); Fed. R. Civ. P. 56(a).  The summary judgment procedure is designed to secure the just, speedy, and inexpensive determination of every action. Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986).

Specifically, courts have authority to grant a motion for partial summary judgment concerning an insurer's duty to defend its insured.  See Anthem Electronic, Inc. v. Pacific Employers Ins. Co., 302 F.3d 1049, 1060 (9th Cir. 2002). Where the undisputed facts demonstrate that an insurer breached its duty to defend its insured, the court may grant a motion for partial summary judgment.  Crosby Estate at Rancho Santa Fe Master Association v. Ironshore Specialty Insurance Company, 498 F.Supp.3d 1242, 1259-1260 (2020).

In cases for which jurisdiction is based upon diversity jurisdiction, the question of whether a party must prevail as a matter of law is created by California law.  Milne v. USA Cycling, Inc., 575 F. 3d 1120, 1129 (10th Cir. 2009). Accordingly, California substantive law regarding the duty to defend such as the one involved in this action controls.

## IV.

## LEGAL ARGUMENT

**A.**   **Plaintiffs Satisfied all Conditions to Trigger Coverage under the 2018 Policy and HCC owed Plaintiffs a Defense from the Underlying Action**

Timely reporting of a claim is the event triggering coverage and an insurer's duty to defend under a "claims made and reported" policy.  KPFF v. California Union Ins. Co., 56 Cal. App. 4th 963, 972 (1997).  To defend meaningfully, the insurer must defend immediately.  Montrose Chemical Corp. v. Superior Court, 6 Cal. 4th 287, 295 (1993).

An insured only bears the burden to establish that the occurrence forming the basis of the claim is within the basic scope of insurance coverage, and the burden is on the insurer to prove the claim is specifically excluded, whether the dispositive policy language is found in clauses described as exclusions, exceptions, limitations,

**conditions**, or endorsements.  [emphasis added] See, <u>Dart Industries, Inc. v.</u> <u>Commercial Union Ins. Co.</u>, 28 Cal. 4th 1059, 1071 (2002); <u>Aydin Corp. v. First</u> <u>State Ins. Co.</u>, 18 Cal. 4th 1183, 1188 (1998).

California case law is clear that exclusions and limitations on coverage in an insurance policy are "strictly construed against the insurer and liberally interpreted in favor of the insured."  <u>Delgado v. Heritage Life Ins. Co.</u>, 157 Cal. App. 3d 262, 271 (1984).  Moreover, insurance contracts are regarded as contracts of adhesion expressing superior bargaining power of the insurer.  <u>Hays v. Pac. Indem. Grp.</u>, 8 Cal. App. 3d 158, 162 (1970).  As a consequence, the exclusions in the insurance policy are strictly construed against the insurer and liberally interpreted in favor of the insured.  <u>Cannizzo v. Guarantee Ins. Co.</u>, 245 Cal. App. 2d 70, 73 (1966).

HCC's policy expressly provides that it has the "right and duty to defend any 'claim' for an 'insured event' made or brought against any insured to which this Policy applies."  (Ex. "1," at AVB000045; Ex. "2," at AVB000103.)  The Policy states that it applies only to "claims" first made or brought against the insured while the Policy is in effect. (Ex. "1," at AVB000055; Ex. "2," at AVB000113.) The term "claim" is defined in the 2017 Policy and 2018 Policy to mean "a ***written*** demand received by the insured ***alleging damages*** or the filing of a 'suit,' or any administrative proceeding . . . ." The term "claim" is defined in the 2017 Policy to mean "a ***written*** demand received by the insured ***alleging damages*** or the filing of a 'suit,' or any administrative proceeding . . . ."  (Emphasis added.) (Ex. "1," at AVB000057; Ex. "2," at AVB000115.)  The Policies' Insuring Agreement provides that the Policy covers: "discrimination," "harassment" and inappropriate employment conduct." (Ex. "1," at AVB000045; Ex. "2," at AVB000103.)

Under the Insuring Agreement HCC agrees to pay "loss" that the insured is legally obligated to pay because of an "insured event" to which the Policy Applies. Ex. "1," at AVB000045; Ex. "2," at AVB000103.)  An "insured event" is defined by the 2017 and 2018 Policy as an actual or alleged act of discrimination, harassment

and/or inappropriate employment conduct by an Insured against an employee. (Ex. "2," at AVB000117.)  The Policy applies if a "claim" and potential "claim" ***because of an "insured event"*** is first made and reported in the policy period.

Additionally, the Policy applies when the "insured event" does not arise from any potential "claim" or circumstances of which any "management or supervisory employee" had knowledge prior to the effective date of the first Employment Practices Liability Insurance policy issued by HCC to the insured and continuously renewed and maintained in effect to the inception date of the Policy (which in this case is 2003).  Ex. "1," at AVB000045; Ex. "2," at AVB000103.) Pursuant to the 2018 HCC Policy, endorsement EP 530 01/15, AVB and Mr. MADUREIRA were required to give notice of the claim to HCC within sixty (60) days. (Ex. "2," at AVB000092.)

Plaintiffs satisfied all of the above conditions to warrant coverage.  The 2018 Policy went into effect on August 19, 2018. (Ex. "2," at AVB000065.)  The first "claim" because of an "insured event" was made by Ms. Dusina on September 13, 2018, which was within the 2018 Policy period.  (Ex. "3," at 121:20-122:18, 134:22-24, 154:13-156:24, 157:2-10; Ex. "4," at 215:14-216:2.)  Plaintiffs reported the claim to HCC on October 15, 2018, which is within the 60-day period for reporting a "claim", as required by the 2018 Policy.  (Ex. "11.")  Plaintiffs were not aware of a potential "claim" before September 13, 2018, and there was no evidence that Plaintiffs had knowledge of a "claim" because of "insured" event any time before September 13, 2018.  In this case, Plaintiffs first became aware of an "insured event" which they reasonably believed may result in a future "claim" was on September 13, 2018, and notice of that event was given to HCC on October 15, 2018, both of which dates occurred "during the Policy Period

At no time before September 13, 2018, did any insured receive a demand, let alone the required written demand, from Ms. Dusina alleging damages because of actual or alleged acts of "discrimination," "harassment" and inappropriate

employment conduct." (Ex. "3," at 121:20-122:18, 134:22-24, 154:13-156:24, 157:2-10; Ex. "4," at 215:14-216:2.)    Therefore, the 2018 Policy applies, and HCC had a legal obligation to defend Plaintiffs from the Underlying Action.

### 1.    Ms. Dusina's Claim Arose Under the 2018 Policy

To emphasize, pursuant to the 2017 Policy and the 2018 Policy, a "claim" arises when a written demand alleging damages relating to discrimination, harassment, or inappropriate employment conduct is received by the insured.  (Ex. "1," at AVB000045, AVB000057, Ex. "2," at AVB000103, AVB000115.)    HCC's confusion stems from the fact that it mistakenly believes the discussions between Mr. MADUREIRA and Ms. Dusina in the summer of 2018 had anything to do with AVB's alleged inappropriate employment conduct or claims of sexual harassment or discrimination.  Nothing could be further from the truth.

Ms. Dusina and Mr. MADUREIRA were involved in a consensual personal and sexual relationship for many years.  (Ex. "3," at 39:22-40:2.)  The separation between the two of them which came to light in the spring of 2018 was entirely a personal separation and the consideration being proposed and negotiated related solely to Ms. Dusina's perceived value from the relationship – not because Mr. MADUREIRA had done anything *wrong*.  (Ex. "3," at 131:24-132:2, 132:11-19; Ex. "4," at 215:14-216:2.)

However, the first written demand from Ms. Dusina alleging damages because of actual or alleged acts of "discrimination," "harassment" and inappropriate employment conduct" (i.e., to which the insurance applies) was made through her newly-retained lawyer on September 13, 2018.  This is confirmed by the claimant, Ms. Dusina herself, Ms. Dusina's attorney, the insureds, and all of the outstanding communications between Plaintiffs and Ms. Dusina.

There is no evidence of a demand, let alone a written document that was provided to Plaintiffs before September 13, 2018, that constitutes a "claim" because of an "insured event".  This refutes HCC's position that a claim was made before

September 13, 2018.  HCC's own adjuster, Ms. Sherman, and HCC's coverage counsel, Robert Cutbirth, essentially agreed.  When under oath, they could only <u>speculate</u> that Ms. Dusina was intending to make a claim for covered damages based on the entire context of the circumstances.  Neither HCC nor its coverage counsel could identify a single communication or email – except for the September 13, 2018, email with the draft complaint – that constituted a written demand for damages relating to an "insured event." Nonetheless, HCC's November 9, 2018 denial letter heavily relied on the July 23, 2018 emails between Ms. Dusina and Mr. MADUREIRA.  HCC's denial thus stems from its manufactured argument that the claim can be made through the "totality of the circumstances."  That is not what the policy allows.

                **i.**    **<u>The July 23, 2018 Communications did not Constitute a "Claim"</u>**

HCC's claims adjuster, Ms. Sherman, attempted to argue that a July 23, 2018 email should have been taken "into the context" with "all other information." . (Ex. "7," at 195:8-12.) This argument does not make sense. The Plaintiffs did not have all the information until September 13, 2018!  How could they put the July 23, 2018 emails in context with the claims in the draft complaint which they did not yet have? Basically, what she really meant was in context with the select other information she could point to in support of her pre-determined denial.

There was no indication Ms. Dusina had a claim for harassment, discrimination, or inappropriate employment conduct until her lawyer got a hold of her and drafted the September 13, 2018 demand.  Thus, there was no "context" for the Plaintiffs to determine there was a claim as of July 23, 2018.  The Plaintiffs simply had to rely on the four-corner contents of the emails on July 23, 2018, at the time they received them and the actual context of the discussions between Mr. MADUREIRA and Ms. Dusina.  Those emails do not make a demand for damages that rise to a level of a claim – which Ms. Sherman confirmed at her deposition.  (Ex. "7," at 211:18-212:5.)

1    Similarly, HCC's coverage counsel, Mr. Cutbirth, could not identify a written

2  demand for damages arising from an insured event in any of the July 23, 2018 emails

3  between Mr. MADUREIRA and Ms. Dusina. (Ex. "8," at 148:8-150:2.)  Instead, Mr.

4  Cutbirth uses the same flawed and incomprehensible logic as Ms. Sherman by using

5  future communications to add context in hindsight to prior communications and

6  presume that the Plaintiffs "must have known" a claim was being made on July 23,

7  2018. ██████████████████████████████████████████

8  ████████████████████████████████████████████

9  ████████████████████████████████████████████

10  ████████████████ (Ex. "8," at 148:8-150:2.)

11        **ii.   The August 14, 2018 Communications did not Constitute a "Claim"**

12    HCC also argues that a claim had arose by at least August 14, 2018, when Ms.

13  Dusina's counsel, Joshua Gruenberg, contacted Plaintiffs' counsel, Dick Semerdjian,

14  via email and informed him that he would be representing Ms. Dusina in her claims

15  against Plaintiffs.  In the email, Mr. Gruenberg simply states he had been retained by

16  Ms. Dusina, "relative to her claims against MR. Madureira and AV Builders [sic]."

17  (Ex. "9.")  However, at no point did Mr. Gruenberg explain what those claims were

18  against Mr. MADUREIRA and AVB.  Moreover, Ms. Dusina's attorney, Joshua

19  Gruenberg confirmed that he was first retained on August 14, 2018, and that he had

20  no information at that time of any claims having been made by Ms. Dusina.(Ex. "13.")

21    Importantly, Mr. Gruenberg did not make any "claims" as that term is

22  defined in HCC's policies in the August 14, 2018 email. In fact, Mr. Semerdjian's

23  understanding of the August 14, 2018 email upon receipt, and the phrase "claims"

24  solely involved negotiating the terms of the proposed separation agreement. (Ex.

25  "13.")  Mr. Semerdjian's understanding was that Mr. Gruenberg would represent

26  Ms. Dusina to try and negotiate a larger payout on her behalf. (Ex. "5," at 38:8-23.)

27    Regardless, this did not stop HCC from speculating that this email constituted

28  a claim under the 2017 Policy.  Yet neither HCC, nor its coverage counsel, can

explain how the August 14, 2018 email from Ms. Dusina's counsel constituted a claim. (Ex. "7," at 195-8-12; Ex. "8," at 75:10-76-3.) ████████████████████ ████████████████████████████████████ ████████████████████████████████████ ████████████████████████████████ (Ex. "8," at 75:10-76:3.)

In reviewing the August 14, 2018 email between Mr. Gruenberg and Mr. Semerdjian, Ms. Sherman could not point to a single portion of the email that, on its own, made a claim for written damages relating to discrimination, harassment, or inappropriate employment conduct.  Instead, Ms. Sherman argued that in confirming that a claim was made in August 14, 2018, she has to go back to "reviewing the totality of the claim, including the actual complaint that was later filed." Ex. "7," at 195:8-12.)

HCC's entire argument seeking to establish that it properly denied coverage is based on speculation, bias, and incorrect facts.  It is clear HCC did not understand the unique personal relationship between Ms. Dusina and Mr. MADUREIRA, did not try to understand it, and instead relied on hostile and emotional emails of a couple breaking up to justify its conclusions.  Instead of looking at the facts in chronological order, HCC simply applied the allegations and claims in Ms. Dusina's draft complaint, assumed they were true and then misinterpreted prior writings from July 23, 2018, and August 14, 2018.

### iii.  **Ms. Dusina and the Parties Involved Confirmed a "Claim" was not Made Until September 13, 2018**

Ms. Dusina has confirmed under oath that the September 13, 2018, email with the draft complaint was "the first time she ever demanded damages relating to [her] employment." Ex. "3," at 132:11-19, 134:22-24, 154:13-23.)

All of Ms. Dusina's prior communications with Mr. MADUREIRA, following the termination of their consensual personal and sexual relationship

involved their personal relationship and Ms. Dusina's belief she was entitled to something for years of support. (Ex. "3," at 121:20-122:18, 134:22-24, 154:13-156:24, 157:2-10.)  Furthermore, Ms. Dusina never made any demand for damages arising out of discrimination, harassment, or inappropriate employment conduct before September 13, 2018.  According to Ms. Dusina, none of the writing, emails, text messages, and or communications between herself and Mr. Madureira before September 13, 2018, were a demand by her for damages relating to discrimination, harassment, or inappropriate employment conduct. (Ex. "3," at 154:24-156:24.)

Mr. MADUREIRA also confirmed that Ms. Dusina never made a written demand for damages relating to discrimination, harassment, or inappropriate employment conduct prior to September 13, 2018. (Ex. "4," at 215:14-216:2.) Mr. MADUREIRA corroborated Ms. Dusina's testimony by verifying that all communications between Ms. Dusina and himself from February 2018 through August 2018 involved their personal consensual relationship and her belief that she had earned the money because of the value sha brought to the relationship.  (Ex. "4," at 215:14-216:2.)

Mr. Semerdjian also explicitly confirmed that September 13, 20218 was the first day he and Mr. MADUREIRA became aware of the sexual harassment, discrimination, and inappropriate employment conduct claims by Ms. Dusina. (Ex. "5," at 51:10-12.)   He further testified that as a result of this being the first time that Mr. MADUREIRA had heard such claims, he was "blown away." (Ex. "5," at 52:4-9.)  According to Mr. Semerdjian the first "claim" because of an "insured event" issued to Plaintiffs on September 13, 2018, "came out of left field.  It was like someone hit Tony right in the face.  It was filled with mistruths, in his opinion, lies and just over, over the top." (Ex. "5," at 52:4-9.)

All of the parties involved in the Underlying Action, including the claimant herself, have confirmed that the first written demand for damages relating to discrimination, harassment, or inappropriate employment conduct was made on

September 13, 2018.  Furthermore, HCC is unable to identify a single document that supports its position a written demand for damage relating to discrimination, harassment, or inappropriate employment conduct was made before September 13, 2018.

**V.**

**<u>CONCLUSION</u>**

Plaintiffs have provided undisputed evidence that the first "claim" because of an "insured event" arose on September 13, 2018.  No prior "claim" because of an "insured event" was made prior to September 13, 2018.  Therefore, HCC had a duty to defend Plaintiffs from the Underlying Action under the 2018 Policy.  Therefore, Plaintiffs' Motion for Partial Summary Judgment on HCC's duty to defend should be granted.


Dated: September 3, 2021          SCHULZ BRICK & ROGASKI


                                  By:  *s/ Peter J. Schulz*
                                       Peter J. Schulz, Esq.
                                       Tommy U. Schroeder, Esq.
                                       Attorneys for Plaintiffs
                                       AV BUILDER CORP, RESTORCORP,
                                       and ANTHONY MADUREIRA