

# Exhibit 1


TOKIOMARINE
HCC

# Houston Casualty Company
Houston, TX

## DECLARATIONS
## EMPLOYMENT PRACTICES LIABILITY INSURANCE
### THIS IS A CLAIMS MADE AND REPORTED POLICY

> This insurance is issued pursuant to the California
> Insurance Code, Sections 1760 through 1780, and
> is placed in an insurer or insurers not holding a
> Certificate of Authority from or regulated by the
> California Insurance Commissioner.

Broker No.:  1888

Socius Insurance Services, Inc.

No.:  H717-917293

Renewal of No.:  H716-914586

Item 1.   Named Insured:   AV Builder Corporation; ReStorCorp

Item 2.   Address:   6373 Nancy Ridge Drive
San Diego,
CA, 92121

Item 3.   The Named Insured is a: Corporation

Item 4.   Limits of Insurance:

$ 500,000          Each "Claim" (including "defense costs")
$ 500,000          Total Policy Limit for all "Claims" (including "defense costs")

Item 5.   Retention:

$ 10,000           Each "Claim"
$ 10,000           Third Party

Item 6.   Notice of Claim:
Director of Claims:
TM-HCC Professional Lines Group
37 Radio Circle Drive
Mt. Kisco, New York 10549
Telephone: 800-742-2210

Item 7.   Program Administrator:
TM-HCC Professional Lines Group
235 Pine Street, Suite 1675
San Francisco, California 94104
Telephone: 415-288-0701

Item 8.   Date of Application: 06/26/2017

Item 9.   Policy Period:   Inception Date: 08/19/2017          Expiration Date: 08/19/2018
12:01 A.M. Standard Time at the address of the Named Insured herein.

Item 10.  Premium:          $ 7,207.00   Policy Fee          50.00
This Policy has been signed at San Francisco, California Dated 07/06/2017

CA Surplus Lines Tax:  $217.71
CA Surplus Lines Fee:  $14.51
Socius Broker Fee:  $350.00

by _____
Authorized Representative

EP0002 01/11

Page 1 of 2

**AVB 000007**

AVB MSJ Appendix P. 002

 **TOKIO MARINE HCC**

# Houston Casualty Company
### Houston, TX

## DECLARATIONS
## EMPLOYMENT PRACTICES LIABILITY INSURANCE
### THIS IS A CLAIMS MADE AND REPORTED POLICY

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

Item 11.   Attachments:   EP 0001 (12/01), EPHRM001, EP 0068, EP 0044, EP 0066, EP ALLOC, D-2, EP 0062, EP CTSM, EP 526, TRIA (2015), EP 530, EP 00IM

This Policy has been signed at <u>San Francisco, California</u> Dated <u>07/06/2017</u>

by _(signature)_

Authorized Representative

EP0002 01/11

**AVB 000008**

AVB MSJ Appendix P. 003

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EPHRM001 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**HUMAN RESOURCES MANAGEMENT SERVICES AND
RETENTION MODIFICATION ENDORSEMENT**

This endorsement modifies your Policy as follows:

**HR Pilot™ Services Notice**

In conjunction with your Policy a Human Resources Management program titled HR Pilot™ is available to you. To implement these services you need to call 800-980-2988.

**Retention Modification**

**Section V – Retention, Item 1 and Item 1.a.** are deleted and replaced by the following:

**SECTION V – RETENTION**

1.  Our obligation to pay under this Policy applies only to the amount of "loss" in excess of the **RETENTION** amount shown in the Declarations and the **LIMITS OF INSURANCE** shown in the Declarations will not be reduced by the amount of such **RETENTION**.

    The applicable **RETENTION** will be decreased by fifty percent (50%) (i.e., a $5,000 **RETENTION** will be $2,500) if one or both of the following conditions are met:

    a.  **Wrongful Termination or Demotion Condition.** For any "claim" alleging wrongful termination or wrongful demotion of an "employee" if prior to termination or demotion of that "employee" you have consulted with and materially complied with the advice of the HR Pilot™ telephone Help Line (800-

by *[signature]*
Authorized Representative

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2017** | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EPHRM001** |

980-2988) or your assigned "Panel Defense Counsel". This provision does not apply unless the contact with either the above is made at least 24 hours prior to the termination or demotion, and the HR Pilot™ Help Line or the "Panel Defense Counsel" has had a reasonable length of time to respond to the information provided by you.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 0068 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**SERVICE OF SUIT ENDORSEMENT**

This endorsement modifies your Policy as follows:

This applies in jurisdictions where the Company is not an admitted insurer.

It is agreed that in the event of the Company's failure to pay the amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court. Nothing in this Endorsement constitutes or should constitute a waiver of the Company's rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or any State in the United States.

It is further agreed that, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this Policy of insurance, and hereby designates the President of the Houston Casualty Company in care of the General Counsel, at 13403 Northwest Freeway, Houston, TX, 77040, as the person to whom the said officer is authorized to mail such process or true copy thereof.

It is further understood and agreed that service of process in such suit may be made upon RANDY RINICELLA, Secretary, at 13403 Northwest Freeway, Houston, TX, 77040, and that in any suit instituted against any one of them upon this contract, the Company will abide by the

by _____
Authorized Representative

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 0068 |

final decision of such Court or of any Appellate Court in the event of an appeal.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by

Authorized Representative

EP 0068  (01/11)                     Page 2 of 2
**AVB 000012**

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 0044 |

> **This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

## THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.

### DEFENSE COUNSEL (ATTORNEY) SELECTION MODIFICATION ENDORSEMENT

THIS ENDORSEMENT MODIFIES YOUR POLICY AS FOLLOWS:

**SECTION I – COVERAGE  4. a. and b. are deleted and replaced by:**

4. **Defense Counsel (Attorney) Selection**

   a.   We have the right and duty to select and appoint an attorney to defend you against any "suit" other than for criminal proceedings.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated below. All other terms and conditions of this Policy

by _[signature]_
Authorized Representative

EP 0044  (02/06)                    Page 1 of 2
**AVB 000013**

AVB MSJ Appendix P. 008

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2017** | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 0044** |

remain unchanged.

by _(signature)_
Authorized Representative

EP 0044  (02/06)                    Page 2 of 2
**AVB 000014**

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 0066 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT**

This endorsement modifies your Policy as follows:

1. This insurance does not apply:

   A. To liability:

   (1) With respect to which an "insured" under this policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   B. To liability resulting from "hazardous properties" of "nuclear material", if:

   (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf or, an "insured" or **(b)** has been discharged or dispersed therefrom;

   (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

**Houston Casualty Company**
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 0066 |

**(3)** The liability arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion **(3)** applies only to "property damage" to such "nuclear facility" and any property threat.

2.   As used in this endorsement:

**A.** "Hazardous properties" includes radioactive, toxic or explosive properties.

**B.** "Nuclear material" means "source material", "special nuclear material" or "by-product material".

**C.** "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

**D.** "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

**E.** "Waste" means any waste material **(1)** containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and **(2)** resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

**F.** "Nuclear facility" means:

**(1)** Any "nuclear reactor";

**(2)** Any equipment or device designed or used for **(a)** separating the isotopes of uranium or plutonium, **(b)** processing or utilizing "spent fuel", or **(c)** handling, processing or packaging "waste";

**(3)** Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

by _____
Authorized Representative

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 0066 |

Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste"; and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**G.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**H.** "Property damage" includes all forms of radioactive contamination of property.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated below. All other terms and conditions of this Policy remain unchanged.

by _[signature]_
Authorized Representative

EP 0066  (02/02)                          Page 3 of 3

AVB MSJ Appendix P. 012

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP ALLOC** |

> **This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**ALLOCATION PROVISION ENDORSEMENT**

It is agreed that **SECTION IV - LIMITS OF INSURANCE, Subsection 5. Allocation of "Defense Costs"** is deleted in its entirety and replaced with the following:

**SECTION IV        LIMITS OF INSURANCE**

**5.      Allocation of "Defense Costs"**

If both "loss" covered by this Policy and "loss" not covered by this Policy are incurred in connection with any "claim," we will use all reasonable efforts to agree, with you, upon a fair and proper allocation of "defense costs" attributable to the covered "loss" and the uncovered "loss."

If there can be an agreement on the allocation of "defense costs," we will pay, on a current basis, "defense costs" allocated to the covered "loss" in accordance with our obligations under the Policy.

If there can be no agreement on an allocation of "defense costs:"

a.      then no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

b.      we will pay, on a current basis, "defense costs" that we believe are reasonably related to the covered "loss" under the Policy until a different allocation is negotiated or arbitrated; and

c.      we, if requested by you, shall submit such dispute to binding arbitration, in which case the rules of the American Arbitration Association shall apply.    All administrative costs associated with the arbitration shall be shared equally between the parties.  The amounts paid by you in connection with the arbitration will not be considered "loss" under the terms of this Policy.

by _____
Authorized Representative

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP ALLOC |

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

_by_ _(signature)_
Authorized Representative

## NOTICE:

1. **THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE, AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER.   YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.**

5. **FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

6. **FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF**

STD  H717-917293

D-2 (Effective July 21, 2011)

**AVB 000020**

AVB MSJ Appendix P. 015

APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

STD H717-917293

D-2 (Effective July 21, 2011)

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 0062 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

### THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.

### THIRD PARTY DISCRIMINATION AND HARASSMENT COVERAGE ENDORSEMENT

This endorsement modifies your Policy as follows:

**Policy Limits Modification**

Only as respects the additional coverage provided by this endorsement, if the total Policy Limit, for all "claims" (including "defense costs") indicated at Item 4. of the Declarations is greater than $1,000,000, then that amount is deleted and replaced by the amount of $1,000,000. Therefore, the aggregate maximum amount we will pay for all "claims" under this endorsement is $1,000,000 or if a lesser amount, the Total Policy Limit indicated at Item 4. of the Declarations.

**Policy Form Modifications**

Only as respects the additional coverage provided by this endorsement the following sections or subsections of the Policy are deleted:

**SECTION I - COVERAGE, Item 1.a.**

**SECTION II – EXCLUSIONS, entire section**

**SECTION V – RETENTION, Item 4.**

**SECTION VI - CONDITIONS, Item 2.a.**

**SECTION IX - DEFINITIONS, Items 1, 5, 7, 9, 12 and 15.**

and replaced by the following:

**SECTION I - COVERAGE**

EP 0062  (07/03)                    Page 1 of 6
**AVB 000022**

AVB MSJ Appendix P. 017

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 0062** |

1.   **Insuring Agreement**

    a.   By this endorsement the Policy covers "discrimination" and "harassment" liability that the insured is legally obligated to pay to:

        (1)   an existing or former client, customer or patient, or

        (2)   any other person(s), within the terms, conditions, limitations and exclusions set forth in this endorsement and the Policy to which it is attached. This endorsement has been issued in reliance upon statements made to us in the "application".

## SECTION II – EXCLUSIONS

1.   **Workers' Compensation**

Coverage provided by this Endorsement does not include coverage for any "loss" arising out of any obligation under any workers' compensation, disability benefits or unemployment compensation law, or any similar law.

2.   **Contractual Liability**

Coverage provided by this Endorsement does not include coverage for any "loss" which any insured is obligated to pay be reason of the assumption of another's liability for an "insured event" in a contract or agreement.

This exclusion does not apply to liability for damages because of an "insured event" that any insured would have without the contract or agreement.

3.   **Consequential Loss**

Coverage provided by this Endorsement does not include coverage for any direct, indirect or derivative "loss" to any claimant's domestic partner, spouse, child, parent , brother , sister, step-parent, step-brother or step-sister as a consequence of an "insured event."

4.   **Bodily Injury**

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 0062** |

Coverage provided by this Endorsement does not include coverage for any "loss" based upon bodily injury, sickness, disease or death of any person, or loss of use or economic benefits resulting therefrom. This exclusion, however, does not apply to emotional distress, humiliation, mental injury or mental anguish resulting from an "insured event".

5. **Retroactive Date**

   Coverage provided by this Endorsement does not include any "loss" based on an "insured event" which occurs prior to the **RETROACTIVE DATE** indicated below on this Endorsement.

**SECTION V – RETENTION**

4. The **RETENTION** amount applies separately to each "claim" made. However, the **RETENTION** amount will only apply once to all "claims" arising out of any "one insured event", other than "insured events" alleging disability discrimination at one or more of the Insured's buildings or properties, regardless of the number of claimants who allege damages.

**SECTION VI - SPECIAL CONDITIONS**

We have no duty to provide coverage under this endorsement unless there has been full compliance with all of the conditions contained in this endorsement and the Policy.

2. **Duties in the event of a "claim", or potential "claim" or "suit".**

   a. You must see to it that we or our authorized representative are notified within sixty (60) days or as soon as practicable after a "claim" is made. Notice should include:

      (1) The identity of the person(s) alleging "discrimination" or "harassment";

      (2) The identity of the insured(s) who allegedly committed the "discrimination" or "harassment" act;

      (3) The identity of any witness to the alleged "discrimination" or "harassment";

      (4) The date the "insured event" took place, and the date the alleged "discrimination" or "harassment" took place; and

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 0062** |

      **(5)**     The written charge, complaint or demand as applicable.

## SECTION IX - DEFINITIONS

As respects the coverage provided under this endorsement the following definitions are modified or added:

1.     "Application" means the Third Party Discrimination and Harassment Supplemental Application, including any materials submitted in connection with such "application", all of which are on file with us and are a part of the Policy, as if physically attached.

5.     "Discrimination" means the taking of any adverse or differential action(s) by an "employee" of the insured because of race, color, religion, age, sex, pregnancy, sexual orientation or preference, national origin, or disability including a disability resulting from human immunodeficiency virus (HIV) or acquired immune deficiency syndrome (AIDS), or any other basis prohibited by federal, state or local law.

7.     "Harassment" means unwelcome sexual or non-sexual advances, requests for sexual or non-sexual favors or other verbal, visual or physical conduct of a sexual or non-sexual nature made to an existing or former client, customer or patient, or any other person(s) by an "employee" of the insured that:

     **a.**     are explicitly or implicitly made a condition of doing business,

     **b.**     are used as a basis for business decisions, or

     **c.**     create an environment that interferes with individual comfort or performance.

9.     "Insured Event" means your existing or former client, customer or patient, or any other person(s) alleging, during the policy period, "discrimination" and/or "harassment" by:

     **a.**     an "employee" during the course of his or her employment by you, or

     **b.**     "discrimination" by any other insured; provided always such allegation relates to "discrimination" and/or "harassment" which first commenced on or after the **RETROACTIVE DATE** indicated on page 6 of this endorsement.

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 0062** |

12. "Loss" means damages, judgments, settlements, statutory attorney fees and "defense costs", including prejudgment and post judgment interest awarded against an insured on that part of any judgment paid by us.

However, "loss" does not include:

a. civil or criminal fines or penalties imposed by law that are not otherwise insurable, or

b. non-monetary relief, or

c. liquidated damages where there is a finding of willfulness, or

d. punitive or exemplary damages where such damages are not insurable because of state or federal law, or

e. costs incurred by an insured to modify or adapt any building or property in order to make such building or property more accessible or accommodating to any disabled person, or

f. matters which may be deemed uninsurable according to the law under which this Policy is construed, or

g. amounts owed under federal, state or local wage and hour laws, and/or earned commissions, bonuses, stock options, profit sharing or benefits pursuant to a contract of employment.

"One Insured Event" means:

a. "insured events" which are (1) related by an unbroken chain of events or (2) made or brought by the same claimant, other than those alleging disability discrimination at one or more of the Insured's buildings or properties; or

b. class action or multiple plaintiffs suits arising out of related "insured events", other than those alleging disability discrimination at one or more of the Insured's buildings or properties.

24. "Alleging" means lodging a complaint or charge with your "Management and Supervisors" or with any government agency, or commencing a "suit".

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2017** | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 0062** |

RETROACTIVE DATE:  N/A

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

EP 0062  (07/03)                    Page 6 of 6
                              **AVB 000027**

AVB MSJ Appendix P. 022

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP CTSM |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

**CONSENT TO SETTLE MODIFICATION ENDORSEMENT**

This endorsement modifies your Policy as follows:

**SECTION I, ITEM 6. Consent to Settle** is deleted and replaced by the following:

**Consent to Settle**

We have the right to investigate and settle any "claim" in the manner and to the extent that we believe proper, however, we will not settle any "claim" without your consent. If you refuse to consent to any settlement recommended by us or our representatives and you elect to contest or continue any legal proceedings, then our liability shall not exceed the amount for which the "claim" could have been settled including "defense costs" approved by us, up to the date of such refusal.

However, in the event "Panel Defense Counsel" is defending, then our liability for all "loss" on account of such "claim" shall not exceed (1) the amount for which we could have settled such "claim" plus "defense costs" incurred as the date such settlement was proposed in writing by us. ("Total Settlement Amount"), plus (2) 75% of covered "loss" in excess of such Total Settlement Amount, it being a condition of this Policy that the remaining 25% of such "loss" excess of the Total Settlement Amount shall be carried by you at your own risk and be uninsured.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

EP CTSM  (07/07)                    Page 1 of 1
**AVB 000028**

AVB MSJ Appendix P. 023

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 526 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

### THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.

### WAGE AND HOUR LAWS LEGAL DEFENSE COSTS ENDORSEMENT WITH INCREASED RETENTION

This Endorsement modifies your Policy as follows:

**SECTION II, Exclusion 11.** is deleted in its entirety and replaced by the following:

**11.**   **Wage and Hour Laws**

**a.**   This Policy does not cover any "loss" arising out of any private, governmental or administrative "claim" alleging violations of federal, state or local wage and hour laws or regulations, including, but not limited to, any laws or regulations concerning monetary or non-monetary compensation or benefits that may be owed to a past or present "employee" based upon misclassification of their job status, title or duties.

**b.**   However, we will pay "defense costs" up to, but in no event greater than $100,000 in the aggregate for all "claims" made during this Policy Period and excluded by **a.** above without any liability by us to pay such monetary portion that you shall become legally obligated to pay because of any damages, judgment or settlement, including punitive damages. The $100,000 "defense costs" provided under this Endorsement is part of and not in addition of the Limits of Liability stated in the Declarations.

**c.**   Paragraph **a.**, above, shall not apply to that portion of any "claim" seeking to recover "loss" for alleged "discrimination" or "retaliation" by an Insured.

**SECTION IX – DEFINITIONS**, 2. is deleted in its entirety and replaced by the following solely for the purposes of the coverage provided by this Endorsement:

**2.**   "Claim" means a written demand received by the insured alleging damages or the filing of a lawsuit, or a federal, state or local administrative proceeding alleging violation of federal, state or local wage and hour laws or regulations. However,

by _____
Authorized Representative

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 526 |

"claim" does not include (1) labor or grievance arbitration subject to a collective bargaining agreement; (2) criminal charges or proceeding; or (3) any regulatory or administrative investigation or audit.

**Increased Retention Applies**

The coverage afforded by this Endorsement is subject to a separate Retention of $25,000.00, which applies to any "claim(s)" for, based upon, arising out of or in any way involving one or more allegations of violations of federal, state or local wage and hour laws or regulations. The Retention set forth by this Endorsement applies even in the event that any portion of such "claim(s)" otherwise involves an "insured event."

**Additional Premium: $0.00**

This Endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

EP 526  12.13                Page 2 of 2
                         **AVB 000030**

AVB MSJ Appendix P. 025

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | TRIA (2015) |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

### THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.

### POLICYHOLDER DISCLOSURE NOTICE
### TERRORISM RISK INSURANCE ACT OF 2015
### PREMIUM NOTICE

Your policy contains coverage for certain losses caused by terrorism. In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributed to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributed to such coverage is show in the Schedule of this endorsement or in the policy Declarations.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

---

**SCHEDULE- PART I**

**Terrorism Premium (Certified Acts): $ 0.00**

---

by _(signature)_
Authorized Representative

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2017** | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **TRIA (2015)** |

---

**SCHEDULE-PART II**

Federal share of terrorism losses 85% Year: 2015
Federal share of terrorism losses 84% Year: 2016
Federal share of terrorism losses 83% Year: 2017
Federal share of terrorism losses 82% Year: 2018
Federal share of terrorism losses 81% Year: 2019
Federal share of terrorism losses 80% Year: 2020

---

Please be advised that the actual coverage provided by your Policy for acts of terrorism, as is true for all coverages, is limited by terms, conditions, exclusions, limits, other provisions of your Policy, any endorsements to the Policy and generally applicable rules of law.

All other terms and conditions remain unchanged.

By _(signature)_
Authorized Representative

TRIA (2015)  2015

Page 2 of 2
**AVB 000032**

AVB MSJ Appendix P. 027

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 530** |

> This insurance is issued pursuant to the California
> Insurance Code, Sections 1760 through 1780, and
> is placed in an insurer or insurers not holding a
> Certificate of Authority from or regulated by the
> California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

**CLAIMS MADE & REPORTED COVERAGE
WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT**

This Endorsement modifies the Policy as follows:

**SECTION VII - WHEN COVERAGE IS PROVIDED**, paragraph **1.** is deleted in its entirety and replaced with the following:

**SECTION VII - WHEN COVERAGE IS PROVIDED**

1.  **Claims Made and Reported Coverage.**  This Policy applies only to "claims" first made or brought against you and reported to us, in writing, within the Policy Period set forth on the Declarations page of this Policy or any Limited or Extended Reporting Period (if applicable).

    A "claim" will be considered first made or brought on the date we or any insured receives a written "claim" whichever comes first.

    All "claims" because of "one insured event" will be considered to have been made or brought on the date that the first of those "claims" was made or brought.  Any "claim" arising out of an "insured event" reported to us pursuant to paragraph 2. will be deemed first made on the date notice of the "insured event" was given to us.

Further, **SECTION VI - CONDITIONS**, paragraphs **2.a.** and **2.b.** are deleted in their entirety and replaced with the following:

**SECTION VI-CONDITIONS**

2.      Duties in the event of a "claim" or "suit."

by _____
Authorized Representative

EP 530  01/15                          Page 1 of 2
**AVB 000033**

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | **AV Builder Corporation; ReStorCorp** | **H717-917293** | **EP 530** |

a.  You must see to it that we receive written notice of a "claim" as soon as practicable, but in no event later than sixty (60) days after your actual notice or receipt of the "claim," or thirty (30) days after the expiration, termination, or cancellation of the Policy or any Extended Reporting Period, whichever comes first.  Notice should include:

   (1)  The identity of the person(s) alleging "discrimination," "harassment" or "inappropriate employment conduct;"

   (2)  The identity of the insured(s) who allegedly committed the "discrimination," "harassment" or "inappropriate employment conduct;"

   (3)  The identity of any witness to the alleged "discrimination," "harassment" or "inappropriate employment conduct;"

   (4)  The date the "insured event" took place; and

   (5)  The written charge, complaint or demand as applicable.

b.  If a "suit" is brought against any insured, you must see to it that we receive written notice of such "suit," including the specifics of the "suit" and the date received, as soon as practicable, but in no event later than sixty (60) days after your actual notice or receipt of the "suit," or thirty (30) days after the expiration, termination, or cancellation of the Policy or any Extended Reporting Period, whichever comes first.

This Endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

EP 530  01/15

Page 2 of 2
**AVB 000034**

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 00IM |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

## THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.

### IMMIGRATION COVERAGE EXTENSION/DEFENSE SUB-LIMIT

**In consideration of the premium charged, it is agreed that:**

If the Insured(s) become legally obligated to pay a "claim" for which coverage is afforded otherwise under this policy alleging violations of the Immigration Reform Control Act of 1986 ("IRCA") or any other similar federal, state or local laws or regulations (collectively "immigration practices laws") which is first made against any Insured in accordance with Sections VII. (WHEN COVERAGE IS PROVIDED) and VIII. (COVERAGE TERRITORY) of the Policy, we will pay "defense costs".

The coverage afforded by this Endorsement shall apply solely to "defense costs" and is subject to a sub-Limit of Liability of $50,000 in the aggregate for all "claims" made during the Policy Period, which is part of and not in addition to the Limit of Liability set forth in the Declarations. The Retention set forth in the Declarations applies to each "claim" for which coverage is provided by this Endorsement.  In no event shall the sub-limit provided for by this Endorsement (or the coverage provided for herein) apply to any "loss" incurred in connection with any "claim" alleging violations of "immigration practices laws," and in no event shall we be obligated to pay more than the Limit of Liability set forth in the Declarations.

Notwithstanding the above, no coverage shall be available for any "claim" alleging violations of any "immigration practices laws," which arises from any potential "claim" or circumstances of which any "management or supervisory employee," in-house counsel, any employee(s) within the HR or Risk Management department, or employee(s) with personnel and risk management responsibilities had knowledge prior to the inception date of this Policy Period.

Coverage pursuant this Endorsement is conditioned upon the Insured's compliance with the rules and regulations promulgated by the Department of Homeland Security ("DHS") and the U.S. Immigration and Customs Enforcement ("ICE") concerning responses to Social Security Administration Employee Correction Requests ("no match letters") or the DHS Notice of Suspect Documents.

by _(signature)_
Authorized Representative

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2017 | AV Builder Corporation; ReStorCorp | H717-917293 | EP 00IM |

This Endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _[signature]_
Authorized Representative

EP 00IM

Page 2 of 2

**AVB 000036**


**TOKIO MARINE HCC**

# Employment Practices Liability Insurance Renewal Application

## Section A. General Information

**1. Name of Insured:** A V Builder Corp and ReStorCorp

If there are other entities for which coverage under this Policy is requested, please provide their name(s) prior to binding coverage and complete the Additional Insured/Location schedule.

**2. Address of Named Insured (physical address required, no P.O. Box):** 6373 Nancy Ridge Dr., San Diego CA 92121

**3. Federal Tax Classification:** C Corp___ S Corp_X_ Partnership___ LLC (C Corp)___ LLC (S Corp)___ Partnership____ Other:

**4. Years in Operation:** 36

**5. Nature of Business:** General Contractor

**6. Website:** www.avbuilder.com

**7. Contact Name:** Rosa Martinez

**8. Telephone:** 858-875-5077

**9. Fax:** 858-622-9299

**10. Email Address:** rmartinez@avbuilder.com

**11. Is your company a franchise?** ___Yes _X_No

**11a. If yes, please provide the name of the franchise:**

**12. Total Number of Employees:**
a. Full Time: 70  Part Time:____ Seasonal:____ Temporary:____ Union Full Time:____ Union Part Time:____

| **Please do not include independent contractors or leased workers in the above employee counts. See below** | | |
|---|---|---|
| 13. Does your organization use Independent Contractors? | ___Yes _X_No | |
| a. If you are seeking coverage for Independent Contractors, please indicate the total number: | | |
| 14. Does your organization use Leased Workers? | ___Yes _x_No | |
| If you are seeking coverage for Leased Workers, please indicate the total number and provide the name of the Leasing Firm: | | |
| a. Number of Leased Workers: _____ | b. Name of Leasing Firm: | |
| 15. Indicate the number of employees whose annual income is greater than $100,000: ___1___ | | |
| 16. Total Number of Locations: ___2___ (If more than one, you **must fully complete** the Additional Insured/Location schedule) | | |
| 17. Provide the turnover rate (%) for the past three years: 60 / 60 / 70    2016  2015  2014 | | |
| 18. If applicable, how many involuntary terminations within the past 12 months? | 3 | |
| a. Of those, how many individuals were senior managements, officers/directors or partners? | 0 | |
| 19. If applicable, how many resignations of senior management/ officer/ partner within the past 12 months? | 1 | |
| 20. Do you anticipate any work force reduction or lay-offs within the next 12 months? | ___Yes _✓_No | |

## Section B. Human Resources

| | |
|---|---|
| 1. Does your company have a Human Resources or Personnel Department? | _x_Yes ___No |
| 2. Do you train all your managers and supervisors on HR related issues, including prohibited harassment and discrimination? | X Yes ___No |
| 3. Have you adopted and implemented anti-sexual harassment policies and written procedures? | _x_Yes ___No |
| 4. Do you have an EEO Statement or have you adopted and implemented anti-discrimination policies and developed written procedures? | _x_Yes ___No |
| 5. Does your company have an Employee Handbook? | _x_Yes ___No |

**AVB 000037**

## Section C. Acquisitions/ Mergers/ Closures

| | | |
|---|---|---|
| 1. Have you acquired another entity or organization, or have you had any other organizational or structural changes during the past 12 months? | ___Yes | _X_No |
| a. If yes, did you terminate any employees or officers? | ___Yes | ___No |
| 2. Are there any plans to merge with or acquire any entities or organizations, or are there any plans for organizational or structural changes within the next 12 months? | ___Yes | _x_No |
| a. If yes, do you plan to terminate any employees or officers? | ___Yes | ___No |

## Section D. Third Party Discrimination & Sexual Harassment Coverage

| | | |
|---|---|---|
| 1. Do you have written procedures for handling complaints of discrimination and sexual harassment from a person other than an employee? | _x_Yes | ___No |
| 2. Are your facilities designed to accommodate the disabled in compliance with the Americans with Disabilities Act (ADA) of 1990 and the Americans With Disabilities Act Accessibility Guidelines (ADAAG)(collectively "ADA")? | _X_Yes | ___No |
| a. If yes, do you anticipate that your facilities will be in compliance with ADA for the next twelve (12) months? | _x_Yes | ___No |

## Section F. Representations and Important Notices

The undersigned, acting on behalf of all Insureds, declare that the statements set forth herein are true and correct and that thorough efforts have been made to obtain sufficient information from each and every Insured proposed for this insurance to facilitate the proper and accurate completion of this Application.

The undersigned agree that the particulars and statements contained in the Application and any material submitted herewith are their representations and that they are material and are the basis of the insurance contract. The undersigned further agree that the Application and any material submitted herewith shall be considered attached to and a part of the Policy. Any material submitted with the Application shall be maintained on file (either electronically or paper) with the Insurer and shall be deemed to be attached hereto as if physically attached.

It is further agreed that:

- If any significant change in the condition of the applicant is discovered between the date of this Application and the Policy inception date, which would render this Application inaccurate or incomplete, notice of such change will be reported in writing to the Insurer immediately;
- Any Policy, if issued, will be in reliance upon the truth of such representations; provided, however, with respect to such statements and representations, no knowledge or information possessed by any Insureds shall be imputed to any other Insureds. If any person or persons knew as of the Policy inception date that such declarations and statements contained in the Application(s) were untrue, inaccurate or incomplete, then this Policy will be void as to that person or persons. However, if the Chairperson of the Board of Directors, President, Chief Executive Officer, or Chief Financial Officer of the Insured Entity knew as of the Policy inception date that such declarations and statements contained in the Application(s) were untrue, inaccurate or incomplete, the this Policy will be void as to that person or persons and the Insured Entity;
- This Application has been completed as respects the entire Insured Entity;
- The signing of this Application does not bind the undersigned to purchase the insurance.

**AVB 000038**

AVB MSJ Appendix P. 033

Applicant's Authorized Signature of the President, Chief Executive Office, or equivalent position

Signature: _____    Date: 6/26/17

Printed Name: ANTONIO MADUREIRA    Title: President / Owner

Producing Broker: _____    License No.: _____

APPLICABLE TO NEW YORK:
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

General Statement:

Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties. (Not applicable in CO, DC, FL, HI, KS, MA, MN, NE, NY, OH, OK, OR, VT or WA – for those states see their statements below.) (In LA, ME, TN, and VA, insurance benefits may also be denied.)

APPLICABLE IN COLORADO:
It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement of award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

APPLICABLE IN THE DISTRICT OF COLUMBIA:
WARNING:  It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person.  Penalties include imprisonment and/or fines.  In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.

APPLICABLE IN FLORIDA:
Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

APPLICABLE IN HAWAII:
For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

APPLICABLE IN KANSAS:
Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto, or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

APPLICABLE IN MASSACHUSETTS, NEBRASKA, OREGON AND VERMONT:
Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information

EPL Application 01/15

Page 3 of 5

AVB MSJ Appendix P. 034

concerning any fact material thereto, may be committing a fraudulent insurance act, which may be a crime and may subject the person to criminal and civil penalties.

APPLICABLE IN MINNESOTA:
Any person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

APPLICABLE IN OHIO:
Any person, who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deception statement is guilty of insurance fraud.

APPLICABLE IN OKLAHOMA:
WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

APPLICABLE IN WASHINGTON:
It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company. Penalties include imprisonment, fines, and denial of insurance benefits.

APPLICABLE IN MARYLAND:

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**AVB 000040**

AVB MSJ Appendix P. 035

# EMPLOYMENT PRACTICES LIABILITY INSURANCE

## LOCATION AND EMPLOYEE INFORMATION SCHEDULE

**INSTRUCTIONS:**
List all locations to be covered by the policy for which you are applying. Please note all entities must have a majority ownership of 50% + by the Named Insured

| | Entity Name | Entity Address | Nature of Business | Employees Full Time | Part Time |
|---|---|---|---|---|---|
| 1. | A V Builder Corp | 6373 Nancy Ridge Dr. San Diego, CA 92121 | General Contracting | 42 | |
| 2. | ReStorCorp | 6373 Nancy Ridge Dr San Diego, CA 92121 | Same as above | 8 | |
| 3. | A V Builder Corp | 7316 E. 6th Ave Scottsdale, AZ 85251 | Same as above | 10 | |
| 4. | ReStorCorp | 7316 E. 6th Ave Scottsdale, AZ 85251 | Same as above | 10 | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| | | | **Totals** | 70 | |

*I understand the Location and Employee Information Schedule form will become part of my organization's Employment Practices Liability Application and is subject to the same representations and conditions.*

EPL Application 01/15

Page 5 of 5

**AVB 000041**

AVB MSJ Appendix P. 036



**TOKIO MARINE HCC**

*Employment Practices Liability Insurance*

**Houston Casualty Companies / U.S. Specialty Insurance Company**

## WAGE & HOUR SUPPLEMENTAL APPLICATION

*Eligibility is subject to completion of the Wage and Hour Supplemental Application and underwriter approval. No backdating allowed for this coverage. Coverage must be elected at time of binding.*

| | | | |
|---|---|---|---|
| 1. | In the past five (5) years has any current or former employee made or threatened a claim for any violation of wage and hour laws, including but not limited to, claims related to meal periods, rest periods or unpaid overtime? If yes, please describe the outcome and how you have changed your practice to prevent claims (attach explanation if needed). | Yes ☐ | No ☐ X |
| **Question 2 does NOT apply to current HCC renewals that have Wage & Hour coverage** | | | |
| 2. | Does any manager, supervisor, shareholder, partner or owner within your organization have knowledge of a potential violation of any wage and hour law that could result in a claim for any violation of wage and hour laws, including but not limited to, claims related to meal periods, rest periods or unpaid overtime? | Yes ☐ | No ☐ |
| 3. | In the last 3 years, has any insured received from the Department of Labor or similar federal, state or local agency notice of an audit or other regulatory or administrative investigation related to compliance with or violation of any federal, state or local wage and hour laws? | Yes ☐ | No ☐ X |
| 4. | Are all your full time employees allowed to take a meal period of at least 30 minutes during which they are relieved of all duties? | Yes ☒ | No ☐ |
| **Questions 5–7 apply only to employers with employees located in CALIFORNIA:** | | | |
| 5. | Do any of your employees take on–duty meal periods? | Yes ☐ | No ☒ |
| 6. | Are all employees allowed to take a rest period of 10 minutes or more in the middle of each 4 hour work period? | Yes ☒ | x No ☐ |
| 7. | Do all salaried employees receive a salary of least two times the minimum wage per week that is not subject to reduction based on the number of hours they work? | Yes ☒ | No ☐ |
| **Question 8 applies only to employers with employees located in NEW YORK:** | | | |
| 8. | Do all salaried employees receive a salary of at least: $600.00/week on or after December 31, 2013; $656.25/week on or after December 31, 2014; and $675/week on or after December 31, 2015 | N/A Yes ☐ | No ☐ |
| **Question 9 applies only to employers with employees located in NEW JERSEY:** | | | |
| 9. | Do all salaried employees receive a salary of at least $455 per week that is not subject to reduction based on the number of hours they work? | N/A Yes ☐ | No ☐ |

| | |
|---|---|
| I represent after full investigation and inquiry that the statements set forth are true and complete. I understand the information on this form will become a part of my organization's Employment Practices Liability Application and is subject to the same representations and conditions. | |
| Applicant's Signature: | Date: 6/26/17 |

**AVB 000042**



# EMPLOYMENT PRACTICES LIABILITY INSURANCE CLAIMS MADE AND REPORTED POLICY FORM

This Policy Form applies to the following
HCC Insurance Holdings, Inc. Companies:

- HOUSTON CASUALTY COMPANY
- U.S. SPECIALTY INSURANCE COMPANY
- HCC SPECIALTY INSURANCE COMPANY

EP 0001 12/01

**AVB 000043**

# EMPLOYMENT PRACTICES
# LIABILITY INSURANCE
# CLAIMS-MADE POLICY FORM

## PLEASE READ THE ENTIRE POLICY CAREFULLY

**IMPORTANT NOTICES:**

1.   **THIS IS A CLAIMS-MADE POLICY.**

2.   **DEFENSE COSTS ARE INCLUDED WITHIN THE POLICY LIMITS AND ARE INCLUDED WITHIN THE RETENTION.**

3.   **THIS POLICY IS SUBJECT TO A TOTAL POLICY LIMIT FOR ALL INSURED EVENTS (POLICY AGGREGATE LIMIT).**

4.   **VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE YOUR RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.**

**THE FORMAT OF THIS POLICY**

Throughout this Policy the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as an insured under this Policy. The words "we", "us" and "our" refer to the insurance company shown is the Declarations who is the **"Underwriter"** providing this insurance.

The word "insured" means any person or organization qualifying as such under **WHO IS AN INSURED (SECTION III)**. The special meaning of other words and phrases that appear in quotation marks (") are defined in **DEFINITIONS (SECTION IX)** of this Policy.

To assist in finding major sections of this Policy, headings and subheadings appear in capital bold letters. The descriptions in these headings and subheadings are solely for convenience, and form no part of the terms, conditions, limitations and exclusions of this Policy.

# SECTION I - COVERAGE

**1.**    **Insuring Agreement**

    **a.**    This Policy covers "discrimination", "harassment" and "inappropriate employment conduct" liability within the terms, conditions, limitations and exclusions set forth below. It has been issued in reliance upon statements made to us in the "application".

    **b.**    We will pay "loss" that the insured is legally obligated to pay because of an "insured event" to which this Policy applies. However, the amount we will pay is limited as described in the **LIMITS OF INSURANCE (SECTION IV)**, and **RETENTION (SECTION V)** sections.

    **c.**    This Policy applies only if:

        **(1)**    a "claim" because of an "insured event" is first made against any insured in accordance with the **WHEN COVERAGE IS PROVIDED (SECTION VII)** and **COVERAGE TERRITORY (SECTION VIII)** sections; and

        **(2)**    a potential "claim" is first reported in accordance with the **WHEN COVERAGE IS PROVIDED (SECTION VII)** and **COVERAGE TERRITORY (SECTION VIII)** sections; and

        **(3)**    the "claim" is first reported in accordance with the **WHEN COVERAGE IS PROVIDED (SECTION VII)** and **COVERAGE TERRITORY (SECTION VIII)** sections, and

        **(4)**    the "insured event" does not arise from any potential "claim" or circumstances of which any "management or supervisory employee" had knowledge prior to the effective date of the first Employment Practices Liability Insurance policy issued by us to the insured and continuously renewed and maintained in effect to the inception date of this Policy.

**2.**    **Defense**

We have the right and duty to defend any "claim" for an "insured event" made or brought against any insured to which this Policy applies. We have no duty to provide other services or take other actions. Our duty to defend any "claim" ends when the applicable limit of insurance has been exhausted by payment of "loss" and/or "defense costs" under this Policy.

You may take over control of any outstanding "claim" previously reported to us only if we both agree that you should, or if a court orders you to do so.

If one or more of the applicable **LIMITS OF INSURANCE** shown in the Declarations is/are exhausted, we will notify you of all outstanding "claims" so that you can take over control of their defense. We will help transfer control to you.

During the transfer of control, we agree to take whatever steps are necessary to continue the defense of any outstanding "claim" and avoid a default judgment. If we do so, you agree that we do not waive or give up any of our rights. You also agree to pay reasonable expenses we incur for taking such steps after the **LIMITS OF INSURANCE** are exhausted.

**3.    Optional Defense of Criminal Proceedings**

At your request we shall have the option, but not the duty, to defend any criminal proceedings brought against any insured.  Should we at our sole discretion exercise the option to defend any criminal proceeding, any "defense costs" incurred therein shall reduce and may exhaust the applicable **LIMITS OF INSURANCE**.  The exercise of the option to defend any criminal proceeding shall not serve to render us liable for any other "loss incurred in connection with any criminal proceedings, and we shall retain the right to withdraw from the defense upon giving you thirty (30) days notice.  Whether or not we exercise the option to defend criminal proceedings, we shall defend, subject to this Policy's terms, conditions, limitations and exclusions, any civil proceeding brought against an insured which alleges the same or similar "insured events" as a criminal proceeding,

**4.    Defense Counsel (Attorney) Selection**

**a.**    We have the right and duty to select and appoint an attorney to defend you against any "suit" other than for criminal proceedings. This attorney will be the "Panel Defense Counsel" selected by you when you applied for this Policy or by mutual agreement another attorney listed on our current "Panel Defense Counsel" list.

**b.**    If you do not desire to accept the services of our appointed attorney or another attorney from our current "Panel Defense Counsel" list, you may retain another attorney, subject to our prior approval and the following modifications in the conditions of this Policy. If you elect to use an attorney other than one selected from our current "Panel Defense Counsel" list, then the Policy **RETENTION** indicated in the Declarations for this coverage will double in amount (i.e., a $5,000 retention will be $10,000) and a "co-payment" will apply.

**5.    Duty to Pay**

**a.**    We have the duty to pay any "loss" in excess of the **RETENTION** that the insured becomes legally obligated to pay as a result of a "claim" based upon an "insured event" to which this Policy applies. Our duty to pay ends when the available **LIMITS OF INSURANCE** have been exhausted. We will not pay more than the applicable **LIMITS OF INSURANCE**.

**b.**    We have the duty to pay "defense costs", in excess of the **RETENTION**, incurred for the defense of any "claim" controlled by us. Payment of "defense costs" is included in the **LIMITS OF INSURANCE**.  "Defense Costs" are **NOT** in addition to the **LIMITS OF INSURANCE**.

**c.**    We will pay "defense costs" before we pay any damages from an "insured event".

**6.    Consent to Settle**

We have the right to investigate and settle any "claim" in the manner and to the extent that we believe proper, however, we will not settle any "claim" without your consent. If you refuse to consent to any settlement recommended by us or our representatives and you elect to contest or continue any legal proceedings, then our liability shall not exceed the amount for which the "claim" could have been settled including "defense costs" approved by us, up to the date of such refusal.

However, in the event "Panel Defense Counsel" is defending, then our liability for all "loss" on account of such "claim" shall not exceed: (1) the amount for which we could have settled such "claim" plus "defense costs" incurred as of the date such settlement was proposed in writing by us, ("Total Settlement Amount"), plus (2) 50% of covered "loss" in excess of such Total Settlement Amount, it being a condition of this Policy that the remaining 50% of such "loss" excess of the Total Settlement Amount shall be carried by you at your own risk and be uninsured.

## SECTION II - EXCLUSIONS

1. **Workers' Compensation**

   This Policy does not cover any "loss" arising out of any obligation under any workers' compensation, disability benefits or unemployment compensation law, or any similar law.

   This exclusion does not, however, apply to any "claim" for "retaliation" or "discrimination" or "inappropriate employment conduct" on account of the filing of a workers' compensation claim or a claim for disability benefits.

2. **Contractual Liability**

   This Policy does not cover any "loss" which any insured is obligated to pay by reason of the assumption of another's liability for an "insured event" in a contract or agreement.

   This exclusion does not apply to liability for damages because of an "insured event" that any insured would have without the contract or agreement.

3. **Employee Retirement Income Security Act (ERISA)**

   This Policy does not cover any "loss" imposed on any insured under the Employee Retirement Income Security Act of 1974, or any amendment thereto.  This includes fiduciary liability, liability arising out of the administration of any employee benefit plan and any other liability under any such law.

   This exclusion does not apply, however, to any "claim" for "retaliation" under section 510 of ERISA.

4. **Strikes and Lockouts**

   This Policy does not cover any "loss" arising out of a strike, lockout, picket line, replacement or other similar action resulting from labor disputes or labor negotiations, or any protections contained within the National Labor Relations Act.

5. **Consequential Loss**

   This Policy does not cover any direct, indirect or derivative "loss" to any claimant's domestic partner, spouse, child, parent, brother, sister, step-parent, step-brother or step-sister as a consequence of an "insured event."

6.    **Workers' Adjustment and Retraining Notification Act**

This Policy does not cover any "loss" arising out of the Workers' Adjustment and Retraining Notification Act, Public Law 100-379 (1988) or any amendment thereto, or any similar federal, state or local law.

7.    **Major Stockholders**

If the Named Insured is a corporation this Policy does not cover any "loss" arising out of a claim made by any "employee" who owns or controls twenty-five percent (25%) or more of the voting stock of the Named Insured.

8.    **Family Members**

If the Named Insured is an individual, a partnership with less than ten (10) partners, or a corporation with less than ten (10) stockholders this Policy does not cover any "loss" arising out of a "claim" made by any "employee" who is a domestic partner, spouse, child, parent, brother, sister, step-parent, step-brother or step-sister of:

   a.   the Named Insured listed in the Declarations;

   b.   any individual who owns or controls, directly or indirectly, more than 50% of the voting stock of the Named Insured; or

   c.   the trustees or beneficiaries of any trust created by the Named Insured, any individual described in paragraph b. or their relatives or representatives.

This exclusion shall apply, but is not limited to, any estate proceedings and divorce proceedings.

9.    **Bodily Injury**

This Policy does not cover any "loss" based upon bodily injury, sickness, disease or death of any person, or loss of use or economic benefits resulting therefrom.  This exclusion, however, does not apply to emotional distress, humiliation, mental injury or mental anguish resulting from an "insured event".

10.   **Comprehensive Omnibus Budget Reconciliation Act (COBRA)**

This Policy does not cover any "loss" imposed on any insured under the Comprehensive Omnibus Budget Reconciliation Act of 1985, or any amendment thereto.

This exclusion does not apply, however, to any "claim" for "retaliation" or "discrimination" or "inappropriate employment conduct" on account of the filing of a claim for benefits under COBRA.

11.   **Wage and Hour Laws**

This Policy does not cover any "loss" based upon or arising out of any private, governmental or administrative "claim" or "suit" alleging violation of federal, state or local wage and hour laws or regulations, including, but not limited to, any laws or regulations concerning monetary

or non-monetary compensation or benefits that may be owed to a past or present "employee" based upon a misclassification of their job status, title or duties.

This exclusion shall not apply, however, to any such "claim" or "suit" seeking to recover "loss" for alleged "discrimination" or "retaliation" by an "insured".

## SECTION III - INSURED

1.  **If you are designated in the Declarations as:**

    a.  An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    b.  A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business.

    d.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your stockholders are also insureds, but only with respect to their liability as stockholders for the conduct of your business.

2.  **Each of the following is also an insured:**

    a.  Your "management and supervisors" and "employees," are insureds, but only for the conduct of your business within the scope of their employment. Your "management and supervisors" and "employee's" status as an insured will be determined as of the date of the "discrimination," "harassment" or "inappropriate employment conduct" which caused the "insured event."

    b.  Any organization that you newly acquire, form or merge with while this Policy is in effect is an insured if you own at least fifty-one percent (51%) of it, but no newly acquired or formed or merged organization is covered for more than sixty (60) days or the remainder of the Policy Period, whichever is less, from the date that you acquire or form it, or for "loss" that results from an "insured event" that happened or commenced before you acquired or formed it, or for "loss" covered under any other insurance unless agreed by us within such sixty (60) day period. We may require an additional premium for any individuals who become "employees" as a result of such acquisition or formation or merger.

        This paragraph does not apply to a partnership, joint venture, or to any organization once it is shown in the Declarations.

    c.  If a "claim" against an individual insured under this Policy includes a "claim" against the lawful spouse of such insured solely by reason of :

        (1)   Status as a spouse, or

        (2)   Such spouse's ownership interest in property or assets that are sought as recovery for an "insured event"

any "loss" for which such spouse becomes legally obligated to pay on account of such "claim" shall be deemed a "loss" which such insured of the spouse becomes legally obligated to pay as a result of such "claim".

All terms, conditions, limitations and exclusions of this Policy applicable to "loss" sustained by such individual insured in the "claim" shall also apply to such spouse's "loss".

This extension of coverage shall not apply to the extent the "claim" alleges any wrongful act or omission by such spouse.

## SECTION IV - LIMITS OF INSURANCE

1. The **LIMITS OF INSURANCE** shown in the Declarations and the provisions contained in this section establish the most we will pay regardless of the number of:

   a. Insureds;

   b. "Claims" made; or

   c. Persons or organizations making "claims."

2. **Each Claim Limit**

   This is the most we will pay for "claims" made or brought during the Policy Period for "loss" that results from any "one insured event" regardless of the number of "claims."

3. **Total Policy Limit for All Claims (Policy Aggregate Limit)**

   This is the most we will pay for the combined total of all "claims" first made or brought during the Policy Period.

4. **How the LIMITS OF INSURANCE apply to an extension of the Policy Period.**

   If the Policy Period is extended after issuance for an additional period, the additional period will be deemed part of the past preceding period for purposes of determining the limits of liability. Accordingly, the extension of the Policy Period will in no way increase the limits of liability.

5. **Allocation of "Defense Costs"**

   In the event that any portion of a "claim" does not come within the coverage afforded by this Policy, we will be entitled to an allocation of "defense costs" incurred on behalf of the insureds based upon the ratio of the number of counts, causes of actions or allegations for which coverage is afforded under this Policy as compared to the number of such counts, causes of action or allegations which are not within the scope of coverage. We will not be required or obligated to pay that portion of "defense costs" allocated to those counts, causes of action, or allegations which are not within the scope of coverage herein.

## SECTION V - RETENTION

1.  Our obligation to pay under this Policy applies only to the amount of "loss" in excess of the **RETENTION** amount shown in the Declarations and the **LIMITS OF INSURANCE** shown in the Declarations will not be reduced by the amount of such **RETENTION**.

    The applicable **RETENTION** will be decreased by fifty percent (50%) (i.e., a $5,000 **RETENTION** will be $2,500) if one or both of the following conditions are met:

    a.  **Wrongful Termination or Demotion Condition.** For any "claim" alleging wrongful termination or wrongful demotion of an "employee" if prior to the termination or demotion of that "employee" you have consulted with and materially complied with the advice of "Panel Defense Counsel" or a labor law attorney approved by us prior to the termination or demotion of that "employee." This Provision does not apply unless the contact with our appointed attorney is made at least 24 hours prior to the termination or demotion, and the attorney has had a reasonable length of time to respond to the information provided.

    b.  **"Mediation" of "Claims" Condition.** If a "claim" is fully and finally resolved to the satisfaction of all parties, including us, through "mediation," provided that such "mediation" is initiated and concluded and/or abandoned before and not subsequent to commencement of any litigation or arbitration. In the event such "mediation" does not fully and finally resolve the "claim," there shall be no reduction of the **RETENTION** obligation, and all "loss" expenses incurred in the "mediation" shall be included in the total "loss" expenses for the " claim."

2.  You are responsible for the payment of "loss" within the **RETENTION**, including the payment of "defense costs" directly to any law firm(s) that we have retained on your behalf to defend a "claim." At the time a "claim" is reported we will advise you of the name of any law firm(s) we have retained on your behalf and advise them that they are to bill you directly for the **RETENTION** amount.

3.  We may advance on your behalf payment for the amount of an award or settlement that is within the **RETENTION** amount, and you must repay us any such amount promptly upon demand.

4.  The **RETENTION** amount applies separately to each "claim" made. However, the **RETENTION** amount will only apply once to all "claims" arising out of any "one insured event" regardless of the number of claimants who allege damages.

5.  We have no obligation whatsoever, either to you or to any other person or entity, to pay all or any portion of the **RETENTION** amount, except as indicated in Item 3 above. We will, however, at our sole discretion, have the right and option to do so, in which event you must repay us any such amount promptly upon demand.

## SECTION VI - CONDITIONS

We have no duty to provide coverage under this Policy unless there has been full compliance with all the conditions contained in this Policy.

1.   **Cancellation**

   a.   The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

   b.   We may cancel this Policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

   (1). 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

   (2). 30 days before the effective date of cancellation if we cancel for any other reason.

   c.   We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

   d.   Notice of cancellation will state the effective date of cancellation. The Policy period will end on that date.

   e.   If this Policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

   f.   If notice is mailed, proof of mailing will be sufficient proof of notice.

2.   **Duties in the event of a "claim" or "suit".**

   a.   You must see to it that we or our authorized representative are notified within sixty (60) days or as soon as practicable after a "claim" is made.  Notice should include:

   (1)   The identity of the person(s) alleging "discrimination," "harassment" or "inappropriate employment conduct";

   (2)   The identity of the insured(s) who allegedly committed the "discrimination" or "harassment" or "inappropriate employment conduct;"

   (3)   The identity of any witness to the alleged "discrimination," "harassment" or "inappropriate employment conduct";

   (4)   The date the "insured event" took place; and

   (5)   The written charge, complaint or demand as applicable.

   b.   If a "suit" is brought against any insured, you must:

   (1)   record the specifics of the "suit" and the date received; and

   (2)   immediately see to it that we receive written notice of the "suit".

    **c.**    You and any other insured must:

        **(1)**    Send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

        **(2)**    Authorize us to obtain records and other information;

        **(3)**    Cooperate with us in the investigation or defense of the "claim"; and

        **(4)**    Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this Policy may also apply.

    **d.**    No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent. Subsequent payments which are deemed by us as having been prejudiced by any such voluntary payment will also be your sole responsibility.

**3.**    **Legal Action Against Us**

    **a.**    No person or organization has a right under this Policy:

        **(1)**    To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

        **(2)**    To sue us on this Policy unless all of its terms have been fully complied with.

    **b.**    A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial or by motion, but we will not be liable for damages that are not payable under the terms of this Policy or that are in excess of the applicable **LIMITS OF INSURANCE**.  An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4.**    **Other Insurance**

If other valid and collectible insurance is available to you for a "loss" we cover under this Policy, our obligations are limited as follows:

    **a.**    **Primary Insurance**

    This Policy is primary insurance except when b. below applies. If this Policy is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with that other insurance by the method described in c. below.

    **b.**    **Excess Insurance**

    This Policy is excess over any other insurance, whether primary, excess, contingent, or any other basis, that is:

        **(1)**    Effective prior to the beginning of the policy period shown in the Declarations of this Policy;

AVB MSJ Appendix P. 048

(2)     Applies on other than a claims-made basis.

When this Policy is excess, we shall have no duty to defend any "claim" that any other insurer defends. If no other insurer defends, we shall undertake to do so, but we shall be entitled to your rights against all those other insurers.

When this insurance is excess over other insurance, we shall pay only our share of the amount of the "loss," if any, that exceeds the sum of:

(a)     The total amount that all such other insurance would pay for the "loss" in the absence of this insurance; and

(b)     The total of all deductible and self-insured amounts under all other insurance; and

(c)     Your **RETENTION** amount.

We shall share the remaining "loss", if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the **LIMITS OF INSURANCE** shown in the Declarations.

**c.   Method of Sharing**

(1)     If all of such other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of liability or none of the "loss" remains, whichever comes first.

(2)     If any of such other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its appropriate limits to the limits of liability of all other insurers.

**5.   Calculation of Premium**

**a.   Our Manuals**

Our manual of rules, rates, rating plans and classifications will determine all premium for this policy.  We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

**b.   Premium Adjustment**

Premium adjustment may be made either at the time cancellation is effected or as soon as practicable thereafter, but payment or tender of unearned premium is not a condition of cancellation.

**6.   Premiums**

The first Named Insured shown in the Declarations:

**a.**     Is responsible for the payment of all premiums; and

**b.**     Will be the payee for any return premiums we pay.

7.    **Representations**

By accepting this Policy, you agree:

a.    The statements in the "application" and declarations are accurate and complete;

b.    Those statements are based upon representations you made to us; and

c.    We have issued this Policy in reliance upon your representations.

8.    **Changes**

This Policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This Policy's terms can be amended or waived only by endorsement issued by us and made a part of this Policy.

9.    **Separation of Insureds**

With respect to any "claim" reported under this Policy, knowledge possessed by any one insured shall not be imputed to any other insured.

10.    **Subrogation**

If an insured has rights to recover all or part of any payments we have made under this Policy those rights are transferred to us; no insured may do anything after a "loss" to impair them. At our request, such insured will bring suit or transfer those rights to us and help enforce them.

11.    **Death, Incapacity or Bankruptcy**

We will not be relieved of our obligations under this Policy because of:

a.    The death or incapacity of an insured.

b.    Bankruptcy or insolvency of any insured or of any insured's estate.

12.    **False or fraudulent claims**

If any insured shall proffer any "claim" knowing the same to be false or fraudulent as regards amount or otherwise, this Policy shall become void and all claims hereunder shall be forfeited as respects that particular insured; however, the policy shall not be voided as to any other insured who was not party to such false and fraudulent claim submission.

13.    **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without our written consent.

## SECTION VII - WHEN COVERAGE IS PROVIDED

1.    **Claims Made Coverage.**  This Policy applies only to "claims" first made or brought against you, while this Policy is in effect or during the Limited Reporting Period or Extended Reporting Period if applicable.

A "claim" will be considered first made or brought on the date we or any insured receives a written "claim" whichever comes first.

All "claims" because of "one insured event" will be considered to have been made or brought on the date that the first of those "claims" was first made or brought. Any "claim" arising out of an "insured event" reported to us pursuant to paragraph 2 will be deemed first made on the date notice of the "insured event" was given to us.

2.  **Notice of potential claim.**  If during the Policy Period, any insured becomes aware of an "insured event" which they reasonably believe may result in a future "claim" and they or the Named Insured or any insured entity provide(s) notice in writing to us of such "insured event" prior to the end of the Policy Period, then any "claim" subsequently arising from such "insured event" shall be deemed to have been made on the date notice of such "insured event" was given to us.  Such notice must describe the "insured event" in reasonable detail and provide the name or names of the potential "claimant(s)."

    This Policy provides coverage for potential "claims" reported under this paragraph, provided an actual "claim" is made or "suit" is brought within five (5) years after the end of the Policy Period.

3.  **Limited Reporting Period** means the sixty (60) day period starting with the end of the Policy Period.  Coverage under the Limited Reporting Period applies to "claims" which are first made against the insured during such 60-day period based upon "insured events" which happen prior to the expiration or cancellation of coverage and are otherwise covered by the Policy.

    The Limited Reporting Period does not extend the Policy Period nor change the scope of coverage provided. We will consider any "claim" first made or brought during the Limited Reporting Period to have been made on the last date on which this Policy is in effect.

4.  **When the Limited Reporting Period will apply**.  The Limited Reporting Period will apply if this Policy is canceled or not renewed by us or the Named Insured for any reason other than nonpayment of premium. Coverage under the limited reporting period may not be canceled.

    However, the Limited Reporting Period will not apply to "claims" if other insurance you buy covers them or would cover them if its limits of coverage had not been exhausted.

5.  **How to add an Extended Reporting Period**. If the Limited Reporting Period applies, an Extended Reporting Period of twelve (12) months can be added by means of an Extended Reporting Period Endorsement and the payment of an additional premium.  Such additional premium shall not exceed one hundred percent (100%) of the annual premium charged for the last Policy Period.  The endorsement sets forth the terms of coverage during the Extended Reporting Period.  Coverage under an extended reporting period is limited to "claims" which are first made against the insured during the extended reporting period based upon "insured events" which happen prior to the expiration or cancellation of coverage and are otherwise covered by the Policy.

    The Extended Reporting Period Endorsement will not be issued unless we receive a written request for it within thirty (30) days after this Policy ends. Once that premium is paid, the endorsement may not be canceled and the premium will be fully earned.

6.   **The LIMITS OF INSURANCE also apply to the Limited and Extended Reporting Periods**. The **LIMITS OF INSURANCE** that apply at the end of the Policy Period are not renewed or increased and the total limits shown in the Declarations shall not be increased by the addition of either limited or extended reporting periods.

## SECTION VIII - COVERAGE TERRITORY

We will defend "claims," or pay judgments or settlements, for "insured events" that happen:

1.   in the United States of America, its territories and possessions, and Puerto Rico; or

2.   anywhere in the world with respect to the activities of a person whose place of employment is in the territory described in 1. above, while he or she is away on your business.

Provided that "claim" is made or "suit" is brought in, and the insured's obligation to pay "loss" is determined on the merits under the substantive federal, state or local law of, the United States, its territories and possessions or Puerto Rico.

## SECTION IX - DEFINITIONS

1.   "Application" means the application attached to and forming part of this Policy, or maintained of record in our file, including any materials submitted in connection with such "application," shall be considered a part of this Policy, as if physically attached.

2.   "Claim" means a written demand received by the insured alleging damages or the filing of a "suit", or any administrative proceeding including but not limited to the Equal Employment Opportunity Commission, or any other state or federal agency or authority with jurisdiction over you.  However, "claim" does not include (1) labor or grievance arbitration subject to a collective bargaining agreement or (2) criminal proceedings.

3.   "Co-Payment" means that after you have paid the applicable **RETENTION** as required, we will only pay ninety percent (90%) of the balance of the "loss" and you will be responsible for ten percent (10%) of the balance of the "loss".

     This definition only applies to **SECTION I, 4.b.** of this Policy and any Endorsement specifically providing for a "Co-Payment".

4.   "Defense Costs" means those reasonable and necessary expenses that result from the investigation, settlement or defense of a specific "claim", including attorney fees and expenses, the cost of legal proceedings, the cost of covered "mediation", the cost of appeal bonds, the cost of bonds to release property being used to secure a legal obligation (but only for bond amounts within the **LIMITS OF INSURANCE** that apply; we have no obligation to furnish such bonds), all reasonable expenses that any insured incurs in court at our request while helping us investigate or defend a "claim" (we will not pay more than $100 per day for earnings lost by the insured because of time taken off work), and all costs taxed against any insured in a "suit".

     However, "defense costs" do not include  salaries and expenses of our employees, including employed attorneys, salaries and expenses of your employees, fees and expenses of independent adjusters we hire, and interest that accumulates on the amount of a judgment.

5.   "Discrimination" means termination of the employment relationship, a demotion or failure or refusal to hire or promote or denial of an employment benefit or the taking of any adverse or differential employment action because of race, color, religion, age, sex, pregnancy, sexual orientation or preference, national origin, or disability including a disability resulting from human immunodeficiency virus (HIV) or acquired immune deficiency syndrome (AIDS), or any other basis prohibited by federal, state or local law.

6.   "Employee" means:

a.   an individual whose labor or service is engaged by and directed by an insured. This includes "part-time employees," "seasonal employees," "temporary employees," "temporary workers," "interns," "volunteers" and "management or supervisory employees;"

The term "employee" also includes a former "employee". As respects coverage for former "employees" also refer to **SECTION III – INSURED**, item **2.a.**

b.   an individual who is a "leased worker" provided such individual shall be deemed an "employee" only if, and to the extent that, you provide indemnification to such individual for services rendered as if they were rendered by an actual "employee" of yours, and the labor leasing firm(s) with whom you have such agreement(s) is(are) scheduled by written endorsement to this Policy; and

c.   an individual who is an independent contractor contracted to perform services for you; provided that such individual shall be deemed an "employee" only if, and to the extent that you provide indemnification to such individual for services rendered as if they were rendered by an actual "employee" of yours, and provided further that such individual is scheduled by written endorsement to this Policy. This Policy does not cover any "loss" which any insured is obligated to pay to an independent contractor for overtime pay, vacation pay, or any employee benefit.

7.   "Harassment" means, unwelcome sexual or non-sexual advances, requests for sexual or non-sexual favors or other verbal, visual or physical conduct of a sexual or non-sexual nature that:

a.   is explicitly or implicitly made a condition of employment,

b.   are used as a basis for employment decisions, or

c.   create a work environment that interferes with performance.

"Harassment" includes allegations of assault and battery, but only if they are related to a charge of sexual harassment.

8.   "Inappropriate Employment Conduct" means actual or constructive termination of an employment relationship in a manner which is against the law and wrongful or in breach of an implied agreement to continue employment, including allegations of breach of an implied employment contract and breach of the covenant of good faith and fair dealings in the employment contract, or an employment related incident resulting in one or more of the following offenses:

a.   wrongful demotion or wrongful failure to employ or promote;

b.   wrongful discipline;

c.   wrongful denial of tenure or deprivation of career opportunity;

d.   negligent hiring, supervision or evaluation;

e.   "retaliation";

f.   misrepresentation or defamation;

g.   infliction of emotional distress, humiliation, mental injury or mental anguish;

h.   false arrest, detention or imprisonment; or

I.   libel, slander, defamation of character or any invasion of right of privacy.

j.   employment terminations, disciplinary actions, demotions or other employment decisions which violate public policy or the Family Medical Leave Act or similar state law;

k.   violations of the Uniformed Services Employment and Reemployment Rights Act, however,

"Inappropriate Employment Conduct" does not include severance payments or amounts determined to be owing under a written contract of employment for a definite period of time; however, "defense costs" for "claims" of breach of a written or express contract of employment for a definite period of time are covered.

9.   "Insured Event" means actual or alleged acts of "discrimination," "harassment," and/or "inappropriate employment conduct" by an Insured against an "employee," former "employee," or an applicant seeking employment with the Named Insured.

10.   "Intern" means a person who is an advanced student or recent graduate in a professional field who provides services to the Named Insured or is receiving practical experience from the Named Insured without any express or implied promise of remuneration. Coverage is only extended to "interns" while they are acting at the direction of and within the scope of duties for you.

11.   "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12.   "Loss" means damages, judgments, settlements, statutory attorney fees and "defense costs", including:

a.   prejudgment and post judgment interest awarded against an insured on that part of any judgment paid by us, and

b.   back pay awards and front pay awards.

However, "loss" does not include:

**a.**   civil, criminal or administrative fines or penalties imposed by law that are not otherwise insurable, or

**b.**   non-monetary relief, or

**c.**   punitive or exemplary damages where such damages are not insurable because of state or federal law, or,

**d.**   payment of insurance or trust plan benefits by or on behalf of retired employees, or that to which a claimant would have been entitled as an employee had the insured provided the claimant with a continuation of insurance, or

**e.**   costs incurred by an insured to modify or adapt any building or property in order to make such building or property more accessible or accommodating to any disabled person, or

**f.**   matters which may be deemed uninsurable according to the law under which this Policy is construed, or

**g.**   amounts owed under federal, state or local wage and hour laws, and/or earned commissions, bonuses, stock options, profit sharing or benefits pursuant to a contract of employment.

**13.**   "Management and Supervisors" means a director, owner, partner, principal, officer, in-house attorney, or shareholder of the insured, the personnel or human resources director, risk management personnel or any other "employee" of the insured having management-level responsibility for personnel matters (i.e., ability to hire, terminate, demote or prepare a written evaluation of employees).

**14.**   "Mediation" means a non-binding process in which a neutral panel or individual assists the parties in reaching their own settlement. To be considered "mediation" under this Policy, the process must be of the kind set forth in the Commercial Mediation rules of the American Arbitration Association. We may, however, at our sole option, recognize any "mediation" process presented by you to us for approval.

"Mediation" under this Policy does not include any mediation, conciliation, or any other alternative dispute resolution mechanism that is part of a proceeding before the Equal Employment Opportunity Commission or a similar state agency.

**15.**   "One Insured Event" means:

**a.**   "insured events" which are (1) related by an unbroken chain of events or (2) made or brought by the same claimant; or

**b.**   class action or multiple plaintiffs suits arising out of related "insured events."

**16.**   "Panel Defense Counsel" means an attorney previously selected by us and who is listed on our current published listing of approved defense attorneys.

17. "Part Time Employee" means an "employee" whose labor or service is engaged on the basis that the "employee" will not work more than twenty (20) hours per week.

18. "Retaliation" means, retaliatory treatment against an "employee" of the insured on account of such "employee's" exercise or attempted exercise of his or her rights under law.

19. "Seasonal employee" means, an "employee" whose labor or service is engaged on the basis that the "employee" will not work more 1,000 hours per year.

20. "Suit" means, a civil proceeding in which damages because of a covered "insured event" to which this Policy applies are alleged. "Suit" includes:

    a. An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
    b. Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

21. "Temporary employee" means, an "employee" or "part time employee" whose labor or service is engaged for a specific time period or project. "Temporary employee" does not include a "temporary worker".

22. "Temporary worker" means a person who is furnished to you through an outside temporary employment agency to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

23. "Volunteer worker" means a person who provides services to the named insured without any express or implied promise of remuneration. Coverage is only extended to a "volunteer worker" while acting at the direction of, and within the scope of duties for you.

# NAVIGATE THROUGH HR CURRENTS

## HR Pilot™ offers HR services designed to help employers spend less time on compliance while reducing risk.

HR Pilot™ is provided to policyholders that have EPL insurance with:

Houston Casualty Company, U.S. Specialty Insurance Company, and Avemco Insurance Company.

## *HR Pilot Services Include:*

### Expert HR Advice
**Unlimited HR Support by Telephone and Email:** Prompt answers to tough questions by experienced HR professionals. Our HR professionals are all SPHR/PHR certified.

**State-Specific Online Content for all 50 States**: Summaries/flowcharts guide you through the maze of employment laws. Employment attorneys* update the content regularly.

**Step-by-Step Procedures and over 500 HR Forms:** Includes federal & state posters; required HR forms; recommended HR forms; procedures for HR issues in each state.

**Customizable Handbooks:** Use one of our 102 templates (2 per state) or build your own. Employment attorneys* ensure the content is current and accurate. Semi-annual updates emailed right to your inbox.

**Toll-Free Employee Complaint Hotline:** A "win-win" for employers to prevent employment lawsuits or mitigate damages.

### HR Services in Spanish
**Bilingual HR Professionals:** Provide both (1) HR advice to employers, and (2) respond to "employee complaint hotline" calls.

**Spanish Handbooks and Posters:** Employee handbooks (key states), required bilingual posters & important HR forms.

**Harassment Training:** Train managers/employees in their primary language and comply with the law.

### Workforce Training
**Online Training:** Engaging and interactive training covering a wide range of HR topics (e.g., anti-harassment, hiring, discipline, and termination).

**Learning Management System:** Upload our training programs to your LMS or use our database to assign, track and report training.

**Animated Training:** Fun training programs for managers and supervisors. MCLE credit available for CA attorneys (selected courses).

**Manager Training Bulletins/Posters:** We provide the content for the "ongoing" training that regulators expect.

**Educational Webinars:** Stay current with our monthly webinars. HRCI credit available for your HR professionals.

*HR Pilot services, content, and updates do not constitute legal advice.

## For more information call (800) 980-2988

 **HCC** # Claim Reporting

## NOTICE OF CLAIM

If you receive notice of a claim or want to report a potential incident that you feel may result in a claim, please report the claim directly to:

**HCC Specialty
Claims Department**

HCC Specialty
37 Radio Circle Drive
P.O. Box 5000
Mount Kisco, NY 10549-5000

FAX:
**914.241.8045**

Email:
**submitclaims@hcc.com**

Inquiries regarding claims may be directed to the HCC Specialty Claims Department at **914.241.8900**

## DO NOT DELAY
## The Reporting of Any Claim

The timely reporting of claims is very important and can be time sensitive.

In the event that you are reporting a claim, you should expect to provide the following:

1. Have your EPLI policy available for reference.
2. Your EPLI Policy Number
3. Your EPLI Policy Period

You may be asked to provide:

- Details including but not limited to:
  - Date of claim
  - Date of notice of claim
  - Names of parties involved
  - Job position of parties involved

- Description and nature of the claim

- Current status of the claim

- Complaints, letters, and correspondence pertaining to the claim

- Personnel file(s)

- Be sure to immediately issue a litigation hold on all documents (including electronic documents and emails) that may be related to the potential claim.

**AVB 000063**

## Employee Complaint Hotline

Your employer provides a third-party hotline for employment complaints regarding harassment, discrimination, hiring, termination, discipline, working conditions, leaves of absence, and other concerns about the workplace.

This hotline does not handle safety issues or workplace injuries. Employees with these concerns should consult their supervisor, human resources, or other posted notices.

When making a complaint you should first attempt to follow your employer's reporting procedures. You may also contact the team of human resources professionals at HR Pilot™ who provide an alternative to talking directly to your employer. You may contact the human resources managers at HR Pilot™ by telephone at no cost.

### To make comments or complaints call: 877-557-7419

Always report concerns of wrongdoing in your workplace. Do not ignore problems, even if the problem relates to another employee and does not involve you.

AVB 000064



# Exhibit 2



TOKIO MARINE
HCC

# Houston Casualty Company
Houston, TX

## DECLARATIONS
## EMPLOYMENT PRACTICES LIABILITY INSURANCE
### THIS IS A CLAIMS MADE AND REPORTED POLICY

> This insurance is issued pursuant to the California
> Insurance Code, Sections 1760 through 1780, and
> is placed in an insurer or insurers not holding a
> Certificate of Authority from or regulated by the
> California Insurance Commissioner.

| | | | |
|---|---|---|---|
| **Broker No.:** | 1035843 | **No.:** | H718-920263 |
| | Socius Insurance Services, Inc. | **Renewal of No.:** | H717-917293 |

**Item 1.**  Named Insured:  AV Builder Corporation; ReStorCorp

**Item 2.**  Address:  6373 Nancy Ridge Drive
San Diego,
CA, 92121

**Item 3.**  The Named Insured is a: Corporation

**Item 4.**  Limits of Insurance:

$ 1,000,000   Each "Claim" (including "defense costs")
$ 1,000,000   Total Policy Limit for all "Claims" (including "defense costs")

**Item 5.**  Retention:

$ 10,000   Each "Claim"
$ 10,000   Third Party

**Item 6.**  Notice of Claim:
Director of Claims:
TM-HCC Professional Lines Group
37 Radio Circle Drive
Mt. Kisco, New York 10549
Telephone: 800-742-2210

**Item 7.**  Program Administrator:
TM-HCC Professional Lines Group
235 Pine Street, Suite 1675
San Francisco, California 94104
Telephone: 415-288-0701

**Item 8.**  Date of Application: 06/07/2018

**Item 9.**  Policy Period:  Inception Date: 08/19/2018   Expiration Date: 08/19/2019
12:01 A.M. Standard Time at the address of the Named Insured herein.

**Item 10.**  Premium:   $ 8,703.00   Policy Fee   75.00
This Policy has been signed at San Francisco, California Dated 06/12/2018

CA Surplus Lines Tax: $263.34
CA Surplus Lines Fee: $17.56
Socius Broker Fee: $350.00

by _____
Authorized Representative

EP0002 01/11

**AVB 000065**

AVB MSJ Appendix P. 061



# Houston Casualty Company
### Houston, TX

## DECLARATIONS
## EMPLOYMENT PRACTICES LIABILITY INSURANCE
### THIS IS A CLAIMS MADE AND REPORTED POLICY

> **This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

Item 11.     Attachments:     EP 0001 (12/01),
EPHRM001, EP 0068, EP 0044, EP 0066, EP ALLOC, D-2, EP 0062, EP CTSM, EP 526, TRIA (2015), EP 530, EP 00IM

This Policy has been signed at <u>San Francisco, California</u> Dated <u>06/12/2018</u>

by

Authorized Representative

EP0002 01/11

**AVB 000066**

AVB MSJ Appendix P. 062

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EPHRM001 |

> **This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

### THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.

### HUMAN RESOURCES MANAGEMENT SERVICES AND RETENTION MODIFICATION ENDORSEMENT

This endorsement modifies your Policy as follows:

**HR Pilot™ Services Notice**

In conjunction with your Policy a Human Resources Management program titled HR Pilot™ is available to you. To implement these services you need to call 800-980-2988.

**Retention Modification**

**Section V – Retention, Item 1** and **Item 1.a.** are deleted and replaced by the following:

**SECTION V – RETENTION**

1.  Our obligation to pay under this Policy applies only to the amount of "loss" in excess of the **RETENTION** amount shown in the Declarations and the **LIMITS OF INSURANCE** shown in the Declarations will not be reduced by the amount of such **RETENTION**.

    The applicable **RETENTION** will be decreased by fifty percent (50%) (i.e., a $5,000 **RETENTION** will be $2,500) if one or both of the following conditions are met:

    a.  **Wrongful Termination or Demotion Condition.** For any "claim" alleging wrongful termination or wrongful demotion of an "employee" if prior to termination or demotion of that "employee" you have consulted with and materially complied with the advice of the HR Pilot™ telephone Help Line (800-

*by* _____
Authorized Representative

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EPHRM001 |

980-2988) or your assigned "Panel Defense Counsel". This provision does not apply unless the contact with either the above is made at least 24 hours prior to the termination or demotion, and the HR Pilot™ Help Line or the "Panel Defense Counsel" has had a reasonable length of time to respond to the information provided by you.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _[signature]_
Authorized Representative

EPHRM001

Page 2 of 2

**Houston Casualty Company**
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0068 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**SERVICE OF SUIT ENDORSEMENT**

This endorsement modifies your Policy as follows:

This applies in jurisdictions where the Company is not an admitted insurer.

It is agreed that in the event of the Company's failure to pay the amount claimed to be due hereunder, the Company, at the request of the Insured, will submit to the jurisdiction of a Court of competent jurisdiction within the United States and will comply with all requirements necessary to give such Court jurisdiction and all matters arising hereunder shall be determined in accordance with the law and practice of such Court. Nothing in this Endorsement constitutes or should constitute a waiver of the Company's rights to commence an action in any Court of competent jurisdiction in the United States, to remove an action to a United States District Court, or to seek a transfer of a case to another Court as permitted by the laws of the United States or any State in the United States.

It is further agreed that, pursuant to any statute of any state, territory or district of the United States which makes provision therefore, the Company hereby designates the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as its true and lawful attorney upon whom may be served any lawful process in any action, suit or proceeding instituted by or on behalf of the Insured or any beneficiary hereunder arising out of this Policy of insurance, and hereby designates the President of the Houston Casualty Company in care of the General Counsel, at 13403 Northwest Freeway, Houston, TX, 77040, as the person to whom the said officer is authorized to mail such process or true copy thereof.

It is further understood and agreed that service of process in such suit may be made upon RANDY RINICELLA, Secretary, at 13403 Northwest Freeway, Houston, TX, 77040, and that in any suit instituted against any one of them upon this contract, the Company will abide by the

by _[signature]_
Authorized Representative

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0068 |

final decision of such Court or of any Appellate Court in the event of an appeal.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _[signature]_
Authorized Representative

EP 0068  (01/11)                    Page 2 of 2

AVB MSJ Appendix P. 066

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0044 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**DEFENSE COUNSEL (ATTORNEY) SELECTION
MODIFICATION ENDORSEMENT**

THIS ENDORSEMENT MODIFIES YOUR POLICY AS FOLLOWS:

**SECTION I – COVERAGE  4. a. and b. are deleted and replaced by:**

**4.     Defense Counsel (Attorney) Selection**

    **a.**  We have the right and duty to select and appoint an attorney to defend you against any "suit" other than for criminal proceedings.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated below. All other terms and conditions of this Policy

by _[signature]_
Authorized Representative

EP 0044  (02/06)                   Page 1 of 2

AVB MSJ Appendix P. 067

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0044 |

remain unchanged.

by

Authorized Representative

EP 0044  (02/06)                     Page 2 of 2
**AVB 000072**

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | **AV Builder Corporation; ReStorCorp** | **H718-920263** | **EP 0066** |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

## THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.

### NUCLEAR ENERGY LIABILITY EXCLUSION ENDORSEMENT

This endorsement modifies your Policy as follows:

1. This insurance does not apply:

   **A.** To liability:

   (1) With respect to which an "insured" under this policy is also an insured under a nuclear energy liability policy issued by Nuclear Energy Liability Insurance Association, Mutual Atomic Energy Liability Underwriters, Nuclear Insurance Association of Canada or any of their successors, or would be an insured under any such policy but for its termination upon exhaustion of its limit of liability; or

   (2) Resulting from the "hazardous properties" of "nuclear material" and with respect to which **(a)** any person or organization is required to maintain financial protection pursuant to the Atomic Energy Act of 1954, or any law amendatory thereof, or **(b)** the "insured" is, or had this policy not been issued would be, entitled to indemnity from the United States of America, or any agency thereof, under any agreement entered into by the United States of America, or any agency thereof, with any person or organization.

   **B.** To liability resulting from "hazardous properties" of "nuclear material", if:

   (1) The "nuclear material" **(a)** is at any "nuclear facility" owned by, or operated by or on behalf or, an "insured" or **(b)** has been discharged or dispersed therefrom;

   (2) The "nuclear material" is contained in "spent fuel" or "waste" at any time possessed, handled, used, processed, stored, transported or disposed of, by or on behalf of an "insured"; or

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0066 |

(3) The liability arises out of the furnishing by an "insured" of services, materials, parts or equipment in connection with the planning, construction, maintenance, operation or use of any "nuclear facility", but if such facility is located within the United States of America, its territories or possessions or Canada, this exclusion (3) applies only to "property damage" to such "nuclear facility" and any property thereat.

2.    As used in this endorsement:

A. "Hazardous properties" includes radioactive, toxic or explosive properties.

B. "Nuclear material" means "source material", "special nuclear material" or "by-product material".

C. "Source material", "special nuclear material", and "by-product material" have the meanings given them in the Atomic Energy Act of 1954 or in any law amendatory thereof.

D. "Spent fuel" means any fuel element or fuel component, solid or liquid, which has been used or exposed to radiation in a "nuclear reactor".

E. "Waste" means any waste material (1) containing "by-product material" other than the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its "source material" content, and (2) resulting from the operation by any person or organization of any "nuclear facility" included under the first two paragraphs of the definition of "nuclear facility".

F. "Nuclear facility" means:

(1) Any "nuclear reactor";

(2) Any equipment or device designed or used for (a) separating the isotopes of uranium or plutonium, (b) processing or utilizing "spent fuel", or (c) handling, processing or packaging "waste";

(3) Any equipment or device used for the processing, fabricating or alloying of "special nuclear material" if at any time the total amount of such material in the custody of the "insured" at the premises where such equipment or device is located consists of or contains more than 25 grams of plutonium or uranium 233 or any combination thereof, or more than 250 grams of uranium 235;

by [signature] Authorized Representative

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0066 |

Any structure, basin, excavation, premises or place prepared or used for the storage or disposal of "waste"; and includes the site on which any of the foregoing is located, all operations conducted on such site and all premises used for such operations.

**G.** "Nuclear reactor" means any apparatus designed or used to sustain nuclear fission in a self-supporting chain reaction or to contain a critical mass of fissionable material.

**H.** "Property damage" includes all forms of radioactive contamination of property.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated below. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP ALLOC |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**ALLOCATION PROVISION ENDORSEMENT**

It is agreed that **SECTION IV - LIMITS OF INSURANCE, Subsection 5. Allocation of "Defense Costs"** is deleted in its entirety and replaced with the following:

**SECTION IV          LIMITS OF INSURANCE**

**5.      Allocation of "Defense Costs"**

If both "loss" covered by this Policy and "loss" not covered by this Policy are incurred in connection with any "claim," we will use all reasonable efforts to agree, with you, upon a fair and proper allocation of "defense costs" attributable to the covered "loss" and the uncovered "loss."

If there can be an agreement on the allocation of "defense costs," we will pay, on a current basis, "defense costs" allocated to the covered "loss" in accordance with our obligations under the Policy.

If there can be no agreement on an allocation of "defense costs:"

a.      then no presumption as to allocation shall exist in any arbitration, suit or other proceeding;

b.      we will pay, on a current basis, "defense costs" that we believe are reasonably related to the covered "loss" under the Policy until a different allocation is negotiated or arbitrated; and

c.      we, if requested by you, shall submit such dispute to binding arbitration, in which case the rules of the American Arbitration Association shall apply.   All administrative costs associated with the arbitration shall be shared equally between the parties.  The amounts paid by you in connection with the arbitration will not be considered "loss" under the terms of this Policy.

by _____
Authorized Representative

# Houston Casualty Company
## Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP ALLOC |

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

AVB 000077

## NOTICE:

1. THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NONADMITTED" OR "SURPLUS LINE" INSURERS.

2. THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.

3. THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.

4. THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN) INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE, AT THE FOLLOWING TOLL-FREE TELEPHONE NUMBER: 1-800-927-4357. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER.   YOU MAY ALSO CONTACT THE NAIC'S INTERNET WEB SITE AT WWW.NAIC.ORG.

5. FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATE'S DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

6. FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF

STD  H718-920263

D-2 (Effective July 21, 2011)

**AVB 000078**

APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.

7. CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS. ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEB SITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: WWW.INSURANCE.CA.GOV.

8. IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE BOUND IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKER'S FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.

STD H718-920263

D-2 (Effective July 21, 2011)

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0062 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

### THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.

### THIRD PARTY DISCRIMINATION AND HARASSMENT COVERAGE ENDORSEMENT

This endorsement modifies your Policy as follows:

**Policy Limits Modification**

Only as respects the additional coverage provided by this endorsement, if the total Policy Limit, for all "claims" (including "defense costs") indicated at Item 4. of the Declarations is greater than $1,000,000, then that amount is deleted and replaced by the amount of $1,000,000. Therefore, the aggregate maximum amount we will pay for all "claims" under this endorsement is $1,000,000 or if a lesser amount, the Total Policy Limit indicated at Item 4. of the Declarations.

**Policy Form Modifications**

Only as respects the additional coverage provided by this endorsement the following sections or subsections of the Policy are deleted:

**SECTION I - COVERAGE, Item 1.a.**

**SECTION II – EXCLUSIONS, entire section**

**SECTION V – RETENTION, Item 4.**

**SECTION VI - CONDITIONS, Item 2.a.**

**SECTION IX - DEFINITIONS, Items 1, 5, 7, 9, 12 and 15.**

and replaced by the following:

**SECTION I - COVERAGE**

EP 0062  (07/03)

Page 1 of 6
**AVB 000080**

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0062 |

1.    **Insuring Agreement**

    a.    By this endorsement the Policy covers "discrimination" and "harassment" liability that the insured is legally obligated to pay to:

        (1)    an existing or former client, customer or patient, or

        (2)    any other person(s), within the terms, conditions, limitations and exclusions set forth in this endorsement and the Policy to which it is attached. This endorsement has been issued in reliance upon statements made to us in the "application".

## SECTION II – EXCLUSIONS

1.    **Workers' Compensation**

Coverage provided by this Endorsement does not include coverage for any "loss" arising out of any obligation under any workers' compensation, disability benefits or unemployment compensation law, or any similar law.

2.    **Contractual Liability**

Coverage provided by this Endorsement does not include coverage for any "loss" which any insured is obligated to pay be reason of the assumption of another's liability for an "insured event" in a contract or agreement.

This exclusion does not apply to liability for damages because of an "insured event" that any insured would have without the contract or agreement.

3.    **Consequential Loss**

Coverage provided by this Endorsement does not include coverage for any direct, indirect or derivative "loss" to any claimant's domestic partner, spouse, child, parent , brother , sister, step-parent, step-brother or step-sister as a consequence of an "insured event."

4.    **Bodily Injury**

Coverage provided by this Endorsement does not include coverage for any "loss" based upon bodily injury, sickness, disease or death of any person, or loss of use or economic benefits resulting therefrom. This exclusion, however, does not apply to

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0062 |

emotional distress, humiliation, mental injury or mental anguish resulting from an "insured event".

5. **Retroactive Date**

Coverage provided by this Endorsement does not include any "loss" based on an "insured event" which occurs prior to the **RETROACTIVE DATE** indicated below on this Endorsement.

**SECTION V – RETENTION**

4. The **RETENTION** amount applies separately to each "claim" made. However, the **RETENTION** amount will only apply once to all "claims" arising out of any "one insured event", other than "insured events" alleging disability discrimination at one or more of the Insured's buildings or properties, regardless of the number of claimants who allege damages.

**SECTION VI - SPECIAL CONDITIONS**

We have no duty to provide coverage under this endorsement unless there has been full compliance with all of the conditions contained in this endorsement and the Policy.

2. **Duties in the event of a "claim", or potential "claim" or "suit".**

a. You must see to it that we or our authorized representative are notified within sixty (60) days or as soon as practicable after a "claim" is made. Notice should include:

(1) The identity of the person(s) alleging "discrimination" or "harassment";

(2) The identity of the insured(s) who allegedly committed the "discrimination" or "harassment" act;

(3) The identity of any witness to the alleged "discrimination" or "harassment";

(4) The date the "insured event" took place, and the date the alleged "discrimination" or "harassment" took place; and

(5) The written charge, complaint or demand as applicable.

**SECTION IX - DEFINITIONS**

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | **AV Builder Corporation; ReStorCorp** | **H718-920263** | **EP 0062** |

As respects the coverage provided under this endorsement the following definitions are modified or added:

1.   "Application" means the Third Party Discrimination and Harassment Supplemental Application, including any materials submitted in connection with such "application", all of which are on file with us and are a part of the Policy, as if physically attached.

5.   "Discrimination" means the taking of any adverse or differential action(s) by an "employee" of the insured because of race, color, religion, age, sex, pregnancy, sexual orientation or preference, national origin, or disability including a disability resulting from human immunodeficiency virus (HIV) or acquired immune deficiency syndrome (AIDS), or any other basis prohibited by federal, state or local law.

7.   "Harassment" means unwelcome sexual or non-sexual advances, requests for sexual or non-sexual favors or other verbal, visual or physical conduct of a sexual or non-sexual nature made to an existing or former client, customer or patient, or any other person(s) by an "employee" of the insured that:

    a.   are explicitly or implicitly made a condition of doing business,

    b.   are used as a basis for business decisions, or

    c.   create an environment that interferes with individual comfort or performance.

9.   "Insured Event" means your existing or former client, customer or patient, or any other person(s) alleging, during the policy period, "discrimination" and/or "harassment" by:

    a.   an "employee" during the course of his or her employment by you, or

    b.   "discrimination" by any other insured; provided always such allegation relates to "discrimination" and/or "harassment" which first commenced on or after the **RETROACTIVE DATE** indicated on page 6 of this endorsement.

12.  "Loss" means damages, judgments, settlements, statutory attorney fees and "defense costs", including prejudgment and post judgment interest awarded against an insured on that part of any judgment paid by us.

    However, "loss" does not include:

EP 0062  (07/03)                    Page 4 of 6
**AVB 000083**

AVB MSJ Appendix P. 079

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 0062 |

    **a.**    civil or criminal fines or penalties imposed by law that are not otherwise insurable, or

    **b.**    non-monetary relief, or

    **c.**    liquidated damages where there is a finding of willfulness, or

    **d.**    punitive or exemplary damages where such damages are not insurable because of state or federal law, or

    **e.**    costs incurred by an insured to modify or adapt any building or property in order to make such building  or property more accessible or accommodating to any disabled person, or

    **f.**    matters which may be deemed uninsurable according to the law under which this Policy is construed, or

    **g.**    amounts owed under federal, state or local wage and hour laws, and/or earned commissions, bonuses, stock options, profit sharing or benefits pursuant to a contract of employment.

"One Insured Event" means:

    **a.**    "insured events" which are (1) related by an unbroken chain of events or (2) made or brought by the same claimant, other than those alleging disability discrimination at one or more of the Insured's buildings or properties; or

    **b.**    class action or multiple plaintiffs suits arising out of related "insured events", other than those alleging disability discrimination at one or more of the Insured's buildings or properties.

**24.**    "Alleging" means lodging a complaint or charge with your "Management and Supervisors" or with any government agency, or commencing a "suit".

RETROACTIVE DATE:  N/A

EP 0062  (07/03)

AVB MSJ Appendix P. 080

### Houston Casualty Company
#### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2018** | **AV Builder Corporation; ReStorCorp** | **H718-920263** | **EP 0062** |

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

EP 0062  (07/03)            Page 6 of 6
                        **AVB 000085**

AVB MSJ Appendix P. 081

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP CTSM |

> **This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

### THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.

### CONSENT TO SETTLE MODIFICATION ENDORSEMENT

This endorsement modifies your Policy as follows:

**SECTION I, ITEM 6. Consent to Settle** is deleted and replaced by the following:

**Consent to Settle**

We have the right to investigate and settle any "claim" in the manner and to the extent that we believe proper, however, we will not settle any "claim" without your consent. If you refuse to consent to any settlement recommended by us or our representatives and you elect to contest or continue any legal proceedings, then our liability shall not exceed the amount for which the "claim" could have been settled including "defense costs" approved by us, up to the date of such refusal.

However, in the event "Panel Defense Counsel" is defending, then our liability for all "loss" on account of such "claim" shall not exceed (1) the amount for which we could have settled such "claim" plus "defense costs" incurred as the date such settlement was proposed in writing by us. ("Total Settlement Amount"), plus (2) 75% of covered "loss" in excess of such Total Settlement Amount, it being a condition of this Policy that the remaining 25% of such "loss" excess of the Total Settlement Amount shall be carried by you at your own risk and be uninsured.

This endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

**Houston Casualty Company**
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 526 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

**WAGE AND HOUR LAWS LEGAL DEFENSE COSTS
ENDORSEMENT WITH INCREASED RETENTION**

This Endorsement modifies your Policy as follows:

**SECTION II, Exclusion 11.** is deleted in its entirety and replaced by the following:

**11.    Wage and Hour Laws**

    **a.**  This Policy does not cover any "loss" arising out of any private, governmental or administrative "claim" alleging violations of federal, state or local wage and hour laws or regulations, including, but not limited to, any laws or regulations concerning monetary or non-monetary compensation or benefits that may be owed to a past or present "employee" based upon misclassification of their job status, title or duties.

    **b.**  However, we will pay "defense costs" up to, but in no event greater than $100,000 in the aggregate for all "claims" made during this Policy Period and excluded by **a.** above without any liability by us to pay such monetary portion that you shall become legally obligated to pay because of any damages, judgment or settlement, including punitive damages.  The $100,000 "defense costs" provided under this Endorsement is part of and not in addition of the Limits of Liability stated in the Declarations.

    **c.**  Paragraph **a.**, above, shall not apply to that portion of any "claim" seeking to recover "loss" for alleged "discrimination" or "retaliation" by an Insured.

**SECTION IX – DEFINITIONS**, 2. is deleted in its entirety and replaced by the following solely for the purposes of the coverage provided by this Endorsement:

    **2.**    "Claim" means a written demand received by the insured alleging damages or the filing of a lawsuit, or a federal, state or local administrative proceeding alleging violation of federal, state or local wage and hour laws or regulations.  However,

*by* _____
Authorized Representative

## Houston Casualty Company
### Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2018** | **AV Builder Corporation; ReStorCorp** | **H718-920263** | **EP 526** |

"claim" does not include (1) labor or grievance arbitration subject to a collective bargaining agreement; (2) criminal charges or proceeding; or (3) any regulatory or administrative investigation or audit.

**Increased Retention Applies**

The coverage afforded by this Endorsement is subject to a separate Retention of $25,000.00, which applies to any "claim(s)" for, based upon, arising out of or in any way involving one or more allegations of violations of federal, state or local wage and hour laws or regulations. The Retention set forth by this Endorsement applies even in the event that any portion of such "claim(s)" otherwise involves an "insured event."

**Additional Premium: $0.00**

This Endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

EP 526  12.13

Page 2 of 2

**AVB 000088**

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2018** | **AV Builder Corporation; ReStorCorp** | **H718-920263** | **TRIA (2015)** |

> **This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.**

## THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.

### POLICYHOLDER DISCLOSURE NOTICE
### TERRORISM RISK INSURANCE ACT OF 2015
### PREMIUM NOTICE

Your policy contains coverage for certain losses caused by terrorism.  In accordance with the federal Terrorism Risk Insurance Act, we are required to provide you with a notice disclosing the portion of your premium, if any, attributed to coverage for terrorist acts certified under the Terrorism Risk Insurance Act. The portion of your premium attributed to such coverage is show in the Schedule of this endorsement or in the policy Declarations.

The United States Government, Department of the Treasury, will pay a share of terrorism losses insured under the federal program. The federal share equals a percentage (as shown in Part II of the Schedule of this endorsement) of that portion of the amount of such insured losses that exceeds the applicable insurer retention. However, if aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year, the Treasury shall not make any payment for any portion of the amount of such losses that exceeds $100 billion.

If aggregate insured losses attributable to terrorist acts certified under the Terrorism Risk Insurance Act exceed $100 billion in a calendar year and we have met our insurer deductible under the Terrorism Risk Insurance Act, we shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case insured losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

---

**SCHEDULE- PART I**

**Terrorism Premium (Certified Acts): $ 0.00**

---

by _____
Authorized Representative

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| **08/19/2018** | **AV Builder Corporation; ReStorCorp** | **H718-920263** | **TRIA (2015)** |

**SCHEDULE-PART II**

Federal share of terrorism losses 85% Year: 2015
Federal share of terrorism losses 84% Year: 2016
Federal share of terrorism losses 83% Year: 2017
Federal share of terrorism losses 82% Year: 2018
Federal share of terrorism losses 81% Year: 2019
Federal share of terrorism losses 80% Year: 2020

Please be advised that the actual coverage provided by your Policy for acts of terrorism, as is true for all coverages, is limited by terms, conditions, exclusions, limits, other provisions of your Policy, any endorsements to the Policy and generally applicable rules of law.

All other terms and conditions remain unchanged.

by _[signature]_
Authorized Representative

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 530 |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY.  PLEASE READ IT CAREFULLY.**

### CLAIMS MADE & REPORTED COVERAGE
### WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT

This Endorsement modifies the Policy as follows:

**SECTION VII - WHEN COVERAGE IS PROVIDED**, paragraph **1.** is deleted in its entirety and replaced with the following:

**SECTION VII - WHEN COVERAGE IS PROVIDED**

1. **Claims Made and Reported Coverage**.  This Policy applies only to "claims" first made or brought against you and reported to us, in writing, within the Policy Period set forth on the Declarations page of this Policy or any Limited or Extended Reporting Period (if applicable).

   A "claim" will be considered first made or brought on the date we or any insured receives a written "claim" whichever comes first.

   All "claims" because of "one insured event" will be considered to have been made or brought on the date that the first of those "claims" was made or brought.  Any "claim" arising out of an "insured event" reported to us pursuant to paragraph 2. will be deemed first made on the date notice of the "insured event" was given to us.

Further, **SECTION VI - CONDITIONS**, paragraphs **2.a.** and **2.b.** are deleted in their entirety and replaced with the following:

**SECTION VI-CONDITIONS**

2. Duties in the event of a "claim" or "suit."

EP 530  01/15

Page 1 of 2

**AVB 000091**

## Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 530 |

    a.   You must see to it that we receive written notice of a "claim" as soon as practicable, but in no event later than sixty (60) days after your actual notice or receipt of the "claim," or thirty (30) days after the expiration, termination, or cancellation of the Policy or any Extended Reporting Period, whichever comes first.  Notice should include:

        (1)    The identity of the person(s) alleging "discrimination," "harassment" or "inappropriate employment conduct;"

        (2)    The identity of the insured(s) who allegedly committed the "discrimination," "harassment" or "inappropriate employment conduct;"

        (3)    The identity of any witness to the alleged "discrimination," "harassment" or "inappropriate employment conduct;"

        (4)    The date the "insured event" took place; and

        (5)    The written charge, complaint or demand as applicable.

    b.   If a "suit" is brought against any insured, you must see to it that we receive written notice of such "suit," including the specifics of the "suit" and the date received, as soon as practicable, but in no event later than sixty (60) days after your actual notice or receipt of the "suit," or thirty (30) days after the expiration, termination, or cancellation of the Policy or any Extended Reporting Period, whichever comes first.

This Endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _____
Authorized Representative

EP 530  01/15

Page 2 of 2

**AVB 000092**

AVB MSJ Appendix P. 088

# Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 00IM |

> This insurance is issued pursuant to the California Insurance Code, Sections 1760 through 1780, and is placed in an insurer or insurers not holding a Certificate of Authority from or regulated by the California Insurance Commissioner.

**THIS ENDORSEMENT CHANGES YOUR POLICY. PLEASE READ IT CAREFULLY.**

**IMMIGRATION COVERAGE EXTENSION/DEFENSE SUB-LIMIT**

**In consideration of the premium charged, it is agreed that:**

If the Insured(s) become legally obligated to pay a "claim" for which coverage is afforded otherwise under this policy alleging violations of the Immigration Reform Control Act of 1986 ("IRCA") or any other similar federal, state or local laws or regulations (collectively "immigration practices laws") which is first made against any Insured in accordance with Sections VII. (WHEN COVERAGE IS PROVIDED) and VIII. (COVERAGE TERRITORY) of the Policy, we will pay "defense costs".

The coverage afforded by this Endorsement shall apply solely to "defense costs" and is subject to a sub-Limit of Liability of $50,000 in the aggregate for all "claims" made during the Policy Period, which is part of and not in addition to the Limit of Liability set forth in the Declarations. The Retention set forth in the Declarations applies to each "claim" for which coverage is provided by this Endorsement. In no event shall the sub-limit provided for by this Endorsement (or the coverage provided for herein) apply to any "loss" incurred in connection with any "claim" alleging violations of "immigration practices laws," and in no event shall we be obligated to pay more than the Limit of Liability set forth in the Declarations.

Notwithstanding the above, no coverage shall be available for any "claim" alleging violations of any "immigration practices laws," which arises from any potential "claim" or circumstances of which any "management or supervisory employee," in-house counsel, any employee(s) within the HR or Risk Management department, or employee(s) with personnel and risk management responsibilities had knowledge prior to the inception date of this Policy Period.

Coverage pursuant this Endorsement is conditioned upon the Insured's compliance with the rules and regulations promulgated by the Department of Homeland Security ("DHS") and the U.S. Immigration and Customs Enforcement ("ICE") concerning responses to Social Security Administration Employee Correction Requests ("no match letters") or the DHS Notice of Suspect Documents.

by _____
Authorized Representative

EP 00IM

Page 1 of 2

**AVB 000093**

### Houston Casualty Company
Houston, TX

| Endorsement Effective Date | Policyholder | Policy Number | Endorsement |
|---|---|---|---|
| 08/19/2018 | AV Builder Corporation; ReStorCorp | H718-920263 | EP 00IM |

This Endorsement changes the Policy to which it is attached effective on the inception date of the Policy unless a different date is indicated above. All other terms and conditions of this Policy remain unchanged.

by _(signature)_
Authorized Representative

EP 00IM                      Page 2 of 2
                             **AVB 000094**

 **TOKIO MARINE** **HCC**

# Employment Practices Liability Insurance Renewal Application

## Section A. General Information

**1.** Name of Insured:

*A V Builder Corp and ReStorCorp*

If there are other entities for which coverage under this Policy is requested, please provide their name(s) prior to binding coverage and complete the Additional Insured/Location schedule.

**2.** Address of Named Insured (physical address required, no P.O. Box):

*6373 Nancy Ridge Dr., San Diego, CA 92121*

| | |
|---|---|
| **3.** Federal Tax Classification: C Corp___ S Corp ✓ Partnership___ LLC (C Corp)___ LLC (S Corp)___ Partnership___ Other: | **4.** Years in Operation: *37* |
| **5.** Nature of Business: *General Contractor* | **6.** Website: *WWW.AVBUILDER.COM* |
| **7.** Contact Name: *Laura Dusina* | **8.** Telephone: *858-622-9200* |
| **9.** Fax: *858-622-9299* | **10.** Email Address: *Ldusina@AVBuilder.com* |
| **11.** Is your company a franchise? ___Yes ✓No | **11a.** If yes, please provide the name of the franchise: |

**12.** Total Number of Employees:
a. Full Time: *70* Part Time:___ Seasonal:___ Temporary:___ Union Full Time:___ Union Part Time:___

**Please do not include independent contractors or leased workers in the above employee counts. See below**

| | |
|---|---|
| **13.** Does your organization use Independent Contractors? | |
| a. If you are seeking coverage for Independent Contractors, please indicate the total number: | ___Yes ✓No |
| **14.** Does your organization use Leased Workers? | ___Yes ✓No |
| If you are seeking coverage for Leased Workers, please indicate the total number and provide the name of the Leasing Firm: | |
| a. Number of Leased Workers:___     b. Name of Leasing Firm: | |
| **15.** Indicate the number of employees whose annual income is greater than $100,000: *1* | |
| **16.** Total Number of Locations: *2* (If more than one, you must fully complete the Additional Insured/Location schedule) | |

**17.** Provide the turnover rate (%) for the past three years: *60* 20*17* *60* 20*16* *60* 20*15*

| | |
|---|---|
| **18.** If applicable, how many involuntary terminations within the past 12 months? | *3* |
| a. Of those, how many individuals were senior managements, officers/directors or partners? | *0* |
| **19.** If applicable, how many resignations of senior management/ officer/ partner within the past 12 months? | *1* |
| **20.** Do you anticipate any work force reduction or lay-offs within the next 12 months? | ___Yes ✓No |

## Section B. Human Resources

| | |
|---|---|
| **1.** Does your company have a Human Resources or Personnel Department? | ✓Yes ___No |
| **2.** Do you train all your managers and supervisors on HR related issues, including prohibited harassment and discrimination? | ✓Yes ___No |
| **3.** Have you adopted and implemented anti-sexual harassment policies and written procedures? | ✓Yes ___No |
| **4.** Do you have an EEO Statement or have you adopted and implemented anti-discrimination policies and developed written procedures? | ✓Yes ___No |
| **5.** Does your company have an Employee Handbook? | ✓Yes ___No |

**AVB 000095**

## Section C. Acquisitions/ Mergers/ Closures

| | | |
|---|---|---|
| 1. Have you acquired another entity or organization, or have you had any other organizational or structural changes during the past 12 months? | __Yes | _✓_No |
| a. If yes, did you terminate any employees or officers? | __Yes | __No |
| 2. Are there any plans to merge with or acquire any entities or organizations, or are there any plans for organizational or structural changes within the next 12 months? | __Yes | _✓_No |
| a. If yes, do you plan to terminate any employees or officers? | __Yes | __No |

## Section D. Third Party Discrimination & Sexual Harassment Coverage

| | | |
|---|---|---|
| 1. Do you have written procedures for handling complaints of discrimination and sexual harassment from a person other than an employee? | _✓_Yes | __No |
| 2. Are your facilities designed to accommodate the disabled in compliance with the Americans with Disabilities Act (ADA) of 1990 and the Americans With Disabilities Act Accessibility Guidelines (ADAAG)(collectively "ADA")? | _✓_Yes | __No |
| a. If yes, do you anticipate that your facilities will be in compliance with ADA for the next twelve (12) months? | _✓_Yes | __No |

## Section F. Representations and Important Notices

The undersigned, acting on behalf of all Insureds, declare that the statements set forth herein are true and correct and that thorough efforts have been made to obtain sufficient information from each and every Insured proposed for this insurance to facilitate the proper and accurate completion of this Application.

The undersigned agree that the particulars and statements contained in the Application and any material submitted herewith are their representations and that they are material and are the basis of the insurance contract. The undersigned further agree that the Application and any material submitted herewith shall be considered attached to and a part of the Policy. Any material submitted with the Application shall be maintained on file (either electronically or paper) with the Insurer and shall be deemed to be attached hereto as if physically attached.

It is further agreed that:

- If any significant change in the condition of the applicant is discovered between the date of this Application and the Policy inception date, which would render this Application inaccurate or incomplete , notice of such change will be reported in writing to the Insurer immediately;
- Any Policy, if issued, will be in reliance upon the truth of such representations; provided, however, with respect to such statements and representations, no knowledge or information possessed by any Insureds shall be imputed to any other Insureds. If any person or persons knew as of the Policy inception date that such declarations and statements contained in the Application(s) were untrue, inaccurate or incomplete, then this Policy will be void as to that person or persons. However, if the Chairperson of the Board of Directors, President, Chief Executive Officer, or Chief Financial Officer of the Insured Entity knew as of the Policy inception date that such declarations and statements contained in the Application(s) were untrue, inaccurate or incomplete, the this Policy will be void as to that person or persons and the Insured Entity;
- This Application has been completed as respects the entire Insured Entity;
- The signing of this Application does not bind the undersigned to purchase the insurance.

EPL Application 01/15

Page **2** of 5

**AVB 000096**

---

Applicant's Authorized Signature of the President, Chief Executive Office, or equivalent position

Signature: _____  Date: __6/7/19__

Printed Name: _ANTONIO MADUREIRA_____  Title: _____

Producing Broker: _____  License No.: _____

---

**APPLICABLE TO NEW YORK:**
Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime, and shall also be subject to a civil penalty not to exceed five thousand dollars and the stated value of the claim for each such violation.

**General Statement:**
Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime and subjects the person to criminal and civil penalties. (Not applicable in CO, DC, FL, HI, KS, MA, MN, NE, NY, OH, OK, OR, VT or WA – for those states see their statements below.) (In LA, ME, TN, and VA, insurance benefits may also be denied.)

**APPLICABLE IN COLORADO:**
It is unlawful to knowingly provide false, incomplete, or misleading facts or information to an insurance company for the purpose of defrauding or attempting to defraud the company. Penalties may include imprisonment, fines, denial of insurance, and civil damages. Any insurance company or agent of an insurance company who knowingly provides false, incomplete, or misleading facts or information to a policy holder or claimant for the purpose of defrauding or attempting to defraud the policy holder or claimant with regard to a settlement or award payable from insurance proceeds shall be reported to the Colorado Division of Insurance within the Department of Regulatory Agencies.

**APPLICABLE IN THE DISTRICT OF COLUMBIA:**
WARNING: It is a crime to provide false or misleading information to an insurer for the purpose of defrauding the insurer or any other person. Penalties include imprisonment and/or fines. In addition, an insurer may deny insurance benefits, if false information materially related to a claim was provided by the applicant.

**APPLICABLE IN FLORIDA:**
Any person who knowingly and with intent to injure, defraud, or deceive any insurer files a statement of claim or an application containing any false, incomplete, or misleading information is guilty of a felony of the third degree.

**APPLICABLE IN HAWAII:**
For your protection, Hawaii law requires you to be informed that presenting a fraudulent claim for payment of a loss or benefit is a crime punishable by fines or imprisonment, or both.

**APPLICABLE IN KANSAS:**
Any person who, knowingly and with intent to defraud, presents, causes to be presented or prepares with knowledge or belief that it will be presented to or by an insurer, purported insurer, broker or any agent thereof, any written statement as part of, or in support of, an application for the issuance of, or the rating of an insurance policy for personal or commercial insurance, or a claim for payment or other benefit pursuant to an insurance policy for commercial or personal insurance which such person knows to contain materially false information concerning any fact material thereto, or conceals, for the purpose of misleading, information concerning any fact material thereto commits a fraudulent insurance act.

**APPLICABLE IN MASSACHUSETTS, NEBRASKA, OREGON AND VERMONT:**
Any person who knowingly and with intent to defraud any insurance company or another person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading information

---

EPL Application 01/15

**AVB 000097**

concerning any fact material thereto, may be committing a fraudulent insurance act, which may be a crime and may subject the person to criminal and civil penalties.

APPLICABLE IN MINNESOTA:
Any person who files a claim with intent to defraud or helps commit a fraud against an insurer is guilty of a crime.

APPLICABLE IN OHIO:
Any person, who, with intent to defraud or knowing that he/she is facilitating a fraud against an insurer, submits an application or files a claim containing a false or deception statement is guilty of insurance fraud.

APPLICABLE IN OKLAHOMA:
WARNING: Any person who knowingly, and with intent to injure, defraud or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

APPLICABLE IN WASHINGTON:
It is a crime to knowingly provide false, incomplete, or misleading information to an insurance company for the purpose of defrauding the company.  Penalties include imprisonment, fines, and denial of insurance benefits.

APPLICABLE IN MARYLAND:

Any person who knowingly or willfully presents a false or fraudulent claim for payment of a loss or benefit or who knowingly or willfully presents false information in an application for insurance is guilty of a crime and may be subject to fines and confinement in prison.

**AVB 000098**

# EMPLOYMENT PRACTICES LIABILITY INSURANCE

## LOCATION AND EMPLOYEE INFORMATION SCHEDULE

**INSTRUCTIONS:**
List all locations to be covered by the policy for which you are applying. Please note all entities must have a majority ownership of 50%+ by the Named Insured

| | Entity Name | Entity Address | Nature of Business | Employees Full Time | Employees Part Time |
|---|---|---|---|---|---|
| 1. | A V Builder Corp | 6373 Nancy Ridge Drive San Diego, CA 92121 | General Contracting | 42 | |
| 2. | ReStorCorp | 6373 Nancy Ridge Drive San Diego, CA 92121 | General Contracting | 8 | |
| 3. | A V Builder Corp | 7316 E. 6th Avenue Scottsdale, AZ 85251 | General Contracting | 10 | |
| 4. | ReStorCorp | 7316 E. 6th Avenue Scottsdale, AZ 85251 | General Contracting | 10 | |
| 5. | | | | | |
| 6. | | | | | |
| 7. | | | | | |
| 8. | | | | | |
| 9. | | | | | |
| 10. | | | | | |
| | | | Totals | 70 | |

*I understand the Location and Employee Information Schedule form will become part of my organization's Employment Practices Liability Application and is subject to the same representations and conditions.*

**AVB 000099**

AVB MSJ Appendix P. 095


**TOKIO MARINE HCC**

*Employment Practices Liability Insurance*

Houston Casualty Companies/ U.S. Specialty Insurance Company

## WAGE & HOUR SUPPLEMENTAL APPLICATION

*Eligibility is subject to completion of the Wage and Hour Supplemental Application and underwriter approval. No backdating allowed for this coverage. Coverage must be elected at time of binding.*

| | | | |
|---|---|---|---|
| 1. | In the past five (5) years has any current or former employee made or threatened a claim for any violation of wage and hour laws, including but not limited to, claims related to meal periods, rest periods or unpaid overtime? If yes, please describe the outcome and how you have changed your practice to prevent claims (attach explanation if needed). | Yes ☐ | No ☑ |
| **Question 2 does NOT apply to current HCC renewals that have Wage & Hour coverage** | | | |
| 2. | Does any manager, supervisor, shareholder, partner or owner within your organization have knowledge of a potential violation of any wage and hour law that could result in a claim for any violation of wage and hour laws, including but not limited to, claims related to meal periods, rest periods or unpaid overtime? | Yes ☐ | No ☐ |
| 3. | In the last 3 years, has any insured received from the Department of Labor or similar federal, state or local agency notice of an audit or other regulatory or administrative investigation related to compliance with or violation of any federal, state or local wage and hour laws? | Yes ☐ | No ☑ |
| 4. | Are all your full time employees allowed to take a meal period of at least 30 minutes during which they are relieved of all duties? | Yes ☑ | No ☐ |
| **Questions 5–7 apply only to employers with employees located in CALIFORNIA:** | | | |
| 5. | Do any of your employees take on–duty meal periods? | Yes ☐ | No ☑ |
| 6. | Are all employees allowed to take a rest period of 10 minutes or more in the middle of each 4 hour work period? | Yes ☑ | No ☐ |
| 7. | Do all salaried employees receive a salary of at least two times the minimum wage per week that is not subject to reduction based on the number of hours they work? | Yes ☑ | No ☐ |
| **Question 8 applies only to employers with employees located in NEW YORK:** | | | |
| 8. | Do all salaried employees receive a salary of at least: $600.00/week on or after December 31, 2013; $656.25/week on or after December 31, 2014; and $675/week on or after December 31, 2015 | Yes ☐ | No ☐ |
| **Question 9 applies only to employers with employees located in NEW JERSEY:** | | | |
| 9. | Do all salaried employees receive a salary of at least $455 per week that is not subject to reduction based on the number of hours they work? | Yes ☐ | No ☐ |

I represent after full investigation and inquiry that the statements set forth are true and complete. I understand the information on this form will become a part of my organization's Employment Practices Liability Application and is subject to the same representations and conditions.

Applicant's Signature: _____ Date: 12 - 7 - 13



# EMPLOYMENT PRACTICES LIABILITY INSURANCE CLAIMS MADE AND REPORTED POLICY FORM

This Policy Form applies to the following Tokio Marine HCC Companies:

- HOUSTON CASUALTY COMPANY
- U.S. SPECIALTY INSURANCE COMPANY
- HCC SPECIALTY INSURANCE COMPANY

EP 0001 12/01

**AVB 000101**

# EMPLOYMENT PRACTICES LIABILITY INSURANCE CLAIMS-MADE POLICY FORM

## PLEASE READ THE ENTIRE POLICY CAREFULLY

**IMPORTANT NOTICES:**

1.    THIS IS A CLAIMS-MADE POLICY.

2.    DEFENSE COSTS ARE INCLUDED WITHIN THE POLICY LIMITS AND ARE INCLUDED WITHIN THE RETENTION.

3.    THIS POLICY IS SUBJECT TO A TOTAL POLICY LIMIT FOR ALL INSURED EVENTS (POLICY AGGREGATE LIMIT).

4.    VARIOUS PROVISIONS IN THIS POLICY RESTRICT COVERAGE. READ THE ENTIRE POLICY CAREFULLY TO DETERMINE YOUR RIGHTS, DUTIES AND WHAT IS AND IS NOT COVERED.

**THE FORMAT OF THIS POLICY**

Throughout this Policy the words "you" and "your" refer to the Named Insured shown in the Declarations and any other person or organization qualifying as an insured under this Policy. The words "we", "us" and "our" refer to the insurance company shown is the Declarations who is the **"Underwriter"** providing this insurance.

The word "insured" means any person or organization qualifying as such under **WHO IS AN INSURED (SECTION III)**.  The special meaning of other words and phrases that appear in quotation marks (") are defined in **DEFINITIONS (SECTION IX)** of this Policy.

To assist in finding major sections of this Policy, headings and subheadings appear in capital bold letters. The descriptions in these headings and subheadings are solely for convenience, and form no part of the terms, conditions, limitations and exclusions of this Policy.

## SECTION I - COVERAGE

1.   **Insuring Agreement**

  a.   This Policy covers "discrimination", "harassment" and "inappropriate employment conduct" liability within the terms, conditions, limitations and exclusions set forth below. It has been issued in reliance upon statements made to us in the "application".

  b.   We will pay "loss" that the insured is legally obligated to pay because of an "insured event" to which this Policy applies. However, the amount we will pay is limited as described in the **LIMITS OF INSURANCE (SECTION IV)**, and **RETENTION (SECTION V)** sections.

  c.   This Policy applies only if:

   (1)   a "claim" because of an "insured event" is first made against any insured in accordance with the **WHEN COVERAGE IS PROVIDED (SECTION VII)** and **COVERAGE TERRITORY (SECTION VIII)** sections; and

   (2)   a potential "claim" is first reported in accordance with the **WHEN COVERAGE IS PROVIDED (SECTION VII)** and **COVERAGE TERRITORY (SECTION VIII)** sections; and

   (3)   the "claim" is first reported in accordance with the **WHEN COVERAGE IS PROVIDED (SECTION VII)** and **COVERAGE TERRITORY (SECTION VIII)** sections, and

   (4)   the "insured event" does not arise from any potential "claim" or circumstances of which any "management or supervisory employee" had knowledge prior to the effective date of the first Employment Practices Liability Insurance policy issued by us to the insured and continuously renewed and maintained in effect to the inception date of this Policy.

2.   **Defense**

  We have the right and duty to defend any "claim" for an "insured event" made or brought against any insured to which this Policy applies. We have no duty to provide other services or take other actions. Our duty to defend any "claim" ends when the applicable limit of insurance has been exhausted by payment of "loss" and/or "defense costs" under this Policy.

  You may take over control of any outstanding "claim" previously reported to us only if we both agree that you should, or if a court orders you to do so.

  If one or more of the applicable **LIMITS OF INSURANCE** shown in the Declarations is/are exhausted, we will notify you of all outstanding "claims" so that you can take over control of their defense. We will help transfer control to you.

  During the transfer of control, we agree to take whatever steps are necessary to continue the defense of any outstanding "claim" and avoid a default judgment. If we do so, you agree that we do not waive or give up any of our rights. You also agree to pay reasonable expenses we incur for taking such steps after the **LIMITS OF INSURANCE** are exhausted.

AVB MSJ Appendix P. 099

3.  **Optional Defense of Criminal Proceedings**

At your request we shall have the option, but not the duty, to defend any criminal proceedings brought against any insured.  Should we at our sole discretion exercise the option to defend any criminal proceeding, any "defense costs" incurred therein shall reduce and may exhaust the applicable **LIMITS OF INSURANCE**.  The exercise of the option to defend any criminal proceeding shall not serve to render us liable for any other "loss incurred in connection with any criminal proceedings, and we shall retain the right to withdraw from the defense upon giving you thirty (30) days notice.  Whether or not we exercise the option to defend criminal proceedings, we shall defend, subject to this Policy's terms, conditions, limitations and exclusions, any civil proceeding brought against an insured which alleges the same or similar "insured events" as a criminal proceeding,

4.  **Defense Counsel (Attorney) Selection**

a.  We have the right and duty to select and appoint an attorney to defend you against any "suit" other than for criminal proceedings. This attorney will be the "Panel Defense Counsel" selected by you when you applied for this Policy or by mutual agreement another attorney listed on our current "Panel Defense Counsel" list.

b.  If you do not desire to accept the services of our appointed attorney or another attorney from our current "Panel Defense Counsel" list, you may retain another attorney, subject to our prior approval and the following modifications in the conditions of this Policy. If you elect to use an attorney other than one selected from our current "Panel Defense Counsel" list, then the Policy **RETENTION** indicated in the Declarations for this coverage will double in amount (i.e., a $5,000 retention will be $10,000) and a "co-payment" will apply.

5.  **Duty to Pay**

a.  We have the duty to pay any "loss" in excess of the **RETENTION** that the insured becomes legally obligated to pay as a result of a "claim" based upon an "insured event" to which this Policy applies. Our duty to pay ends when the available **LIMITS OF INSURANCE** have been exhausted. We will not pay more than the applicable **LIMITS OF INSURANCE**.

b.  We have the duty to pay "defense costs", in excess of the **RETENTION**, incurred for the defense of any "claim" controlled by us. Payment of "defense costs" is included in the **LIMITS OF INSURANCE**.  "Defense Costs" are **NOT** in addition to the **LIMITS OF INSURANCE**.

c.  We will pay "defense costs" before we pay any damages from an "insured event".

6.  **Consent to Settle**

We have the right to investigate and settle any "claim" in the manner and to the extent that we believe proper, however, we will not settle any "claim" without your consent. If you refuse to consent to any settlement recommended by us or our representatives and you elect to contest or continue any legal proceedings, then our liability shall not exceed the amount for which the "claim" could have been settled including "defense costs" approved by us, up to the date of such refusal.

However, in the event "Panel Defense Counsel" is defending, then our liability for all "loss" on account of such "claim" shall not exceed: (1) the amount for which we could have settled such "claim" plus "defense costs" incurred as of the date such settlement was proposed in writing by us, ("Total Settlement Amount"), plus (2) 50% of covered "loss" in excess of such Total Settlement Amount, it being a condition of this Policy that the remaining 50% of such "loss" excess of the Total Settlement Amount shall be carried by you at your own risk and be uninsured.

## SECTION II - EXCLUSIONS

**1.      Workers' Compensation**

This Policy does not cover any "loss" arising out of any obligation under any workers' compensation, disability benefits or unemployment compensation law, or any similar law.

This exclusion does not, however, apply to any "claim" for "retaliation" or "discrimination" or "inappropriate employment conduct" on account of the filing of a workers' compensation claim or a claim for disability benefits.

**2.      Contractual Liability**

This Policy does not cover any "loss" which any insured is obligated to pay by reason of the assumption of another's liability for an "insured event" in a contract or agreement.

This exclusion does not apply to liability for damages because of an "insured event" that any insured would have without the contract or agreement.

**3.      Employee Retirement Income Security Act (ERISA)**

This Policy does not cover any "loss" imposed on any insured under the Employee Retirement Income Security Act of 1974, or any amendment thereto.  This includes fiduciary liability, liability arising out of the administration of any employee benefit plan and any other liability under any such law.

This exclusion does not apply, however, to any "claim" for "retaliation" under section 510 of ERISA.

**4.      Strikes and Lockouts**

This Policy does not cover any "loss" arising out of a strike, lockout, picket line, replacement or other similar action resulting from labor disputes or labor negotiations, or any protections contained within the National Labor Relations Act.

**5.      Consequential Loss**

This Policy does not cover any direct, indirect or derivative "loss" to any claimant's domestic partner, spouse, child, parent, brother, sister, step-parent, step-brother or step-sister as a consequence of an "insured event."

6.    **Workers' Adjustment and Retraining Notification Act**

This Policy does not cover any "loss" arising out of the Workers' Adjustment and Retraining Notification Act, Public Law 100-379 (1988) or any amendment thereto, or any similar federal, state or local law.

7.    **Major Stockholders**

If the Named Insured is a corporation this Policy does not cover any "loss" arising out of a claim made by any "employee" who owns or controls twenty-five percent (25%) or more of the voting stock of the Named Insured.

8.    **Family Members**

If the Named Insured is an individual, a partnership with less than ten (10) partners, or a corporation with less than ten (10) stockholders this Policy does not cover any "loss" arising out of a "claim" made by any "employee" who is a domestic partner, spouse, child, parent, brother, sister, step-parent, step-brother or step-sister of:

    a.   the Named Insured listed in the Declarations;

    b.   any individual who owns or controls, directly or indirectly, more than 50% of the voting stock of the Named Insured; or

    c.   the trustees or beneficiaries of any trust created by the Named Insured, any individual described in paragraph b. or their relatives or representatives.

This exclusion shall apply, but is not limited to, any estate proceedings and divorce proceedings.

9.    **Bodily Injury**

This Policy does not cover any "loss" based upon bodily injury, sickness, disease or death of any person, or loss of use or economic benefits resulting therefrom.  This exclusion, however, does not apply to emotional distress, humiliation, mental injury or mental anguish resulting from an "insured event".

10.   **Comprehensive Omnibus Budget Reconciliation Act (COBRA)**

This Policy does not cover any "loss" imposed on any insured under the Comprehensive Omnibus Budget Reconciliation Act of 1985, or any amendment thereto.

This exclusion does not apply, however, to any "claim" for "retaliation" or "discrimination" or "inappropriate employment conduct" on account of the filing of a claim for benefits under COBRA.

11.   **Wage and Hour Laws**

This Policy does not cover any "loss" based upon or arising out of any private, governmental or administrative "claim" or "suit" alleging violation of federal, state or local wage and hour laws or regulations, including, but not limited to, any laws or regulations concerning monetary

or non-monetary compensation or benefits that may be owed to a past or present "employee" based upon a misclassification of their job status, title or duties.

This exclusion shall not apply, however, to any such "claim" or "suit" seeking to recover "loss" for alleged "discrimination" or "retaliation" by an "insured".

## SECTION III - INSURED

1.  **If you are designated in the Declarations as:**

    a.  An individual, you and your spouse are insureds, but only with respect to the conduct of a business of which you are the sole owner.

    b.  A partnership or joint venture, you are an insured. Your members, your partners, and their spouses are also insureds, but only with respect to the conduct of your business.

    c.  A limited liability company, you are an insured. Your members are also insureds, but only with respect to the conduct of your business.

    d.  An organization other than a partnership, joint venture or limited liability company, you are an insured. Your stockholders are also insureds, but only with respect to their liability as stockholders for the conduct of your business.

2.  **Each of the following is also an insured:**

    a.  Your "management and supervisors" and "employees," are insureds, but only for the conduct of your business within the scope of their employment. Your "management and supervisors" and "employee's" status as an insured will be determined as of the date of the "discrimination," "harassment" or "inappropriate employment conduct" which caused the "insured event."

    b.  Any organization that you newly acquire, form or merge with while this Policy is in effect is an insured if you own at least fifty-one percent (51%) of it, but no newly acquired or formed or merged organization is covered for more than sixty (60) days or the remainder of the Policy Period, whichever is less, from the date that you acquire or form it, or for "loss" that results from an "insured event" that happened or commenced before you acquired or formed it, or for "loss" covered under any other insurance unless agreed by us within such sixty (60) day period. We may require an additional premium for any individuals who become "employees" as a result of such acquisition or formation or merger.

        This paragraph does not apply to a partnership, joint venture, or to any organization once it is shown in the Declarations.

    c.  If a "claim" against an individual insured under this Policy includes a "claim" against the lawful spouse of such insured solely by reason of :

        (1)  Status as a spouse, or

        (2)  Such spouse's ownership interest in property or assets that are sought as recovery for an "insured event"

any "loss" for which such spouse becomes legally obligated to pay on account of such "claim" shall be deemed a "loss" which such insured of the spouse becomes legally obligated to pay as a result of such "claim".

All terms, conditions, limitations and exclusions of this Policy applicable to "loss" sustained by such individual insured in the "claim" shall also apply to such spouse's "loss".

This extension of coverage shall not apply to the extent the "claim" alleges any wrongful act or omission by such spouse.

## SECTION IV - LIMITS OF INSURANCE

1.  The **LIMITS OF INSURANCE** shown in the Declarations and the provisions contained in this section establish the most we will pay regardless of the number of:

    a.  Insureds;

    b.  "Claims" made; or

    c.  Persons or organizations making "claims."

2.  **Each Claim Limit**

    This is the most we will pay for "claims" made or brought during the Policy Period for "loss" that results from any "one insured event" regardless of the number of "claims."

3.  **Total Policy Limit for All Claims (Policy Aggregate Limit)**

    This is the most we will pay for the combined total of all "claims" first made or brought during the Policy Period.

4.  **How the LIMITS OF INSURANCE apply to an extension of the Policy Period.**

    If the Policy Period is extended after issuance for an additional period, the additional period will be deemed part of the past preceding period for purposes of determining the limits of liability. Accordingly, the extension of the Policy Period will in no way increase the limits of liability.

5.  **Allocation of "Defense Costs"**

    In the event that any portion of a "claim" does not come within the coverage afforded by this Policy, we will be entitled to an allocation of "defense costs" incurred on behalf of the insureds based upon the ratio of the number of counts, causes of actions or allegations for which coverage is afforded under this Policy as compared to the number of such counts, causes of action or allegations which are not within the scope of coverage. We will not be required or obligated to pay that portion of "defense costs" allocated to those counts, causes of action, or allegations which are not within the scope of coverage herein.

## SECTION V - RETENTION

1.  Our obligation to pay under this Policy applies only to the amount of "loss" in excess of the **RETENTION** amount shown in the Declarations and the **LIMITS OF INSURANCE** shown in the Declarations will not be reduced by the amount of such **RETENTION**.

    The applicable **RETENTION** will be decreased by fifty percent (50%) (i.e., a $5,000 **RETENTION** will be $2,500) if one or both of the following conditions are met:

    a.  **Wrongful Termination or Demotion Condition.** For any "claim" alleging wrongful termination or wrongful demotion of an "employee" if prior to the termination or demotion of that "employee" you have consulted with and materially complied with the advice of "Panel Defense Counsel" or a labor law attorney approved by us prior to the termination or demotion of that "employee." This Provision does not apply unless the contact with our appointed attorney is made at least 24 hours prior to the termination or demotion, and the attorney has had a reasonable length of time to respond to the information provided.

    b.  **"Mediation" of "Claims" Condition.** If a "claim" is fully and finally resolved to the satisfaction of all parties, including us, through "mediation," provided that such "mediation" is initiated and concluded and/or abandoned before and not subsequent to commencement of any litigation or arbitration. In the event such "mediation" does not fully and finally resolve the "claim," there shall be no reduction of the **RETENTION** obligation, and all "loss" expenses incurred in the "mediation" shall be included in the total "loss" expenses for the " claim."

2.  You are responsible for the payment of "loss" within the **RETENTION**, including the payment of "defense costs" directly to any law firm(s) that we have retained on your behalf to defend a "claim." At the time a "claim" is reported we will advise you of the name of any law firm(s) we have retained on your behalf and advise them that they are to bill you directly for the **RETENTION** amount.

3.  We may advance on your behalf payment for the amount of an award or settlement that is within the **RETENTION** amount, and you must repay us any such amount promptly upon demand.

4.  The **RETENTION** amount applies separately to each "claim" made.  However, the **RETENTION** amount will only apply once to all "claims" arising out of any "one insured event" regardless of the number of claimants who allege damages.

5.  We have no obligation whatsoever, either to you or to any other person or entity, to pay all or any portion of the **RETENTION** amount, except as indicated in Item 3 above. We will, however, at our sole discretion, have the right and option to do so, in which event you must repay us any such amount promptly upon demand.

## SECTION VI - CONDITIONS

We have no duty to provide coverage under this Policy unless there has been full compliance with all the conditions contained in this Policy.

1.  **Cancellation**

    a.  The first Named Insured shown in the Declarations may cancel this policy by mailing or delivering to us advance written notice of cancellation.

    b.  We may cancel this Policy by mailing or delivering to the first Named Insured written notice of cancellation at least:

        (1). 10 days before the effective date of cancellation if we cancel for nonpayment of premium; or

        (2). 30 days before the effective date of cancellation if we cancel for any other reason.

    c.  We will mail or deliver our notice to the first Named Insured's last mailing address known to us.

    d.  Notice of cancellation will state the effective date of cancellation. The Policy period will end on that date.

    e.  If this Policy is cancelled, we will send the first Named Insured any premium refund due. If we cancel, the refund will be pro rata. If the first Named Insured cancels, the refund may be less than pro rata. The cancellation will be effective even if we have not made or offered a refund.

    f.  If notice is mailed, proof of mailing will be sufficient proof of notice.

2.  **Duties in the event of a "claim" or "suit".**

    a.  You must see to it that we or our authorized representative are notified within sixty (60) days or as soon as practicable after a "claim" is made.  Notice should include:

        (1)  The identity of the person(s) alleging "discrimination," "harassment" or "inappropriate employment conduct";

        (2)  The identity of the insured(s) who allegedly committed the "discrimination" or "harassment" or "inappropriate employment conduct;"

        (3)  The identity of any witness to the alleged "discrimination," "harassment" or "inappropriate employment conduct";

        (4)  The date the "insured event" took place; and

        (5)  The written charge, complaint or demand as applicable.

    b.  If a "suit" is brought against any insured, you must:

        (1)  record the specifics of the "suit" and the date received; and

        (2)  immediately see to it that we receive written notice of the "suit".

**c.**   You and any other insured must:

   **(1)**   Send us copies of any demands, notices, summonses or legal papers received in connection with the "claim";

   **(2)**   Authorize us to obtain records and other information;

   **(3)**   Cooperate with us in the investigation or defense of the "claim"; and

   **(4)**   Assist us, upon our request, in the enforcement of any right against any person or organization which may be liable to the insured because of injury or damage to which this Policy may also apply.

**d.**   No insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any expense without our consent. Subsequent payments which are deemed by us as having been prejudiced by any such voluntary payment will also be your sole responsibility.

**3.   Legal Action Against Us**

**a.**   No person or organization has a right under this Policy:

   **(1)**   To join us as a party or otherwise bring us into a "suit" asking for damages from an insured; or

   **(2)**   To sue us on this Policy unless all of its terms have been fully complied with.

**b.**   A person or organization may sue us to recover on an agreed settlement or on a final judgment against an insured obtained after an actual trial or by motion, but we will not be liable for damages that are not payable under the terms of this Policy or that are in excess of the applicable **LIMITS OF INSURANCE**.  An agreed settlement means a settlement and release of liability signed by us, the insured and the claimant or the claimant's legal representative.

**4.   Other Insurance**

If other valid and collectible insurance is available to you for a "loss" we cover under this Policy, our obligations are limited as follows:

**a.   Primary Insurance**

   This Policy is primary insurance except when b. below applies. If this Policy is primary, our obligations are not affected unless any of the other insurance is also primary. Then, we will share with that other insurance by the method described in c. below.

**b.   Excess Insurance**

   This Policy is excess over any other insurance, whether primary, excess, contingent, or any other basis, that is:

   **(1)**   Effective prior to the beginning of the policy period shown in the Declarations of this Policy;

**(2)** Applies on other than a claims-made basis.

When this Policy is excess, we shall have no duty to defend any "claim" that any other insurer defends. If no other insurer defends, we shall undertake to do so, but we shall be entitled to your rights against all those other insurers.

When this insurance is excess over other insurance, we shall pay only our share of the amount of the "loss," if any, that exceeds the sum of:

**(a)** The total amount that all such other insurance would pay for the "loss" in the absence of this insurance; and

**(b)** The total of all deductible and self-insured amounts under all other insurance; and

**(c)** Your **RETENTION** amount.

We shall share the remaining "loss", if any, with any other insurance that is not described in this Excess Insurance provision and was not bought specifically to apply in excess of the **LIMITS OF INSURANCE** shown in the Declarations.

**c.   Method of Sharing**

**(1)** If all of such other insurance permits contribution by equal shares, we will follow this method also. Under this approach each insurer contributes equal amounts until it has paid its applicable limit of liability or none of the "loss" remains, whichever comes first.

**(2)** If any of such other insurance does not permit contribution by equal shares, we will contribute by limits. Under this method, each insurer's share is based on the ratio of its appropriate limits to the limits of liability of all other insurers.

**5.   Calculation of Premium**

**a.   Our Manuals**

Our manual of rules, rates, rating plans and classifications will determine all premium for this policy.  We may change our manuals and apply the changes to this policy if authorized by law or a governmental agency regulating this insurance.

**b.   Premium Adjustment**

Premium adjustment may be made either at the time cancellation is effected or as soon as practicable thereafter, but payment or tender of unearned premium is not a condition of cancellation.

**6.   Premiums**

The first Named Insured shown in the Declarations:

**a.** Is responsible for the payment of all premiums; and

**b.** Will be the payee for any return premiums we pay.

AVB MSJ Appendix P. 108

7. **Representations**

By accepting this Policy, you agree:

a. The statements in the "application" and declarations are accurate and complete;

b. Those statements are based upon representations you made to us; and

c. We have issued this Policy in reliance upon your representations.

8. **Changes**

This Policy contains all the agreements between you and us concerning the insurance afforded. The first Named Insured shown in the Declarations is authorized to make changes in the terms of this policy with our consent. This Policy's terms can be amended or waived only by endorsement issued by us and made a part of this Policy.

9. **Separation of Insureds**

With respect to any "claim" reported under this Policy, knowledge possessed by any one insured shall not be imputed to any other insured.

10. **Subrogation**

If an insured has rights to recover all or part of any payments we have made under this Policy those rights are transferred to us; no insured may do anything after a "loss" to impair them. At our request, such insured will bring suit or transfer those rights to us and help enforce them.

11. **Death, Incapacity or Bankruptcy**

We will not be relieved of our obligations under this Policy because of:

a. The death or incapacity of an insured.

b. Bankruptcy or insolvency of any insured or of any insured's estate.

12. **False or fraudulent claims**

If any insured shall proffer any "claim" knowing the same to be false or fraudulent as regards amount or otherwise, this Policy shall become void and all claims hereunder shall be forfeited as respects that particular insured; however, the policy shall not be voided as to any other insured who was not party to such false and fraudulent claim submission.

13. **Transfer Of Your Rights And Duties Under This Policy**

Your rights and duties under this Policy may not be transferred without our written consent.

**SECTION VII - WHEN COVERAGE IS PROVIDED**

1. **Claims Made Coverage.**  This Policy applies only to "claims" first made or brought against you, while this Policy is in effect or during the Limited Reporting Period or Extended Reporting Period if applicable.

A "claim" will be considered first made or brought on the date we or any insured receives a written "claim" whichever comes first.

All "claims" because of "one insured event" will be considered to have been made or brought on the date that the first of those "claims" was first made or brought. Any "claim" arising out of an "insured event" reported to us pursuant to paragraph 2 will be deemed first made on the date notice of the "insured event" was given to us.

2.   **Notice of potential claim.**   If during the Policy Period, any insured becomes aware of an "insured event" which they reasonably believe may result in a future "claim" and they or the Named Insured or any insured entity provide(s) notice in writing to us of such "insured event" prior to the end of the Policy Period, then any "claim" subsequently arising from such "insured event" shall be deemed to have been made on the date notice of such "insured event" was given to us.  Such notice must describe the "insured event" in reasonable detail and provide the name or names of the potential "claimant(s)."

This Policy provides coverage for potential "claims" reported under this paragraph, provided an actual "claim" is made or "suit" is brought within five (5) years after the end of the Policy Period.

3.   **Limited Reporting Period** means the sixty (60) day period starting with the end of the Policy Period.  Coverage under the Limited Reporting Period applies to "claims" which are first made against the insured during such 60-day period based upon "insured events" which happen prior to the expiration or cancellation of coverage and are otherwise covered by the Policy.

The Limited Reporting Period does not extend the Policy Period nor change the scope of coverage provided. We will consider any "claim" first made or brought during the Limited Reporting Period to have been made on the last date on which this Policy is in effect.

4.   **When the Limited Reporting Period will apply**.   The Limited Reporting Period will apply if this Policy is canceled or not renewed by us or the Named Insured for any reason other than nonpayment of premium. Coverage under the limited reporting period may not be canceled.

However, the Limited Reporting Period will not apply to "claims" if other insurance you buy covers them or would cover them if its limits of coverage had not been exhausted.

5.   **How to add an Extended Reporting Period**. If the Limited Reporting Period applies, an Extended Reporting Period of twelve (12) months can be added by means of an Extended Reporting Period Endorsement and the payment of an additional premium.  Such additional premium shall not exceed one hundred percent (100%) of the annual premium charged for the last Policy Period.  The endorsement sets forth the terms of coverage during the Extended Reporting Period.  Coverage under an extended reporting period is limited to "claims" which are first made against the insured during the extended reporting period based upon "insured events" which happen prior to the expiration or cancellation of coverage and are otherwise covered by the Policy.

The Extended Reporting Period Endorsement will not be issued unless we receive a written request for it within thirty (30) days after this Policy ends. Once that premium is paid, the endorsement may not be canceled and the premium will be fully earned.

AVB MSJ Appendix P. 110

6.    **The LIMITS OF INSURANCE also apply to the Limited and Extended Reporting Periods**. The **LIMITS OF INSURANCE** that apply at the end of the Policy Period are not renewed or increased and the total limits shown in the Declarations shall not be increased by the addition of either limited or extended reporting periods.

## SECTION VIII - COVERAGE TERRITORY

We will defend "claims," or pay judgments or settlements, for "insured events" that happen:

1.    in the United States of America, its territories and possessions, and Puerto Rico; or

2.    anywhere in the world with respect to the activities of a person whose place of employment is in the territory described in 1. above, while he or she is away on your business.

Provided that "claim" is made or "suit" is brought in, and the insured's obligation to pay "loss" is determined on the merits under the substantive federal, state or local law of, the United States, its territories and possessions or Puerto Rico.

## SECTION IX - DEFINITIONS

1.    "Application" means the application attached to and forming part of this Policy, or maintained of record in our file, including any materials submitted in connection with such "application," shall be considered a part of this Policy, as if physically attached.

2.    "Claim" means a written demand received by the insured alleging damages or the filing of a "suit", or any administrative proceeding including but not limited to the Equal Employment Opportunity Commission, or any other state or federal agency or authority with jurisdiction over you.  However, "claim" does not include (1) labor or grievance arbitration subject to a collective bargaining agreement or (2) criminal proceedings.

3.    "Co-Payment" means that after you have paid the applicable **RETENTION** as required, we will only pay ninety percent (90%) of the balance of the "loss" and you will be responsible for ten percent (10%) of the balance of the "loss".

      This definition only applies to **SECTION I, 4.b.** of this Policy and any Endorsement specifically providing for a "Co-Payment".

4.    "Defense Costs" means those reasonable and necessary expenses that result from the investigation, settlement or defense of a specific "claim", including attorney fees and expenses, the cost of legal proceedings, the cost of covered "mediation", the cost of appeal bonds, the cost of bonds to release property being used to secure a legal obligation (but only for bond amounts within the **LIMITS OF INSURANCE** that apply; we have no obligation to furnish such bonds), all reasonable expenses that any insured incurs in court at our request while helping us investigate or defend a "claim" (we will not pay more than $100 per day for earnings lost by the insured because of time taken off work), and all costs taxed against any insured in a "suit".

      However, "defense costs" do not include  salaries and expenses of our employees, including employed attorneys, salaries and expenses of your employees, fees and expenses of independent adjusters we hire, and interest that accumulates on the amount of a judgment.

5.  "Discrimination" means termination of the employment relationship, a demotion or failure or refusal to hire or promote or denial of an employment benefit or the taking of any adverse or differential employment action because of race, color, religion, age, sex, pregnancy, sexual orientation or preference, national origin, or disability including a disability resulting from human immunodeficiency virus (HIV) or acquired immune deficiency syndrome (AIDS), or any other basis prohibited by federal, state or local law.

6.  "Employee" means:

    a.  an individual whose labor or service is engaged by and directed by an insured. This includes "part-time employees," "seasonal employees," "temporary employees," "temporary workers," "interns," "volunteers" and "management or supervisory employees;"

        The term "employee" also includes a former "employee". As respects coverage for former "employees" also refer to **SECTION III – INSURED**, item **2.a.**

    b.  an individual who is a "leased worker" provided such individual shall be deemed an "employee" only if, and to the extent that, you provide indemnification to such individual for services rendered as if they were rendered by an actual "employee" of yours, and the labor leasing firm(s) with whom you have such agreement(s) is(are) scheduled by written endorsement to this Policy; and

    c.  an individual who is an independent contractor contracted to perform services for you; provided that such individual shall be deemed an "employee" only if, and to the extent that you provide indemnification to such individual for services rendered as if they were rendered by an actual "employee" of yours, and provided further that such individual is scheduled by written endorsement to this Policy. This Policy does not cover any "loss" which any insured is obligated to pay to an independent contractor for overtime pay, vacation pay, or any employee benefit.

7.  "Harassment" means, unwelcome sexual or non-sexual advances, requests for sexual or non-sexual favors or other verbal, visual or physical conduct of a sexual or non-sexual nature that:

    a.  is explicitly or implicitly made a condition of employment,

    b.  are used as a basis for employment decisions, or

    c.  create a work environment that interferes with performance.

    "Harassment" includes allegations of assault and battery, but only if they are related to a charge of sexual harassment.

8.  "Inappropriate Employment Conduct" means actual or constructive termination of an employment relationship in a manner which is against the law and wrongful or in breach of an implied agreement to continue employment, including allegations of breach of an implied employment contract and breach of the covenant of good faith and fair dealings in the employment contract, or an employment related incident resulting in one or more of the following offenses:

    **a.**    wrongful demotion or wrongful failure to employ or promote;

    **b.**    wrongful discipline;

    **c.**    wrongful denial of tenure or deprivation of career opportunity;

    **d.**    negligent hiring, supervision or evaluation;

    **e.**    "retaliation";

    **f.**    misrepresentation or defamation;

    **g.**    infliction of emotional distress, humiliation, mental injury or mental anguish;

    **h.**    false arrest, detention or imprisonment; or

    **I.**    libel, slander, defamation of character or any invasion of right of privacy.

    **j.**    employment terminations, disciplinary actions, demotions or other employment decisions which violate public policy or the Family Medical Leave Act or similar state law;

    **k.**    violations of the Uniformed Services Employment and Reemployment Rights Act, however,

"Inappropriate Employment Conduct" does not include severance payments or amounts determined to be owing under a written contract of employment for a definite period of time; however, "defense costs" for "claims" of breach of a written or express contract of employment for a definite period of time are covered.

9.    "Insured Event" means actual or alleged acts of "discrimination," "harassment," and/or "inappropriate employment conduct" by an Insured against an "employee," former "employee," or an applicant seeking employment with the Named Insured.

10.    "Intern" means a person who is an advanced student or recent graduate in a professional field who provides services to the Named Insured or is receiving practical experience from the Named Insured without any express or implied promise of remuneration. Coverage is only extended to "interns" while they are acting at the direction of and within the scope of duties for you.

11.    "Leased worker" means a person leased to you by a labor leasing firm under an agreement between you and the labor leasing firm, to perform duties related to the conduct of your business. "Leased worker" does not include a "temporary worker".

12.    "Loss" means damages, judgments, settlements, statutory attorney fees and "defense costs", including:

    **a.**    prejudgment and post judgment interest awarded against an insured on that part of any judgment paid by us, and

    **b.**    back pay awards and front pay awards.

However, "loss" does not include:

**a.**   civil, criminal or administrative fines or penalties imposed by law that are not otherwise insurable, or

**b.**   non-monetary relief, or

**c.**   punitive or exemplary damages where such damages are not insurable because of state or federal law, or,

**d.**   payment of insurance or trust plan benefits by or on behalf of retired employees, or that to which a claimant would have been entitled as an employee had the insured provided the claimant with a continuation of insurance, or

**e.**   costs incurred by an insured to modify or adapt any building or property in order to make such building or property more accessible or accommodating to any disabled person, or

**f.**   matters which may be deemed uninsurable according to the law under which this Policy is construed, or

**g.**   amounts owed under federal, state or local wage and hour laws, and/or earned commissions, bonuses, stock options, profit sharing or benefits pursuant to a contract of employment.

**13.**   "Management and Supervisors" means a director, owner, partner, principal, officer, in-house attorney, or shareholder of the insured, the personnel or human resources director, risk management personnel or any other "employee" of the insured having management-level responsibility for personnel matters (i.e., ability to hire, terminate, demote or prepare a written evaluation of employees).

**14.**   "Mediation" means a non-binding process in which a neutral panel or individual assists the parties in reaching their own settlement. To be considered "mediation" under this Policy, the process must be of the kind set forth in the Commercial Mediation rules of the American Arbitration Association. We may, however, at our sole option, recognize any "mediation" process presented by you to us for approval.

"Mediation" under this Policy does not include any mediation, conciliation, or any other alternative dispute resolution mechanism that is part of a proceeding before the Equal Employment Opportunity Commission or a similar state agency.

**15.**   "One Insured Event" means:

**a.**   "insured events" which are (1) related by an unbroken chain of events or (2) made or brought by the same claimant; or

**b.**   class action or multiple plaintiffs suits arising out of related "insured events."

**16.**   "Panel Defense Counsel" means an attorney previously selected by us and who is listed on our current published listing of approved defense attorneys.

17.   "Part Time Employee" means an "employee" whose labor or service is engaged on the basis that the "employee" will not work more than twenty (20) hours per week.

18.   "Retaliation" means, retaliatory treatment against an "employee" of the insured on account of such "employee's" exercise or attempted exercise of his or her rights under law.

19.   "Seasonal employee" means, an "employee" whose labor or service is engaged on the basis that the "employee" will not work more 1,000 hours per year.

20.   "Suit" means, a civil proceeding in which damages because of a covered "insured event" to which this Policy applies are alleged. "Suit" includes:

   a.   An arbitration proceeding in which such damages are claimed and to which the insured must submit or does submit with our consent; or
   b.   Any other alternative dispute resolution proceeding in which such damages are claimed and to which the insured submits with our consent.

21.   "Temporary employee" means, an "employee" or  "part time employee" whose labor or service is engaged for a specific time period or project. "Temporary employee" does not include a "temporary worker".

22.   "Temporary worker" means a person who is furnished to you through an outside temporary employment agency to substitute for a permanent "employee" on leave or to meet seasonal or short-term workload conditions.

23.   "Volunteer worker" means a person who provides services to the named insured without any express or implied promise of remuneration. Coverage is only extended to a "volunteer worker" while acting at the direction of, and within the scope of duties for you.

## Employee Complaint Hotline

Your employer provides a third-party hotline for employment complaints regarding harassment, discrimination, hiring, termination, discipline, working conditions, leaves of absence, and other concerns about the workplace.

This hotline does not handle safety issues or workplace injuries. Employees with these concerns should consult their supervisor, human resources, or other posted notices.

When making a complaint you should first attempt to follow your employer's reporting procedures. You may also contact the team of human resources professionals at HR Pilot™ who provide an alternative to talking directly to your employer. You may contact the human resources managers at HR Pilot™ by telephone at no cost.

## To make comments or complaints call: 877-557-7419

Always report concerns of wrongdoing in your workplace. Do not ignore problems, even if the problem relates to another employee and does not involve you.

 

# HRPilot.com

HR Pilot offers HR services designed to help employers spend less time on compliance while reducing risk.



HR PILOT IS PROVIDED FREE OF CHARGE TO POLICYHOLDERS THAT HAVE EPL INSURANCE WITH: TOKIO MARINE HCC, U.S. SPECIALITY INSURANCE COMPANY AND AVEMCO INSURANCE COMPANY.

## HR Risk Services

**TRAINING PROGRAMS**
**Employment Courses Include:** Harassment/Discrimination for supervisors, English and Spanish (compliant in CA and CT); Harassment/Discrimination for employees; ADA; Hiring; and Termination

**EXPERT ADVICE**
**Unlimited HR Advice:** A team of HR professionals supervised by employment attorneys makes a perfect sounding board or second opinion for solving HR issues in all 50 States, in English and Spanish. Contact us at 800-980-2988 or email hrdirectors@eplaceinc.com.

**COMPLIANCE GUIDANCE**
**Compare Employment Compliance Requirements Across all 50 States:** Comparative charts summarize key compliance areas for all 50 states. Your HR obligations across the USA found in just one resource, updated regularly by employment attorneys.

**Step-by-Step Employment Checklists and Templates:** Checklists and templates save your HR team time while helping ensure compliance.

**MODEL HANDBOOKS, UPDATED REGULARLY**
**50-State Coverage:** 102 sample handbooks (2 in each state). HR Pilot helps you stay current by monitoring state/federal laws that may require changes to your employee handbooks and can send a summary twice each year with related sample policies in English and Spanish.

**Hundreds of additional resources are included!**

*HR Pilot services, content and updates do not constitute legal advice.*

### LOGIN INFORMATION

On your first visit:
1. Visit www.hrpilot.com
2. Click "Register"
3. Enter the information in the required fields (your Sign Up Code is your current EPLI policy number)
4. Click "Sign Up"
5. On the next page, read the Terms of Service and indicate your acceptance by clicking "I Accept."

On your next visit to www.hrpilot.com:
1. Enter your email address and password. If you forgot your password, click "forgot my password" and a new password will be sent via email.
2. Click "Login"

For assistance, call us at:
800-980-2988

For more information, contact EPL Practice Manager, Laurian C. Rutterbush
(800) 387-4468 EXT. 250
LRUTTERBUSH@EPLACEINC.COM

**AVB 000121**

AVB MSJ Appendix P. 117

 **TOKIO MARINE HCC**

# Claim Reporting

## NOTICE OF CLAIM

If you receive notice of a claim or want to report a potential incident that you feel may result in a claim, please report the claim directly to:

**TMHCC Professional Lines Group Claims Department**

Tokio Marine HCC Professional Lines Group
37 Radio Circle Drive
P.O. Box 5000
Mount Kisco, NY 10549-5000

FAX:
**914.241.8045**

EMAIL:
**submitclaims@tmhcc.com**

Inquires regarding claims may be directed to the Tokio Marine HCC Professional Lines Group Claims Department at
**914.241.8900**

## DO NOT DELAY
## The Reporting of Any Claim

The timely reporting of claims is very important and can be time sensitive.

In the event that you are reporting a claim, you should expect to provide the following:

1. Have your EPLI policy available for reference.
2. Your EPLI Policy Number
3. Your EPLI Policy Period

You may be asked to provide:

- Details including but not limited to:
  - ✓ Date of claim
  - ✓ Date of notice of claim
  - ✓ Names of parties involved
  - ✓ Job position of parties involved

- Description and nature of the claim

- Current status of the claim

- Complaints, letters, and correspondence pertaining to the claim

- Personnel file(s)

- Be sure to immediately issue a litigation hold on all documents (including electronic documents and emails) that may be related to the potential claim.

**AVB 000122**



# Exhibit 3

**CERTIFIED COPY**

1          UNITED STATES DISTRICT COURT

2        SOUTHERN DISTRICT OF CALIFORNIA

3

4   AV BUILDER CORP, A CALIFORNIA      )
    CORPORATION; RESTORCORP, A         )
5   CALIFORNIA CORPORATION; AND        )
    ANTONIO MADUREIRA, AN INDIVIDUAL,  )
6                                      )
            Plaintiffs,                )
7                                      )
        vs.                            )   No. 3:20-CV-01679-W-KSC
8                                      )
    HOUSTON CASUALTY COMPANY, A        )
9   TEXAS CORPORATION,                 )
                                       )
10          Defendant.                 )
    _____)
11

12

13          TRANSCRIPT AND EXHIBITS

14         DESIGNATED CONFIDENTIAL

15   UNDER THE TERMS OF THE PROTECTIVE ORDER

16      DEPOSITION OF LAURA DUSINA

17           April 7, 2021

18

19

20

21

22

23

24   Diana L. Porter, CSR No. 12729.
     471571
25

SINCE
1972  ⊛

**BARKLEY**
Court Reporters
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco   (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose        (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez        (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn        (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

```
 1   it's going to take 20 minutes to call the magistrate.
 2   If the magistrate will take the call, then it's a
 3   20-minute issue.  But it takes three minutes to call the
 4   magistrate to determine whether the magistrate is
 5   available.
 6           This is not a fishing expedition.  Okay?  This
 7   is not a -- this is a billing opportunity for you.  You
 8   have not asked one question, I don't think, one real
 9   question that goes to the issues in this case.
10           MS. KATZER:  Counsel, I obviously disagree with
11   your statements, but I --
12           MR. GRUENBERG:  No.  I've asked you for offers
13   of proof, and you've been mute on that issue.  Every
14   time I ask you why is it reasonably calculated to the
15   issues in the bad faith case, you've never answered me.
16           MS. KATZER:  We were on a topic of Ms. Dusina's
17   employment history with AV Builder --
18           MR. GRUENBERG:  Correct.
19           MS. KATZER:  -- when she stated and --
20           CERTIFIED SHORTHAND REPORTER:  I'm sorry.  I
21   can't do this all day.  One at a time.
22           MR. GRUENBERG:  Okay.  You were on the issue of
23   her employment history.  Her employment history has
24   nothing to do with the issues in bad faith case.  If
25   they do, please explain how.  I am all ears.  What is
```

<div align="center">33</div>

1    your offer of proof as to how it is reasonably

2    calculated?

3         MS. KATZER:  Counsel, I was asking her when she

4    started with AV Builder before you objected.

5         MR. GRUENBERG:  No.  That wasn't the question.

6         You can answer that.

7         THE DEPONENT:  February of 2010.

8         MS. KATZER:  One more objection like that on

9    the record, Counsel, and I -- we are going to call the

10    magistrate.

11         MR. GRUENBERG:  Sounds good.

12         MS. KATZER:  The objections are disruptive.

13         MR. GRUENBERG:  I would invite is the

14    magistrate's intervention given your objections, so

15    let's move on.

16    BY MS. KATZER:

17     Q   Ms. Dusina, you said you mentioned -- you

18    testified that you started with AV Builders in February

19    2010.  What was your -- what was your job then, or what

20    was your response -- what were your responsibilities

21    then?

22     A   I was hired as a temporary receptionist, and my

23    duties were answering the phone and providing some admin

24    support.

25     Q   Do you recall what you were making at the time?

<center>34</center>

```
1      A     Twelve dollars an hour.

2      Q     And at some point, you were promoted to an

3  office manager; is that correct?

4      A     Ultimately, yes.

5      Q     Do you recall when that occurred?

6      A     2012, October.

7      Q     Do you recall whether that came with increased

8  salary or pay?

9      A     Yes.  Yes, it did.

10     Q     And how much were you receiving then?

11     A     I believe it was 14 or maybe between 14 and 15.

12     Q     What were your responsibilities as an office

13  manager?

14     A     Everything I was doing as far as the reception

15  went.  I, then, was also handling some billing DTs and

16  just, in general, office ordering, mail.

17     Q     Were you --

18     A     That was about it.

19     Q     Were you responsible for HR or human resources?

20     A     No.

21     Q     Who at the company was responsible for

22  HR-related issues?

23     A     In 2012, Sarah McNamara.

24     Q     Was Sarah --

25           How do you spell letter last name for the
```

35

BARKLEY
Court Reporters

1   that correct?

2        A     Correct.  Yes.  I did -- I did all the

3   reconstruction billing the last year that I was there,

4   lawsuit support.

5             THE DEPONENT:  I don't know what she's asking.

6   BY MS. KATZER:

7        Q     You're doing great.  I'm asking what you did at

8   your time at AV Builder.

9        A     Right.

10       Q     Did your pay increase as you took on these

11  responsibilities?

12       A     Yes.

13       Q     What was your last salary at AV Builder?

14       A     Fifty dollars an hour.

15       Q     Were you working full-time?

16       A     Yes.

17       Q     Was that about 40 hours a week?

18       A     It was more like 50.

19       Q     I'm sorry.  50?

20       A     Fifty, 5-0.

21       Q     Fifty.  Thank you.

22             In your -- in the complaint in the underlying

23  action, you mentioned that your compensation included

24  commissions; is that correct?

25       A     Not until the final year, yes.

37

1      Q    And you were promised these commissions; is

2   that correct?

3      A    Yes, and they are in writing.

4      Q    And at the time you filed the -- the complaint

5   in the underlying action, you hadn't received those

6   commissions.  Is that accurate?

7      A    Yes.

8      Q    When did you -- when did your employment with

9   AV Builders terminate?

10     A    August 6th, 2018.

11     Q    Have you been employed since then?

12     A    Yes.

13     Q    Now, where were you employed afterwards?

14     A    Where my --

15          I've only had one position, and it's with a

16   company called Empire.

17     Q    When did you start with Empire?

18     A    November 2020.

19     Q    Are you currently with Empire?

20     A    I am.

21     Q    What is your job with Empire?

22     A    I don't actually have a title.  We're allowed

23   to call ourselves whatever we want.  The work is

24   basically the same thing I was doing for AV Builder.

25     Q    And what is your current compensation?

38

R E D A C T E D



1      Q      And you were promised these commissions; is

2   that correct?

3      A      Yes, and they are in writing.

4      Q      And at the time you filed the -- the complaint

5   in the underlying action, you hadn't received those

6   commissions.  Is that accurate?

7      A      Yes.

8      Q      When did you -- when did your employment with

9   AV Builders terminate?

10      A      August 6th, 2018.

11      Q      Have you been employed since then?

12      A      Yes.

13      Q      Now, where were you employed afterwards?

14      A      Where my --

15             I've only had one position, and it's with a

16   company called Empire.

17      Q      When did you start with Empire?

18      A      November 2020.

19      Q      Are you currently with Empire?

20      A      I am.

21      Q      What is your job with Empire?

22      A      I don't actually have a title.  We're allowed

23   to call ourselves whatever we want.  The work is

24   basically the same thing I was doing for AV Builder.

25      Q      And what is your current compensation?

38

R E D A C T E D



39

R E D A C T E D



40

# R E D A C T E D



41

REDACTED



AVB MSJ Appendix P. 131

# REDACTED



86

# REDACTED



87

1   changed by the IT guy.  And this was all happening in a

2   consecutive ten-minute period of time or whatever it

3   was.

4        So the IT guy -- this is what I was told.  The

5   IT guy was instructed by Tony to do something with my

6   email and password.  I don't know what that was.  And

7   somehow the guy changed it and booted me out so I no

8   longer had access to my email.  I didn't have a

9   password.  I didn't have the credentials to be on the

10  system.  And then this stuff occurred.  So I didn't --

11  the accusation is a little suspicious.

12       Q    I'm going to now introduce Exhibit 53,

13  previously marked at Tony's deposition.  It's a

14  multipage document.

15            (Exhibit 53 introduced.)

16            THE DEPONENT:  We don't have it yet, 53.

17  BY MS. KATZER:

18       Q    Do you see it now?

19       A    Almost.  Yes.  Okay.  Right.  Mm-hmm.

20       Q    Have you seen this email before?

21       A    Yes.

22       Q    He -- he wishes you congratulations.  That's

23  the first line of the email.  Third paragraph down, he

24  says:

25            "This has now changed my offer in the

                          114

1          agreement as the spirit of the agreement

2          has been substantially violated."

3          What -- do you know what he is referring to

4   there?

5      A    Right.  So the -- it was -- our relationship

6   was private for all those years.  It was confidential.

7   It was never meant for anyone to know about.  And me

8   leaving, I was supposed to take all of that with me and

9   no one -- you know, no one needed to know about it, and

10  now people in the office knew about it.  And that

11  changed his offer.

12     Q    So is it your understanding that he was

13  withdrawing the offer, then?

14          MR. SCHULZ:  Misstates testimony.

15          THE DEPONENT:  Yes.  That's what it states in

16  the email.

17  BY MS. KATZER:

18     Q    What is your understanding of the status of the

19  offer around this time, August 2018?

20     A    Well, it states in the email exactly what he's

21  saying, that he'll -- the $400,000 will now become my

22  responsibility to pay taxes on.

23     Q    Right.

24          Let's look at the second --

25     A    Because of the email and because of people now

                                115

```
 1  knew, he was cutting it in half, basically.

 2      Q    Right.

 3           Let's look at the bottom of that email.  He

 4  writes:

 5              "You should have had plenty of time by

 6           now to have your attorney review the

 7           document."

 8           He goes on to say:

 9              "I'm not willing to make any more

10           adjustments."

11           By this time, had you retained an attorney?

12      A    No.  I had not.

13      Q    He continues:

14              "I will give you three days to execute

15           the agreement once you receive it.  If you

16           do not, then you may pursue me in any

17           fashion you see fit."

18           Did you have any discussions with Tony after

19  receiving this email?

20      A    No.

21      Q    Did you discuss with him any more changes or

22  revisions to the draft agreement?

23      A    What -- no, wouldn't I have had to talk to him

24  if I had?  No.  There was no -- this was the last

25  communication, was this.
```

116

```
 1      Q    Now, let's look -- let's turn the page over,

 2  same exhibit, and let's look at this draft agreement.

 3  Do you know who drafted this agreement initially?

 4      A    I'm sorry.  What was your question?

 5      Q    Do you know who initially drafted this

 6  agreement?

 7      A    Dick.

 8      Q    We're looking at --

 9           MR. GRUENBERG:  Dick Semerdjian.

10           THE DEPONENT:  Yes.

11           MR. GRUENBERG:  She doesn't know for sure, but

12  she thinks it's Dick.

13  BY MS. KATZER:

14      Q    Okay.  But it did originate from someone on

15  Tony's side; right?

16      A    Dick is Tony's attorney.

17      Q    Right, but you didn't draft agreement.

18           MR. GRUENBERG:  I'm sorry, Counsel?

19  BY MS. KATZER:

20      Q    Ms. Dusina, you didn't draft the agreement;

21  right?

22      A    Did I draft?  No.

23      Q    Thank you.

24           Have you read --

25           Actually, if you could look at the second page
```

LAURA DUSINA, CONFIDENTIAL

BARKLEY
Court Reporters

AVB MSJ Appendix P. 137

```
 1      A    I do.

 2      Q    Can you describe for me what that is referring

 3  to?

 4           MR. SCHULZ:  Objection.  Foundation.

 5  Speculation.  She's not the author.

 6           MR. GRUENBERG:  Calls for legal conclusion.

 7           MS. KATZER:  I couldn't hear you.  You were

 8  talking over each other.

 9           What was that?

10           MR. SCHULZ:  Did you get my objection?

11           MS. KATZER:  Oh, I didn't hear the objection.

12  BY MS. KATZER:

13      Q    But, Ms. Dusina, unless there's an instruction

14  not to answer, I --

15           MR. GRUENBERG:  Oh, no.  She can answer.  It's

16  vague and ambiguous.  Calls for legal conclusion.  But

17  she can answer.

18           THE DEPONENT:  Yeah.  I think it was Tony's

19  attorney Dick writing a professional document.  I don't

20  think that -- Dick, I don't -- was not privileged to

21  what was going on between Tony and I to the extent that

22  it was.  And so I think Dick was being professional and

23  wrote a professional paragraph, a legal paragraph.

24  BY MS. KATZER:

25      Q    Did you have any conversations with Tony before
```

AVB MSJ Appendix P. 138

1   you resigned about workplace issues?

2       A    Yeah.  I mean, do you mean did I have a --

3   conversations with Tony?  I had millions, millions.  I

4   don't understand that question.

5       Q    Well, this paragraph refers to a series of

6   discussions concerning workplace and personal issues,

7   and then they're referred to as a dispute.  So did you

8   have any conversations with Tony about disputes

9   regarding the workplace?

10      A    What's the legal definition of a dispute?  I

11  mean, I think everything we were doing was fighting, if

12  fighting is a dispute.  So I don't know if you're

13  picking out one particular word and saying does this

14  apply to, you know, what I'm trying to do.

15           We fought.  We fought real bad.  And Dick is a

16  professional who wasn't going to use the same verbiage

17  that I would have.  And I didn't sign this agreement,

18  so --

19      Q    Sure.

20           Prior to your resignation, did you have any

21  conversations with Tony about sexual harassment?

22      A    No.

23      Q    Prior to your resignation, did you ever tell

24  Tony you were being unfairly compensated?

25      A    No.  I think I just said it was -- the $50 an

                           121

```
 1   hour was generous.
 2       Q    Prior to your resignation, did you ever tell
 3   Tony you were entitled to commissions that hadn't been
 4   paid?
 5       A    Probably.  There were things in 2015 that I --
 6   you know, that I had been promised commissions on.  I
 7   have a difficult time getting Tony to not just say
 8   things, to put things in writing.  And there were
 9   probably -- I'll take it back and say positively times
10   that I had asked that things be put in writing.  There
11   were times when I would get the commission.  It wasn't
12   in writing.  He would just decide.  So, sure, if those
13   were arguments --
14       Q    Prior to your --
15       A    -- or discussions.
16       Q    I'm sorry.  I didn't hear that last part.
17       A    I said "or discussions," arguments or
18   discussions.
19       Q    Prior to your resignation, did you ever tell
20   Tony that you wanted to stay with AV Builder?
21       A    Sure, absolutely.
22       Q    Prior to your resignation, did you ever tell
23   Tony that you shouldn't be -- or did you ever -- strike
24   that.
25            Prior to your resignation, did you tell Tony
```

122

# R E D A C T E D



AVB MSJ Appendix P. 141

1   hour was generous.

2       Q     Prior to your resignation, did you ever tell

3   Tony you were entitled to commissions that hadn't been

4   paid?

5       A     Probably.  There were things in 2015 that I --

6   you know, that I had been promised commissions on.  I

7   have a difficult time getting Tony to not just say

8   things, to put things in writing.  And there were

9   probably -- I'll take it back and say positively times

10  that I had asked that things be put in writing.  There

11  were times when I would get the commission.  It wasn't

12  in writing.  He would just decide.  So, sure, if those

13  were arguments --

14      Q     Prior to your --

15      A     -- or discussions.

16      Q     I'm sorry.  I didn't hear that last part.

17      A     I said "or discussions," arguments or

18  discussions.

19      Q     Prior to your resignation, did you ever tell

20  Tony that you wanted to stay with AV Builder?

21      A     Sure, absolutely.

22      Q     Prior to your resignation, did you ever tell

23  Tony that you shouldn't be -- or did you ever -- strike

24  that.

25            Prior to your resignation, did you tell Tony

                          122

BARKLEY
Court Reporters

1   that he -- or did you ever.  Third try -- strike that.

2          Prior to your resignation, did you ever ask

3   Tony to keep you on at AV Builder.

4       A   Yes.  Yes.

5       Q   And how did he respond?

6       A   I think there was effort on both of our parts

7   to try to figure out what could be done.  He is not the

8   kind of guy who's going to take responsibility for the

9   fact that he's the one who did wrong in this situation.

10          In every case, if she was blaming me, he was

11  like, yeah, it's Laura's fault.  And if I was blaming

12  her, it was like, yeah, it's Noy's fault, and Tony's

13  just there with his clean hands.  So I would say that

14  guilt played a part in what he was ultimately going to

15  have to do in the end, which is to pay one of us to

16  go -- I shouldn't say pay one of us to go away, but,

17  like, it wasn't going to work and something had to give.

18      Q   If it wasn't for Noy --

19      A   There was effort put into not making that

20  happen.

21      Q   If it wasn't for Noy, would you have resigned?

22      A   I didn't resign, and, no, I wouldn't -- I

23  wouldn't have left AV Builder.

24      Q   Left me rephrase that.

25          If it wasn't for Noy, would you have been

                          123

1   terminated?

2      A    No.  I don't believe so.

3      Q    So let me just take a look at this exhibit.

4   This is Exhibit 53.  And Tony says, sign this or pursue

5   me in any fashion you see fit.  And it was your

6   testimony this was the last time you spoke with Tony; is

7   that correct?

8      A    Right.  So I got that email.  I didn't respond.

9      Q    Did you retain counsel afterwards?

10     A    I did.

11     Q    I'm going to now go back to Exhibit 58.

12          MS. KATZER:  Counsel, do you see that?  That's

13   a copy of the underlying complaint.

14          CERTIFIED SHORTHAND REPORTER:  It's not in the

15   chat box.

16          MS. KATZER:  It was one of the earlier ones I

17   had sent.

18          MR. GRUENBERG:  I'm not able to access it in

19   the chat.

20          (Off-the-record discussion regarding

21          chat box and exhibit.)

22          MS. KATZER:  You know what.  Let me just resend

23   it.  I'm happy to do that.

24          MR. GRUENBERG:  Oh, no, 58.  Is that the

25   complaint?

124

BARKLEY
Court Reporters

```
 1   BY MS. KATZER:

 2       Q    Thank you.

 3            Paragraph F, first sentence:

 4                "Dusina and Madureira -- Madureira

 5            proceeded to negotiate a personal

 6            separation agreement based on Dusina's

 7            belief and assertion that she had brought

 8            value to their relationship and to AV

 9            Builder."

10            Is this characterization; correct?

11       A    Yes.

12       Q    That the separation agreement was based on your

13   belief and assertion that you brought value to the

14   company?

15       A    Yes.

16       Q    And then let's look at the next sentence.

17                "During this time period and while

18            negotiating the severance agreement, Dusina

19            never made any claims, demands, or

20            allegations against AV Builder or Madureira

21            that in any way related to claims of sexual

22            harassment, discrimination, or any types of

23            employment practices."

24            Is that an accurate statement?

25       A    Well, let me --
```

# REDACTED



131

# REDACTED



25          MR. GRUENBERG:   What was the next question?

132

```
 1  BY MS. KATZER:

 2      Q    You wanted -- you would have stayed at the

 3  company but for Noy; isn't that correct?

 4          MR. GRUENBERG:  Calls for speculation.

 5          THE DEPONENT:  Yeah, I don't know.

 6  BY MS. KATZER:

 7      Q    You're not --

 8          That's not speculation.  You testified earlier

 9  you wanted to stay at the company.

10      A    I did not ever plan on leaving AV Builder.  I

11  did not ever plan on having to exit my position at AV

12  Builder.  What could cause those things?  I think the

13  future is unforeseen.  This happened.  I'm not there

14  anymore.

15      Q    Let's look now at paragraph -- Paragraph J,

16  Recital J.

17      A    Sure.  Tony has lots --

18          MR. GRUENBERG:  Hold on.  Hold on.

19          THE DEPONENT:  Okay.  I want to clarify that,

20  though.

21  BY MS. KATZER:

22      Q    Ms. Dusina, you're allowed to clarify, you

23  know, a prior response.  I promised you in the beginning

24  of the --

25          (Simultaneous speaking.)
```

133

# REDACTED



131

# REDACTED



25          MR. GRUENBERG:  What was the next question?

132

```
 1   BY MS. KATZER:

 2       Q    You wanted -- you would have stayed at the

 3   company but for Noy; isn't that correct?

 4            MR. GRUENBERG:  Calls for speculation.

 5            THE DEPONENT:  Yeah, I don't know.

 6   BY MS. KATZER:

 7       Q    You're not --

 8            That's not speculation.  You testified earlier

 9   you wanted to stay at the company.

10       A    I did not ever plan on leaving AV Builder.  I

11   did not ever plan on having to exit my position at AV

12   Builder.  What could cause those things?  I think the

13   future is unforeseen.  This happened.  I'm not there

14   anymore.

15       Q    Let's look now at paragraph -- Paragraph J,

16   Recital J.

17       A    Sure.  Tony has lots --

18            MR. GRUENBERG:  Hold on.  Hold on.

19            THE DEPONENT:  Okay.  I want to clarify that,

20   though.

21   BY MS. KATZER:

22       Q    Ms. Dusina, you're allowed to clarify, you

23   know, a prior response.  I promised you in the beginning

24   of the --

25            (Simultaneous speaking.)
```

<div align="center">133</div>

```
 1      A    Yes.

 2      Q    Can you generally describe what those emails

 3  were about?

 4      A    The title to the Lexus.

 5      Q    Since the underlying action was settled, have

 6  you spoken with anybody at AV Builder?

 7      A    No.

 8      Q    And what about RestorCorp?

 9      A    It's the same people.  RestorCorp's not, like,

10  a real company.

11      Q    So the answer's no?

12      A    No.  The answer's no.

13      Q    Okay.  I don't have any other questions.

14           MR. SCHULZ:  I just have a few.  Do you want to

15  just go right into it, Josh?

16           MR. GRUENBERG:  Yeah, let's go, Peter.

17           MR. SCHULZ:  Okay.

18                        EXAMINATION

19  BY MR. SCHULZ:

20      Q    Hi, Laura.  As you know, I'm Peter Schulz.  I

21  represent Mr. Madureira and the corporations in this

22  case.  I just have a few questions relevant to the --

23  kind of the key issues relating to insurance coverage.

24           I want to show you what's been previously

25  marked as Exhibit 6.  And I just uploaded that for you.
```

LAURA DUSINA, CONFIDENTIAL

BARKLEY
Court Reporters

```
 1   Let me know when you have it.
 2           (Exhibit 6 introduced.)
 3           MR. GRUENBERG:  Okay.  It's up.
 4   BY MR. SCHULZ:
 5      Q    And, now, Exhibit 6 is a letter dated
 6   September 13, 2018, authored by Attorney Joshua
 7   Gruenberg, addressed to Mr. Dick Semerdjian, and it
 8   encloses a draft of a complaint drafted on your behalf.
 9           Do you recall authorizing your attorney on or
10   about September 13, 2018, to make the demands that are
11   contained within this letter?
12      A    Yes.
13      Q    Okay.  And we previously -- and I can pull it
14   back up again if you need to see it.  But when
15   Ms. Katzer showed you the settlement agreement in this
16   case, you confirmed the recital that the September 2018
17   demand was the first written demand on AV Builder and
18   Tony Madureira for money damages arising out of the
19   employment practices of Tony Madureira and AV Builder.
20   And that's correct?
21      A    Yeah.  So that's --
22           Yes.  That's the first time I asked for
23   anything, yes.
24      Q    Okay.  So -- so would it be accurate, then, to
25   say that none of the writings that we referred to or you
```

154

1   were examined on today that existed or were created

2   prior to September 2018 were intended by you to make

3   demands that Tony pay you damages because he had

4   harassed you?

5          MS. KATZER:  Calls for a legal conclusion.

6          THE DEPONENT:  I can answer?

7          MR. GRUENBERG:  You can answer.

8          THE DEPONENT:  I would agree they were not

9   about -- they were about commissions.

10  BY MR. SCHULZ:

11     Q    And would you grow with me, or is it accurate

12  to say, that none of the writings that preexisted the

13  September 2018 letter that you were asked about today

14  were intended by you to make demands that Tony pay you

15  damages because he had discriminated against you?

16     A    That would be correct, except September 13th

17  letter; right?  The September 13th?  You keep saying

18  September 20th.

19     Q    I'm sorry.  Prior to September 2018, the

20  September 13 letter.  All the writings that you were

21  referred to today, you did not intend for any of those

22  to make a demand that Tony pay you damages because he

23  had discriminated against you; right?

24     A    Correct.

25     Q    And then, lastly, none of those writings prior

155

BARKLEY
Court Reporters

1   to September 13, 2018, were intended by you to make

2   demands on Tony because he had engaged in wrongful

3   employment practices against you; right?

4           MS. KATZER:  Objection.  Legal conclusion.

5           THE DEPONENT:  Right.  I'm sorry.  Can you --

6   you're going to have to ask the question again.  If I'm

7   supposed to answer, you're going to have to ask the

8   question again.

9           So are you asking me if, prior to

10  September 13th, I -- the demands I made on Tony for

11  money --

12          I don't -- I'm sorry.  You're going to have to

13  ask it again.

14  BY MR. SCHULZ:

15    Q   Let me just ask the question subject to

16  counsel's objection.

17          So is it accurate to say that none of the

18  writings that we referred to today or that you were

19  examined on today, that were prepared prior to

20  September 13, 2018 -- is it accurate to say that none of

21  those were intended by you to make demands that Tony pay

22  you damages because he had engaged in wrongful

23  employment practices?

24    A   Correct.

25          MS. KATZER:  Same objections.

```
 1   BY MR. SCHULZ:
 2        Q    So, in realty, all of the communications that
 3   you had had with Mr. Madureira, both writing and in
 4   verbal, prior to September 13, 2018, and that entire
 5   deal that you had been put -- working on, was really
 6   yours and Tony's attempt at closure of your personal
 7   relationship; right?
 8        A    Well, it was about paying me what I was owed
 9   from AV Builder in commissions and ending our
10   relationship.
11        Q    You mean paying you for what you thought you
12   had earned?
13        A    Yes.
14        Q    That's all I have.
15             CERTIFIED SHORTHAND REPORTER:  Anything else or
16   off the record?
17             MS. KATZER:  We can go off the record.
18             (A recess was taken.)
19             CERTIFIED SHORTHAND REPORTER:  Back on the
20   record.
21             MR. SCHULZ:  Off the record, we had a
22   discussion similar to what we've agreed to in other
23   depos in this case, and that is that this entire
24   transcript and all of the exhibits will be deemed
25   confidential as that term is used in the protective
```

<div align="center">157</div>

1    to September 13, 2018, were intended by you to make

2    demands on Tony because he had engaged in wrongful

3    employment practices against you; right?

4            MS. KATZER:  Objection.  Legal conclusion.

5            THE DEPONENT:  Right.  I'm sorry.  Can you --

6    you're going to have to ask the question again.  If I'm

7    supposed to answer, you're going to have to ask the

8    question again.

9            So are you asking me if, prior to

10   September 13th, I -- the demands I made on Tony for

11   money --

12           I don't -- I'm sorry.  You're going to have to

13   ask it again.

14   BY MR. SCHULZ:

15       Q    Let me just ask the question subject to

16   counsel's objection.

17           So is it accurate to say that none of the

18   writings that we referred to today or that you were

19   examined on today, that were prepared prior to

20   September 13, 2018 -- is it accurate to say that none of

21   those were intended by you to make demands that Tony pay

22   you damages because he had engaged in wrongful

23   employment practices?

24       A    Correct.

25           MS. KATZER:  Same objections.

156

BARKLEY
Court Reporters

AVB MSJ Appendix P. 157

1  BY MR. SCHULZ:

2       Q     So, in realty, all of the communications that

3  you had had with Mr. Madureira, both writing and in

4  verbal, prior to September 13, 2018, and that entire

5  deal that you had been put -- working on, was really

6  yours and Tony's attempt at closure of your personal

7  relationship; right?

8       A     Well, it was about paying me what I was owed

9  from AV Builder in commissions and ending our

10  relationship.

11       Q     You mean paying you for what you thought you

12  had earned?

13       A     Yes.

14       Q     That's all I have.

15            CERTIFIED SHORTHAND REPORTER:   Anything else or

16  off the record?

17            MS. KATZER:   We can go off the record.

18            (A recess was taken.)

19            CERTIFIED SHORTHAND REPORTER:   Back on the

20  record.

21            MR. SCHULZ:   Off the record, we had a

22  discussion similar to what we've agreed to in other

23  depos in this case, and that is that this entire

24  transcript and all of the exhibits will be deemed

25  confidential as that term is used in the protective

BARKLEY
Court Reporters

1  order in place for this litigation.

2         Any party or the witness may, within 60 days,

3  designate specifically lines and pages and/or exhibits

4  that they wish to mark as confidential under the

5  protective order.  After the 60 days, if there's no

6  testimony designated or those portions of testimony not

7  designated will no longer be considered confidential

8  under the requirements of the protective order.

9         Everyone okay with that?

10        MS. KATZER:  So stipulated.

11        MR. GRUENBERG:  Yes.

12        MR. SCHULZ:  Okay.

13        CERTIFIED SHORTHAND REPORTER:  We're off the

14  record.

15        (Deposition concluded at 2:21 p.m.)

16                       -oOo-

17

18

19

20

21

22

23

24

25

                          158

BARKLEY
Court Reporters

```
 1              DEPOSITION OFFICER'S CERTIFICATE

 2   STATE OF CALIFORNIA      )
                              ) ss.
 3   COUNTY OF SAN BERNARDINO)

 4

 5

 6         I, Diana L. Porter, hereby certify:

 7         I am a duly qualified Certified Shorthand

 8   Reporter in the State of California, holder of

 9   Certificate Number CSR 12729 issued by the Certified Court

10   Reporters' Board of California and which is in full

11   force and effect.  (Fed. R. Civ. P. 28(a)(1)).

12         I am authorized to administer oaths or

13   affirmations pursuant to California Code of Civil

14   Procedure, Section 2093(b) and prior to being examined,

15   the witness was first duly sworn by me.  (Fed. R. Civ.

16   P. 28(a)(a)).

17         I am not a relative or employee or attorney or

18   counsel of any of the parties, nor am I a relative or

19   employee of such attorney or counsel, nor am I

20   financially interested in this action.  (Fed. R. Civ. P.

21   28).

22         I am the deposition officer that

23   stenographically recorded the testimony in the foregoing

24   deposition and the foregoing transcript is a true record

25                         / / /
```

160

**BARKLEY**
Court Reporters

AVB MSJ Appendix P. 160

1   of the testimony given by the witness.  (Fed. R. Civ. P.

2   30(f)(1)).

3           Before completion of the deposition, review of

4   the transcript [xx] was [  ] was not requested.  If

5   requested, any changes made by the deponent (and

6   provided to the reporter) during the period allowed, are

7   appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9   Dated: April 14, 2021

10

11

12

13

14   _____

15

16

17

18

19

20

21

22

23

24

25

161

BARKLEY
Court Reporters

AVB MSJ Appendix P. 161



# Exhibit 4

**CERTIFIED COPY**

1          UNITED STATES DISTRICT COURT

2         SOUTHERN DISTRICT OF CALIFORNIA

3

4   AV BUILDERS CORP, A CALIFORNIA      )
    CORPORATION; RESTORCORP, A          )
5   CALIFORNIA CORPORATION; AND         )
    ANTONIO MADUREIRA, AN INDIVIDUAL,   )
6                                       )
              Plaintiffs,               )
7                                       )
         vs.                            )   No. 3:20-cv-01679-W-KSC
8                                       )
    HOUSTON CASUALTY COMPANY, A         )
9   TEXAS CORPORATION,                  )
                                        )
10            Defendant.                )
    _____)

11

12

13

14

15         SUBJECT TO PROTECTIVE ORDER

16       DEPOSITION OF ANTONIO MADUREIRA

17            March 16, 2021

18

19

20

21

22

23

24   Diana L. Porter, CSR No. 12729
     471066

25

SINCE 1972  ⊛

**BARKLEY**
*Court Reporters*
barkley.com

(310) 207-8000 Los Angeles      (415) 433-5777 San Francisco   (949) 955-0400 Irvine          (858) 455-5444 San Diego
(310) 207-8000 Century City     (408) 885-0550 San Jose        (760) 322-2240 Palm Springs    (800) 222-1231 Carlsbad
(916) 922-5777 Sacramento       (800) 222-1231 Martinez        (702) 366-0500 Las Vegas       (800) 222-1231 Monterey
(951) 686-0606 Riverside        (818) 702-0202 Woodland Hills  (702) 366-0500 Henderson       (516) 277-9494 Garden City
(212) 808-8500 New York City    (347) 821-4611 Brooklyn        (518) 490-1910 Albany          (914) 510-9110 White Plains
(312) 379-5566 Chicago          00+1+800 222 1231 Paris        00+1+800 222 1231 Dubai        001+1+800 222 1231 Hong Kong

```
 1    said?

 2            Nevada would be the one state that may be

 3    inactive.

 4    BY MR. HAZLEHURST:

 5        Q    Okay.  And your company, AV Builders, what year

 6    was that formed?

 7        A    '81.

 8        Q    Okay.  And it was formed by you; correct?

 9        A    Correct.

10        Q    Okay.  And what type of company or entity is

11    it?  LLC?  Corporation?

12        A    At that time -- at that time, it could have

13    been a sole proprietorship.  Ultimately, in some short

14    period of time, it turned into a -- a corporation, an S

15    Corp.

16        Q    Okay.  And when it -- when it became an S Corp,

17    were you the sole shareholder?

18        A    Yes.

19        Q    Have there ever been any other shareholders in

20    AV Builders?

21        A    Well, when AV Builders was first formed in '81,

22    I had an RMO, and so I honestly forget how all that was.

23    But they were the license holder at the time, and I held

24    the business license.  And so I believe it was until

25    1984 that I was licensed solely under my own name.
```

16

```
 1       Q    You said RMO; is that right?

 2       A    Yeah.

 3       Q    Okay.  What does that stand for?

 4       A    Responsible managing officer.  And so it could

 5   have been an RME, which is responsible managing

 6   employee.  And, honestly, you know, that's 40 years ago.

 7   It's not -- it's not clear in my mind at all how that

 8   all happened.

 9       Q    Okay.  That's fine.

10            During the time period relevant to this case,

11   which I'm going to say is 2010 to 2018, was AV Builders

12   an S Corp during that time period?

13       A    Yes.

14       Q    Okay.  And you were the sole shareholder during

15   that time period.

16       A    Yes.

17       Q    Okay.  And what was your official title with AV

18   Builders during that 2010-to-2018 time period?

19       A    President.  President.  Actually, I think,

20   because I'm an S Corp, president, secretary.  I hold all

21   the offices.  So my title on my business corp is

22   president, but I believe legally it included -- I would

23   sign off as the secretary.  There's three things, and

24   I'd be honest with you.  I've forgotten which the third

25   is.
```

<div align="center">17</div>

```
 1        Q      Let me put it this way.  Were you the sole

 2   officer for the company?

 3        A      That is correct.

 4        Q      Okay.  Where were you employed before AV

 5   Builders?

 6        A      I was self-employed from the time I left high

 7   school.  Did I have one job?  Maybe right out of high

 8   school, I had a laboring job for a little while.

 9        Q      So you mentioned that you were in college from

10   '81 to '84, I believe, and it sounded like AV Builders

11   was formed around that same time.  What years would this

12   prior employment have been?  What years would that have

13   spanned?

14        A      Sometime before that.  Honestly, I don't even

15   really remember it.  It's just a small capsule.  I

16   worked perhaps for someone for a month or something.

17   You know, I just don't want to say I was never, ever

18   somebody's employee, because I believe I did work for

19   somebody and pulled a little paycheck for a small amount

20   of time.

21        Q      Okay.  That's fine.  I understand it was a long

22   time ago.

23               Was it the same type of work in the same

24   industry, construction work?

25        A      It was construction work.  I just said it was
```

18

BARKLEY
Court Reporters

AVB MSJ Appendix P. 166

# REDACTED



20



21

# REDACTED



22

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 169

# R E D A C T E D



69

**R E D A C T E D**



70

1  work that she did for AV Builders, that she was not

2  compensated enough?

3      A    She just, you know --

4          No.  It wasn't like, "You should have been

5  paying me 75 an hour."  No, that's right.  "You should

6  have been paying me 75, and so, now, there's all of this

7  money that I left" -- no, it wasn't anything like that.

8  She just, in general -- just felt that she wasn't

9  acknowledged properly.

10          You know, look, basically, for all intents and

11  purposes, we're breaking up on -- on our physical

12  relationship, which was somewhat -- which was -- which

13  gave our relationship a lot of buoyancy.  It was part of

14  who we became.  So that was leaving.  So, now, what you

15  have is this void of emotion, this raw, raw, raw

16  emotion.  That translated somehow through her, best I

17  can do here -- is somehow -- because you'll have to ask

18  her -- translated through her into this feeling of not

19  being valued properly by me.  And so, however it came

20  out, the 200 was -- was -- was, like, a makeup number.

21  It was just a number that made her feel as if she had a

22  place, I guess.  I don't how else to say it.  I'm sure

23  there's ten other ways for me to try to say it, but it's

24  all going to sort of come out the same way.

25      Q    Do you think $200,000 is a lot of money?

71

BARKLEY
Court Reporters

```
1              MR. SCHULZ:  Objection.  Argumentative.
2    Irrelevant.
3              THE DEPONENT:  Yeah.  It's a lot of money.
4    Yes.  It's a lot of money.  I'm not supposed to say
5    "yeah."
6    BY MR. HAZLEHURST:
7        Q    At this time, were you concerned that Laura
8    might tell Noylan some of the details of your sexual
9    relationship?
10       A    No.  Not -- not at -- not at this juncture, no.
11   This was -- this was -- this was just -- it stood kind
12   of by itself, interestingly enough.
13       Q    So there was no agreement at this time between
14   you and Laura that you would pay her $200,000 and she
15   would not say anything to Noylan about your
16   relationship?
17       A    No.  No.  That was -- there was no threats from
18   Laura, you know, at that time, you know, so no.
19       Q    Why did you pay her $200,000 when she just
20   asked -- I mean -- strike that.
21            You said $200,000 is a lot of money.  Did you
22   have any hesitation about paying it to her?
23       A    No.
24       Q    Why not?
25       A    Because it was a negotiation.  I negotiated it
```

<center>72</center>

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 173

1   is an April 16th, 2018, email from you to Laura,

2   Bates-labeled AVM 8.

3              (Exhibit 37 marked.)

4              THE DEPONENT:  Oh, here it is.

5   BY MR. HAZLEHURST:

6       Q     Let me know when you've got a chance to look at

7   that.

8       A     I'm familiar with this email.

9       Q     Okay.  You see in the first line it says, "I'm

10   in receipt of your verbal resignation"?

11       A     Yes.

12       Q     In Laura's complaint, she denies that she

13   resigned and says that her resignation was a resignation

14   from having sex with you.  Is that an accurate

15   allegation in her complaint?

16       A     Completely.

17       Q     Okay.

18       A     Well, no, I -- you had it -- actually, you made

19   a compound statement.  So what was completely inaccurate

20   is that we were continuing to have sex.  That absolutely

21   ended at the end of February 2018, completely, sex.

22              MR. SCHULZ:  Hold on a second.  We've got to

23   start over, because I think there was a blurb in the

24   audio transmission.  I need you to restate the question

25   again, because the blurb was either was it -- is that an

78

1  accurate statement or an inaccurate statement.  I wasn't

2  sure what the question was.  I want to make sure he's

3  answering the right question.

4       THE DEPONENT:  Compound.

5  BY MR. HAZLEHURST:

6       Q    Okay.  Let's start with the allegation in

7  Laura's complaint that she did not actually resign.  Is

8  that accurate?

9       A    No.  Not from my perspective, or I would have

10 never written this.

11      Q    How did she verbally resign?  Was it

12 face-to-face or over the phone?

13      A    I honestly don't remember which it was, whether

14 we had a face-to-face conversation or it was on the

15 phone.  But it was a conversation.

16      Q    And what did she say?

17      A    Honestly, I don't remember the content of the

18 conversation, but this was my takeaway from the

19 conversation.

20      Q    Did she give any reasons for why she was

21 resigning?

22      A    No.  Well, maybe she did.  Maybe she didn't.

23 As I just said, I don't really remember the -- all -- I

24 don't remember the conversation in and of itself.  But

25 the conversation that I had with her, this was my

79

BARKLEY
Court Reporters

1  takeaway.  And, more importantly, the reason that I

2  wrote it is because the conversation had so much angst

3  in it that I wanted to make sure that she understood

4  what I was offering her to stay.

5      Q    Had Laura discussed resigning from AV Builders

6  before this, discussed with you?

7      A    Yeah.  She had -- she had talked about it.

8      Q    When?

9      A    Oh, various times.  I don't have dates for you.

10  I don't have any particular moments in time.  But it

11  was, absolutely, she had mentioned it any number of

12  times after February, the end of February 2018.

13      Q    Okay.  So not before February 2018?

14      A    Correct.

15      Q    Okay.

16      A    Although, there was an email, I think,

17  somewhere back there where maybe she had talked about

18  it, but not to where we become, like, say, a feature,

19  you know, after February 2018.  It would pop up, you

20  know.  It was -- let's put it this way.  It was not an

21  unusual component of a conversation for her to say, "I'm

22  not sure I'm going to stay.  I'm not sure I'm going to

23  leave.  I'm not sure what I want to do."  Yeah.  There

24  was a lot of that going on.

25      Q    And at this time in April 2018, you didn't want

80

1  her to resign; correct?

2      A    I -- I never wanted her to resign.  I promised

3  her that she was there for as long as she ever wanted to

4  be there.  She was my best friend for -- for a long

5  time.

6      Q    On the second sentence in this email, you say,

7  "I want to confirm what would be included in your

8  severance package beyond what California law says you're

9  entitled to."

10         Why were you offering her something beyond what

11  she was entitled to by law?

12     A    Because I believe she deserved it.

13     Q    The first number down there, payment upon

14  departure of 1 percent for Newport Bluffs --

15     A    Yes.

16     Q    -- what's the -- what's the dollar -- what

17  would be the dollar amount of that?

18     A    About a hundred K.

19     Q    And then, the second one, the Lexus RX, what

20  would be the value of that?

21     A    Let's just say plus-or-minus 50K.

22     Q    Okay.  So you are essentially offering her

23  about 150,000 as severance?

24     A    You know, severance has a lot of different

25  meanings.  I'm not, I guess, sure -- attorneys seem to

81

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

# REDACTED



84

# REDACTED



85

ANTONIO MADUREIRA,   SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 179

# REDACTED



86

BARKLEY
Court Reporters

REDACTED



126

# REDACTED



127

BARKLEY
Court Reporters

# REDACTED



128

REDACTED



132

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

# REDACTED

133

ANTONIO MADUREIRA, SUBJECT TO PROTECTIVE ORDER



# R E D A C T E D



134

REDACTED

135

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

REDACTED



136

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

# REDACTED



137

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

```
1      Q    Stop --

2      A    Then, I'm done.

3      Q    All right.  So you had offered 400,000.  That

4    was the number in the severance agreement.  And she came

5    back and said in this email, no, the number's 475; is

6    that correct?

7      A    I'm guessing that's her severance.  Without

8    looking at the severance agreement, which I'm really not

9    familiar with, the first one that went out, I'm guessing

10   that that -- it had 400 there.  And this is her

11   reminding me that the actual number's 475.

12     Q    And is it your testimony that it was Laura's

13   idea to -- to leave AV Builders?

14     A    At the time, she is kicking around the idea of

15   leaving, absolutely, or we wouldn't be talking about

16   severance.  There would be no reason to have the

17   conversation if -- if -- if the -- if the subject hadn't

18   come up.

19     Q    Okay.  So if Laura's going to voluntarily leave

20   AV Builders, why would she get 475,000 in severance?

21     A    Two reasons.  One is if she's really leaving,

22   she deserves part of it, most likely.  I would probably

23   have just done it for her anyway.  The other reason is

24   that I still love my girlfriend, and it was more than a

25   veiled threat that something could happen there.
```

<div align="center">138</div>

1     Q   When you say "I still love my girlfriend," are

2  you referring to Noy?

3     A   Yes.

4     Q   And what do you mean by it's more than a veiled

5  threat that something could happen there?

6     A   So let's leave my last lie.  My last lie on the

7  record here was that Laura and I last engaged in sex

8  approximately four years ago, and that is how the story

9  resided at this moment in time in my girlfriend's head.

10  Laura, through text predominantly, could prove at any

11  time that that was not a true statement, which would

12  create a cataclysmic event with my girlfriend.  Now, I'm

13  not saying Laura threatened me, but I'm going to tell

14  you I felt threatened.  And so it was my goal to find a

15  number that I could choke down, that would work for her

16  and would allow my life to continue forward.

17     Q   So, essentially, the 475,000 would get Laura

18  out of the company and she would no longer be a threat

19  to tell Noylan the truth about your sexual relationship?

20     A   Well, I --

21        Getting out of the company was not part of

22  the -- was not an objective item.  The 475 is going to

23  buy me peace in my life, is what it's going to do.  I

24  mean, for all intents and purposes, it's buying me

25  peace.  I can finally be done with the hell that I'm

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 191

```
 1              THE DEPONENT:  Yeah.  You'll have to ask her.

 2   BY MR. HAZLEHURST:

 3       Q    What do you understand that to mean?

 4       A    I have -- I don't really care what it means.

 5   To be honest with you, I don't know what it means.  I

 6   don't know what it affects.  And I don't know why I -- I

 7   should care.

 8       Q    Well, she says, "All parties are aware that

 9   this is not just an employment severance agreement."

10   Were you aware that?

11       A    Well, I don't know what she means.

12            MR. SCHULZ:  Hold on.  Foundation.

13   Speculation.

14            You can answer.

15            Are you waiting for an answer?

16            MR. HAZLEHURST:  Yeah.

17            MR. SCHULZ:  You remember the question?

18            THE DEPONENT:  No.  I'm making a note.

19            Could you repeat the question?

20            MR. HAZLEHURST:  May I have the question read

21   back?

22            (The testimony was read back as

23            follows:

24                "Q  Well, she says, "All parties are

25                aware that this is not just an employment
```

<div align="center">151</div>

```
 1              severance agreement."  Were you aware

 2              that?")

 3              MR. SCHULZ:  You're a party.  Were you aware of

 4      that?

 5              THE DEPONENT:  Yeah.  I just don't know what

 6      she means, and I -- and I certainly wasn't going to open

 7      up the door to find out what or whatever.  I don't know.

 8      No.  I don't even mean it that way.  I just don't know

 9      what she meant.  I have no idea.  And I don't believe I

10      ever responded to that, but we can -- we can see through

11      the emails.  Perhaps there is.

12      BY MR. HAZLEHURST:

13         Q    If you look up at the top of the email, above

14      the subject line, there's a ldusina309@gmail.com.  Do

15      you recognize that as Laura's personal email?

16         A    Not necessarily, but it appears to be a -- an

17      email of Laura's.  I've never used it.  I don't know.

18         Q    Okay.  And if you look at the part of the email

19      that says "Changes," are these the changes that are

20      being requested by Laura?

21         A    Yeah.  It looks as if those are Laura's

22      requests.

23              MR. SCHULZ:  Don't guess.

24              THE DEPONENT:  Well, I'm just reading it.

25      That's how I'm guessing it to be.  I would have to --
```

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

**BARKLEY**
Court Reporters

AVB MSJ Appendix P. 193

```
 1   again, I would have to read, like, four emails, put it
 2   together, see what it is.  But the way it's written --
 3   well, because it says can -- "You can show somewhere
 4   that I have received 200,000," which means that she's
 5   writing it; right?  "But that you owe the taxes on the
 6   600" -- that's referring to me, making her the writer.
 7            Let's do it again.  The agreement must read
 8   that this is not (reading to self).  Sorry.  I'm reading
 9   the thing out loud.  I shouldn't be.
10   BY MR. HAZLEHURST:
11       Q    That's okay.  Let's move on, and it might be
12   more clear.  We can come back to this one.
13       A    Okay.
14       Q    Okay.  Exhibit 48, this is an August 2nd, 2018,
15   email from you to --
16            (Exhibit 48 marked.)
17            THE DEPONENT:  Can we go back?  I just figured
18   out what this "all parties are aware this is not just an
19   employee severance agreement" and "don't play Noy as a
20   neutral party."  This is back at the -- go up a
21   little -- Exhibit 47.
22   BY MR. HAZLEHURST:
23       Q    Your answer to the question about that was that
24   you had no understanding of what she meant as to
25   employment --
```

<div align="center">153</div>

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

```
 1      A    I figured it out.

 2      Q    Okay.  Do you want to clarify your testimony on

 3 that?

 4      A    Yeah.  Yes, I do.

 5      Q    Okay.

 6           MR. SCHULZ:  Go ahead.

 7           THE DEPONENT:  So -- so this, the big also part

 8 of this agreement is the nondisclosure confidentiality

 9 part.  I am asking for silence, and so this is a big

10 deal.  And so this is why she's saying Noy is not a

11 neutral party anymore.  This is where she's saying Noy

12 must be silenced also, because this is not just a

13 severance agreement.  This is -- this is a blanket

14 release and nondisclosure, or I'm not sure what the

15 legal terminology is.  It's where you don't get to open

16 up your mouth about this anymore, and neither do we.

17 And what she's also saying here is that -- is that Noy

18 also needs to be silenced, because Noy has become privy

19 to the information within.

20 BY MR. HAZLEHURST:

21      Q    And is it your testimony that you would have

22 entered into this agreement for confidentiality and

23 silence even if Laura remained an employee?

24           MR. SCHULZ:  Misstates his testimony.

25           THE DEPONENT:  Sounds good.  I mean --
```

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

```
 1          THE DEPONENT:  I wouldn't be sitting here if
 2   that didn't happen.
 3   BY MR. HAZLEHURST:
 4       Q     This is your August 11, 2018, email to Laura.
 5   It attaches a copy of the severance agreement.  It's
 6   Bates-labeled AVM 10 to AVM 16.  Do you recognize the
 7   email?
 8       A     I do.
 9       Q     I want to skip down to the last full paragraph.
10   It says, "I will give you three days to execute the
11   agreement once you see receive it.  If you do not, then
12   you may pursue me in any fashion you see fit."
13              What did you mean by "pursue me in any fashion
14   you see fit"?
15       A     Just what I said.  I write letters to that --
16   to people who, you know -- that -- that if they need to
17   do something about something they don't like, you know,
18   have at it.  If the world's out there -- you know, the
19   United States of America gives you ways to do it.  The
20   state government gives you ways to do it.  You have ways
21   to do it yourself.  Knock yourself out.
22       Q     So does that mean I'll give you three days to
23   sign the agreement and, if you don't, then you can sue
24   me?
25       A     You fill in the blank any way you want.  At
```

172

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

1   that point, I don't really care.  At that point, I

2   couldn't have cared less about anything that she had to

3   say.

4       Q     At this point, did you expect her to sue you if

5   she didn't sign the agreement?

6       A     I didn't have any.  There wasn't a lot in my

7   head at the time except just maybe just some really pure

8   hatred.  I was pissed off.  I was not happy.

9   Everything, all the effort, all the time, all the stuff

10  all the crap I put up with, all the conversations,

11  everything got exposed in one moment.  It was all gone.

12  As a matter of fact, to that end, you will even see her

13  say, "I have lost everything."  She says that herself in

14  response to finding out that she sent out that email.

15  And I don't know where that is.  It's burned in my head

16  and -- and -- because that's what happened.  It was --

17  it was a complete -- it was a complete nuclear meltdown.

18      Q     At the time that you sent this e-mail to her on

19  August 11, 2018, you had just requested an increase in

20  your EPL policy limits the day before; correct?

21      A     What's the date here?

22      Q     August 11, 2018?

23      A     Yeah.  I think -- I think -- what is it?  I

24  think it renews on the 19th.  Erik usually comes down a

25  week or two early to explain -- and that's Erik with

                              173

1    Wateridge, Erik Hulquist -- to explain to me what his

2    insurance proposals are, and then we go over all of

3    the -- of the features of the GL and -- and anything

4    else that the package has.

5        Q    Okay.  So when you're inviting Laura to pursue

6    you in any fashion she sees fit, you know at this point

7    that the day before, you had just increased your

8    insurance policy limits?

9            MR. SCHULZ:  Objection.  That completely

10   misstates his testimony.  It's argumentative.

11           THE DEPONENT:  Yeah.  Well, first of all, I

12   didn't increase it the day after.  I don't -- it was not

13   done at --

14           It was a discussion item that Erik and I went

15   over, all of the endorsements and all the individual

16   stuff.  I mean, you know, just, like, building content

17   and fire stuff and everything.  And so -- so we did come

18   across the EPL policy that was -- had only $500,000.

19   You know, $500,000 to me is the number that, you know,

20   you have for protection when you're not worried about

21   much, you know.  And so, obviously, being through what I

22   was with Laura and all other things, it seemed prudent

23   to me at the time that it was probably prudent to bump

24   it if it was affordable.  And so at that time, I'm sure

25   what I asked Erik was how much would 500 cost.  I don't

174

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

REDACTED



177

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 199

REDACTED



178

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

**R E D A C T E D**



179

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

REDACTED



180

REDACTED



181

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

R E D A C T E D

182

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

REDACTED



183

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

```
 1      A    No.  It is not accurate.  Not on a specific
 2  schedule, no.
 3      Q    Paragraph 37 alleges that in 2013, you moved
 4  Laura to a corner office upstairs and that other
 5  employees left every day at 3:00 and that -- is that --
 6  is that accurate?  That the employees on that floor
 7  would leave at 3:00 p.m.?
 8      A    They would leave earlier, whether it was 3:00
 9  or 4:00 or 5:00.  But, at some point, you know, sure,
10  they would leave.
11      Q    Is the allegation in the following sentence
12  that after being relocated to the office, you began
13  directing Laura to go on the internet and search for
14  women interested in having threesomes?  Is that
15  accurate?
16      A    Not as a sole directive from me.  Laura was the
17  person who showed me the websites that she would get
18  onto to be able to find other people to have sex with.
19      Q    Why was Laura relocated upstairs in 2013?
20      A    Because the office became available.  There are
21  three corner offices.  The three corner offices are the
22  nicest offices in the building.  One became available,
23  and Laura was the power person that deserved the office.
24  And I have no idea if that happened in 2013, by the way,
25  so --
```

203

**BARKLEY**
Court Reporters

1   Q   Okay.  But the allegation that she would search

2   for women to have threesomes with with you in the --

3   while at the office, that's an accurate allegation?

4   A   I mean, it happened occasionally, sure.

5   Q   The allegation at the end of Paragraph 37 that

6   Laura was expected to give you oral sex before you left

7   for the workday, is that accurate?

8   A   There was no expectation.

9   Q   But the allegation that this occurred at the

10   office, that's accurate?

11   A   That is accurate.

12   Q   Okay.  And it occurred in her office?

13   A   It did.

14   Q   Paragraph 43, alleges that Laura continued to

15   perform -- perform her job more than competently as

16   shown by continued raises and promotions.  Is that

17   accurate?

18   A   Oh, yes.  Laura was completely competent

19   throughout the entirety of her time at AV Builders.  She

20   was a star.

21   Q   You never had an issue with her job

22   performance; correct?

23   A   Well, occasionally, we had issues.  But, you

24   know, every once in a while, you know, I mean, she would

25   forget who owned the company and thought she did.  But

204

1  besides that, no, she was a -- she was a superstar.

2      Q    Paragraph 44 alleges that you made a series of

3  verbal promises, including stating that Laura's job was

4  guaranteed for life or words to that effect.  Is that

5  accurate?

6      A    Words to that effect would be accurate, yeah.

7  She is -- she was -- she was my bro.

8      Q    Continuing on in that paragraph, there's an

9  allegation of further promises, including the

10  commissions that we discussed for the various projects,

11  and then portion of the sale of AV Builders in 2021 or

12  '22, 2022, title of the company vehicle, and 400,000 in

13  a joint venture.  Are all those allegations correct?

14      A    Okay.  So let's just go through them, though.

15  Where do we start?  Which letter?

16      Q    Well, I think we can take A through D together,

17  because we previously looked at these.  These are the

18  commissions on the projects.  So are those accurate?

19      A    Well, as shown in the emails are accurate,

20  correct.

21      Q    Okay.  And then --

22          (Simultaneous speaking.)

23  BY MR. HAZLEHURST:

24      Q    -- E, the allegation that she would receive a

25  portion of the sale price of the company?

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 208

```
 1   BY MR. HAZLEHURST:
 2       Q    You made Laura aware that Noylan had ordered
 3   you -- sorry.  Not -- strike ordered.
 4            You made Noylan aware that -- sorry.
 5            You made Laura aware that Noylan had directed
 6   you to terminate her employment; is that correct?
 7       A    I would not doubt that I had conversations with
 8   Laura where I may have said to her that Noy, you know,
 9   is unhappy and is not happy that you're there, and, you
10   know, you're making it tough and what are we doing here
11   and can this all stop?  And, yeah, yeah, sure.  As --
12   as -- as talking goes between people as to what's
13   happening with the creation, the angst, you know, these
14   things kind of naturally occur with one other.  But to
15   say Noylan had ordered me to do it would be inaccurate.
16            CERTIFIED SHORTHAND REPORTER:  It's been an
17   hour, and I need five minutes to stand up.
18            MR. HAZLEHURST:  Okay.
19            MR. SCHULZ:  Off.
20            CERTIFIED SHORTHAND REPORTER:  We're off the
21   record.
22            (A recess was taken.)
23            CERTIFIED SHORTHAND REPORTER:  Back on the
24   record.
25   ///
```

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 209

# R E D A C T E D



215

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

AVB MSJ Appendix P. 210

**R E D A C T E D**



216

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

**BARKLEY**
Court Reporters

# R E D A C T E D



217

ANTONIO MADUREIRA, SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

REDACTED



218

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

REDACTED



223

BARKLEY
Court Reporters

AVB MSJ Appendix P. 214

REDACTED



224

ANTONIO MADUREIRA,  SUBJECT TO PROTECTIVE ORDER

BARKLEY
Court Reporters

**REDACTED**



225

```
 1    record.
 2              (Deposition concluded at 6:53 p.m.)
 3                        -oOo-
 4
 5
 6
 7
 8              I have read the foregoing deposition
 9    transcript and by signing hereafter, subject to
10    any changes I have made, approve same.
11
12    Dated_____4/20/21_____.
13
14
15                              _____
16                              (Signature of Deponent)
17
18
19
20
21
22
23
24
25
```

240

BARKLEY
Court Reporters

April 20, 2021

**CHANGES TO TRANSCRIPT OF**

Antonio Madureira _____, March 18 , 2021

CASE NAME AV Builders et al _____ v. Houston Casualty Co.

(If Federal case, provide reason for change)

| Page / Line | |
|---|---|
| | No Changes |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |

Signature of Deponent _____



# Exhibit 5

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

AV BUILDER CORP, a California      )
corporation; RESTOR, a            )
California corporation; and       )
ANTONIO MADUREIRA, an             )
individual,                       )
                                  )
          Plaintiffs,             )
                                  )
     vs.                          )   Case No. 3:20-cv-
                                  )        01679-W-KSC
HOUSTON CASUALTY COMPANY, a       )
Texas corporation,                )
                                  )
          Defendant.              )
_____)

DEPOSITION OF DICRAN "DICK" AVEDIS SEMERDJIAN, ESQ.

VIA VIDEO CONFERENCE

TUESDAY, APRIL 27, 2021

1:01 P.M.

FILE NO. 411135
REPORTED BY LEESA DURRANT, CSR NO. 11899, RPR



AdvancedONE LEGAL

(866) 715-7770
advancedONE.com

# REDACTED

AV BUILDER CORP vs HOUSTON CASUALTY                                29
Dicran Avedis Semerdjian, Esq. 04/27/2021



AV BUILDER CORP vs HOUSTON CASUALTY
Dicran Avedis Semerdjian, Esq. 04/27/2021
30



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

# REDACTED

AV BUILDER CORP vs HOUSTON CASUALTY
Dicran Avedis Semerdjian, Esq. 04/27/2021

32



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

R E D A C T E D

AV BUILDER CORP vs HOUSTON CASUALTY                              37
Dicran Avedis Semerdjian, Esq. 04/27/2021



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

# REDACTED

AV BUILDER CORP vs HOUSTON CASUALTY
Dicran Avedis Semerdjian, Esq. 04/27/2021
38



R E D A C T E D

AV BUILDER CORP vs HOUSTON CASUALTY
Dicran Avedis Semerdjian, Esq. 04/27/2021                    39



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com




(866) 715-7770
advancedONE.com

AV BUILDER CORP vs HOUSTON CASUALTY                    41
Dicran Avedis Semerdjian, Esq. 04/27/2021

1   stamped HCC 469.

2       A    I have it up, James.

3       Q    Okay.  Thank you.  The August 14th e-mail, you

4   responded to Josh and he said, "As always, good to be

5   working with you."  I take it to mean that you were

6   familiar with Josh when you received his August 14th

7   e-mail?

8       A    Oh, yeah, I was.

9       Q    Can you explain to me the basis of that

10  familiarity with him?

11      A    Probably as of August 15th, 2018, Josh and I

12  were adverse to each other in at least ten cases.  It

13  could be more.  It's definitely not less.

14      Q    And are you saying that as of that time

15  period, you had ten active cases that you are adverse --

16  okay.

17      A    No.

18      Q    So you had ten total over what time period?

19      A    Probably a ten-year time period.

20      Q    So on average, maybe one a year?

21      A    Yeah, it could be a little higher, like I

22  said.  We ran into each other in cases all the time.  As

23  you might know, you know, he does plaintiff's employment

24  work.  We do defense work.  And we see each other quite

25  a bit on these cases.



(866) 715-7770
advancedONE.com

AV BUILDER CORP vs HOUSTON CASUALTY                                    46
Dicran Avedis Semerdjian, Esq. 04/27/2021

1   Incomplete hypothetical.  I'll defer to Mr. Semerdjian's

2   counsel as to whether he wants him to answer those types

3   of questions in this depo.

4           MR. PETTIT:  That was going to be my objection

5   too.  That's overbroad.  Incomplete hypothetical.  To

6   some extent you appear to be calling for expert

7   testimony and I don't think he's here as an expert

8   witness.  I think he's here as a percipient witness.

9   BY MR. HAZELHURST:

10          Q    I'm not asking for an expert opinion on it.  I

11  just wanted to know if that would be the practice if you

12  have an employer and somebody is asserting claims

13  against them, even if you think it's wage and hour,

14  would you tender to the insurer?

15          A    No, I would not tender to the insurer at that

16  time until I have an absolute understanding as to what

17  the claims are.  Once I understand what the claims are,

18  then I would tender.

19          I've tendered before, James, to insurance

20  companies and they are like, "We're not going to respond

21  because we don't know if this is an insured event or a

22  covered claim.  You know, wait until the lawsuit is

23  filed and then we'll evaluate it."  So at this

24  particular juncture I had nothing to tender.

25          Q    Okay.  I'm going to move to Exhibit 84.



(866) 715-7770
advancedONE.com

```
 1              (Whereupon Defendant's Exhibit 84 was

 2              marked for identification by the Court

 3              Reporter.)

 4    BY MR. HAZELHURST:

 5        Q    And this is a September 13th, 2018 letter from

 6    Josh Gruenberg to you attaching the draft complaint from

 7    Laura Dusina.   It's Bates stamped HC 345 to HC 368.

 8        A    Got it.

 9        Q    Okay.  The question I have on this one is we

10    just looked at the e-mail chain between you and Josh

11    from August 15th of 2018.  Now we have this

12    September 13th, 2018 letter.  Did you have any

13    communications with Josh Gruenberg about the Laura

14    Dusina matter between August 15th, 2018 and

15    September 13th, 2018?

16        A    No.  In fact, I looked as I was reviewing

17    e-mails.  There was no communication for that one month

18    period at all.

19        Q    Okay.  Exhibit 85.

20              (Whereupon Defendant's Exhibit 85 was

21              marked for identification by the Court

22              Reporter.)

23    BY MR. HAZELHURST:

24        Q    This is a September 25th, 2018 e-mail from

25    Tony to you, Bates stamped HC 436.
```

1      A    Okay.   I have it open.

2      Q    Okay.   And in that e-mail, Tony to you, the

3   line before the last one, it says, "I requested my EPL

4   policy from my broker and as soon as I receive it, I

5   will forward it to you."

6           The question I have is does this refresh your

7   memory as to when you first reviewed the EPL policy?

8      A    I note that he -- around this time period he

9   did request it from his broker and sent it to me.   I do

10  know that.   I don't know exactly when I reviewed it, but

11  it was not too far off from where we were.

12     Q    Okay.   And going back to when Tony had

13  requested it on August 6th, 2018, is it your testimony

14  that you don't know if you reviewed it at that point?

15     A    I don't have any recollection one way or

16  another.

17          (Whereupon Defendant's Exhibit 86 was

18          marked for identification by the Court

19          Reporter.)

20  BY MR. HAZELHURST:

21     Q    Exhibit 86 is an October 15th, 2018 letter

22  from you to Tokio Marine HCC, Bates stamped HC 277 to

23  302.

24     A    Okay.   It's opened, James.

25     Q    Okay.   I think we covered this but I just want

AV BUILDER CORP vs HOUSTON CASUALTY                           50
Dicran Avedis Semerdjian, Esq. 04/27/2021

1  Great American doesn't write employment litigation

2  anymore.  Hartford, I haven't had a case in a while.

3  Aspen, I'm on their panel.  Hiscox, I'm on their panel

4  and I don't think York is around.

5      Q    You mentioned that some insurance policies

6  have some wage and hour coverage.  Have you been panel

7  counsel for any of these insurers on wage and hour

8  matters?

9      A    I'm sure I have, but I couldn't tell you.  I

10 mean, the policies change so frequently.  There was a

11 time when wage and hour was covered and then there were

12 so many wage and hour cases, as you probably well know,

13 that exclusions started popping up and so that question

14 is a little too general for me to answer.

15     Q    Can you give a time frame as to when you

16 started to see wage and hour exclusions on policies?

17     A    They're pretty tough today, I'll tell you that

18 much.  I mean, you don't see a lot of wage and hour

19 coverage anymore.  Maybe you'll see minimal defense

20 costs of like 25 grand.

21          So I would say within the past five to seven

22 years you see a proliferation of insurance companies

23 providing wage and hour exclusions.

24     Q    Referring back to this letter on the next

25 sentence you say that you can give a referral for a

AdvancedONE        (866) 715-7770
LEGAL              advancedONE.com

AVB MSJ Appendix P. 233

1   matter handled for HCC?

2        A    Yeah, my partner, Sarah Evans, is also an

3   employment defense attorney and she had worked with

4   Carol Antinnuni (phonetic) in the past, had a good

5   relationship with her.  We thought that if Tokio Marine

6   or Houston Casualty was interested in the retention of

7   our firm and wanted more information, it would be good

8   to give them a referral source.

9        Q    Are you familiar with the matter that Sarah

10  Evans handled?

11       A    I'm not.

12       Q    Move on to the next exhibit, 87.

13            (Whereupon Defendant's Exhibit 87 was

14            marked for identification by the Court

15            Reporter.)

16  BY MR. HAZELHURST:

17       Q    And this is an October 22nd, 2018 letter from

18  you to Kathryn Sherman of Tokio Marine HCC, Bates

19  stamped HCC 429 to 430.

20       A    Okay.  I have it up.

21       Q    Okay.  I want to direct your attention to

22  No. 2, the first sentence there, it says, "The date upon

23  which your insured first became aware of the claim is a

24  nuanced issue."

25       A    I don't really know but I think what I meant

AV BUILDER CORP vs HOUSTON CASUALTY                    52
Dicran Avedis Semerdjian, Esq. 04/27/2021

1    to say was that when we received the complaint from Josh
2    Gruenberg and I think it was that e-mail -- I mean, the
3    September 13th, 2018 letter that included the complaint,
4    we were blown away, meaning Tony and I were blown away
5    by the bombastic language and pleadings in that
6    complaint.  It came out of left field.  It was like
7    someone hit Tony right in the face.  It was filled with
8    mistruths, in his opinion, lies and just overt -- over
9    the top.
10           And what I believe I'm saying here is we
11   became aware of those claims on that date,
12   September 13th, 2018.  It's the "nuanced issue," it's
13   probably a bad form of art, but it was -- it should have
14   said, "Claims which are completely outrageous."  That's
15   what I was trying to say is that, "This complaint is
16   full of stuff that is hotly disputed."
17      Q    Based on your experience with Josh Gruenberg,
18   would you say that the way the allegations were pled was
19   uncharacteristic of him?
20      A    I would say they were over the top.  They
21   were, even for Josh, over the top.
22      Q    What do you mean by that, "even for Josh"?
23      A    He's known to be a very aggressive attorney
24   and he does assert highly contentious allegations.
25   We've seen this in the past.  But this one seemed to be



(866) 715-7770
advancedONE.com

1  way more than normal.  Clearly they came out of left

2  field for Tony.  And there was a definite difference of

3  opinion with regards to the truth of the matters

4  asserted.

5         And that's why when I was talking -- or

6  writing this letter to Ms. Sherman, the claims are a

7  nuanced issue because they were hotly contested and

8  disputed.

9     Q    You mentioned earlier that when you saw that

10  Josh was going to be handling Laura's case, that you

11  felt a little bit -- I don't know if you used the term,

12  kind of like a relief that, you know, "It will be

13  something I can get resolved."  But you just also

14  mentioned that Josh is known to be an aggressive

15  attorney.  Did you have that thought as well, like that

16  this might be protractive litigation because Josh was

17  involved?

18     A    Not when I first got his e-mail in August.  I

19  did not think that.  In fact, when I got the claim, I

20  called Josh and immediately he said, "Let's try to get

21  it settled.  Let's -- before I file this thing, let's

22  see if we can get it settled.  Let's go to mediation,

23  work it out."

24         I was telling Josh that, you know, I believed,

25  as did Tony, that what Laura wants is compensation, you



AdvancedONE
LEGAL

(866) 715-7770
advancedONE.com

AV BUILDER CORP vs HOUSTON CASUALTY                    59
Dicran Avedis Semerdjian, Esq. 04/27/2021

```
 1        A    Okay.  It's up, James.
 2        Q    Okay.  Do you remember receiving this letter
 3   in November of 2018?
 4        A    I know I received it.  I don't remember
 5   receiving it, but I know I received it.
 6        Q    Did you review this letter in connection with
 7   the deposition today?
 8        A    No.
 9        Q    If you flip to the ninth page of the letter,
10   you see that there's a denial of coverage?
11        A    Yes.
12        Q    What was your reaction to the denial of
13   coverage?
14        A    Well, you have to remember one thing is that I
15   think we tendered the lawsuit after I received Josh's
16   complaint in October of 2018.  During the time period
17   between October 15th of 2018 and this November 9th
18   letter, so almost a month, we had supplied Houston
19   Casualty, through Ms. Sherman and the claims adjuster
20   with the last name Gonzalez and I don't remember her
21   first name, all of the information that they wanted.
22             They asked for a lot of material having to do
23   with the claim and we made sure we cooperated and
24   provided them everything they wanted.  And nothing was
25   held back whatsoever.
```

AV BUILDER CORP vs HOUSTON CASUALTY                    60
Dicran Avedis Semerdjian, Esq. 04/27/2021

1              And so my reaction when I got this letter, was
2    disbelief frankly.  I could not believe that an
3    insurance company who's taking premiums from a business
4    client, when a tender of a case made is covered, would
5    flat out deny a defense and flat out deny indemnity,
6    not even defending with a reservation of rights.  I was
7    just blown away and was not happy at all and obviously
8    my client wasn't happy as well.  So that was my
9    reaction.
10        Q    As of the point that you're receiving this
11   November 9th, 2018 letter, are you contemplating
12   litigation with the insurance company, HCC at that
13   point?
14        A    I was begging them for reconsideration and
15   begging them to step up and come to the mediation with
16   us.  It was four days after this.
17              That's another thing I should mention.  We had
18   mediation set that they knew about on
19   November 13th, 2018 before a very respected retired
20   female judge, Linda Quinn.  I urged them and begged them
21   to attend.
22              I really thought they would because if they
23   were, in my opinion, looking out for the best interest
24   of their insured, they would have been there.  They
25   could have been noncommittal.  They could have just



(866) 715-7770
advancedONE.com

AV BUILDER CORP vs HOUSTON CASUALTY                    61
Dicran Avedis Semerdjian, Esq. 04/27/2021

```
 1   listened.  But they should have been there.  And the
 2   fact that three days -- four days before our mediation I
 3   get a denial letter was very disappointing to say the
 4   least especially after giving them all this information
 5   they requested.
 6           We held back nothing.  We had nothing to hide.
 7   We submitted everything they asked for, including Tony's
 8   name, phone number, address, e-mail address thinking
 9   that, you know what, they'll pick up the phone and
10   they'll take a statement of their insured and then
11   they'll sort of get what really happened.  I understand
12   from my client that they never even called him which --
13   it just blows me away, James.  Blows me away.
14       Q    What other information did the company request
15   that you said that you provided?
16       A    We provided all e-mails between me and
17   Mr. Gruenberg, Josh.  We provided all e-mails between
18   Tony and Laura which they requested.  We provided all
19   information concerning her claims which they requested.
20   I think there was four -- three or four different
21   requests that came in that we worked diligently on to
22   get to either Ms. Sherman or Ms. Gonzalez thinking that
23   they would, at a minimum, review and then attend the
24   mediation to at least participate.  That's all we asked
25   for.
```



**(866) 715-7770**
advancedONE.com

AV BUILDER CORP vs HOUSTON CASUALTY                    62
Dicran Avedis Semerdjian, Esq. 04/27/2021

1        But the fact that they -- after receiving all

2   that information, including all of Tony's information,

3   they still never statementized him, called him to get

4   his side of the story, their insured's side of the

5   story, was just unacceptable.

6        So when I got this November 9th, 2018 letter,

7   it was extremely disappointing.

8        Q    Exhibit 88.

9             (Whereupon Defendant's Exhibit 88 was

10            marked for identification by the Court

11            Reporter.)

12  BY MR. HAZELHURST:

13       Q    This is an October 23rd, 2018 e-mail from you

14  to Kathryn Sherman of HCC, Bates stamped HC 305 to HC

15  308.

16            On the first page, the e-mail from you to

17  Kathryn, it says, "Attached is the communications

18  between me and the Dusina attorneys."  Was that what you

19  were just referring to as far as the requests?

20       A    That's one of probably three or four e-mails

21  that I recall or letters requesting information.  But

22  the answer is, yes.

23       Q    Okay.  And the next page, HC 306, there's an

24  e-mail from you to Kathryn Sherman at 6:33 p.m. and the

25  second paragraph says, "We are in the process of getting


AdvancedONE LEGAL     (866) 715-7770
                      advancedONE.com

AVB MSJ Appendix P. 240

1    a copy of Ms. Dusina's personnel file and we'll forward

2    it to you."  My understanding is that was never found;

3    is that correct?

4         A    Yeah, we believe she took it with her when she

5    left.  But this e-mail also attached additional

6    information they requested per Ms. Rene Carter-Ali's

7    letter of October 18th.  There was, I think, eight or

8    nine different categories of areas the insurance company

9    wanted and we diligently and quickly found the documents

10   responsive and sent it on to the insurance company.

11        Q    Do you know what was done to look for the

12   personnel file for Laura?

13        A    Yeah, I think what happened was, James, is we

14   got the request and Tony looked for it.  All the

15   employee files were there except for Laura's.  Laura was

16   in charge -- part of her job responsibilities was human

17   resources.  So she and only she had -- and Tony -- had

18   access to the cabinet containing employee files.  So

19   when Tony, you know, went and looked for it, it was

20   gone, no file.

21        Q    Okay.  Exhibit 89.

22             (Whereupon Defendant's Exhibit 89 was

23             marked for identification by the Court

24             Reporter.)

25



# Exhibit 6

# REDACTED

CHRISTINE PHILLIPS - 03/05/2021

```
 1                UNITED STATED DISTRICT COURT

 2              SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   AV BUILDER CORP, a California      )
     corporation; RESTORCORP, a        )
 5   California corporation; and       )
     ANTONIO MADUREIRA, an individual, )
 6                                      )
              Plaintiffs,              )
 7                                      )
        v.                             )   Case No.
 8                                      )   3:20-cv-01679-
     HOUSTON CASUALTY COMPANY,          )   W-KSC
 9   a Texas corporation,              )
                                        )
10              Defendant.             )
     _____ )
11
12
13
14
15
16
17
18
19
20
21
22       VIDEOTAPED VIDEOCONFERENCE DEPOSITION OF CHRISTINE
23   PHILLIPS, taken on Friday, March 5, 2021, at 7:05 a.m.,
24   before Terri L. Emery, Certified Shorthand Reporter, in
25   and for the State of California.
```

REDACTED

CHRISTINE PHILLIPS - 03/05/2021



AVB MSJ Appendix P. 244

REDACTED

CHRISTINE PHILLIPS - 03/05/2021



REDACTED

CHRISTINE PHILLIPS - 03/05/2021



AVB MSJ Appendix P. 246

REDACTED

CHRISTINE PHILLIPS - 03/05/2021



1          DECLARATION UNDER PENALTY OF PERJURY

2

3          I, Christine Phillips, do hereby certify

4     under penalty of perjury that I have reviewed the

5     foregoing transcript of my deposition taken on March 5,

6     2021; that I have made such corrections as appear noted

7     herein in ink; that my testimony as contained herein,

8     as corrected, is true and correct.

9

10         DATED this 26th     day of April        , 20___,

11     at Brewster                            ,  NY           .

12                     City                        State

13

14

15

16                     *Christine Phillips*

17         _____

18                     Christine Phillips

19

20

21

22

23

24

25



# Exhibit 7

KATHRYN SHERMAN - 03/02/2021

```
 1                    UNITED STATES DISTRICT COURT

 2                   SOUTHERN DISTRICT OF CALIFORNIA

 3

 4   AV BUILDER CORP, a California )
     corporation; RESTORCORP, a    )
 5   California corporation; and   )
     ANTONIO MADUREIRA, an         )
 6   individual,                   ) Case No.
                                   ) 3:20-cv-01679-W-KSC
 7        Plaintiffs,              )
                                   )
 8    vs.                          )
                                   )
 9   HOUSTON CASUALTY COMPANY, a   )
     Texas corporation,            )
10                                 )
          Defendant.               )
11   _____)

12

13

14

15

16

17

18

19

20

21   DEPOSITION OF Kathryn Sherman, taken via Zoom,

22   Encino, California, on Tuesday, March 2, 2021, at

23   7:04 A.M., before Michelle Somers, Certified

24   Shorthand Reporter in and for the State of

25   California.
```

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 08:46:44 | 1 | know to change it. |
| 08:46:45 | 2 | Q    So when this file was initially -- the claims |
| 08:46:49 | 3 | admin person placed the 2018 and 2019 policy into the |
| 08:46:54 | 4 | claim file because the claim was first received in |
| 08:46:59 | 5 | October of 2018, correct? |
| 08:47:01 | 6 | A    Just a -- a correction there, you refer to it |
| 08:47:05 | 7 | as a 2018, 2019 policy we've been referring to it as |
| 08:47:08 | 8 | the 2018 policy.  There was no 2019 policy standing |
| 08:47:13 | 9 | alone.  So I just wanted to clarify your question. |
| 08:47:16 | 10 | Q    Okay.  We have agreed to use certain terms at |
| 08:47:20 | 11 | the beginning so let me -- let me try to stick with |
| 08:47:24 | 12 | that.  So when the claim was first initially set up, |
| 08:47:26 | 13 | the claim admin person would have inserted a 2018 |
| 08:47:30 | 14 | policy into the claim file, correct? |
| 08:47:33 | 15 | A    Yes, and it was -- it was opened under that |
| 08:47:36 | 16 | policy period. |
| 08:47:38 | 17 | Q    And that's because the first notice that was |
| 08:47:41 | 18 | received by HCC regarding the Dusina claim was |
| 08:47:46 | 19 | October 15, 2018, correct? |
| 08:47:48 | 20 | A    And like I said, it's whatever the policy is |
| 08:47:54 | 21 | in effect at the time that we receive notice, that's |
| 08:47:56 | 22 | generally where they initially would set it up. |
| 08:48:01 | 23 | Q    And were you the person that then inserted a |
| 08:48:03 | 24 | copy of the 2017 policy into the claim file? |
| 08:48:08 | 25 | A    I don't recall doing that. |

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 08:48:12 | 1 | Q    Okay.  Do you know why the 2017 policy was |
| 08:48:19 | 2 | added to the claim file? |
| 08:48:20 | 3 | A    I don't know that -- I guess you're assuming |
| 08:48:23 | 4 | that it was.  I don't know that it was.  So I can't |
| 08:48:27 | 5 | answer why something was done that I don't know |
| 08:48:29 | 6 | happened. |
| 08:48:29 | 7 | Q    So you're unable to tell by looking at |
| 08:48:34 | 8 | Exhibit 21 whether the 2017 policy, which we identified |
| 08:48:38 | 9 | as pages 4 through 39, were included in or part of the |
| 08:48:44 | 10 | Dusina claim file? |
| 08:48:46 | 11 | A    When you're talking about the claim file |
| 08:48:48 | 12 | you're talking about that in a more broad context then |
| 08:48:53 | 13 | the file that I guess I'm thinking of in my brain so... |
| 08:48:57 | 14 | Q    Why don't you tell me what file you're |
| 08:49:00 | 15 | thinking of in your brain? |
| 08:49:01 | 16 | A    Well, as we discussed earlier when the -- when |
| 08:49:05 | 17 | this deposition started, we had two separate claim |
| 08:49:08 | 18 | numbers, and that's for reasons having to do with our |
| 08:49:11 | 19 | administrative procedures like I just said.  When the |
| 08:49:14 | 20 | claim came it was under the 2018 policy, which is why |
| 08:49:17 | 21 | it initially had a claim number with the No. 18 in it, |
| 08:49:22 | 22 | reflective of it coming under -- under that policy |
| 08:49:23 | 23 | period. |
| 08:49:24 | 24 |      It was later changed after our investigation |
| 08:49:28 | 25 | to 2017 policy period and a new file was opened in |

AVB MSJ Appendix P. 252

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 08:49:32 | 1 | ImageRight.  So the 2017 policy would be in that file, |
| 08:49:38 | 2 | but when you're talking about 2018 -- we were talking |
| 08:49:39 | 3 | about 2018 policy in that initial file and your |
| 08:49:46 | 4 | reference to adding the 2017 policy to that file. |
| 08:49:49 | 5 | That's what I'm -- you're losing me on because as far |
| 08:49:53 | 6 | as I know that didn't happen. |
| 08:49:53 | 7 | Q    Okay.  So let's -- let's -- let's clarify that |
| 08:49:57 | 8 | because there was the footnote that talked about change |
| 08:50:02 | 9 | in the claim number, and perhaps I mistakenly assumed |
| 08:50:06 | 10 | that when that occurred anything that was found in |
| 08:50:09 | 11 | the -- in the original 2018 ImageRight file was copied |
| 08:50:16 | 12 | over in the 2017 file.  So maybe I'm wrong on that, but |
| 08:50:19 | 13 | let me just ask you some questions. |
| 08:50:21 | 14 |     When this claim was first received, it was set |
| 08:50:24 | 15 | up in ImageRight under claim No. STD-18-07037, correct? |
| 08:50:37 | 16 | A    I don't know.  I'd have to look at another |
| 08:50:40 | 17 | document that says that.  I don't have it memorized. |
| 08:50:43 | 18 | Q    Take a look at Exhibit 8 in the Binder 1, |
| 08:50:50 | 19 | which is your November 9, 2018 denial letter.  Tell me |
| 08:51:00 | 20 | if that refreshes your recollection as to the initially |
| 08:51:01 | 21 | assigned claim number? |
| 08:51:02 | 22 | A    Could you repeat what you said the claim |
| 08:51:03 | 23 | number was, please. |
| 08:51:05 | 24 | Q    STD-18-07037. |
| 08:51:12 | 25 | A    That's correct. |

AVB MSJ Appendix P. 253

KATHRYN SHERMAN - 03/02/2021

08:51:13  1        Q    Okay.  So claim comes in, claim administrative
08:51:20  2   person opens up a new claim in ImageRight identified in
08:51:24  3   reference by STD-18-07037, correct?
08:51:24  4        A    Yes.
08:51:32  5        Q    And then in your footnote in Exhibit 8 you
08:51:35  6   say, "For administrative purposes the matter has been
08:51:38  7   resigned claim No. STD-17-07093; do you see that?
08:51:47  8        A    Yes.
08:51:49  9        Q    Describe for me physically how that
08:51:53  10  reassignment occurred, as far as what information went
08:51:56  11  where or what information is stored where within
08:52:01  12  ImageRight?
08:52:01  13       A    Well, typically what would happen is I would
08:52:07  14  direct my claims assistant to copy and paste all of the
08:52:12  15  correspondence, et cetera, and any file notes and put
08:52:16  16  them into a new file that she would have to open.  I
08:52:19  17  don't have authority to open files on my own.  She
08:52:22  18  would have to set up the new file under the 2017 policy
08:52:27  19  and put all that information in there.
08:52:29  20       Q    Okay.  And who is that assistant that would
08:52:32  21  have -- that did that for this case?
08:52:34  22       A    I believe based on reviewing these documents
08:52:37  23  it was Ariana Gonzalez.
08:52:40  24       Q    And do you recall instructing her in this case
08:52:45  25  to cut and paste or copy all the information there from

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 08:52:49 | 1 | the 2018 ImageRight file into the 2017 ImageRight file, |
| 08:52:55 | 2 | once she set that up? |
| 08:52:56 | 3 | A    I don't have an independent recollection of |
| 08:52:59 | 4 | doing that, but I saw an email from myself telling her |
| 08:53:01 | 5 | to, so I know I did. |
| 08:53:03 | 6 | Q    Okay.  And just to confirm, when the documents |
| 08:53:09 | 7 | were produced in this suit, as far as you understand, |
| 08:53:14 | 8 | documents HC1 through at least HC591, which is |
| 08:53:25 | 9 | Exhibit 21, that came from the ImageRight file |
| 08:53:30 | 10 | STD-17-07093, correct? |
| 08:53:35 | 11 | MS. KATZER:  I'm going to go ahead and |
| 08:53:37 | 12 | interject, Mr. Schulz, because the HC production |
| 08:53:43 | 13 | consists of not just the claim file but also documents |
| 08:53:45 | 14 | from the underwriting as well. |
| 08:53:47 | 15 | BY MR. SCHULZ: |
| 08:53:51 | 16 | Q    All right.  Let me just ask you this then: |
| 08:53:52 | 17 | When you provided documents to your attorney to be |
| 08:53:53 | 18 | produced in this lawsuit, did you include everything |
| 08:53:57 | 19 | from the '18 claim file in ImageRight and the '17 claim |
| 08:54:03 | 20 | file in ImageRight? |
| 08:54:04 | 21 | A    I did not provide the claims files to counsel |
| 08:54:09 | 22 | in this case. |
| 08:54:10 | 23 | Q    Who did? |
| 08:54:11 | 24 | A    I don't know. |
| 08:54:11 | 25 | Q    Are you -- from the review of documents that |

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 11:06:09 | 1 | the claim to the insured with information as to your |
| 11:06:16 | 2 | assignment as the person who will be reviewing and |
| 11:06:20 | 3 | responding to the claim, correct? |
| 11:06:22 | 4 | A    Yes, and it includes some requests for |
| 11:06:27 | 5 | information. |
| 11:06:28 | 6 | Q    Yep.  And so in your October 15, 2018 letter |
| 11:06:33 | 7 | you -- you basically generally summarize -- I'm sorry, |
| 11:06:43 | 8 | acknowledge receipt of the claim, let us know -- let |
| 11:06:47 | 9 | Mr. Madureira know you have not yet made any |
| 11:06:47 | 10 | determinations on coverage or liability, that you |
| 11:06:51 | 11 | reserve your rights on both accounts, and that you |
| 11:06:53 | 12 | asked him to provide several enumerated documents as |
| 11:06:57 | 13 | part of your coverage investigation, correct? |
| 11:07:00 | 14 | A    Yes. |
| 11:07:20 | 15 | Q    Okay.  I want to turn now to Exhibit 6 in |
| 11:07:31 | 16 | Binder 1, this has been previously marked as an |
| 11:07:34 | 17 | exhibit, let me know when you're there? |
| 11:07:37 | 18 | A    Yes. |
| 11:07:44 | 19 | Q    You're familiar with Exhibit 6, you've seen it |
| 11:07:47 | 20 | before? |
| 11:07:47 | 21 | A    Yes. |
| 11:07:49 | 22 | Q    In preparation for today and then in the |
| 11:07:51 | 23 | handling of your claim, you're generally familiar with |
| 11:07:54 | 24 | the content of the pleading and the information |
| 11:07:57 | 25 | contained in Exhibit 6? |

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 11:07:59 | 1 | A     Yes. |
| 11:08:01 | 2 | Q     Okay.  Would you agree with me that Exhibit 6 |
| 11:08:08 | 3 | in and of itself is a written document or a writing |
| 11:08:14 | 4 | that would meet the definition of claim as that term is |
| 11:08:18 | 5 | used in the 2018 policy? |
| 11:08:21 | 6 | A     Yes. |
| 11:08:23 | 7 | Q     Okay.  Would you also agree with me that |
| 11:08:30 | 8 | Exhibit 6 and the information contained within the |
| 11:08:33 | 9 | writing that is Exhibit 6 meets the definition of a |
| 11:08:38 | 10 | claim because of an insured event as those terms are |
| 11:08:42 | 11 | defined in the 2018 policy? |
| 11:08:45 | 12 | A     Yes. |
| 11:08:46 | 13 | Q     Okay.  Now the -- and would you agree with me |
| 11:08:57 | 14 | that the claim enumerated in Exhibit 6 because of an |
| 11:09:01 | 15 | insured event was first reported to HCC on October 15, |
| 11:09:08 | 16 | 2018, by Mr. Semerdjian? |
| 11:09:12 | 17 | A     Can you repeat that question. |
| 11:09:16 | 18 | Q     Sure.  Would you agree with me that this claim |
| 11:09:20 | 19 | as enumerated in Exhibit 6, that we've agreed to the |
| 11:09:24 | 20 | claim because of an insured event was first reported to |
| 11:09:28 | 21 | HCC on October 15, 2018, by Mr. Semerdjian? |
| 11:09:33 | 22 | A     I don't think I can agree with that statement, |
| 11:09:37 | 23 | actually. |
| 11:09:38 | 24 | Q     Why not? |
| 11:09:39 | 25 | A     Because the way our policy is written is if |

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 11:09:44 | 1 | you have claims that are based on one insured event, |
| 11:09:49 | 2 | then the claim is first made upon receipt of the |
| 11:09:52 | 3 | first of those entered events, and the claim that was |
| 11:09:55 | 4 | reported to us. |
| 11:09:56 | 5 | Q    Okay.  All right.  And so I understand that |
| 11:10:01 | 6 | was expressed in more detail in your ultimate denial |
| 11:10:04 | 7 | letter to Mr. Madureira? |
| 11:10:06 | 8 | A    Yes. |
| 11:10:08 | 9 | Q    Okay.  So let me ask you this though:  If we |
| 11:10:12 | 10 | take Exhibit 6, which on its own is a writing that |
| 11:10:19 | 11 | constitutes a claim for an insured event, right? |
| 11:10:23 | 12 | A    Yes. |
| 11:10:26 | 13 | Q    I'm gonna take the word "first" out my -- out |
| 11:10:29 | 14 | of my -- out of my question, would you agree with me |
| 11:10:30 | 15 | that the claim as enumerated in Exhibit 6 because of an |
| 11:10:34 | 16 | insured event was forwarded to HCC on October 15, 2018? |
| 11:10:44 | 17 | A    Yes. |
| 11:10:48 | 18 | Q    Okay.  Now, here's -- here's kind of an easy |
| 11:10:56 | 19 | one, it's just a condition of coverage, I want to -- I |
| 11:10:59 | 20 | want to make sure we knock out -- and I'm going to |
| 11:11:01 | 21 | direct you to page 242 just to refresh your memory on |
| 11:11:05 | 22 | the first question.  From your investigation you |
| 11:11:11 | 23 | determined that Ms. Dusina was first hired by AV |
| 11:11:19 | 24 | Builder in 210? |
| 11:11:19 | 25 | A    I'm sorry, 242 of which binder? |

AVB MSJ Appendix P. 258

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 01:13:09 | 1 | the exception of a wage-an-hour claim they claim for a |
| 01:13:11 | 2 | reason that is not an insured event policy does not |
| 01:13:16 | 3 | apply, true? |
| 01:13:18 | 4 | A    I believe that is true against -- without any |
| 01:13:26 | 5 | consideration of any other endorsements for any other |
| 01:13:28 | 6 | types of claims that wouldn't fall under our definition |
| 01:13:32 | 7 | of insured event. |
| 01:13:32 | 8 | Q    Okay.  So in determining whether these |
| 01:13:42 | 9 | writings that we listed before constitute a claim for |
| 01:13:48 | 10 | which this policy applies, we need to look to see |
| 01:13:53 | 11 | whether or not those claims are because of an insured |
| 01:13:57 | 12 | event, right? |
| 01:13:58 | 13 | A    Yes. |
| 01:14:00 | 14 | Q    Okay.  So let's start with the 8/14 email. |
| 01:14:19 | 15 | Exhibit 5, let me know when you're there. |
| 01:14:28 | 16 | A    Yep. |
| 01:14:29 | 17 | Q    Okay.  So Exhibit 5 is the August 14, 2018 |
| 01:14:37 | 18 | email, okay.  What is the insured event that |
| 01:14:40 | 19 | this -- we'll, first let me ask you this:  What are the |
| 01:14:49 | 20 | damages being requested by this email? |
| 01:14:56 | 21 | A    Well, the former employee has retained counsel |
| 01:15:02 | 22 | and he is preparing the lawsuit of presumably to seek |
| 01:15:07 | 23 | damages, and again my understanding of attorneys in |
| 01:15:13 | 24 | California and plaintiff's attorneys having been a |
| 01:15:17 | 25 | plaintiff attorney is that they usually have a lien for |

KATHRYN SHERMAN - 03/02/2021

01:15:22   1   attorneys, fees once they've been retained and those

01:15:23   2   instances which are recoverable under employment laws

01:15:28   3   as damages.

01:15:28   4         Q     Okay.   So the damages that this writing

01:15:35   5   is -- are referring to are attorney fees and what else?

01:15:39   6         A     Any damages that would be -- would be

01:15:46   7   collectable in a lawsuit.

01:15:47   8         Q     Okay.   And what if the lawsuit was -- do you

01:15:51   9   know what this lawsuit he's referring to is for?

01:15:54   10         A     Well, again, this goes back to reviewing the

01:16:00   11   totality of the claim, including the actual complaint

01:16:03   12   that later was filed.

01:16:05   13         Q     Okay.   But what your -- but remember what

01:16:11   14   we're analyzing right now is what the insured knew as

01:16:17   15   of the date in which it received this writing, correct?

01:16:23   16         A     Yes, but that doesn't mean that the complaint

01:16:25   17   is irrelevant to our analysis.

01:16:29   18         Q     Well, as of August 14, 2018, this is -- August

01:16:37   19   first let me clarify this, August 14, 2018, was the

01:16:42   20   very first that Mr. Madureira or his counsel ever heard

01:16:47   21   from       Mr. Gruenberg, correct?

01:16:50   22         A     I don't know, you tell me.   I don't know that.

01:16:54   23         Q     Well, you conducted an investigation, right?

01:16:57   24         A     Well, they didn't provide me with that -- any

01:16:59   25   of their documents.   So I -- I mean, I can't

KATHRYN SHERMAN - 03/02/2021

| | | |
|---|---|---|
| 01:17:02 | 1 | definitively say that.  I'm not -- I don't represent |
| 01:17:04 | 2 | them, so based on the documents provided to us I will |
| 01:17:08 | 3 | agree with that. |
| 01:17:09 | 4 | Q    Okay.  So you are unaware of any evidence that |
| 01:17:14 | 5 | Mr. Gruenberg had ever communicated with anyone on |
| 01:17:19 | 6 | the -- on the insured side prior to August 14, 2018? |
| 01:17:24 | 7 | A    Based on my knowledge, yes. |
| 01:17:31 | 8 | Q    And -- and frankly the common sense reading of |
| 01:17:32 | 9 | this email suggests this is a standard notice of |
| 01:17:34 | 10 | representation by an attorney which would suggest that |
| 01:17:39 | 11 | he had just been retained, right? |
| 01:17:41 | 12 | A    I've seen thousands of representation emails |
| 01:17:45 | 13 | probably by attorneys and they're not all the same, I |
| 01:17:49 | 14 | would disagree with that. |
| 01:17:50 | 15 | Q    Did Mr. Gruenberg include a draft complaint |
| 01:17:59 | 16 | with the August 14, 2018 email? |
| 01:18:01 | 17 | A    Not to my knowledge. |
| 01:18:03 | 18 | Q    Does -- did you interpret this email in any |
| 01:18:08 | 19 | way, shape or form to refer to an insured event? |
| 01:18:15 | 20 | A    Yes. |
| 01:18:19 | 21 | Q    What insured event? |
| 01:18:22 | 22 | A    Well, going back to the severance agreement, |
| 01:18:26 | 23 | which was in the process of being negotiated just |
| 01:18:31 | 24 | almost immediately prior to this email being sent out |
| 01:18:34 | 25 | and presumably there was some sort of breakdown and |

# REDACTION

KATHRYN SHERMAN - 03/02/2021

```
01:39:14   1    view of what the claim "because of an insured event"
01:39:18   2    means, it does not need to be an insured event and
01:39:21   3    claim and damages all alleged in one particular
01:39:24   4    document.  And so I've already identified all of the
01:39:27   5    documents and things that we reviewed and relied on.
01:39:30   6         I can go through each of her emails, email by
01:39:34   7    email that lead to our determination, but I'm just -- I
01:39:39   8    disagree with -- I guess what you're saying.  So it's
01:39:42   9    hard for me to answer your question.
01:39:43  10    Q    And -- and I can appreciate that but my right
01:39:49  11    at a deposition is to be able to find out how you
01:39:52  12    respond to questions when they're asked and, you know,
01:39:57  13    the implications or the arguments that flow from those
01:40:01  14    questions is -- is up to me -- it's up to the judge and
01:40:01  15    the jury.
```



AVB MSJ Appendix P. 262

# REDACTION

KATHRYN SHERMAN - 03/02/2021



# REDACTION

KATHRYN SHERMAN - 03/02/2021



# R E D A C T I O N

| | | |
|---|---|---|
| 01:44:23 | 7 | Q    It's not a request for monetary damages, is |
| 01:44:23 | 8 | it? |
| 01:44:27 | 9 | A    No. |
| 01:44:27 | 10 | Q    Request for some -- for -- it's a request for |
| 01:44:32 | 11 | a written statement, right? |
| 01:44:33 | 12 | A    That's what the words say in the email. |
| 01:44:38 | 13 | Q    Is there anything -- let's look at the last |
| 01:44:38 | 14 | email, July 23, 2018, 4:16 p.m. from Laura to -- or to |
| 01:45:08 | 15 | Tony from Laura.  Are there any words in this document |
| 01:45:08 | 16 | which you determined constituted a written demand for |
| 01:45:08 | 17 | damages because of a insured event? |
| 01:45:25 | 18 | A    This is again in conjunction with her prior |
| 01:45:28 | 19 | email from an hour ago where she's asking for $475,000, |
| | 20 | Mr. Madureira responded disputing what she said the |
| | 21 | amount of money was.  And then she issued this |
| | 22 | additional email, detailed the nature of their |
| | 23 | relationship from her perspective, where she says many |
| | 24 | different things about their relationship, and makes a |
| 01:46:01 | 25 | statement about "that's how you want me to accept this |

DECLARATION OF PENALTY OF PERJURY

I, KATHRYN SHERMAN, do hereby certify under penalty of perjury that I have reviewed the foregoing transcript of my deposition taken on Tuesday, March 2, 2021; that I have made such corrections as appear noted herein in ink; that my testimony as contained herein, as corrected, is true and correct.

DATED this ___6th___ day of ___May___, 20 21 at ___Cornelius___, ~~California~~ North Carolina.

_____
KATHRYN SHERMAN



# Exhibit 8

# R E D A C T E D

ROBERT CUTBIRTH - 03/31/2021

1            UNITED STATES DISTRICT COURT

2          SOUTHERN DISTRICT OF CALIFORNIA

3

4   AV BUILDER CORP, A CALIFORNIA      )
    CORPORATION; RESTORCORP, A          )

5   CALIFORNIA CORPORATION; AND         )
    ANTONIO MADUREIRA, AN INDIVIDUAL, )

6                                )
           PLAINTIFFS,           )

7                                )
       VS.                   ) CASE NO. 3:20-CV-01679

8                                )         W-KSC
    HOUSTON CASUALTY COMPANY, A TEXAS )

9     CORPORATION,                 )
                               )

10           DEFENDANT.           )
   _____ )

11

12

13

14

15

16

17

18

19

20

21       VIDEOTAPED REMOTE DEPOSITION OF ROBERT CUTBIRTH,

22   taken on Wednesday, March 31, 2021 at 9:59 A.M. via video

23   conference before Laury Wasoff, Certified Shorthand

24   Reporter, in and for the State of California.

25

AVB MSJ Appendix P. 268

REDACTED

ROBERT CUTBIRTH - 03/31/2021



AVB MSJ Appendix P. 269

REDACTED



CENTEXT LITIGATION SERVICES
855.CENTEXT

44

# REDACTED

ROBERT CUTBIRTH - 03/31/2021



CENTEXT LITIGATION SERVICES
855.CENTEXT

45

REDACTED

ROBERT CUTBIRTH - 03/31/2021



AVB MSJ Appendix P. 272

REDACTED

ROBERT CUTBIRTH - 03/31/2021



CENTEXT LITIGATION SERVICES
855.CENTEXT

75

# REDACTED

ROBERT CUTBIRTH - 03/31/2021



CENTEXT LITIGATION SERVICES
855.CENTEXT

76

REDACTED

ROBERT CUTBIRTH - 03/31/2021



AVB MSJ Appendix P. 275

# REDACTED

ROBERT CUTBIRTH - 03/31/2021



CENTEXT LITIGATION SERVICES
855.CENTEXT

147

REDACTED

ROBERT CUTBIRTH - 03/31/2021



AVB MSJ Appendix P. 277

REDACTED

ROBERT CUTBIRTH - 03/31/2021



CENTEXT LITIGATION SERVICES
855.CENTEXT

149

REDACTED

ROBERT CUTBIRTH - 03/31/2021



CENTEXT LITIGATION SERVICES
855.CENTEXT

150

# REDACTED

ROBERT CUTBIRTH - 03/31/2021



```
 1   STATE OF CALIFORNIA      )
                              )
 2   COUNTY OF LOS ANGELES    )

 3

 4        I declare under penalty of perjury under the laws of

 5   the State of California that I have read the foregoing

 6   transcript, I have made any corrections, additions or

 7   deletions that I was desirous of making in order to render

 8   the within transcript true and correct, and

 9        In witness whereof, I have hereunto subscribed my name

10   this        day of                , 20   , at

11                           , California.

12

13                              ROBERT CUTBIRTH

14

15

16

17

18

19

20

21

22

23

24

25
```



# Exhibit 9

| | |
|---|---|
| **From:** | Josh Gruenberg |
| **To:** | Dick Semerdjian |
| **Cc:** | Daphne Delvaux; Jesse Collman |
| **Subject:** | Re: Laura Dusina/AV Builder Corp. |
| **Date:** | Wednesday, August 15, 2018 12:12:44 AM |

You too. I look forward to figuring this one out with you.
J

On Tue, Aug 14, 2018 at 6:38 PM Dick Semerdjian <das@sscmlegal.com> wrote:
  OK Josh - as always good to be working with you.

  **Sent from my I-Pad**

  **Dick Semerdjian Esq.**
  **Schwartz Semerdjian Cauley & Moot**
  **101 West Broadway, Suite 810**
  **San Diego CA 92101-8229**

  **Direct** 619.699-8326| **Main** 619.236-8821
  **Fax** 619.236-8827
  Los Angeles Office 310. 550-8857
  das@sscmlegal.com
  **www.sscmlegal.com**

  Additional offices worldwide through our affiliation
  with LEGUS.
  Contact our office for more information.
  **www.leguslaw.com**

  *This message is intended for the addressee only and is privileged*
  *and confidential. Interception or other unauthorized use is*
  *prohibited. If you receive this message in error, please notify me by*
  *reply-email and immediately delete copies from your records.*


  On Aug 14, 2018, at 3:33 PM, Josh Gruenberg <josh@gruenberglaw.com> wrote:

    Hi Dick,
    I wanted to let you know that I have been retained by Ms. Dusina relative to her claims against
    Antonio Madureira and AV Builders.  All further communications with regard to this matter are to
    be with me.  Mr. Madureira is not to communicate in any fashion with Ms. Dusina.

    We are in the process of preparing a suit but will provide it to you prior to filing.

    Thank you,

    Josh

    --
    Josh Gruenberg
    Gruenberg Law
    2155 First Avenue
    San Diego, CA 92101
    (619) 230-1234
    (619) 230-1074 (fax)
    web site: www.gruenberglaw.com (http://www.gruenberglaw.com/)

    Email is  covered by the Electronics Privacy Act, 18 U.S.C., sections
    2510-2521, and is  legally privileged. This email may contain confidential and
    privileged material  for the sole use of the intended recipient(s). Any
    review, use, distribution, or  disclosure by others is strictly prohibited. If you
    are not the intended  recipient, please contact the sender by reply email
    and delete all  copies.

HC000469

To comply with IRS regulations, we advise you that any discussion of federal tax issues in this email was not intended or written to be used, and cannot be used by you, (i) to avoid any penalties imposed under the Internal Revenue Code or (ii) to promote, market or recommend to another party any transaction or matter addressed herein.
------------------------------------------------------------------

--
Sent from Josh's iPhone Josh D. Gruenberg Gruenberg Law 2155 First Avenue San Diego, CA 92101 619.230.1234 telephone 619.230.1074 facsimile josh@gruenberglaw.com www.gruenberglaw.com

HC000470

AVB MSJ Appendix P. 284



# Exhibit 10

CONFIDENTIAL
R E D A C T E D

A. Madureira
Mar 16, 2021
**Ex. 44**
Diana Porter, CSR 12729

| | |
|---|---|
| **From:** | Tony Madureira |
| **Sent:** | Monday, July 23, 2018 2:54 PM |
| **To:** | Laura Dusina |
| **Subject:** | Agreement |
| **Attachments:** | Final Severance Agreement.docx |

**Dick A. Semerdjian**



SCHWARTZ SEMERDJIAN

Schwartz Semerdjian Cauley & Moot LLP
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
Direct 619.699-8326 | Main 619.236-8821 | Fax 619.236-8827
Los Angeles | Orange County Office 310.550-8857
das@sscmlegal.com
www.sscmlegal.com

Additional offices worldwide through our affiliation with LEGUS.
Contact our office for more information.
www.leguslaw.com

*This message is intended for the addressee only and is privileged and confidential. Interception or other unauthorized use is prohibited. If you receive this message in error, please notify me by reply-email and immediately delete copies from your records.*

CONFIDENTIAL

# R E D A C T E D

[black redaction bar]

| | |
|---|---|
| **From:** | Laura Dusina |
| **Sent:** | Monday, July 23, 2018 3:11 PM |
| **To:** | Tony Madureira |
| **Subject:** | RE: Agreement |

[black redaction bar]

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 2:54 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement

[black redaction bar]

Dick A. Semerdjian



## SCHWARTZ SEMERDJIAN

**Schwartz Semerdjian Cauley & Moot LLP**
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
Direct 619.699-8326 | Main 619.236-8821 | Fax 619.236-8827
Los Angeles | Orange County Office 310.550-8857
das@sscmlegal.com
www.sscmlegal.com

Additional offices worldwide through our affiliation with LEGUS.
Contact our office for more information.
www.leguslaw.com

*This message is intended for the addressee only and is privileged and confidential. Interception or other unauthorized use is prohibited. If you receive this message in error, please notify me by reply-email and immediately delete copies from your records.*

CONFIDENTIAL
**R E D A C T E D**

From:        Laura Dusina
Sent:        Monday, July 23, 2018 3:24 PM
To:          Tony Madureira
Subject:     RE: Agreement

From: Tony Madureira
Sent: Monday, July 23, 2018 3:14 PM
To: Laura Dusina <ldusina@avbuilder.com>
Subject: RE: Agreement

From: Laura Dusina
Sent: Monday, July 23, 2018 3:11 PM
To: Tony Madureira
Subject: RE: Agreement

From: Tony Madureira
Sent: Monday, July 23, 2018 2:54 PM
To: Laura Dusina <ldusina@avbuilder.com>
Subject: Agreement

Dick A. Semerdjian



SCHWARTZ SEMERDJIAN

**Schwartz Semerdjian Cauley & Moot LLP**
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
Direct 619.699-8326 | Main 619.236-8821 | Fax 619.236-8827
Los Angeles | Orange County Office 310.550-8857
das@sscmlegal.com
www.sscmlegal.com

CONFIDENTIAL
# R E D A C T E D

From:        Laura Dusina
Sent:        Monday, July 23, 2018 3:26 PM
To:          Tony Madureira
Subject:     RE: Agreement

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:14 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** RE: Agreement

**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:11 PM
**To:** Tony Madureira
**Subject:** RE: Agreement

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 2:54 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement

Dick A. Semerdjian

# SCHWARTZ SEMERDJIAN

**Schwartz Semerdjian Cauley & Moot LLP**
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
Direct 619.699.8326 | Main 619.236.8821 | Fax 619.236.8827
Los Angeles | Orange County Office 310.550.8857
das@sscmlegal.com
www.sscmlegal.com

AVM000453

AVB MSJ Appendix P. 289

CONFIDENTIAL

# REDACTED

Additional offices worldwide through our affiliation with LEGUS.
Contact our office for more information.
www.leguslaw.com

*This message is intended for the addressee only and is privileged and confidential. Interception or other unauthorized use is prohibited. If you receive this message in error, please notify me by reply-email and immediately delete copies from your records.*

**009879**
CONFIDENTIAL

AVM000454

CONFIDENTIAL

# R E D A C T E D

From:       Tony Madureira
Sent:       Monday, July 23, 2018 3:31 PM
To:         Laura Dusina
Subject:    RE: Agreement

**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:26 PM
**To:** Tony Madureira
**Subject:** RE: Agreement

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:14 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** RE: Agreement

**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:11 PM
**To:** Tony Madureira
**Subject:** RE: Agreement

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 2:54 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement

Dick A. Semerdjian

CONFIDENTIAL
R E D A C T E D



## SCHWARTZ SEMERDJIAN

**Schwartz Semerdjian Cauley & Moot LLP**
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
Direct 619.699-8326 | Main 619.236-8821 | Fax 619.236-8827
Los Angeles | Orange County Office 310.550-8857
das@sscmlegal.com
www.sscmlegal.com

Additional offices worldwide through our affiliation with LEGUS.
Contact our office for more information.
www.leguslaw.com

*This message is intended for the addressee only and is privileged and confidential. Interception or other unauthorized use is prohibited. If you receive this message in error, please notify me by reply-email and immediately delete copies from your records.*

**009881**
CONFIDENTIAL

AVM000456

AVB MSJ Appendix P. 292

CONFIDENTIAL
# R E D A C T E D

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:43 PM
**To:** Laura Dusina
**Subject:** RE: Agreement



**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:36 PM
**To:** Tony Madureira
**Subject:** Re: Agreement



**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:26 PM
**To:** Tony Madureira
**Subject:** RE: Agreement

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:14 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** RE: Agreement

**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:11 PM
**To:** Tony Madureira
**Subject:** RE: Agreement

CONFIDENTIAL

# R E D A C T E D

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 2:54 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement



**Dick A. Semerdjian**

<image001.jpg>

**Schwartz Semerdjian Cauley & Moot LLP**
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
Direct 619.699-8326 | Main 619.236-8821 | Fax 619.236-8827
Los Angeles | Orange County Office 310.550-8857
das@sscmlegal.com
www.sscmlegal.com

Additional offices worldwide through our affiliation with LEGUS.
Contact our office for more information.
www.leguslaw.com

*This message is intended for the addressee only and is privileged and confidential. Interception or other unauthorized use is prohibited. If you receive this message in error, please notify me by reply-email and immediately delete copies from your records.*

CONFIDENTIAL
# REDACTED

| | |
|---|---|
| **From:** | Laura Dusina |
| **Sent:** | Monday, July 23, 2018 4:16 PM |
| **To:** | Tony Madureira |
| **Subject:** | RE: Agreement |

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:43 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** RE: Agreement

**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:36 PM
**To:** Tony Madureira
**Subject:** Re: Agreement

**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:26 PM
**To:** Tony Madureira
**Subject:** RE: Agreement



**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:14 PM

24
**009886**
CONFIDENTIAL

AVM000461

CONFIDENTIAL
# R E D A C T E D

**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** RE: Agreement



**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:11 PM
**To:** Tony Madureira
**Subject:** RE: Agreement



**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 2:54 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement



**Dick A. Semerdjian**

<image001.jpg>

**Schwartz Semerdjian Cauley & Moot LLP**
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
Direct 619.699.8326 | Main 619.236.8821 | Fax 619.236.8827
Los Angeles | Orange County Office 310.550-8857
das@sscmlegal.com
www.sscmlegal.com

Additional offices worldwide through our affiliation with LEGUS.
Contact our office for more information.
www.leguslaw.com

*This message is intended for the addressee only and is privileged and confidential. Interception or other unauthorized use is prohibited. If yo receive this message in error, please notify me by reply email and immediately delete copies from your records.*

CONFIDENTIAL

# R E D A C T E D

A. Madureira
Mar 16, 2021

**Ex. 45**

Diana Porter, CSR 12729



| | |
|---|---|
| **From:** | Laura Dusina |
| **Sent:** | Tuesday, July 24, 2018 3:49 PM |
| **To:** | Tony Madureira |
| **Cc:** | lauradusina2@gmail.com |
| **Subject:** | RE: Agreement |



**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:43 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** RE: Agreement

CONFIDENTIAL

**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:36 PM
**To:** Tony Madureira
**Subject:** Re: Agreement



**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:26 PM
**To:** Tony Madureira
**Subject:** RE: Agreement

**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 3:14 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** RE: Agreement



**From:** Laura Dusina
**Sent:** Monday, July 23, 2018 3:11 PM
**To:** Tony Madureira
**Subject:** RE: Agreement



**From:** Tony Madureira
**Sent:** Monday, July 23, 2018 2:54 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement

Dick A. Semerdjian

<image001.jpg>

**Schwartz Semerdjian Cauley & Moot LLP**
101 West Broadway, Suite 810 | San Diego, CA 92101-8229
**Direct** 619.699.8326 | **Main** 619.236.8821 | **Fax** 619.236.8827
Los Angeles | Orange County Office 310.550.8857
das@sscmlegal.com
www.sscmlegal.com

Additional offices worldwide through our affiliation with LEGUS.
Contact our office for more information.
www.leguslaw.com

*This message is intended for the addressee only and is privileged and confidential. Interception or other unauthorized use is prohibited. If you receive this message in error, please notify me by reply-email and immediately delete copies from your records.*

CONFIDENTIAL

# REDACTED

A. Madureira
Mar 16, 2021

## Ex. 46

Diana Porter, CSR 12729



**From:** Laura Dusina
**Sent:** Wednesday, July 25, 2018 3:52 PM
**To:** Tony Madureira
**Subject:** RE: Agreement Comments for Dusina Approval



**From:** Tony Madureira
**Sent:** Wednesday, July 25, 2018 1:35 PM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement Comments for Dusina Approval

CONFIDENTIAL
# R E D A C T E D

A. Madureira
Mar 16, 2021
## Ex. 47
Diana Porter, CSR 12729

**From:**       Laura Dusina
**Sent:**       Wednesday, August 01, 2018 6:52 PM
**To:**         Tony Madureira
**Cc:**         ldusina309@gmail.com
**Subject:**    RE: Agreement





**From:** Tony Madureira
**Sent:** Tuesday, July 31, 2018 10:43 AM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Subject:** Agreement

CONFIDENTIAL
**R E D A C T E D**

A. Madureira
Mar 16, 2021
**Ex. 48**
Diana Porter, CSR 12729

**From:** Tony Madureira
**Sent:** Thursday, August 02, 2018 10:53 AM
**To:** Laura Dusina
**Cc:** ldusina309@gmail.com
**Subject:** RE: Agreement

**From:** Laura Dusina
**Sent:** Thursday, August 2, 2018 10:24 AM
**To:** Tony Madureira
**Cc:** ldusina309@gmail.com
**Subject:** RE: Agreement



**From:** Tony Madureira
**Sent:** Thursday, August 2, 2018 10:02 AM
**To:** Laura Dusina <ldusina@avbuilder.com>
**Cc:** ldusina309@gmail.com
**Subject:** RE: Agreement

**From:** Laura Dusina
**Sent:** Wednesday, August 1, 2018 6:52 PM
**To:** Tony Madureira
**Cc:** ldusina309@gmail.com
**Subject:** RE: Agreement

**009899**
CONFIDENTIAL

AVM000474

AVB MSJ Appendix P. 301

# REDACTED
CONFIDENTIAL

A. Madureira
Mar 16, 2021
**Ex. 49**
Diana Porter, CSR 12729

| | |
|---|---|
| From: | Laura Dusina |
| Sent: | Friday, August 03, 2018 11:04 AM |
| To: | Tony Madureira |
| Cc: | ldusina309@gmail.com |
| Subject: | Re: Agreement Comments for Dusina Approval |







<mime-attachment>

<Final Severance Agreement.docx>

<mime-attachment>

AVM000422

AVB MSJ Appendix P. 303

REDACTED
CONFIDENTIAL



**From:** Laura Dusina
**Sent:** Friday, August 03, 2018 1:47 PM
**To:** Tony Madureira
**Cc:** ldusina309@gmail.com
**Subject:** Re: Madureira Agreement

REDACTED
CONFIDENTIAL

| From: | Laura Dusina |
| Sent: | Friday, August 03, 2018 9:23 AM |
| To: | Tony Madureira |
| Cc: | ldusina309@gmail.com |
| Subject: | Re: Your Computer |

REDACTED

AVM000476

AVB MSJ Appendix P. 305

REDACTED

CONFIDENTIAL



| From: | Laura Dusina |
| Sent: | Friday, August 03, 2018 10:13 AM |
| To: | Tony Madureira |
| Cc: | ldusina309@gmail.com |
| Subject: | Re: Your Computer |

REDACTED

**From:** Laura Dusina
**Sent:** Friday, August 03, 2018 9:28 AM
**To:** Tony Madureira
**Cc:** ldusina309@gmail.com
**Subject:** Re: Your Computer



# REDACTED
CONFIDENTIAL

| | |
|---|---|
| From: | Tony Madureira |
| Sent: | Friday, August 03, 2018 10:27 AM |
| To: | Laura Dusina; ldusina309@gmail.com |
| Subject: | Agreement Comments for Dusina Approval |
| Attachments: | RE: Transfer; Final Severance  Agreement.docx; RE: Quick Question |



AVM000480

# REDACTED

CONFIDENTIAL



# REDACTED

009906
CONFIDENTIAL

AVM000481

**R E D A C T E D**
CONFIDENTIAL



| | |
|---|---|
| **From:** | Tony Madureira |
| **Sent:** | Friday, August 03, 2018 10:31 AM |
| **To:** | Laura Dusina |
| **Cc:** | ldusina309@gmail.com |
| **Subject:** | RE: Your Computer |

On Aug 3, 2018, at 9:32 AM, Tony Madureira <AV@avbuilder.com> wrote:

How about if I pay you to go through it and remove anything you feel fit?

**From:** Laura Dusina
**Sent:** Friday, August 03, 2018 9:23 AM
**To:** Tony Madureira
**Cc:** ldusina309@gmail.com
**Subject:** Re: Your Computer





# Exhibit 11



## SCHWARTZ SEMERDJIAN

Attorneys at Law

**DICK A. SEMERDJIAN**
Direct dial: (619) 699-8326
E-mail: das@sscmlegal.com

October 15, 2018

**VIA ELECTRONIC MAIL AND U.S. MAIL**

Tokio Marine HCC Professional Lines Group
37 Radio Circle Drive
P.O. Box 5000
Mount Kisco, NY  10549-5000
EMAIL:  submitclaims@tmhcc.com

     **Re:**    **Employment claim against your insured AV Builder Corporation**
               **Policy number H718-920263, renewal of number H717-917293**
               **Policy period:  8/19/18-8/19/19**
               **Tender of Claim**

To Whom It May Concern:

     We write to provide you, under the above-referenced policy and any other insurance policies you issued with respect to this new claim, with notice of a claim against your insured AV Builder Corporation.

     We have received the attached draft complaint along with a request for attendance at a mediation, to which we have agreed.  Your insured hereby invokes coverage and tenders its defense and indemnity available under the above-referenced policy or any other applicable policies for this new claim.

     Ms. Dusina's employment at AV Builder was terminated when her consensual relationship with the company president ended.  Our office has begun an investigation related to these claims with our client, and we believe that the legal defense of AV Builder is very strong in light of the long-term, consensual nature of the parties' relationship.

     We know AV Builder's personnel very well, and we also know Ms. Dusina's attorney very well, having litigated at least ten matters with him in the last 12 years.  President Tony Madureira has asked that we continue in our representation in this matter, and we have scheduled a November 12 mediation with retired Superior Court Judge Linda Quinn.

     Our firm is approved panel counsel for several employment practices liability insurance carriers including C N A, Monitor, Federated, Chubb, State Farm, Great American, Hartford, Aspen, Hyscox, and York.  If you would like any referral recommendations from any carrier, please let us know.  If you would like a referral recommendation from within your organization,

Schwartz Semerdjian Cauley & Moot LLP
101 West Broadway, Suite 810 · San Diego, CA  92101-8229 · tel:  619.236.8821 fax: 619.236.8827
www.sscmlegal.com

HC000277



SCHWARTZ SEMERDJIAN
Attorneys at Law

October 15, 2018
Page 2

Tokio Marine HCC's claims attorney Carol Antonini recently worked with my partner Sarah Evans—who will assist in this matter—on a matter which is your claim number STD-17-06003.

Our office understands the reporting and procedural requirements necessary for your company. I know that you will find our legal work exemplary and cost-efficient and our attorney rates very fair.

We have handled numerous sexual harassment and other employment discrimination complaints for a variety of for-profit and nonprofit clients and are happy to provide you referral recommendations from them as well. For more information about me and the firm, please see the attached biography or our website at www.sscmlegal.com.

Please contact me or Mr. Madureira if you have any questions or if you require additional information.

Sincerely,

Dick A. Semerdjian
of
SCHWARTZ SEMERDJIAN
CAULEY & MOOT LLP

DAS:ac
Attachments as stated

cc:   Tony Madureira

HC000278



Josh D. Gruenberg, Esq. SB #163281
Benjamin S. Silver, Esq. SB #284741
Jesse A. Collmann, Esq. SB #310664
**GRUENBERG LAW**
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013
TELEPHONE: (619) 230-1234
TELECOPIER: (619) 230-1074

Attorneys for Plaintiff,
**LAURA DUSINA**

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO, CENTRAL DIVISION

| | |
|---|---|
| LAURA DUSINA, an individual, | ) Case No. |
| | ) |
| Plaintiff, | ) **PLAINTIFF'S COMPLAINT FOR:** |
| | ) |
| v. | ) 1. SEXUAL HARASSMENT [Cal. Gov't |
| | )    Code § 12940(j)]; |
| AV BUILDER CORP, a California corporation; | ) 2. GENDER DISCRIMINATION [Cal. |
| RESTORCORP, a California corporation; | )    Gov't Code § 12940(a)]; |
| ANTONIO MADUREIRA, an individual; and | ) 3. RETALIATION [Cal. Gov't Code § |
| DOES 1 through 25, Inclusive, | )    12940(h)]; |
| | ) 4. FAILURE TO PREVENT |
| Defendants. | )    HARASSMENT AND/OR |
| | )    DISCRIMINATION [Cal. Gov't Code |
| | )    § 12940(k)]; |
| | ) 5. NEGLIGENT SUPERVISION; |
| | ) 6. FAILURE TO PAY WAGES UPON |
| | )    TERMINATION [Cal. Lab. Code § |
| | )    201]; |
| | ) 7. FAILURE TO PROVIDE |
| | )    ACCURATE AND ITEMIZED |
| | )    WAGE STATEMENT [Cal. Lab. Code |
| | )    § 226]; |
| | ) 8. BREACH OF WRITTEN |
| | )    CONTRACT; |
| | ) 9. BREACH OF ORAL CONTRACT; |
| | ) 10. UNLAWFUL BUSINESS |
| | )    PRACTICES [Cal. Bus. & Prof. Code |
| | )    § 17200 *et seq.*]; |
| | ) 11. INENTIONAL INFLICTION OF |
| | )    EMOTIONAL DISTRESS. |
| | ) |
| | ) **[JURY TRIAL DEMANDED]** |

**PLAINTIFF'S COMPLAINT FOR DAMAGES**

1

HC000279

COMES NOW THE PLAINTIFF, alleging against Defendants as follows:

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1.    Plaintiff, LAURA DUSINA, (hereinafter "Plaintiff" or "DUSINA") is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California.

2.    Plaintiff is informed and believes and thereon alleges that Defendant, AV BUILDER CORP (hereinafter "Defendant" or "AV BUILDER") is, and at all relevant times herein mentioned was, a California corporation authorized for, and engaging in, business in the State of California, County of San Diego.

3.    Plaintiff is informed and believes and thereon alleges that AV BUILDER is subject to suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"), Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San Diego and elsewhere.

4.    Plaintiff is informed and believes and thereon alleges that Defendant, RESTORCORP (hereinafter "Defendant" or "RESTORCORP") is, and at all relevant times herein mentioned was, a California corporation authorized for, and engaging in, business in the State of California, County of San Diego.

5.    Plaintiff is informed and believes and thereon alleges that RESTORCORP is subject to suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"), Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San Diego and elsewhere.

6.    Plaintiff believes and thereon alleges that at all relevant times herein mentioned Defendant, ANTONION MADUREIRA (hereinafter "Defendant" or "MADUREIRA"), is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California, County of San Diego.

7.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 to 25, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities when they are ascertained.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000280

GRUENBERG LAW
215S FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

8. Plaintiff is informed and believes, and thereon alleges, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by Defendants.

9. Plaintiff is informed and believes and thereon alleges that the aforementioned DOES are somehow responsible for the acts alleged herein as the agents, employers, representatives or employees of other named Defendant, and in doing the acts herein alleged were acting within the scope of their agency, employment or representative capacity of said named Defendant.

10. The tortious acts and omissions alleged to have occurred herein were performed by Defendants' management level employees. Defendants allowed and/or condoned a continuing pattern of unlawful practices, and have caused, and will continue to cause, Plaintiff economic damage in an amount to be proven at trial.

11. Defendants had constructive knowledge of the tortious acts and/or omissions alleged herein as the result of participating in the wrongful acts or ratifying or affirming the acts once heard or known of.

12. Defendants committed the acts alleged herein maliciously, fraudulently, oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiff's rights.

13. Such tortious acts were authorized or ratified by upper-level managerial employees of Defendants. The actions of Defendants, and each of them, against the Plaintiff constitute unlawful practices in violation of California law, and have caused, and will continue to cause Plaintiff loss of earnings, loss of employment benefits, and other losses in amounts to be proven at trial.

14. As a further proximate result of the unlawful actions of Defendants, and each of their agents, against Plaintiff as alleged herein, Plaintiff has been harmed in that she has suffered emotional pain, humiliation, mental anguish, loss of enjoyment of life, and

HC000281

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   emotional distress.

2   15.   Defendants' conduct warrants the assessment of punitive damages in an amount

3         sufficient to punish Defendants and deter others from engaging in similar conduct.

4   16.   Plaintiff filed a complaint with the Department of Fair Employment and Housing on

5         September XX, 2018 and on that same day received a Right-To-Sue Letter. The

6         Complaint and Letter are collectively attached hereto as "Exhibit A."[1]

7   ### SPECIFIC FACTUAL ALLEGATIONS

8   17.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9         the preceding paragraphs as though fully set forth herein.

10  18.   On or about February 10, 2010, Plaintiff began her employment at AV BUILDER, in the

11        position of Temporary Receptionist/Office Manager. In exchange for her services as

12        Temporary Receptionist/Office Manager, AV BUILDER agreed to pay Plaintiff $13.00

13        per hour.

14  19.   AV BUILDER operates as a general contractor that primarily focuses on the

15        reconstruction of medium and large-scale multi-unit properties throughout the Southwest

16        United States.

17  20.   At all relevant times herein mentioned, Plaintiff performed her job in a competent and

18        diligent manner, as evidenced by the multiple promotions she received.

19  21.   From the outset of her employment, Plaintiff noticed that MADUREIRA, AV

20        BUILDER's President and Founder, took a keen interest in her.

21  22.   At the time Plaintiff began her employment, MADUREIRA was married.

22  23.   MADUREIRA invited Plaintiff out to lunch on her first day of employment. Plaintiff

23        learned later from her colleagues that this was not a customary practice. From that point

24        forward, MADUREIRA continued this nearly daily habit of taking Plaintiff out to lunch

25        throughout her eight-year career.

26  24.   On information and belief, MADUREIRA maintained a long-standing pattern and

27

28        _____

          [1] Plaintiff will file her claim with the DFEH prior to filing her lawsuit with the Superior
          Court of California, County of San Diego.

HC000282

practice of grooming female employees and business colleagues, whereby he desensitized them into tolerating his sexual harassment, then, using his position of power, pressured them into a sexual affair.

25. Over the first few months of her employment, Plaintiff experienced a similar process. MADUREIRA made efforts to ingratiate himself into Plaintiff's life, and the two became friends. At the same time, MADUREIRA's sexually-charged comments and behavior ensured that Plaintiff knew that her role as a female employee was a subservient one.

26. After approximately four months of lunches and grooming, MADUREIRA began a consensual sexual relationship with Plaintiff in June 2010.

27. MADUREIRA came to expect not only lunch with Plaintiff everyday, but sex as well.

28. Given that MADUREIRA was married, he requested that Plaintiff keep their relationship a secret from his family and their coworkers. Plaintiff acquiesced. The balance of their sexual relationship remained largely a secret.

29. For the remainder of 2010 through 2012, MADUREIRA and Plaintiff continued engaging in sexual relations on a regular basis. Plaintiff was expected to join MADUREIRA for lunch whenever he requested her presence.

30. In or around November 2011, AV BUILDER promoted Plaintiff to permanent Office Manager, which included a raise to $21.63 per hour.

31. In or around mid December 2012, MADUREIRA and his wife divorced. Although MADUREIRA was now single, he insisted on keeping his ongoing sexual relationship with Plaintiff a secret.

32. From that point on, MADUREIRA had approximately ten to fifteen "traditional" girlfriends. Despite MADUREIRA's girlfriends, his relationship with Plaintiff remained constant. At times, MADUREIRA would schedule his sexual encounters with Plaintiff around his other relationships. Plaintiff would be expected to meet MADUREIRA for sex on, for example, Wednesday, Friday, and Sunday. The other days, MADUREIRA met with whatever girlfriend he had at the time.

33. Additionally, throughout her employment with AV BUILDER, on occasions when

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

AVB MSJ Appendix P. 317

HC000283

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Plaintiff was too busy for lunch, MADUREIRA would stay in Plaintiff's office, pouting,

2    until Plaintiff relented and agreed to join him for lunch. MADUREIRA also continued

3    making sexual comments about Plaintiff in front of clients and coworkers. Plaintiff found

4    these comments offensive.

5    34.   In or around mid April 2012, AV BUILDER promoted Plaintiff again, adding the duties

6          and responsibilities of Marketing Director. This promotion came with a raise from $21.63

7          to $28.85 per hour.

8    35.   As Marketing Director, Plaintiff continued improving AV BUILDER's business. Her

9          duties grew to include travelling to multi-day conventions and events, where she would

10         represent AV BUILDER to colleagues in the industry and potential clients.

11   36.   Despite Plaintiff's integral role in the success of AV BUILDER, MADUREIRA

12         continued to demean Plaintiff by making inappropriate sexual comments about her in

13         front of her clients and coworkers. Plaintiff found these comments degrading and

14         embarrassing.

15   37.   In or around early 2013, MADUREIRA moved Plaintiff upstairs into a corner office. The

16         other employees on that floor left work everyday at approximately 3:00 p.m. After

17         relocating to the new office, MADUREIRA began directing Plaintiff to go on the internet

18         and search for women interested in having a threesome. This became a daily task for

19         Plaintiff. Once the upstairs employees left at around 3:00 p.m., Plaintiff was expected to

20         begin searching for potential women. MADUREIRA would come to Plaintiff's office

21         around 3:30 p.m. or 4:00 p.m., and review Plaintiff's research. MADUREIRA would then

22         watch and comment as Plaintiff continued her search. After approximately one hour of

23         searching, MADUREIRA would tell Plaintiff that "it is now time for [her] to real job of

24         entertaining [him]," or words to that effect. Plaintiff was then expected to give

25         MADUREIRA oral sex before he left work for the day.

26   38.   In or around May 2015, Plaintiff assumed the role of managing the Billing department of

27         RESTORCORP, an affiliate of AV BUILDER that provides Destructive Testing services.

28         This task was in addition to her other responsibilities. In exchange for performing these

PLAINTIFF'S COMPLAINT FOR DAMAGES
6

HC000284

additional duties, RESTORCORP agreed to pay Plaintiff a $15,000 bonus and an annual commission of 3% of RESTORCORP profits. However, RESTORCORP failed to provide Plaintiff a written commission structure, in violation of California law.

39. When Plaintiff assumed her billing duties, RESTORCORP had significant filing issues and approximately $1,000,000 in unbilled work. Over the coming months, Plaintiff resolved RESTOCORP's billing and filing issues. Once that was complete, Plaintiff continued managing RESTORCORP's Destructive Testing department, where she handled all department contracts and billing.

40. In or around the summer of 2017, Plaintiff took on even more responsibilities at AV BUILDER. The company's Reconstruction department entered into multiple large contracts. These additional projects required monthly billings in both California and Arizona. Managing the billings was complex as they required detailed pay charts and releases, subcontracts and sub pay charts, change orders, and inputting data for portal payment applications. Despite the fact that these billings previously required two dedicated employees, Plaintiff assumed these duties in addition to her other responsibilities at AV BUILDER.

41. On or about December 19, 2017, MADUREIRA contacted Plaintiff and notified her that he and his then-girlfriend, Shila (last name unknown), had a "scare" regarding a potential Sexually Transmitted Disease ("STD"). Although Plaintiff's subsequent tests came back negative, she felt stunned and betrayed by MADUREIRA's reckless conduct, as it potentially exposed her to a STD.

42. After that experience, Plaintiff requested that she and MADUREIRA stop having sexual relations. However, MADUREIRA continued to pursue Plaintiff, and before long, they began engaging in sexual relations again. On one occasion, MADUREIRA explained that he was a "sex addict," and Plaintiff was his "crack."

43. Throughout this entire time, Plaintiff continued to perform her job more than competently, as shown by MADUREIRA's continued praise and promotion of Plaintiff.

44. In addition, MADUREIRA made various verbal promises to Plaintiff to ensure that she

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000285

stayed at AV BUILDER. These promises included, but were not limited to, the following:

    a.  Stating that Plaintiff's job was "guaranteed for life," or words to that effect;

    b.  Promising Plaintiff a commission on the Newport Bluffs project;

    c.  Promising Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project;

    d.  Promising Plaintiff a commission of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed;

    e.  Assuring Plaintiff that she would receive a portion of the sale price of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022;

    f.  Agreeing to sign over the title of Plaintiff's company vehicle; and

    g.  Pledging to invest $400,000 in a joint venture.

45.  Despite promising Plaintiff commissions on certain projects, AV BUILDER failed to put the commission structure in writing and provide Plaintiff a copy, in violation of California law.

46.  On or about February 2018, MADUREIRA began a relationship with a new girlfriend, Noylan Pulaski. As before, MADUREIRA continued his sexual relationship with Plaintiff in secret.

47.  On or about April 16, 2018, MADUREIRA contacted Plaintiff and informed her that Pulaski was experiencing "female health issues," or words to that effect. Plaintiff understood MADUREIRA's warning to mean that she should get tested for STDs. Plaintiff did so, and the results came back negative.

48.  After experiencing yet another scare, Plaintiff decided to end her sexual relationship with MADUREIRA. That same day, Plaintiff confronted MADUREIRA at the AV BUILDER office. Plaintiff explained that she could no longer have a sexual relationship with MADUREIRA given that he potentially exposed her to STDs on multiple occasions and did not respect her enough to protect her sexual health. Plaintiff was adamant that all sexual relations between them must cease immediately. MADUREIRA engaged Plaintiff in an argument, but Plaintiff refused to budge on her decision. MADUREIRA's sexual

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    relationship with Plaintiff ended that day.

2    49.   That same afternoon, MADUREIRA sent Plaintiff an email, entitled "Laura's

3          Resignation/Continuation Agreement." In the email, MADUREIRA stated that AV

4          BUILDER accepted Plaintiff's alleged "verbal resignation." In reality, Plaintiff did not

5          resign her position at AV BUILDER on April 16, 2018; she merely resigned from her

6          position as MADUREIRA's obligatory sexual partner.

7    50.   On or about April 17, 2018, Plaintiff went to work, just as she had consistently done for

8          the past eight years. Indeed, Plaintiff continued working at AV BUILDER over the

9          following months.

10   51.   From that point on, MADUREIRA embarked on a campaign of retaliation designed to

11         force Plaintiff out of her employment at AV BUILDER.

12   52.   Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship

13         was a substantial motivating factor in Defendants' decision retaliate against Plaintiff.

14   53.   Over the coming months, MADUREIRA's attempts to force Plaintiff out of AV

15         BUILDER became more desperate—even though Plaintiff continued to show up each

16         day and competently perform the work of multiple employees. MADUREIRA's

17         retaliatory conduct included, but was not limited to, the following:

18         a.   MADUREIRA stopped coming in to the office after Plaintiff ended their sexual

19              relationship, making it more difficult for Plaintiff to perform her job;

20         b.   MADUREIRA told Plaintiff that she was to blame for his girlfriend breaking up

21              with him twice;

22         c.   After his current girlfriend, Pulaski, found out about his sexual relationship with

23              Plaintiff, MADUREIRA directed Plaintiff to support the lies he told Pulaski in an

24              effort to get them back together. MADUREIRA drafted text messages and emails,

25              then had Plaintiff send them from her phone or email address, so it appeared that

26              they came from Plaintiff. In these messages, Plaintiff, ostensibly, admitted to

27              Pulaski that she was to blame for their failed relationship, her sexual relationship

28              with MADUREIRA was long ago and brief, she is a lesbian, and she is bipolar. In

1    reality, these messages were lies written by MADUREIRA;

2        d.   MADUREIRA told Plaintiff that Pulaski ordered him to terminate Plaintiff's

3             employment;

4        e.   MADUREIRA instructed Plaintiff to delete all of the text messages and photos they

5             exchanged over the previous eight years.

6    54.   At the same time, MADUREIRA worked with his accountant and lawyer to draft an

7          agreement that would basically pay Plaintiff off for her silence. Plaintiff was involved in

8          these negotiations.

9    55.   Plaintiff suffered stress and anxiety due to MADUREIRA's retaliatory behavior and his

10         pressure to sign the Nondisclosure Agreement.

11   56.   On or about July 22, 2018, MADUREIRA effectively terminated Plaintiff's employment,

12         for the second time, via text message, stating, in part, "it's time to move on ... sadly [our]

13         chapter is over ... [you] will get [your] agreement on Tuesday."

14   57.   Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship

15         was a substantial motivating factor in his decision to terminate Plaintiff's employment.

16   58.   Plaintiff's final day of employment at AV BUILDER was scheduled for August 3, 2018.

17   59.   In early August 2018, the negotiations regarding the Nondisclosure Agreement between

18         MADUREIRA and Plaintiff broke down. MADUREIRA presented Plaintiff with the

19         ultimatum that she either sign the latest proposed agreement within three days or receive

20         nothing. Plaintiff never signed MADUREIRA's proposed Nondisclosure Agreement.

21   60.   Despite planning on August 3, 2018 being her final day of employment, Plaintiff's true

22         final day was the following Monday, August 6, 2018.

23   61.   Defendants failed to provide Plaintiff her final paycheck and wage statement on her last

24         day of employment.

25   62.   In addition, prior to her termination, Plaintiff earned approximately $100,000 in

26         commissions for the work she performed on the Newport Bluffs project. AV BUILDER,

27         however, failed to pay Plaintiff this commission, and others, at termination. These unpaid

28         commissions remain outstanding.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

10

HC000288

63.   As a result of Defendants' actions, Plaintiff has suffered, and continues to suffer, emotional distress, anxiety, depression, sleeplessness, stress, worry, and humiliation.

### FIRST CAUSE OF ACTION

### SEXUAL HARASSMENT v. All Defendants

### [Cal. Gov't Code § 12940(j)]

64.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

65.   Plaintiff was at all times material hereto an employee covered by California Government Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

66.   Defendants are, and at all times material hereto were, an employer and/or person within the meaning of the Fair Employment and Housing Act and, as such, barred from harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

67.   Plaintiff was subjected to unwanted and harassing conduct on the basis of her sex, as set forth herein.

68.   The harassing conduct was severe and pervasive.

69.   A reasonable woman in Plaintiff's circumstances would have considered the work environment to be hostile or abusive, and Plaintiff did in fact consider the work environment to be hostile or abusive.

70.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

71.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, to her damage, in a sum to be established according to proof.

72.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

1  73.   In addition to such other damages as may properly be recovered herein, Plaintiff is

2       entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

3                          **SECOND CAUSE OF ACTION**

4       **GENDER DISCRIMINATION v. Defendants AV BUILDER and RESTORCORP**

5                          **[Cal. Gov't Code § 12940(a)]**

6  74.   Plaintiff re-alleges and incorporates herein by reference each and every allegation

7       contained in the proceeding paragraphs as though fully set forth herein.

8  75.   Plaintiff was at all times material hereto an employee covered by California Government

9       Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

10  76.   Defendants are, and at all times material hereto were, employers and/or persons within

11       the meaning of the Fair Employment and Housing Act and, as such, barred from

12       harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

13  77.   Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her

14       employment, as stated herein.

15  78.   Plaintiff believes and thereon alleges that her gender, female, was a motivating reason for

16       Defendants' discrimination against her.

17  79.   Defendants' conduct of discriminating against Plaintiff on the basis of her gender

18       violated Cal. Gov't Code § 12940(a).

19  80.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

20       sustained and continues to sustain substantial losses in earnings, employment benefits,

21       employment opportunities, and Plaintiff has suffered other economic losses in an amount

22       to be determined at time of trial. Plaintiff has sought to mitigate these damages.

23  81.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

24       suffered and continues to suffer humiliation, emotional distress, loss of reputation, and

25       mental and physical pain and anguish, all to her damage in a sum to be established

26       according to proof.

27  82.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled

28       to recover punitive and exemplary damages in an amount commensurate with

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000290

1    Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

2    conduct.

3    83.    In addition to such other damages as may properly be recovered herein, Plaintiff is

4    entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

## THIRD CAUSE OF ACTION

### RETALIATION v. Defendants AV BUILDER and RESTORCORP

### [Cal. Gov't Code § 12940(h)]

8    84.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9    the preceding paragraphs as though fully set forth herein.

10   85.    At all times mentioned herein, Cal. Gov't Code § 12940(h) was in full force and effect

11   and was binding on Defendants. This section requires Defendants, as employers, to

12   refrain from retaliating against any employee who has opposed any practices forbidden

13   under Cal. Gov't Code § 12940, or because the employee has filed a complaint, testified,

14   or assisted in any proceeding under Cal. Gov't Code § 12940(h).

15   86.    Defendants, by and through its employees and agents, engaged in conduct that, taken as a

16   whole, materially and adversely affected the terms and conditions of Plaintiff's

17   employment, as stated herein, up to and including claiming Plaintiff verbally resigned;

18   directing Plaintiff to send false statements about herself to Pulaski; instructing Plaintiff to

19   delete all of her text messages and photos with MADUREIRA; informing Plaintiff that

20   Pulaski ordered her termination; and terminating Plaintiff's employment.

21   87.    Plaintiff believes and thereon alleges that her opposition to the sexual harassment

22   perpetuated by MADUREIRA was a motivating reason for Defendants engaging in

23   conduct that, taken as a whole, materially and adversely affected the terms and conditions

24   of Plaintiff's employment, as stated herein, up to and including, claiming Plaintiff

25   verbally resigned; directing Plaintiff to send false statements about herself to Pulaski;

26   instructing Plaintiff to delete all of her text messages and photos with MADUREIRA;

27   informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's

28   employment.

GRUENBERG LAW
215S FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

88. Defendants' conduct of retaliating against Plaintiff in the terms, conditions, and privileges of her employment, as stated herein, up to and including claiming Plaintiff verbally resigned; directing Plaintiff to send false statements about herself to Pulaski; instructing Plaintiff to delete all of her text messages and photos with MADUREIRA; informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's employment, violates Cal. Gov't Code § 12940(h).

89. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

90. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

91. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

92. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

## FOURTH CAUSE OF ACTION

### FAILURE TO PREVENT HARASSMENT v. Defendants AV BUILDER and RESTORCORP

### [Cal. Gov't Code § 12940(k)]

93. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

94. Plaintiff was subjected to discriminatory and harassing conduct on the basis of her sex, as set forth herein. Plaintiff was also subjected to retaliation for opposing said

HC000292

1  discrimination and/or harassment.

2  95. Defendants failed to take reasonable steps to prevent the discrimination, harassment, and

3  retaliation, as described herein.

4  96. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

5  sustained and continues to sustain substantial losses in earnings, employment benefits,

6  employment opportunities, and Plaintiff has suffered other economic losses in an amount

7  to be determined at time of trial. Plaintiff has sought to mitigate these damages.

8  97. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff

9  has suffered and continues to suffer humiliation, emotional distress, loss of reputation,

10  and mental and physical pain and anguish, all to her damage in a sum to be established

11  according to proof.

12  98. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled

13  to recover punitive and exemplary damages in an amount commensurate with

14  Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

15  conduct.

16  99. In addition to such other damages as may properly be recovered herein, Plaintiff is

17  entitled to recover attorney fees and costs pursuant Cal. Gov't. Code § 12965.

18  **FIFTH CAUSE OF ACTION**

19  **NEGLIGENT SUPERVISION v. Defendants AV BUILDER and RESTORCORP**

20  100. Plaintiff re-alleges and incorporates by reference each and every allegation contained in

21  the preceding paragraphs as though fully set forth herein.

22  101. Plaintiff performed work for Defendants, as an employee, as stated herein.

23  102. Defendants had a legal duty to supervise all employees.

24  103. Defendants' employees or agents took part in unlawful discriminatory conduct, including

25  actions to harass Plaintiff on the basis of her sex in an effort to humiliate and embarrass

26  her, as stated herein.

27  104. Defendants knew or should have known that its employees or agents were engaging in

28  unlawful discriminatory practices, as stated herein.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
15

HC000293

105.   Defendants failed to take reasonable steps necessary to prevent the unlawful discriminatory conduct described herein.

106.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

107.   As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental pain and anguish, all to her damage in a sum to be established according to proof.

<u>**SIXTH CAUSE OF ACTION**</u>

**FAILURE TO PAY WAGES UPON TERMINATION v. Defendants**

**AV BUILDER and RESTORCORP**

**[Cal. Lab. Code § 201]**

108.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

109.   At all times relevant herein, Plaintiff performed work for Defendants.

110.   California law considers commissions "wages under Labor Code § 200.

111.   Plaintiff was terminated from her employment with Defendants. Defendants failed to pay Plaintiff all wages earned and owed to her at the time of her termination, as stated herein, including but not limited to, bonuses, incentive payments, commissions, and overtime pay, in violation of Cal. Labor Code § 201.

112.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained, and continues to sustain, substantial economic damages.

113.   In addition to all other damages properly recoverable, Plaintiff is entitled to statutory penalties pursuant to Cal. Labor Code § 203, an award of costs and attorney fees pursuant to Cal. Labor Code § 218.5, and an award of interest pursuant to Cal. Labor Code § 218.6.

///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

16

HC000294

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

## SEVENTH CAUSE OF ACTION

### FAILURE TO PROVIDE ACCURATE ITEMIZED WAGE STATEMENTS

### v. Defendants AV BUILDER and RESTORCORP

#### [Cal. Labor Code § 226]

114.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

115.  At all times relevant herein, Plaintiff was an employee of Defendants.

116.  California law considers commissions "wages" under Cal. Labor Code § 200.

117.  Defendants knowingly and intentionally failed to provide Plaintiff with an accurate itemized wage statement displaying accurate and complete information as required under Cal. Labor Code § 226(a).

118.  As a result, Plaintiff could not promptly and easily determine her gross and net earned wages, among other things, from the wage statement alone because Defendants failed to accurately calculate Plaintiff's earned commissions.

119.  Plaintiff suffered injury as a result.

120.  Plaintiff is therefore entitled to an award of costs, attorney fees, and penalties pursuant to Cal. Labor Code § 226(e), in an amount according to proof.

121.  Plaintiff is entitled to recover the unpaid additional or premium wages, interest thereon, reasonable attorney fees, and costs of suit pursuant to Cal. Labor Code § 1194(a).

## EIGHTH CAUSE OF ACTION

### BREACH OF WRITTEN CONTRACT v. All Defendants

122.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

123.  Plaintiff and Defendants entered into multiple written agreements, as stated herein.

124.  In exchange for Plaintiff performing work for Defendants, Defendants made certain promises to Plaintiff, including but not limited to, promising Plaintiff a commission on the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission

HC000295

of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus and an annual commission of 3% of RESTORCORP profits; and pledging to invest $400,000 in a joint venture.

125. Plaintiff did all, or substantially all, of the things required of her under the contracts, or in the alternative, Plaintiff was excused from such performance.

126. Defendants failed to perform on the contract by failing to provide Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; a commission of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP profits; and a $400,000 investment in a joint venture.

127. As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as stated herein, Plaintiff has been harmed in that she has suffered substantial economic losses, in an amount according to proof plus interest.

### NINTH CAUSE OF ACTION

### BREACH OF ORAL CONTRACT v. All Defendants

128. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

129. Should the trier of fact find that any of the contracts listed above were not reduced to writing, Plaintiff alleges this claim in the alternative.

130. Plaintiff and Defendants entered into multiple oral agreements, as stated herein.

131. In exchange for Plaintiff performing work for Defendants, Defendants made certain promises to Plaintiff, including but not limited to, promising Plaintiff a commission on the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000296

1  revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission

2  of 0.005% of the total revenue received for any Irvine Company project that AV

3  BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price

4  of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign

5  over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus

6  and an annual commission of 3% of RESTORCORP profits; and pledging to invest

7  $400,000 in a joint venture.

8  132.   Plaintiff did all, or substantially all, of the things required of her under the contracts, or in

9  the alternative, Plaintiff was excused from such performance.

10  133.   Defendants failed to perform on the contract by failing to provide Plaintiff a commission

11  of 0.005% of the total revenue on the prime contract for the Oak Glen project; a

12  commission of 0.005% of the total revenue on the prime contract for the Oak Glen

13  project; a commission of 0.005% of the total revenue received for any Irvine Company

14  project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the

15  title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP

16  profits; and a $400,000 investment in a joint venture.

17  134.   As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as

18  stated herein, Plaintiff has been harmed in that she has suffered substantial economic

19  losses, in an amount according to proof plus interest.

20  <div align="center">**TENTH CAUSE OF ACTION**</div>

21  <div align="center">**UNFAIR COMPETITION v. Defendants AV BUILDER and RESTORCORP**</div>

22  <div align="center">**[Cal. Bus. & Prof. Code § 17200 *et seq.*]**</div>

23  135.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

24  the preceding and subsequent paragraphs as though fully set forth herein.

25  136.   California Business & Professions Code § 17200 *et seq.* prohibits the engagement of any

26  business acts or practices constituting unfair competition. Section 17200 defines "unfair

27  competition" to mean and include "...any unlawful, unfair or fraudulent business act or

28  practice."

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

<div align="center">PLAINTIFF'S COMPLAINT FOR DAMAGES
19</div>

HC000297

137. Defendants have not provided all wages owed to Plaintiff in violation of California Labor Code §§ 201, 204, 216, and 510, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

138. Defendants also failed to provide Plaintiff a signed copy of its commission and bonus policies and obtain a signed receipt of the same from Plaintiff, in violation of Cal. Labor Code § 2751, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

139. Furthermore, Defendants' failure to pay Plaintiff pursuant to the terms of the contract, or alternatively, for the reasonable value of her services, constituted unfair business acts or practices in that such practices negatively affect Defendants' competitors who do pay according to the contracts to which they are parties or, in the alternative, pay the reasonable value of services rendered on their behalves, and properly provide their employees with signed copies of their commission and bonus policies.

140. As a direct and proximate result of Defendants' unlawful and/or unfair business act or practices, Plaintiff has suffered an injury-in-fact and was deprived of money or property to which she has valid and cognizable claims.

141. The harm to Plaintiff resulting from Defendants' unlawful and/or unfair business acts or practices, far outweighs whatever benefits, if any, such business practices have for Defendants.

142. In addition to all other damages properly recoverable, Plaintiff is entitled to all restitution damages arising from Defendants' unlawful and/or unfair business acts or practices, in an amount to be established according to proof plus interest.

143. Plaintiff is further entitled to cumulative damages pursuant to Cal. Bus. & Prof. Code § 17205, and an award of attorney fees pursuant to Cal. Code Civ. Proc. § 1021.5.

///
///
///
///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

AVB MSJ Appendix P. 332

HC000298

# ELEVENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### v. All Defendants

144.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

145.  Defendants' intentional conduct, as set forth herein, was extreme and outrageous.

146.  Defendants intended to cause Plaintiff to suffer extreme emotional distress.  Plaintiff suffered extreme emotional distress.

147.  As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to Plaintiff's damage in an amount according to proof at trial.

148.  Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively with the wrongful intention of injuring Plaintiff from an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover exemplary and punitive damages in amounts to be proven at trial.

///
///
///
///
///
///
///
///
///
///
///
///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

AVB MSJ Appendix P. 333

HC000299

1   **WHEREFORE**, Plaintiff prays for the following relief:

2       1.    For compensatory damages, including loss of wages, promotional opportunities,

3           benefits, and other opportunities of employment, according to proof;

4       2.    For special damages in an amount according to proof;

5       3.    For mental and emotional distress damages;

6       4.    For back pay, front pay, and other monetary relief;

7       5.    For restitution and/or disgorgement;

8       6.    For penalties pursuant to Cal. Labor Code §§ 203 and 226;

9       7.    For cumulative damages, pursuant to Cal. Bus. & Prof. Code § 17205;

10      8.    For punitive damages in an amount necessary to make an example of, and to

11          punish, defendants, and to deter future similar misconduct;

12      9.    For costs of suit, including attorneys' fees as permitted by law, including those

13          available pursuant to Cal. Labor Code §§ 218.5 and 218.6, Cal. Code Civ. Proc. §

14          1021.5, and Cal. Gov't. Code § 12965(b);

15      10.   For an award of interest, including prejudgment interest, at the legal rate as

16          permitted by law, including those permitted by Cal. Gov't Code § 12965(b);

17      11.   For such other and further relief as the Court deems proper and just under all the

18          circumstances.

19  **PLAINTIFF LAURA DUSINA** demands a jury trial on all issues in this case.

20

21  DATED: September ___, 2018         **GRUENBERG LAW**

22

23                                        _____

24                                        JOSH D. GRUENBERG
                                      BENJAMIN S. SILVER

25                                        JESSE A. COLLMANN
                                      Attorneys for Plaintiff,

26                                        **LAURA DUSINA**

27

28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

22

HC000300

### Labor & Employment Law—Team Profile

At Schwartz Semerdjian Cauley & Moot, LLP, our attorneys have broad expertise in matters such as work place investigations, development of effective personnel policies and practices, drafting and negotiation of employment and severance agreements, and conducting in-house employment practices training. Furthermore, our lawyers are skilled in the investigation, negotiation, litigation, arbitration and trial of all types of employment related claims such as wrongful termination, discrimination, harassment, Americans with Disabilities Act disputes, wage and hour law claims, trade secret violations, interference with business claims, and privacy right violation claims. We provide effective, efficient, and creative legal services to meet the distinctive needs of San Diego. Our philosophy is to provide advice and representation that allows our clients to achieve their goals while minimizing legal risk.

Dick A. Semerdjian has been named by the San Diego Daily Transcript as a Top Attorney in the area of Labor & Employment and has long been listed in Best Lawyers of America in the practice area of Labor & Employment. He has defended hundreds of employment related matters, including racial discrimination, disability discrimination, retaliation, sexual harassment, wrongful termination, and wage and hour claims. Dick is past Chairman of the American Bar Association (ABA) Tort Trial and Insurance Practice section and is currently the Chairman of the ABA Commission on the American Jury Project.

Sarah Brite Evans is a partner who provides pre-dispute counseling and guidance to employers and also represents individuals and corporations in employment matters, including class action cases. When grievances and litigation arise, Sarah provides our clients with a vigorous, thorough, well-reasoned defense that is aimed at achieving the best possible result. Sarah is co-author of the employment law chapter in both the original and the Second Edition of "A Practitioner's Guide to Class Actions" published by the American Bar Association. In 2018, Sarah was named the Woman of the Year in California's 40th Senate District.

Sierra J. Spitzer represents individuals and businesses in a variety of civil litigation matters, with a focus on labor and employment issues, personal injury and business litigation, and has appeared on behalf of and defended clients in investigations by the DOL, EDD and DFEH, EEOC and other state and local agencies. She also works closely with corporate counsel, human resource personnel, insurance companies and business owners, providing counseling and assistance in prevention, investigation and early resolution of disputes.

Kristen Bush represents individuals and businesses in a variety of civil litigation matters including employment actions. Prior to joining Schwartz Semerdjian, Kristen gained experience as a Judicial Extern for the Honorable Anthony J. Battaglia, United States District Judge of the Southern District of California. During law school, Kristen was an Executive Editor of the San Diego Law Review and a Law School Councilor on the Graduate Student Council. Kristen is a graduate of the University of San Diego School of Law and the University of California, Merced. Kristen is also co-author of the employment law chapter in the second edition of the American Bar Association's "A Practitioner's Guide to Class Actions."

Alison Adelman is an associate on the firm's litigation team, representing individuals and businesses in employment matters. After graduating from the University of San Diego School of

HC000301

Law and prior to joining Schwartz Semerdjian, Alison practiced civil litigation with her father, Marc Adelman, a former San Diego County and California State Bar President. During law school, Alison was a Judicial Extern for the Honorable Anthony J. Battaglia at the United States District Court for the Southern District of California, an Executive Editor of the San Diego International Law Journal, and a member of the Appellate Moot Court Associate Board. Alison earned her undergraduate degree in Business from the University of Connecticut, where she was a pitcher on the UConn Huskies Division 1 softball team and named to the NCAA and Big East Conference All-Academic teams each year.

SSCM staffs each matter efficiently, with skilled capable attorneys who work as efficiently as possible to provide the maximum benefit to clients. We use a team approach so that there will always be at least one attorney who is fully informed as to all issues on a particular matter. SSCM typically communicates with clients through in-person meetings, telephone calls, and in a written form using either email or mail, depending upon which is most appropriate and time-efficient. Upon request, we are happy to provide a regular written report or presentation regarding any or all matters containing information related to the current status of the matter.

HC000302



# Exhibit 12

Josh D. Gruenberg, Esq. SB #163281
Benjamin S. Silver, Esq. SB #284741
Jesse A. Collmann, Esq. SB #310664
**GRUENBERG LAW**
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013
TELEPHONE: (619) 230-1234
TELECOPIER: (619) 230-1074

Attorneys for Plaintiff,
**LAURA DUSINA**

2018 NOV 21  PM 2:55

C[...]
SAN DIEGO COUNTY, CA

# SUPERIOR COURT OF THE STATE OF CALIFORNIA

## COUNTY OF SAN DIEGO, CENTRAL DIVISION

LAURA DUSINA, an individual,

    Plaintiff,

v.

AV BUILDER CORP, a California corporation;
RESTORCORP, a California corporation;
ANTONIO MADUREIRA, an individual; and
DOES 1 through 25, Inclusive,

    Defendants.

Case No. **37-2018-00058998-CU-OE-CTL**

**PLAINTIFF'S COMPLAINT FOR:**

1. SEXUAL HARASSMENT [Cal. Gov't Code § 12940(j)];
2. GENDER DISCRIMINATION [Cal. Gov't Code § 12940(a)];
3. RETALIATION [Cal. Gov't Code § 12940(h)];
4. FAILURE TO PREVENT HARASSMENT AND/OR DISCRIMINATION [Cal. Gov't Code § 12940(k)];
5. NEGLIGENT SUPERVISION;
6. FAILURE TO PAY WAGES UPON TERMINATION [Cal. Lab. Code § 201];
7. FAILURE TO PROVIDE ACCURATE AND ITEMIZED WAGE STATEMENT [Cal. Lab. Code § 226];
8. BREACH OF WRITTEN CONTRACT;
9. BREACH OF ORAL CONTRACT;
10. UNLAWFUL BUSINESS PRACTICES [Cal. Bus. & Prof. Code § 17200 *et seq.*];
11. INENTIONAL INFLICTION OF EMOTIONAL DISTRESS.

**[JURY TRIAL DEMANDED]**

A. Madureira
Mar 16, 2021

**Ex. 58**

Diana Porter, CSR 12729

PLAINTIFF'S COMPLAINT FOR DAMAGES
1

**015897**

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   COMES NOW THE PLAINTIFF, alleging against Defendants as follows:

2   <u>**GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**</u>

3   1.   Plaintiff, LAURA DUSINA, (hereinafter "Plaintiff" or "DUSINA") is a natural person

4   who is, and at all relevant times was, a resident of the United States and a domiciliary of

5   the State of California.

6   2.   Plaintiff is informed and believes and thereon alleges that Defendant, AV BUILDER

7   CORP (hereinafter "Defendant" or "AV BUILDER") is, and at all relevant times herein

8   mentioned was, a California corporation authorized for, and engaging in, business in the

9   State of California, County of San Diego.

10  3.   Plaintiff is informed and believes and thereon alleges that AV BUILDER is subject to

11  suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"),

12  Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San

13  Diego and elsewhere.

14  4.   Plaintiff is informed and believes and thereon alleges that Defendant, RESTORCORP

15  (hereinafter "Defendant" or "RESTORCORP") is, and at all relevant times herein

16  mentioned was, a California corporation authorized for, and engaging in, business in the

17  State of California, County of San Diego.

18  5.   Plaintiff is informed and believes and thereon alleges that RESTORCORP is subject to

19  suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"),

20  Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San

21  Diego and elsewhere.

22  6.   Plaintiff believes and thereon alleges that at all relevant times herein mentioned

23  Defendant, ANTONION MADUREIRA (hereinafter "Defendant" or "MADUREIRA"),

24  is a natural person who is, and at all relevant times was, a resident of the United States

25  and a domiciliary of the State of California, County of San Diego.

26  7.   Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as

27  DOES 1 to 25, and therefore sues these defendants by such fictitious names. Plaintiff will

28  amend this Complaint to allege the true names and capacities when they are ascertained.

PLAINTIFF'S COMPLAINT FOR DAMAGES
2

8.   Plaintiff is informed and believes, and thereon alleges, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by Defendants.

9.   Plaintiff is informed and believes and thereon alleges that the aforementioned DOES are somehow responsible for the acts alleged herein as the agents, employers, representatives or employees of other named Defendant, and in doing the acts herein alleged were acting within the scope of their agency, employment or representative capacity of said named Defendant.

10.   The tortious acts and omissions alleged to have occurred herein were performed by Defendants' management level employees. Defendants allowed and/or condoned a continuing pattern of unlawful practices, and have caused, and will continue to cause, Plaintiff economic damage in an amount to be proven at trial.

11.   Defendants had constructive knowledge of the tortious acts and/or omissions alleged herein as the result of participating in the wrongful acts or ratifying or affirming the acts once heard or known of.

12.   Defendants committed the acts alleged herein maliciously, fraudulently, oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiff's rights.

13.   Such tortious acts were authorized or ratified by upper-level managerial employees of Defendants. The actions of Defendants, and each of them, against the Plaintiff constitute unlawful practices in violation of California law, and have caused, and will continue to cause Plaintiff loss of earnings, loss of employment benefits, and other losses in amounts to be proven at trial.

14.   As a further proximate result of the unlawful actions of Defendants, and each of their agents, against Plaintiff as alleged herein, Plaintiff has been harmed in that she has suffered emotional pain, humiliation, mental anguish, loss of enjoyment of life, and

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
3

015899

1 emotional distress.

2 15. Defendants' conduct warrants the assessment of punitive damages in an amount

3   sufficient to punish Defendants and deter others from engaging in similar conduct.

4 16. Plaintiff filed a complaint with the Department of Fair Employment and Housing on

5   November 21, 2018 and on that same day received a Right-To-Sue Letter. The Complaint

6   and Letter are collectively attached hereto as "Exhibit A."

7        **SPECIFIC FACTUAL ALLEGATIONS**

8 17. Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9   the preceding paragraphs as though fully set forth herein.

10 18. On or about February 10, 2010, Plaintiff began her employment at AV BUILDER, in the

11   position of Temporary Receptionist/Office Manager. In exchange for her services as

12   Temporary Receptionist/Office Manager, AV BUILDER agreed to pay Plaintiff $13.00

13   per hour.

14 19. AV BUILDER operates as a general contractor that primarily focuses on the

15   reconstruction of medium and large-scale multi-unit properties throughout the Southwest

16   United States.

17 20. At all relevant times herein mentioned, Plaintiff performed her job in a competent and

18   diligent manner, as evidenced by the multiple promotions she received.

19 21. From the outset of her employment, Plaintiff noticed that MADUREIRA, AV

20   BUILDER's President and Founder, took a keen interest in her.

21 22. At the time Plaintiff began her employment, MADUREIRA was married.

22 23. MADUREIRA invited Plaintiff out to lunch on her first day of employment. Plaintiff

23   learned later from her colleagues that this was not a customary practice. From that point

24   forward, MADUREIRA continued this nearly daily habit of taking Plaintiff out to lunch

25   throughout her eight-year career.

26 24. On information and belief, MADUREIRA maintained a long-standing pattern and

27   practice of grooming female employees and business colleagues, whereby he desensitized

28   them into tolerating his sexual harassment, then, using his position of power, pressured

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
4

**015900**

them into a sexual affair.

25. Over the first few months of her employment, Plaintiff experienced a similar process. MADUREIRA made efforts to ingratiate himself into Plaintiff's life, and the two became friends. At the same time, MADUREIRA's sexually-charged comments and behavior ensured that Plaintiff knew that her role as a female employee was a subservient one.

26. After approximately four months of lunches and grooming, MADUREIRA began a consensual sexual relationship with Plaintiff in June 2010.

27. MADUREIRA came to expect not only lunch with Plaintiff everyday, but sex as well.

28. Given that MADUREIRA was married, he requested that Plaintiff keep their relationship a secret from his family and their coworkers. Plaintiff acquiesced. The balance of their sexual relationship remained largely a secret.

29. For the remainder of 2010 through 2012, MADUREIRA and Plaintiff continued engaging in sexual relations on a regular basis. Plaintiff was expected to join MADUREIRA for lunch whenever he requested her presence.

30. In or around November 2011, AV BUILDER promoted Plaintiff to permanent Office Manager, which included a raise to $21.63 per hour.

31. In or around mid December 2012, MADUREIRA and his wife divorced. Although MADUREIRA was now single, he insisted on keeping his ongoing sexual relationship with Plaintiff a secret.

32. From that point on, MADUREIRA had approximately ten to fifteen "traditional" girlfriends. Despite MADUREIRA's girlfriends, his relationship with Plaintiff remained constant. At times, MADUREIRA would schedule his sexual encounters with Plaintiff around his other relationships. Plaintiff would be expected to meet MADUREIRA for sex on, for example, Wednesday, Friday, and Sunday. The other days, MADUREIRA met with whatever girlfriend he had at the time.

33. Additionally, throughout her employment with AV BUILDER, on occasions when Plaintiff was too busy for lunch, MADUREIRA would stay in Plaintiff's office, pouting, until Plaintiff relented and agreed to join him for lunch. MADUREIRA also continued

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

5

015901

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   making sexual comments about Plaintiff in front of clients and coworkers. Plaintiff found

2   these comments offensive.

3   34.   In or around mid April 2012, AV BUILDER promoted Plaintiff again, adding the duties

4   and responsibilities of Marketing Director. This promotion came with a raise from $21.63

5   to $28.85 per hour.

6   35.   As Marketing Director, Plaintiff continued improving AV BUILDER's business. Her

7   duties grew to include travelling to multi-day conventions and events, where she would

8   represent AV BUILDER to colleagues in the industry and potential clients.

9   36.   Despite Plaintiff's integral role in the success of AV BUILDER, MADUREIRA

10   continued to demean Plaintiff by making inappropriate sexual comments about her in

11   front of her clients and coworkers. Plaintiff found these comments degrading and

12   embarrassing.

13   37.   In or around early 2013, MADUREIRA moved Plaintiff upstairs into a corner office. The

14   other employees on that floor left work everyday at approximately 3:00 p.m. After

15   relocating to the new office, MADUREIRA began directing Plaintiff to go on the internet

16   and search for women interested in having a threesome. This became a daily task for

17   Plaintiff. Once the upstairs employees left at around 3:00 p.m., Plaintiff was expected to

18   begin searching for potential women. MADUREIRA would come to Plaintiff's office

19   around 3:30 p.m. or 4:00 p.m., and review Plaintiff's research. MADUREIRA would then

20   watch and comment as Plaintiff continued her search. After approximately one hour of

21   searching, MADUREIRA would tell Plaintiff that "it is now time for [her] to real job of

22   entertaining [him]," or words to that effect. Plaintiff was then expected to give

23   MADUREIRA oral sex before he left work for the day.

24   38.   In or around May 2015, Plaintiff assumed the role of managing the Billing department of

25   RESTORCORP, an affiliate of AV BUILDER that provides Destructive Testing services.

26   This task was in addition to her other responsibilities. In exchange for performing these

27   additional duties, RESTORCORP agreed to pay Plaintiff a $15,000 bonus and an annual

28   commission of 3% of RESTORCORP profits. However, RESTORCORP failed to

1    provide Plaintiff a written commission structure, in violation of California law.

2  39.   When Plaintiff assumed her billing duties, RESTORCORP had significant filing issues

3    and approximately $1,000,000 in unbilled work. Over the coming months, Plaintiff

4    resolved RESTOCORP's billing and filing issues. Once that was complete, Plaintiff

5    continued managing RESTORCORP's Destructive Testing department, where she

6    handled all department contracts and billing.

7  40.   In or around the summer of 2017, Plaintiff took on even more responsibilities at AV

8    BUILDER. The company's Reconstruction department entered into multiple large

9    contracts. These additional projects required monthly billings in both California and

10    Arizona. Managing the billings was complex as they required detailed pay charts and

11    releases, subcontracts and sub pay charts, change orders, and inputting data for portal

12    payment applications. Despite the fact that these billings previously required two

13    dedicated employees, Plaintiff assumed these duties in addition to her other

14    responsibilities at AV BUILDER.

15  41.   On or about December 19, 2017, MADUREIRA contacted Plaintiff and notified her that

16    he and his then-girlfriend, Shila (last name unknown), had a "scare" regarding a potential

17    Sexually Transmitted Disease ("STD"). Although Plaintiff's subsequent tests came back

18    negative, she felt stunned and betrayed by MADUREIRA's reckless conduct, as it

19    potentially exposed her to a STD.

20  42.   After that experience, Plaintiff requested that she and MADUREIRA stop having sexual

21    relations. However, MADUREIRA continued to pursue Plaintiff, and before long, they

22    began engaging in sexual relations again. On one occasion, MADUREIRA explained that

23    he was a "sex addict," and Plaintiff was his "crack."

24  43.   Throughout this entire time, Plaintiff continued to perform her job more than

25    competently, as shown by MADUREIRA's continued praise and promotion of Plaintiff.

26  44.   In addition, MADUREIRA made various verbal promises to Plaintiff to ensure that she

27    stayed at AV BUILDER. These promises included, but were not limited to, the following:

28       a.   Stating that Plaintiff's job was "guaranteed for life," or words to that effect;

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
7

  b. Promising Plaintiff a commission on the Newport Bluffs project;

  c. Promising Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project;

  d. Promising Plaintiff a commission of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed;

  e. Assuring Plaintiff that she would receive a portion of the sale price of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022;

  f. Agreeing to sign over the title of Plaintiff's company vehicle; and

  g. Pledging to invest $400,000 in a joint venture.

45. Despite promising Plaintiff commissions on certain projects, AV BUILDER failed to put the commission structure in writing and provide Plaintiff a copy, in violation of California law. On information and belief, AV BUILDER failed to put compensation and commission structures in writing for its female employees, but reduced such agreements to written documents for its male employees.

46. On or about February 2018, MADUREIRA began a relationship with a new girlfriend, Noylan Pulaski. As before, MADUREIRA continued his sexual relationship with Plaintiff in secret.

47. On or about April 16, 2018, MADUREIRA contacted Plaintiff and informed her that Pulaski was experiencing "female health issues," or words to that effect. Plaintiff understood MADUREIRA's warning to mean that she should get tested for STDs. Plaintiff did so, and the results came back negative.

48. After experiencing yet another scare, Plaintiff decided to end her sexual relationship with MADUREIRA. That same day, Plaintiff confronted MADUREIRA at the AV BUILDER office. Plaintiff explained that she could no longer have a sexual relationship with MADUREIRA given that he potentially exposed her to STDs on multiple occasions and did not respect her enough to protect her sexual health. Plaintiff was adamant that all sexual relations between them must cease immediately. MADUREIRA engaged Plaintiff in an argument, but Plaintiff refused to budge on her decision. MADUREIRA's sexual

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

8

1    relationship with Plaintiff ended that day.

2    49.   That same afternoon, MADUREIRA sent Plaintiff an email, entitled "Laura's

3          Resignation/Continuation Agreement." In the email, MADUREIRA stated that AV

4          BUILDER accepted Plaintiff's alleged "verbal resignation." In reality, Plaintiff did not

5          resign her position at AV BUILDER on April 16, 2018; she merely resigned from her

6          position as MADUREIRA's obligatory sexual partner.

7    50.   On or about April 17, 2018, Plaintiff went to work, just as she had consistently done for

8          the past eight years. Indeed, Plaintiff continued working at AV BUILDER over the

9          following months.

10   51.   From that point on, MADUREIRA embarked on a campaign of retaliation designed to

11         force Plaintiff out of her employment at AV BUILDER.

12   52.   Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship

13         was a substantial motivating factor in Defendants' decision retaliate against Plaintiff.

14   53.   Over the coming months, MADUREIRA's attempts to force Plaintiff out of AV

15         BUILDER became more desperate—even though Plaintiff continued to show up each

16         day and competently perform the work of multiple employees. MADUREIRA's

17         retaliatory conduct included, but was not limited to, the following:

18         a.   MADUREIRA stopped coming in to the office after Plaintiff ended their sexual

19              relationship, making it more difficult for Plaintiff to perform her job;

20         b.   MADUREIRA told Plaintiff that she was to blame for his girlfriend breaking up

21              with him twice;

22         c.   After his current girlfriend, Pulaski, found out about his sexual relationship with

23              Plaintiff, MADUREIRA directed Plaintiff to support the lies he told Pulaski in an

24              effort to get them back together. MADUREIRA drafted text messages and emails,

25              then had Plaintiff send them from her phone or email address, so it appeared that

26              they came from Plaintiff. In these messages, Plaintiff, ostensibly, admitted to

27              Pulaski that she was to blame for their failed relationship, her sexual relationship

28              with MADUREIRA was long ago and brief, she is a lesbian, and she is bipolar. In

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    reality, these messages were lies written by MADUREIRA;

2       d.  MADUREIRA told Plaintiff that Pulaski ordered him to terminate Plaintiff's

3           employment;

4       e.  MADUREIRA instructed Plaintiff to delete all of the text messages and photos they

5           exchanged over the previous eight years.

6    54.  At the same time, MADUREIRA worked with his accountant and lawyer to draft an

7        agreement that would basically pay Plaintiff off for her silence. Plaintiff was involved in

8        these negotiations.

9    55.  Plaintiff suffered stress and anxiety due to MADUREIRA's retaliatory behavior and his

10       pressure to sign the Nondisclosure Agreement.

11   56.  On or about July 22, 2018, MADUREIRA effectively terminated Plaintiff's employment,

12       for the second time, via text message, stating, in part, "it's time to move on … sadly [our]

13       chapter is over … [you] will get [your] agreement on Tuesday."

14   57.  Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship

15       was a substantial motivating factor in his decision to terminate Plaintiff's employment.

16   58.  Plaintiff's final day of employment at AV BUILDER was scheduled for August 3, 2018.

17   59.  In early August 2018, the negotiations regarding the Nondisclosure Agreement between

18       MADUREIRA and Plaintiff broke down. MADUREIRA presented Plaintiff with the

19       ultimatum that she either sign the latest proposed agreement within three days or receive

20       nothing. Plaintiff never signed MADUREIRA's proposed Nondisclosure Agreement.

21   60.  Despite planning on August 3, 2018 being her final day of employment, Plaintiff's true

22       final day was the following Monday, August 6, 2018.

23   61.  Defendants failed to provide Plaintiff her final paycheck and wage statement on her last

24       day of employment.

25   62.  In addition, prior to her termination, Plaintiff earned approximately $100,000 in

26       commissions for the work she performed on the Newport Bluffs project. AV BUILDER,

27       however, failed to pay Plaintiff this commission, and others, at termination. These unpaid

28       commissions remain outstanding.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

63.   As a result of Defendants' actions, Plaintiff has suffered, and continues to suffer, emotional distress, anxiety, depression, sleeplessness, stress, worry, and humiliation.

## FIRST CAUSE OF ACTION

### SEXUAL HARASSMENT

#### v. All Defendants

#### [Cal. Gov't Code § 12940(j)]

64.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

65.   Plaintiff was at all times material hereto an employee covered by California Government Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

66.   Defendants are, and at all times material hereto were, an employer and/or person within the meaning of the Fair Employment and Housing Act and, as such, barred from harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

67.   Plaintiff was subjected to unwanted and harassing conduct on the basis of her sex, as set forth herein.

68.   The harassing conduct was severe and pervasive.

69.   A reasonable woman in Plaintiff's circumstances would have considered the work environment to be hostile or abusive, and Plaintiff did in fact consider the work environment to be hostile or abusive.

70.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

71.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, to her damage, in a sum to be established according to proof.

72.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
11

**015907**

1    conduct.

2    73.   In addition to such other damages as may properly be recovered herein, Plaintiff is

3          entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

**SECOND CAUSE OF ACTION**

**GENDER DISCRIMINATION**

**v. Defendants AV BUILDER and RESTORCORP**

**[Cal. Gov't Code § 12940(a)]**

8    74.   Plaintiff re-alleges and incorporates herein by reference each and every allegation

9          contained in the proceeding paragraphs as though fully set forth herein.

10   75.   Plaintiff was at all times material hereto an employee covered by California Government

11         Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

12   76.   Defendants are, and at all times material hereto were, employers and/or persons within

13         the meaning of the Fair Employment and Housing Act and, as such, barred from

14         harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

15   77.   Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her

16         employment, as stated herein.

17   78.   Plaintiff believes and thereon alleges that her gender, female, was a motivating reason for

18         Defendants' discrimination against her.

19   79.   Defendants' conduct of discriminating against Plaintiff on the basis of her gender

20         violated Cal. Gov't Code § 12940(a).

21   80.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

22         sustained and continues to sustain substantial losses in earnings, employment benefits,

23         employment opportunities, and Plaintiff has suffered other economic losses in an amount

24         to be determined at time of trial. Plaintiff has sought to mitigate these damages.

25   81.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

26         suffered and continues to suffer humiliation, emotional distress, loss of reputation, and

27         mental and physical pain and anguish, all to her damage in a sum to be established

28         according to proof.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
12

**015908**

82. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

83. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

## THIRD CAUSE OF ACTION

### RETALIATION

### v. Defendants AV BUILDER and RESTORCORP

### [Cal. Gov't Code § 12940(h)]

84. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

85. At all times mentioned herein, Cal. Gov't Code § 12940(h) was in full force and effect and was binding on Defendants. This section requires Defendants, as employers, to refrain from retaliating against any employee who has opposed any practices forbidden under Cal. Gov't Code § 12940, or because the employee has filed a complaint, testified, or assisted in any proceeding under Cal. Gov't Code § 12940(h).

86. Defendants, by and through its employees and agents, engaged in conduct that, taken as a whole, materially and adversely affected the terms and conditions of Plaintiff's employment, as stated herein, up to and including claiming Plaintiff verbally resigned; directing Plaintiff to send false statements about herself to Pulaski; instructing Plaintiff to delete all of her text messages and photos with MADUREIRA; informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's employment.

87. Plaintiff believes and thereon alleges that her opposition to the sexual harassment perpetuated by MADUREIRA was a motivating reason for Defendants engaging in conduct that, taken as a whole, materially and adversely affected the terms and conditions of Plaintiff's employment, as stated herein, up to and including, claiming Plaintiff verbally resigned; directing Plaintiff to send false statements about herself to Pulaski;

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

13

015909

1    instructing Plaintiff to delete all of her text messages and photos with MADUREIRA;

2    informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's

3    employment.

4    88.   Defendants' conduct of retaliating against Plaintiff in the terms, conditions, and

5    privileges of her employment, as stated herein, up to and including claiming Plaintiff

6    verbally resigned; directing Plaintiff to send false statements about herself to Pulaski;

7    instructing Plaintiff to delete all of her text messages and photos with MADUREIRA;

8    informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's

9    employment, violates Cal. Gov't Code § 12940(h).

10   89.   As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has

11   sustained and continues to sustain substantial losses in earnings, employment benefits,

12   employment opportunities, and other economic losses in an amount to be determined at

13   time of trial. Plaintiff has sought to mitigate these damages.

14   90.   As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff

15   has suffered and continues to suffer humiliation, emotional distress, loss of reputation,

16   and mental and physical pain and anguish, all to her damage in a sum to be established

17   according to proof.

18   91.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled

19   to recover punitive and exemplary damages in an amount commensurate with

20   Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

21   conduct.

22   92.   In addition to such other damages as may properly be recovered herein, Plaintiff is

23   entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

24                          **FOURTH CAUSE OF ACTION**

25                       **FAILURE TO PREVENT HARASSMENT**

26                    **v. Defendants AV BUILDER and RESTORCORP**

27                          **[Cal. Gov't Code § 12940(k)]**

28   93.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
14

015910

the preceding paragraphs as though fully set forth herein.

94.  Plaintiff was subjected to discriminatory and harassing conduct on the basis of her sex, as set forth herein. Plaintiff was also subjected to retaliation for opposing said discrimination and/or harassment.

95.  Defendants failed to take reasonable steps to prevent the discrimination, harassment, and retaliation, as described herein.

96.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

97.  As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

98.  As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

99.  In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover attorney fees and costs pursuant Cal. Gov't. Code § 12965.

## FIFTH CAUSE OF ACTION

### NEGLIGENT SUPERVISION

### v. Defendants AV BUILDER and RESTORCORP

100.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

101.  Plaintiff performed work for Defendants, as an employee, as stated herein.

102.  Defendants had a legal duty to supervise all employees.

103.  Defendants' employees or agents took part in unlawful discriminatory conduct, including

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
15

1    actions to harass Plaintiff on the basis of her sex in an effort to humiliate and embarrass

2    her, as stated herein.

3    104.   Defendants knew or should have known that its employees or agents were engaging in

4    unlawful discriminatory practices, as stated herein.

5    105.   Defendants failed to take reasonable steps necessary to prevent the unlawful

6    discriminatory conduct described herein.

7    106.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

8    sustained and continues to sustain substantial losses in earnings, employment benefits,

9    employment opportunities, and other economic losses in an amount to be determined at

10   time of trial. Plaintiff has sought to mitigate these damages.

11   107.   As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has

12   suffered and continues to suffer humiliation, emotional distress, and mental pain and

13   anguish, all to her damage in a sum to be established according to proof.

## SIXTH CAUSE OF ACTION

## FAILURE TO PAY WAGES UPON TERMINATION

### v. Defendants AV BUILDER and RESTORCORP

### [Cal. Lab. Code § 201]

18   108.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

19   the preceding paragraphs as though fully set forth herein.

20   109.   At all times relevant herein, Plaintiff performed work for Defendants.

21   110.   California law considers commissions "wages under Labor Code § 200.

22   111.   Plaintiff was terminated from her employment with Defendants. Defendants failed to pay

23   Plaintiff all wages earned and owed to her at the time of her termination, as stated herein,

24   including but not limited to, bonuses, incentive payments, commissions, and overtime

25   pay, in violation of Cal. Labor Code § 201.

26   112.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

27   sustained, and continues to sustain, substantial economic damages.

28   113.   In addition to all other damages properly recoverable, Plaintiff is entitled to statutory

PLAINTIFF'S COMPLAINT FOR DAMAGES
16

1   penalties pursuant to Cal. Labor Code § 203, an award of costs and attorney fees pursuant

2   to Cal. Labor Code § 218.5, and an award of interest pursuant to Cal. Labor Code §

3   218.6.

4   ### SEVENTH CAUSE OF ACTION

5   **FAILURE TO PROVIDE ACCURATE ITEMIZED WAGE STATEMENTS**

6   **v. Defendants AV BUILDER and RESTORCORP**

7   **[Cal. Labor Code § 226]**

8   114.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9   the preceding paragraphs as though fully set forth herein.

10   115.   At all times relevant herein, Plaintiff was an employee of Defendants.

11   116.   California law considers commissions "wages" under Cal. Labor Code § 200.

12   117.   Defendants knowingly and intentionally failed to provide Plaintiff with an accurate

13   itemized wage statement displaying accurate and complete information as required under

14   Cal. Labor Code § 226(a).

15   118.   As a result, Plaintiff could not promptly and easily determine her gross and net earned

16   wages, among other things, from the wage statement alone because Defendants failed to

17   accurately calculate Plaintiff's earned commissions.

18   119.   Plaintiff suffered injury as a result.

19   120.   Plaintiff is therefore entitled to an award of costs, attorney fees, and penalties pursuant to

20   Cal. Labor Code § 226(e), in an amount according to proof.

21   121.   Plaintiff is entitled to recover the unpaid additional or premium wages, interest thereon,

22   reasonable attorney fees, and costs of suit pursuant to Cal. Labor Code § 1194(a).

23   ### EIGHTH CAUSE OF ACTION

24   **BREACH OF WRITTEN CONTRACT**

25   **v. All Defendants**

26   122.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

27   the preceding paragraphs as though fully set forth herein.

28   123.   Plaintiff and Defendants entered into multiple written agreements, as stated herein.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
17

015913

124.  In exchange for Plaintiff performing work for Defendants, Defendants made certain promises to Plaintiff, including but not limited to, promising Plaintiff a commission on the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus and an annual commission of 3% of RESTORCORP profits; and pledging to invest $400,000 in a joint venture.

125.  Plaintiff did all, or substantially all, of the things required of her under the contracts, or in the alternative, Plaintiff was excused from such performance.

126.  Defendants failed to perform on the contract by failing to provide Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; a commission of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP profits; and a $400,000 investment in a joint venture.

127.  As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as stated herein, Plaintiff has been harmed in that she has suffered substantial economic losses, in an amount according to proof plus interest.

### NINTH CAUSE OF ACTION

### BREACH OF ORAL CONTRACT

### v. All Defendants

128.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

129.  Should the trier of fact find that any of the contracts listed above were not reduced to

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
18

015914

1      writing, Plaintiff alleges this claim in the alternative.

2   130.   Plaintiff and Defendants entered into multiple oral agreements, as stated herein.

3   131.   In exchange for Plaintiff performing work for Defendants, Defendants made certain

4      promises to Plaintiff, including but not limited to, promising Plaintiff a commission on

5      the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total

6      revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission

7      of 0.005% of the total revenue received for any Irvine Company project that AV

8      BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price

9      of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign

10      over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus

11      and an annual commission of 3% of RESTORCORP profits; and pledging to invest

12      $400,000 in a joint venture.

13   132.   Plaintiff did all, or substantially all, of the things required of her under the contracts, or in

14      the alternative, Plaintiff was excused from such performance.

15   133.   Defendants failed to perform on the contract by failing to provide Plaintiff a commission

16      of 0.005% of the total revenue on the prime contract for the Oak Glen project; a

17      commission of 0.005% of the total revenue on the prime contract for the Oak Glen

18      project; a commission of 0.005% of the total revenue received for any Irvine Company

19      project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the

20      title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP

21      profits; and a $400,000 investment in a joint venture.

22   134.   As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as

23      stated herein, Plaintiff has been harmed in that she has suffered substantial economic

24      losses, in an amount according to proof plus interest.

25   ///

26   ///

27   ///

28   ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

## TENTH CAUSE OF ACTION

### UNFAIR COMPETITION

### v. Defendants AV BUILDER and RESTORCORP

[Cal. Bus. & Prof. Code § 17200 *et seq.*]

135. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding and subsequent paragraphs as though fully set forth herein.

136. California Business & Professions Code § 17200 *et seq.* prohibits the engagement of any business acts or practices constituting unfair competition. Section 17200 defines "unfair competition" to mean and include "...any unlawful, unfair or fraudulent business act or practice."

137. Defendants have not provided all wages owed to Plaintiff in violation of California Labor Code §§ 201, 204, 216, and 510, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

138. Defendants also failed to provide Plaintiff a signed copy of its commission and bonus policies and obtain a signed receipt of the same from Plaintiff, in violation of Cal. Labor Code § 2751, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

139. Furthermore, Defendants' failure to pay Plaintiff pursuant to the terms of the contract, or alternatively, for the reasonable value of her services, constituted unfair business acts or practices in that such practices negatively affect Defendants' competitors who do pay according to the contracts to which they are parties or, in the alternative, pay the reasonable value of services rendered on their behalves, and properly provide their employees with signed copies of their commission and bonus policies.

140. As a direct and proximate result of Defendants' unlawful and/or unfair business act or practices, Plaintiff has suffered an injury-in-fact and was deprived of money or property to which she has valid and cognizable claims.

141. The harm to Plaintiff resulting from Defendants' unlawful and/or unfair business acts or practices, far outweighs whatever benefits, if any, such business practices have for

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

015916

1     Defendants.

2  142.  In addition to all other damages properly recoverable, Plaintiff is entitled to all restitution

3        damages arising from Defendants' unlawful and/or unfair business acts or practices, in an

4        amount to be established according to proof plus interest.

5  143.  Plaintiff is further entitled to cumulative damages pursuant to Cal. Bus. & Prof. Code §

6        17205, and an award of attorney fees pursuant to Cal. Code Civ. Proc. § 1021.5.

7                    <u>ELEVENTH CAUSE OF ACTION</u>

8            INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

9                          v. All Defendants

10 144.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in

11       the preceding paragraphs as though fully set forth herein.

12 145.  Defendants' intentional conduct, as set forth herein, was extreme and outrageous.

13 146.  Defendants intended to cause Plaintiff to suffer extreme emotional distress.  Plaintiff

14       suffered extreme emotional distress.

15 147.  As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff

16       has sustained and continues to suffer humiliation, emotional distress, loss of reputation,

17       and mental and physical pain and anguish, all to Plaintiff's damage in an amount

18       according to proof at trial.

19 148.  Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively

20       with the wrongful intention of injuring Plaintiff from an improper and evil motive

21       amounting to malice and in conscious disregard of Plaintiff's rights. Plaintiff is thus

22       entitled to recover exemplary and punitive damages in amounts to be proven at trial.

23 ///

24 ///

25 ///

26 ///

27 ///

28 ///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
21

015917

WHEREFORE, Plaintiff prays for the following relief:

1.    For compensatory damages, including loss of wages, promotional opportunities, benefits, and other opportunities of employment, according to proof;

2.    For special damages in an amount according to proof;

3.    For mental and emotional distress damages;

4.    For back pay, front pay, and other monetary relief;

5.    For restitution and/or disgorgement;

6.    For penalties pursuant to Cal. Labor Code §§ 203 and 226;

7.    For cumulative damages, pursuant to Cal. Bus. & Prof. Code § 17205;

8.    For punitive damages in an amount necessary to make an example of, and to punish, defendants, and to deter future similar misconduct;

9.    For costs of suit, including attorneys' fees as permitted by law, including those available pursuant to Cal. Labor Code §§ 218.5 and 218.6, Cal. Code Civ. Proc. § 1021.5, and Cal. Gov't. Code § 12965(b);

10.    For an award of interest, including prejudgment interest, at the legal rate as permitted by law, including those permitted by Cal. Gov't Code § 12965(b);

11.    For such other and further relief as the Court deems proper and just under all the circumstances.

**PLAINTIFF LAURA DUSINA** demands a jury trial on all issues in this case.

DATED: November 21, 2018

                    **GRUENBERG LAW**

                    JOSH D. GRUENBERG
                    BENJAMIN S. SILVER
                    JESSE A. COLLMANN
                    Attorneys for Plaintiff,
                    **LAURA DUSINA**

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

22

**015918**

1
2
3
4
5
6
7
8
9
10
11

<div style="text-align:center">**EXHIBIT A**</div>

(1)    PLAINTIFF'S CHARGE FILED WITH THE DEPARTMENT OF FAIR

EMPLOYMENT AND HOUSING (DFEH).

(2)    PLAINTIFF'S RIGHT TO SUE LETTERS FROM THE DFEH.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

PLAINTIFF'S COMPLAINT FOR DAMAGES

23

015919



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                        GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                          DIRECTOR KEVIN KISH
2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

November 21, 2018

RE:   **Notice of Filing of Discrimination Complaint**
      DFEH Matter Number: 201811-04297421
      Right to Sue: Dusina / AV Builder Corp et al.

To All Respondent(s):

Enclosed is a copy of a complaint of discrimination that has been filed with the
Department of Fair Employment and Housing (DFEH) in accordance with Government
Code section 12960. This constitutes service of the complaint pursuant to Government
Code section 12962. The complainant has requested an authorization to file a lawsuit.
This case is not being investigated by DFEH and is being closed immediately. A copy of
the Notice of Case Closure and Right to Sue is enclosed for your records.

Please refer to the attached complaint for a list of all respondent(s) and their contact
information.

No response to DFEH is requested or required.

Sincerely,


Department of Fair Employment and Housing

AVB MSJ Appendix P. 361

**015920**

1

**COMPLAINT OF EMPLOYMENT DISCRIMINATION**
**BEFORE THE STATE OF CALIFORNIA**

2

**DEPARTMENT OF FAIR EMPLOYMENT AND HOUSING**
**Under the California Fair Employment and Housing Act**

3

**(Gov. Code, § 12900 et seq.)**

4

**In the Matter of the Complaint of**

5
Laura Dusina                                                    DFEH No. 201811-04297421

6
                                              Complainant,

7
vs.

8
AV Builder Corp
6373 Nancy Ridge Dr.

9
San Diego, California 92121

10
RestorCorp

11
6373 Nancy Ridge Dr.
San Diego, California 92121

12
Antonio Madureira

13
6373 Nancy Ridge Dr.
San Diego, California 92121

14

15
                                              **Respondents**

16
_____

17
1. Respondent **AV Builder Corp** is an **employer** subject to suit under the California
Fair Employment and Housing Act (FEHA) (Gov. Code, § 12900 et seq.).

18
2. Complainant **Laura Dusina**, resides in the City of **San Diego** State of **California.**

19

20
3. Complainant alleges that on or about **August 6, 2018**, respondent took the
following adverse actions:

21
**Complainant was harassed** because of complainant's sex/gender, sexual

22
harassment- hostile environment, sexual harassment- quid pro quo.

23
**Complainant was discriminated against** because of complainant's sex/gender and
as a result of the discrimination was terminated, reprimanded, asked impermissible

24
non-job-related questions, denied a work environment free of discrimination and/or

25
retaliation, denied any employment benefit or privilege, denied work opportunities or
assignments.

26

27
                                              -1-
                          *Complaint – DFEH No. 201811-04297421*

28
Date Filed: November 21, 2018

**Complainant experienced retaliation** because complainant reported or resisted any form of discrimination or harassment and as a result was terminated, reprimanded, asked impermissible non-job-related questions, denied a work environment free of discrimination and/or retaliation, denied any employment benefit or privilege, failed to give equal considerations in making employment decisions.

**Additional Complaint Details:** On or about February 10, 2010, Plaintiff began her employment at AV BUILDER, in the position of Temporary Receptionist/Office Manager. In exchange for her services as Temporary Receptionist/Office Manager, AV BUILDER agreed to pay Plaintiff $13.00 per hour. AV BUILDER operates as a general contractor that primarily focuses on the reconstruction of medium and large-scale multi-unit properties throughout the Southwest United States. At all relevant times herein mentioned, Plaintiff performed her job in a competent and diligent manner, as evidenced by the multiple promotions she received. From the outset of her employment, Plaintiff noticed that MADUREIRA, AV BUILDER's President and Founder, took a keen interest in her. At the time Plaintiff began her employment, MADUREIRA was married. MADUREIRA invited Plaintiff out to lunch on her first day of employment. Plaintiff learned later from her colleagues that this was not a customary practice. From that point forward, MADUREIRA continued this nearly daily habit of taking Plaintiff out to lunch throughout her eight-year career.  On information and belief, MADUREIRA maintained a long-standing pattern and practice of grooming female employees and business colleagues, whereby he desensitized them into tolerating his sexual harassment, then, using his position of power, pressured them into a sexual affair. Over the first few months of her employment, Plaintiff experienced a similar process. MADUREIRA made efforts to ingratiate himself into Plaintiff's life, and the two became friends. At the same time, MADUREIRA's sexually-charged comments and behavior ensured that Plaintiff knew that her role as a female employee was a subservient one. After approximately four months of lunches and grooming, MADUREIRA began a consensual sexual relationship with Plaintiff in June 2010. MADUREIRA came to expect not only lunch with Plaintiff everyday, but sex as well. Given that MADUREIRA was married, he requested that Plaintiff keep their relationship a secret from his family and their coworkers. Plaintiff acquiesced. The balance of their sexual relationship remained largely a secret. For the remainder of 2010 through 2012, MADUREIRA and Plaintiff continued engaging in sexual relations on a regular basis. Plaintiff was expected to join MADUREIRA for lunch whenever he requested her presence. In or around November 2011, AV BUILDER promoted Plaintiff to permanent Office Manager, which included a raise to $21.63 per hour. In or around mid December 2012, MADUREIRA and his wife divorced. Although MADUREIRA was now single, he insisted on keeping his ongoing sexual relationship with Plaintiff a secret. From that point on, MADUREIRA had approximately ten to fifteen "traditional" girlfriends.

-2-
*Complaint – DFEH No. 201811-04297421*

Date Filed: November 21, 2018

015922

1   Despite MADUREIRA's girlfriends, his relationship with Plaintiff remained constant.
    At times, MADUREIRA would schedule his sexual encounters with Plaintiff around
2   his other relationships. Plaintiff would be expected to meet MADUREIRA for sex on,
    for example, Wednesday, Friday, and Sunday. The other days, MADUREIRA met
3   with whatever girlfriend he had at the time. Additionally, throughout her employment
4   with AV BUILDER, on occasions when Plaintiff was too busy for lunch, MADUREIRA
    would stay in Plaintiff's office, pouting, until Plaintiff relented and agreed to join him
5   for lunch. MADUREIRA also continued making sexual comments about Plaintiff in
6   front of clients and coworkers. Plaintiff found these comments offensive. In or around
    mid April 2012, AV BUILDER promoted Plaintiff again, adding the duties and
7   responsibilities of Marketing Director. This promotion came with a raise from $21.63
    to $28.85 per hour. As Marketing Director, Plaintiff continued improving AV
8   BUILDER's business. Her duties grew to include travelling to multi-day conventions
    and events, where she would represent AV BUILDER to colleagues in the industry
9   and potential clients.
10  Despite Plaintiff's integral role in the success of AV BUILDER, MADUREIRA
    continued to demean Plaintiff by making inappropriate sexual comments about her in
11  front of her clients and coworkers. Plaintiff found these comments degrading and
    embarrassing. In or around early 2013, MADUREIRA moved Plaintiff upstairs into a
12  corner office. The other employees on that floor left work everyday at approximately
13  3:00 p.m. After relocating to the new office, MADUREIRA began directing Plaintiff to
    go on the internet and search for women interested in having a threesome. This
14  became a daily task for Plaintiff. Once the upstairs employees left at around 3:00
    p.m., Plaintiff was expected to begin searching for potential women. MADUREIRA
15  would come to Plaintiff's office around 3:30 p.m. or 4:00 p.m., and review Plaintiff's
16  research. MADUREIRA would then watch and comment as Plaintiff continued her
    search. After approximately one hour of searching, MADUREIRA would tell Plaintiff
17  that "it is now time for [her] to real job of entertaining [him]," or words to that effect.
    Plaintiff was then expected to give MADUREIRA oral sex before he left work for the
18  day. In or around May 2015, Plaintiff assumed the role of managing the Billing
19  department of RESTORCORP, an affiliate of AV BUILDER that provides Destructive
    Testing services. This task was in addition to her other responsibilities. In exchange
20  for performing these additional duties, RESTORCORP agreed to pay Plaintiff a
    $15,000 bonus and an annual commission of 3% of RESTORCORP profits.
21  However, RESTORCORP failed to provide Plaintiff a written commission structure,
    in violation of California law. When Plaintiff assumed her billing duties,
22  RESTORCORP had significant filing issues and approximately $1,000,000 in
    unbilled work. Over the coming months, Plaintiff resolved RESTOCORP's billing and
23  filing issues. Once that was complete, Plaintiff continued managing
    RESTORCORP's Destructive Testing department, where she handled all
24  department contracts and billing. In or around the summer of 2017, Plaintiff took on
    even more responsibilities at AV BUILDER. The company's Reconstruction
25  department entered into multiple large contracts. These additional projects required
26

27                              -3-
                    *Complaint – DFEH No. 201811-04297421*
28
    Date Filed: November 21, 2018

1  monthly billings in both California and Arizona. Managing the billings was complex
   as they required detailed pay charts and releases, subcontracts and sub pay charts,
2  change orders, and inputting data for portal payment applications. Despite the fact
   that these billings previously required two dedicated employees, Plaintiff assumed
3  these duties in addition to her other responsibilities at AV BUILDER.

4  On or about December 19, 2017, MADUREIRA contacted Plaintiff and notified her
   that he and his then-girlfriend, Shila (last name unknown), had a "scare" regarding a
5  potential Sexually Transmitted Disease ("STD"). Although Plaintiff's subsequent
   tests came back negative, she felt stunned and betrayed by MADUREIRA's reckless
6  conduct, as it potentially exposed her to a STD. After that experience, Plaintiff
7  requested that she and MADUREIRA stop having sexual relations. However,
   MADUREIRA continued to pursue Plaintiff, and before long, they began engaging in
8  sexual relations again. On one occasion, MADUREIRA explained that he was a "sex
   addict," and Plaintiff was his "crack." Throughout this entire time, Plaintiff continued
9  to perform her job more than competently, as shown by MADUREIRA's continued
   praise and promotion of Plaintiff. In addition, MADUREIRA made various verbal
10 promises to Plaintiff to ensure that she stayed at AV BUILDER. These promises
11 included, but were not limited to, the following: Stating that Plaintiff's job was
   "guaranteed for life," or words to that effect; Promising Plaintiff a commission on the
12 Newport Bluffs project; Promising Plaintiff a commission of 0.005% of the total
   revenue on the prime contract for the Oak Glen project; Promising Plaintiff a
13 commission of 0.005% of the total revenue received for any Irvine Company project
14 that AV BUILDER performed; Assuring Plaintiff that she would receive a portion of
   the sale price of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022;
15 Agreeing to sign over the title of Plaintiff's company vehicle; and Pledging to invest
   $400,000 in a joint venture. Despite promising Plaintiff commissions on certain
16 projects, AV BUILDER failed to put the commission structure in writing and provide
   Plaintiff a copy, in violation of California law. On information and belief, AV BUILDER
17 failed to put compensation and commission structures in writing for its female
18 employees, but reduced such agreements to written documents for its male
   employees.

19 On or about February 2018, MADUREIRA began a relationship with a new girlfriend,
   Noylan Pulaski. As before, MADUREIRA continued his sexual relationship with
20 Plaintiff in secret.

21 On or about April 16, 2018, MADUREIRA contacted Plaintiff and informed her that
   Pulaski was experiencing "female health issues," or words to that effect. Plaintiff
22 understood MADUREIRA's warning to mean that she should get tested for STDs.
   Plaintiff did so, and the results came back negative. After experiencing yet another
23 scare, Plaintiff decided to end her sexual relationship with MADUREIRA. That same
24 day, Plaintiff confronted MADUREIRA at the AV BUILDER office. Plaintiff explained
   that she could no longer have a sexual relationship with MADUREIRA given that he
25 potentially exposed her to STDs on multiple occasions and did not respect her
   enough to protect her sexual health. Plaintiff was adamant that all sexual relations

26

27

-4-
*Complaint – DFEH No. 201811-04297421*

28 Date Filed: November 21, 2018

between them must cease immediately. MADUREIRA engaged Plaintiff in an argument, but Plaintiff refused to budge on her decision. MADUREIRA's sexual relationship with Plaintiff ended that day. That same afternoon, MADUREIRA sent Plaintiff an email, entitled "Laura's Resignation/Continuation Agreement." In the email, MADUREIRA stated that AV BUILDER accepted Plaintiff's alleged "verbal resignation." In reality, Plaintiff did not resign her position at AV BUILDER on April 16, 2018; she merely resigned from her position as MADUREIRA's obligatory sexual partner. On or about April 17, 2018, Plaintiff went to work, just as she had consistently done for the past eight years. Indeed, Plaintiff continued working at AV BUILDER over the following months. From that point on, MADUREIRA embarked on a campaign of retaliation designed to force Plaintiff out of her employment at AV BUILDER. Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship was a substantial motivating factor in Defendants' decision retaliate against Plaintiff. Over the coming months, MADUREIRA's attempts to force Plaintiff out of AV BUILDER became more desperate—even though Plaintiff continued to show up each day and competently perform the work of multiple employees. MADUREIRA's retaliatory conduct included, but was not limited to, the following: MADUREIRA stopped coming in to the office after Plaintiff ended their sexual relationship, making it more difficult for Plaintiff to perform her job; MADUREIRA told Plaintiff that she was to blame for his girlfriend breaking up with him twice; After his current girlfriend, Pulaski, found out about his sexual relationship with Plaintiff, MADUREIRA directed Plaintiff to support the lies he told Pulaski in an effort to get them back together. MADUREIRA drafted text messages and emails, then had Plaintiff send them from her phone or email address, so it appeared that they came from Plaintiff. In these messages, Plaintiff, ostensibly, admitted to Pulaski that she was to blame for their failed relationship, her sexual relationship with MADUREIRA was long ago and brief, she is a lesbian, and she is bipolar. In reality, these messages were lies written by MADUREIRA; MADUREIRA told Plaintiff that Pulaski ordered him to terminate Plaintiff's employment; and MADUREIRA instructed Plaintiff to delete all of the text messages and photos they exchanged over the previous eight years. At the same time, MADUREIRA worked with his accountant and lawyer to draft an agreement that would basically pay Plaintiff off for her silence. Plaintiff was involved in these negotiations. Plaintiff suffered stress and anxiety due to MADUREIRA's retaliatory behavior and his pressure to sign the Nondisclosure Agreement. On or about July 22, 2018, MADUREIRA effectively terminated Plaintiff's employment, for the second time, via text message, stating, in part, "it's time to move on … sadly [our] chapter is over … [you] will get [your] agreement on Tuesday." Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship was a substantial motivating factor in his decision to terminate Plaintiff's employment. Plaintiff's final day of employment at AV BUILDER was scheduled for August 3, 2018. In early August 2018, the negotiations regarding the Nondisclosure Agreement between MADUREIRA and Plaintiff broke down. MADUREIRA presented Plaintiff with the ultimatum that she either sign the latest

-5-

*Complaint -- DFEH No. 201811-04297421*

Date Filed: November 21, 2018



1  proposed agreement within three days or receive nothing. Plaintiff never signed
2  MADUREIRA's proposed Nondisclosure Agreement. Despite planning on August 3,
   2018 being her final day of employment, Plaintiff's true final day was the following
3  Monday, August 6, 2018. Defendants failed to provide Plaintiff her final paycheck
   and wage statement on her last day of employment. In addition, prior to her
4  termination, Plaintiff earned approximately $100,000 in commissions for the work
5  she performed on the Newport Bluffs project. AV BUILDER, however, failed to pay
   Plaintiff this commission, and others, at termination. These unpaid commissions
6  remain outstanding. As a result of Defendants' actions, Plaintiff has suffered, and
   continues to suffer, emotional distress, anxiety, depression, sleeplessness, stress,
7  worry, and humiliation.

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27
                                    -6-
                    *Complaint – DFEH No. 201811-04297421*
28
   Date Filed: November 21, 2018

015926

1   VERIFICATION

2   I, **Jesse Collmann**, am the **Attorney** in the above-entitled complaint.  I have read the
3   foregoing complaint and know the contents thereof.  The matters alleged are based
    on information and belief, which I believe to be true.
4
    On November 21, 2018, I declare under penalty of perjury under the laws of the State
5   of California that the foregoing is true and correct.

6                                                                          **San Diego, CA**

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27                                          -7-
                                *Complaint – DFEH No. 201811-04297421*
28   Date Filed: November 21, 2018

015927



STATE OF CALIFORNIA | Business, Consumer Services and Housing Agency                                    GOVERNOR EDMUND G. BROWN JR.

**DEPARTMENT OF FAIR EMPLOYMENT & HOUSING**                                          DIRECTOR KEVIN KISH

2218 Kausen Drive, Suite 100 | Elk Grove | CA | 95758
(800) 884-1684 (Voice) | (800) 700-2320 (TTY) | California's Relay Service at 711
http://www.dfeh.ca.gov | email: contact.center@dfeh.ca.gov

November 21, 2018

Laura Dusina
2155 First Avenue
San Diego, California 92101

RE:  **Notice of Case Closure and Right to Sue**
DFEH Matter Number: 201811-04297421
Right to Sue: Dusina / AV Builder Corp et al.

Dear Laura Dusina,

This letter informs you that the above-referenced complaint was filed with the
Department of Fair Employment and Housing (DFEH) has been closed effective
November 21, 2018 because an immediate Right to Sue notice was requested. DFEH
will take no further action on the complaint.

This letter is also your Right to Sue notice. According to Government Code section
12965, subdivision (b), a civil action may be brought under the provisions of the Fair
Employment and Housing Act against the person, employer, labor organization or
employment agency named in the above-referenced complaint. The civil action must be
filed within one year from the date of this letter.

To obtain a federal Right to Sue notice, you must contact the U.S. Equal Employment
Opportunity Commission (EEOC) to file a complaint within 30 days of receipt of this
DFEH Notice of Case Closure or within 300 days of the alleged discriminatory act,
whichever is earlier.

Sincerely,


Department of Fair Employment and Housing



# Exhibit 13

Peter J. Schulz, Esq. (SBN 167646)
pjs@sbrlawsd.com
Tommy U. Schroeder, Esq. (SBN 317542)
ts@sbrlawsd.com
SCHULZ BRICK & ROGASKI
600 West Broadway, Suite 960
San Diego, California 92101
Tel:  (619) 234-3660
Fax:  (619) 234-0626

Attorneys for Plaintiffs AV BUILDER CORP,
RESTORCORP, and ANTONIO MADUREIRA

## UNITED STATED DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AV BUILDER CORP,<br>a California corporation;<br>RESTORCORP,<br>a California corporation; and<br>ANTONIO MADUREIRA,<br>an individual,<br><br>     Plaintiffs,<br><br>       v.<br><br>HOUSTON CASUALTY COMPANY,<br>a Texas corporation,<br><br>     Defendant. | Case No.: 3:20-cv-01679-W-KSC<br><br>**DECLARATION OF<br>JOSHUA D. GRUENBERG** |

I, Joshua D. Gruenberg, declare as follows:

1.    I am an attorney duly licensed to practice law in the state of California

and am the principal of Gruenberg Law specializing in employment-related litigation.

2.     On ___8/14___, 2018, I was first retained by Ms. Laura Dusina.

3.     On August 14, 2018, and August 15, 2018, I had an email exchange with attorney Dick Semerdjian under the subject "Laura Dusina/AV Builder Corp." A true and correct copy of that email exchange is set forth in the document attached hereto as **Exhibit "A"** and identified as Bates No. HC000469.

4.     The first email in the string dated August 14, 2018 at 3:30 p.m. was the first communication I had with Mr. Semerdjian and/or AV Builder relating to my retention on behalf of Ms. Dusina.  As of that date and time, I had no information regarding the existence of any claims having been made by Ms. Dusina and the intent of my email was simply to communicate to Mr. Semerdjian the fact that I had been retained and request that there be no further communications with Ms. Dusina. I had no information regarding whether Ms. Dusina had previously made any claims relating to discrimination, harassment, or wrongful employment acts.

5.     On August 14 and 15, 2018, I had very little information about the matter, which is evidenced by the subsequent communications between myself and Mr. Semerdjian wherein I commented that I looked forward to "figuring this one out" with Mr. Semerdjian in my August 15, 2018 email.

6.     The first time that I made a written demand for damages relating to alleged employment acts against Mr. Madureira and AV Builder was in my September 13, 2018 demand letter and draft complaint, a true and correct copy of which is attached hereto as **Exhibit "B"** and identified as Bates Nos. HC000345-HC000368.

I declare under penalty of perjury, under the laws of the state of California, that the foregoing is true and correct.

Executed this _____ day of June, 2021, at San Diego, California.

7/7/21

By: _____
    Joshua D. Gruenberg, Esq.

# Exhibit A

| From: | Josh Gruenberg |
| To: | Dick Semerdjian |
| Cc: | Daphne Delvaux; Jesse Collman |
| Subject: | Re: Laura Dusina/AV Builder Corp. |
| Date: | Wednesday, August 15, 2018 12:12:44 AM |

You too. I look forward to figuring this one out with you.
J

On Tue, Aug 14, 2018 at 6:38 PM Dick Semerdjian <das@sscmlegal.com> wrote:
OK Josh - as always good to be working with you.

**Sent from my I-Pad**

**Dick Semerdjian Esq.**
**Schwartz Semerdjian Cauley & Moot**
**101 West Broadway, Suite 810**
**San Diego CA 92101-8229**

**Direct** 619.699-8326| **Main** 619.236-8821
**Fax** 619.236-8827
Los Angeles Office 310. 550-8857
das@sscmlegal.com
**www.sscmlegal.com**

Additional offices worldwide through our affiliation
with LEGUS.
Contact our office for more information.
**www.leguslaw.com**

*This message is intended for the addressee only and is privileged*
*and confidential. Interception or other unauthorized use is*
*prohibited. If you receive this message in error, please notify me by*
*reply-email and immediately delete copies from your records.*

On Aug 14, 2018, at 3:33 PM, Josh Gruenberg <josh@gruenberglaw.com> wrote:

Hi Dick,
I wanted to let you know that I have been retained by Ms. Dusina relative to her claims against
Antonio Madureira and AV Builders.  All further communications with regard to this matter are to
be with me.  Mr. Madureira is not to communicate in any fashion with Ms. Dusina.

We are in the process of preparing a suit but will provide it to you prior to filing.

Thank you,

Josh

--
Josh Gruenberg
Gruenberg Law
2155 First Avenue
San Diego, CA 92101
(619) 230-1234
(619) 230-1074 (fax)
web site: www.gruenberglaw.com (http://www.gruenberglaw.com/)

Email is  covered by the Electronics Privacy Act, 18 U.S.C., sections
2510-2521, and is  legally privileged. This email may contain confidential and
privileged material  for the sole use of the intended recipient(s). Any
review, use, distribution, or  disclosure by others is strictly prohibited. If you
are not the intended  recipient, please contact the sender by reply email
and delete all  copies.

HC000469

# Exhibit B

AVB MSJ Appendix P. 376



GRUENBERG LAW

gruenberglaw.com

*Via E-Mail and U.S. Mail*
das@sscmlegal.com

September 13, 2018

Dick Semerdjian, Esq.
Schwartz Semerdjian Cauley & Moot
101 West Broadway, Suite 810
San Diego CA 92101
P: 619.699.8326

Re:   Dusina v. AV Builder Corp, Antonia Madureira, et al.

Dear Mr. Semerdjian:

As you are aware, our office represents Laura Dusina with respect to her claims against AV Builder Corp, Antonia Madureira, and Restocorp. Enclosed please find a draft of Ms. Dusina's suit. As you can see, our client's claims are substantial. If you would like to take part in some form of alternative dispute resolution process, please let us know. If we do not hear from you within 15 days, we will assume your clients would prefer to resolve this matter in San Diego Superior Court.

Should you have any questions or concerns, please do not hesitate to contact us at (619) 230-1234.

Sincerely,

GRUENGERG LAW

JOSHUA D. GRUENBERG

2155 First Avenue · San Diego · California · 92101 · (619) 230-1234 · (619) 230-1074 fax

HC000345

AVB MSJ Appendix P. 377



Josh D. Gruenberg, Esq. SB #163281
Benjamin S. Silver, Esq. SB #284741
Jesse A. Collmann, Esq. SB #310664
**GRUENBERG LAW**
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013
TELEPHONE: (619) 230-1234
TELECOPIER: (619) 230-1074

Attorneys for Plaintiff,
**LAURA DUSINA**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO, CENTRAL DIVISION**

| | |
|---|---|
| LAURA DUSINA, an individual,<br><br>                    Plaintiff,<br><br>         v.<br><br>AV BUILDER CORP, a California corporation;<br>RESTORCORP, a California corporation;<br>ANTONIO MADUREIRA, an individual; and<br>DOES 1 through 25, Inclusive,<br><br>                    Defendants. | Case No.<br><br>**PLAINTIFF'S COMPLAINT FOR:**<br><br>1. SEXUAL HARASSMENT [Cal. Gov't Code § 12940(j)];<br>2. GENDER DISCRIMINATION [Cal. Gov't Code § 12940(a)];<br>3. RETALIATION [Cal. Gov't Code § 12940(h)];<br>4. FAILURE TO PREVENT HARASSMENT AND/OR DISCRIMINATION [Cal. Gov't Code § 12940(k)];<br>5. NEGLIGENT SUPERVISION;<br>6. FAILURE TO PAY WAGES UPON TERMINATION [Cal. Lab. Code § 201];<br>7. FAILURE TO PROVIDE ACCURATE AND ITEMIZED WAGE STATEMENT [Cal. Lab. Code § 226];<br>8. BREACH OF WRITTEN CONTRACT;<br>9. BREACH OF ORAL CONTRACT;<br>10. UNLAWFUL BUSINESS PRACTICES [Cal. Bus. & Prof. Code § 17200 *et seq.*];<br>11. INENTIONAL INFLICTION OF EMOTIONAL DISTRESS.<br><br>**[JURY TRIAL DEMANDED]** |

PLAINTIFF'S COMPLAINT FOR DAMAGES
1

HC000346

COMES NOW THE PLAINTIFF, alleging against Defendants as follows:

## GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION

1.   Plaintiff, LAURA DUSINA, (hereinafter "Plaintiff" or "DUSINA") is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California.

2.   Plaintiff is informed and believes and thereon alleges that Defendant, AV BUILDER CORP (hereinafter "Defendant" or "AV BUILDER") is, and at all relevant times herein mentioned was, a California corporation authorized for, and engaging in, business in the State of California, County of San Diego.

3.   Plaintiff is informed and believes and thereon alleges that AV BUILDER is subject to suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"), Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San Diego and elsewhere.

4.   Plaintiff is informed and believes and thereon alleges that Defendant, RESTORCORP (hereinafter "Defendant" or "RESTORCORP") is, and at all relevant times herein mentioned was, a California corporation authorized for, and engaging in, business in the State of California, County of San Diego.

5.   Plaintiff is informed and believes and thereon alleges that RESTORCORP is subject to suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"), Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San Diego and elsewhere.

6.   Plaintiff believes and thereon alleges that at all relevant times herein mentioned Defendant, ANTONION MADUREIRA (hereinafter "Defendant" or "MADUREIRA"), is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California, County of San Diego.

7.   Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 to 25, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities when they are ascertained.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

8.    Plaintiff is informed and believes, and thereon alleges, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by Defendants.

9.    Plaintiff is informed and believes and thereon alleges that the aforementioned DOES are somehow responsible for the acts alleged herein as the agents, employers, representatives or employees of other named Defendant, and in doing the acts herein alleged were acting within the scope of their agency, employment or representative capacity of said named Defendant.

10.   The tortious acts and omissions alleged to have occurred herein were performed by Defendants' management level employees. Defendants allowed and/or condoned a continuing pattern of unlawful practices, and have caused, and will continue to cause, Plaintiff economic damage in an amount to be proven at trial.

11.   Defendants had constructive knowledge of the tortious acts and/or omissions alleged herein as the result of participating in the wrongful acts or ratifying or affirming the acts once heard or known of.

12.   Defendants committed the acts alleged herein maliciously, fraudulently, oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiff's rights.

13.   Such tortious acts were authorized or ratified by upper-level managerial employees of Defendants. The actions of Defendants, and each of them, against the Plaintiff constitute unlawful practices in violation of California law, and have caused, and will continue to cause Plaintiff loss of earnings, loss of employment benefits, and other losses in amounts to be proven at trial.

14.   As a further proximate result of the unlawful actions of Defendants, and each of their agents, against Plaintiff as alleged herein, Plaintiff has been harmed in that she has suffered emotional pain, humiliation, mental anguish, loss of enjoyment of life, and

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES

3

HC000348

1   emotional distress.

2   15.   Defendants' conduct warrants the assessment of punitive damages in an amount

3   sufficient to punish Defendants and deter others from engaging in similar conduct.

4   16.   Plaintiff filed a complaint with the Department of Fair Employment and Housing on

5   September XX, 2018 and on that same day received a Right-To-Sue Letter. The

6   Complaint and Letter are collectively attached hereto as "Exhibit A."[1]

7   ### SPECIFIC FACTUAL ALLEGATIONS

8   17.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9   the preceding paragraphs as though fully set forth herein.

10  18.   On or about February 10, 2010, Plaintiff began her employment at AV BUILDER, in the

11  position of Temporary Receptionist/Office Manager. In exchange for her services as

12  Temporary Receptionist/Office Manager, AV BUILDER agreed to pay Plaintiff $13.00

13  per hour.

14  19.   AV BUILDER operates as a general contractor that primarily focuses on the

15  reconstruction of medium and large-scale multi-unit properties throughout the Southwest

16  United States.

17  20.   At all relevant times herein mentioned, Plaintiff performed her job in a competent and

18  diligent manner, as evidenced by the multiple promotions she received.

19  21.   From the outset of her employment, Plaintiff noticed that MADUREIRA, AV

20  BUILDER's President and Founder, took a keen interest in her.

21  22.   At the time Plaintiff began her employment, MADUREIRA was married.

22  23.   MADUREIRA invited Plaintiff out to lunch on her first day of employment. Plaintiff

23  learned later from her colleagues that this was not a customary practice. From that point

24  forward, MADUREIRA continued this nearly daily habit of taking Plaintiff out to lunch

25  throughout her eight-year career.

26  24.   On information and belief, MADUREIRA maintained a long-standing pattern and

27  ──────────────

28  [1] Plaintiff will file her claim with the DFEH prior to filing her lawsuit with the Superior
Court of California, County of San Diego.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000349

1    practice of grooming female employees and business colleagues, whereby he desensitized

2    them into tolerating his sexual harassment, then, using his position of power, pressured

3    them into a sexual affair.

4  25.   Over the first few months of her employment, Plaintiff experienced a similar process.

5    MADUREIRA made efforts to ingratiate himself into Plaintiff's life, and the two became

6    friends. At the same time, MADUREIRA's sexually-charged comments and behavior

7    ensured that Plaintiff knew that her role as a female employee was a subservient one.

8  26.   After approximately four months of lunches and grooming, MADUREIRA began a

9    consensual sexual relationship with Plaintiff in June 2010.

10  27.   MADUREIRA came to expect not only lunch with Plaintiff everyday, but sex as well.

11  28.   Given that MADUREIRA was married, he requested that Plaintiff keep their relationship

12    a secret from his family and their coworkers. Plaintiff acquiesced. The balance of their

13    sexual relationship remained largely a secret.

14  29.   For the remainder of 2010 through 2012, MADUREIRA and Plaintiff continued engaging

15    in sexual relations on a regular basis. Plaintiff was expected to join MADUREIRA for

16    lunch whenever he requested her presence.

17  30.   In or around November 2011, AV BUILDER promoted Plaintiff to permanent Office

18    Manager, which included a raise to $21.63 per hour.

19  31.   In or around mid December 2012, MADUREIRA and his wife divorced. Although

20    MADUREIRA was now single, he insisted on keeping his ongoing sexual relationship

21    with Plaintiff a secret.

22  32.   From that point on, MADUREIRA had approximately ten to fifteen "traditional"

23    girlfriends. Despite MADUREIRA's girlfriends, his relationship with Plaintiff remained

24    constant. At times, MADUREIRA would schedule his sexual encounters with Plaintiff

25    around his other relationships. Plaintiff would be expected to meet MADUREIRA for sex

26    on, for example, Wednesday, Friday, and Sunday. The other days, MADUREIRA met

27    with whatever girlfriend he had at the time.

28  33.   Additionally, throughout her employment with AV BUILDER, on occasions when

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1   Plaintiff was too busy for lunch, MADUREIRA would stay in Plaintiff's office, pouting,

2   until Plaintiff relented and agreed to join him for lunch. MADUREIRA also continued

3   making sexual comments about Plaintiff in front of clients and coworkers. Plaintiff found

4   these comments offensive.

5   34.   In or around mid April 2012, AV BUILDER promoted Plaintiff again, adding the duties

6   and responsibilities of Marketing Director. This promotion came with a raise from $21.63

7   to $28.85 per hour.

8   35.   As Marketing Director, Plaintiff continued improving AV BUILDER's business. Her

9   duties grew to include travelling to multi-day conventions and events, where she would

10   represent AV BUILDER to colleagues in the industry and potential clients.

11   36.   Despite Plaintiff's integral role in the success of AV BUILDER, MADUREIRA

12   continued to demean Plaintiff by making inappropriate sexual comments about her in

13   front of her clients and coworkers. Plaintiff found these comments degrading and

14   embarrassing.

15   37.   In or around early 2013, MADUREIRA moved Plaintiff upstairs into a corner office. The

16   other employees on that floor left work everyday at approximately 3:00 p.m. After

17   relocating to the new office, MADUREIRA began directing Plaintiff to go on the internet

18   and search for women interested in having a threesome. This became a daily task for

19   Plaintiff. Once the upstairs employees left at around 3:00 p.m., Plaintiff was expected to

20   begin searching for potential women. MADUREIRA would come to Plaintiff's office

21   around 3:30 p.m. or 4:00 p.m., and review Plaintiff's research. MADUREIRA would then

22   watch and comment as Plaintiff continued her search. After approximately one hour of

23   searching, MADUREIRA would tell Plaintiff that "it is now time for [her] to real job of

24   entertaining [him]," or words to that effect. Plaintiff was then expected to give

25   MADUREIRA oral sex before he left work for the day.

26   38.   In or around May 2015, Plaintiff assumed the role of managing the Billing department of

27   RESTORCORP, an affiliate of AV BUILDER that provides Destructive Testing services.

28   This task was in addition to her other responsibilities. In exchange for performing these

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    additional duties, RESTORCORP agreed to pay Plaintiff a $15,000 bonus and an annual

2    commission of 3% of RESTORCORP profits. However, RESTORCORP failed to

3    provide Plaintiff a written commission structure, in violation of California law.

4  39.  When Plaintiff assumed her billing duties, RESTORCORP had significant filing issues

5    and approximately $1,000,000 in unbilled work. Over the coming months, Plaintiff

6    resolved RESTOCORP's billing and filing issues. Once that was complete, Plaintiff

7    continued managing RESTORCORP's Destructive Testing department, where she

8    handled all department contracts and billing.

9  40.  In or around the summer of 2017, Plaintiff took on even more responsibilities at AV

10    BUILDER. The company's Reconstruction department entered into multiple large

11    contracts. These additional projects required monthly billings in both California and

12    Arizona. Managing the billings was complex as they required detailed pay charts and

13    releases, subcontracts and sub pay charts, change orders, and inputting data for portal

14    payment applications. Despite the fact that these billings previously required two

15    dedicated employees, Plaintiff assumed these duties in addition to her other

16    responsibilities at AV BUILDER.

17  41.  On or about December 19, 2017, MADUREIRA contacted Plaintiff and notified her that

18    he and his then-girlfriend, Shila (last name unknown), had a "scare" regarding a potential

19    Sexually Transmitted Disease ("STD"). Although Plaintiff's subsequent tests came back

20    negative, she felt stunned and betrayed by MADUREIRA's reckless conduct, as it

21    potentially exposed her to a STD.

22  42.  After that experience, Plaintiff requested that she and MADUREIRA stop having sexual

23    relations. However, MADUREIRA continued to pursue Plaintiff, and before long, they

24    began engaging in sexual relations again. On one occasion, MADUREIRA explained that

25    he was a "sex addict," and Plaintiff was his "crack."

26  43.  Throughout this entire time, Plaintiff continued to perform her job more than

27    competently, as shown by MADUREIRA's continued praise and promotion of Plaintiff.

28  44.  In addition, MADUREIRA made various verbal promises to Plaintiff to ensure that she

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  stayed at AV BUILDER. These promises included, but were not limited to, the following:

2    a.  Stating that Plaintiff's job was "guaranteed for life," or words to that effect;

3    b.  Promising Plaintiff a commission on the Newport Bluffs project;

4    c.  Promising Plaintiff a commission of 0.005% of the total revenue on the prime

5        contract for the Oak Glen project;

6    d.  Promising Plaintiff a commission of 0.005% of the total revenue received for any

7        Irvine Company project that AV BUILDER performed;

8    e.  Assuring Plaintiff that she would receive a portion of the sale price of AV

9        BUILDER, which MADUREIRA planned to sell in 2021 or 2022;

10    f.  Agreeing to sign over the title of Plaintiff's company vehicle; and

11    g.  Pledging to invest $400,000 in a joint venture.

12  45.  Despite promising Plaintiff commissions on certain projects, AV BUILDER failed to put

13      the commission structure in writing and provide Plaintiff a copy, in violation of

14      California law.

15  46.  On or about February 2018, MADUREIRA began a relationship with a new girlfriend,

16      Noylan Pulaski. As before, MADUREIRA continued his sexual relationship with

17      Plaintiff in secret.

18  47.  On or about April 16, 2018, MADUREIRA contacted Plaintiff and informed her that

19      Pulaski was experiencing "female health issues," or words to that effect. Plaintiff

20      understood MADUREIRA's warning to mean that she should get tested for STDs.

21      Plaintiff did so, and the results came back negative.

22  48.  After experiencing yet another scare, Plaintiff decided to end her sexual relationship with

23      MADUREIRA. That same day, Plaintiff confronted MADUREIRA at the AV BUILDER

24      office. Plaintiff explained that she could no longer have a sexual relationship with

25      MADUREIRA given that he potentially exposed her to STDs on multiple occasions and

26      did not respect her enough to protect her sexual health. Plaintiff was adamant that all

27      sexual relations between them must cease immediately. MADUREIRA engaged Plaintiff

28      in an argument, but Plaintiff refused to budge on her decision. MADUREIRA's sexual

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1     relationship with Plaintiff ended that day.

2    49.    That same afternoon, MADUREIRA sent Plaintiff an email, entitled "Laura's

3       Resignation/Continuation Agreement." In the email, MADUREIRA stated that AV

4       BUILDER accepted Plaintiff's alleged "verbal resignation." In reality, Plaintiff did not

5       resign her position at AV BUILDER on April 16, 2018; she merely resigned from her

6       position as MADUREIRA's obligatory sexual partner.

7    50.    On or about April 17, 2018, Plaintiff went to work, just as she had consistently done for

8       the past eight years. Indeed, Plaintiff continued working at AV BUILDER over the

9       following months.

10   51.    From that point on, MADUREIRA embarked on a campaign of retaliation designed to

11       force Plaintiff out of her employment at AV BUILDER.

12   52.    Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship

13       was a substantial motivating factor in Defendants' decision retaliate against Plaintiff.

14   53.    Over the coming months, MADUREIRA's attempts to force Plaintiff out of AV

15       BUILDER became more desperate—even though Plaintiff continued to show up each

16       day and competently perform the work of multiple employees. MADUREIRA's

17       retaliatory conduct included, but was not limited to, the following:

18        a.   MADUREIRA stopped coming in to the office after Plaintiff ended their sexual

19           relationship, making it more difficult for Plaintiff to perform her job;

20        b.   MADUREIRA told Plaintiff that she was to blame for his girlfriend breaking up

21           with him twice;

22        c.   After his current girlfriend, Pulaski, found out about his sexual relationship with

23           Plaintiff, MADUREIRA directed Plaintiff to support the lies he told Pulaski in an

24           effort to get them back together. MADUREIRA drafted text messages and emails,

25           then had Plaintiff send them from her phone or email address, so it appeared that

26           they came from Plaintiff. In these messages, Plaintiff, ostensibly, admitted to

27           Pulaski that she was to blame for their failed relationship, her sexual relationship

28           with MADUREIRA was long ago and brief, she is a lesbian, and she is bipolar. In

HC000354

AVB MSJ Appendix P. 386

reality, these messages were lies written by MADUREIRA;

   d.  MADUREIRA told Plaintiff that Pulaski ordered him to terminate Plaintiff's employment;

   e.  MADUREIRA instructed Plaintiff to delete all of the text messages and photos they exchanged over the previous eight years.

54. At the same time, MADUREIRA worked with his accountant and lawyer to draft an agreement that would basically pay Plaintiff off for her silence. Plaintiff was involved in these negotiations.

55. Plaintiff suffered stress and anxiety due to MADUREIRA's retaliatory behavior and his pressure to sign the Nondisclosure Agreement.

56. On or about July 22, 2018, MADUREIRA effectively terminated Plaintiff's employment, for the second time, via text message, stating, in part, "it's time to move on ... sadly [our] chapter is over ... [you] will get [your] agreement on Tuesday."

57. Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship was a substantial motivating factor in his decision to terminate Plaintiff's employment.

58. Plaintiff's final day of employment at AV BUILDER was scheduled for August 3, 2018.

59. In early August 2018, the negotiations regarding the Nondisclosure Agreement between MADUREIRA and Plaintiff broke down. MADUREIRA presented Plaintiff with the ultimatum that she either sign the latest proposed agreement within three days or receive nothing. Plaintiff never signed MADUREIRA's proposed Nondisclosure Agreement.

60. Despite planning on August 3, 2018 being her final day of employment, Plaintiff's true final day was the following Monday, August 6, 2018.

61. Defendants failed to provide Plaintiff her final paycheck and wage statement on her last day of employment.

62. In addition, prior to her termination, Plaintiff earned approximately $100,000 in commissions for the work she performed on the Newport Bluffs project. AV BUILDER, however, failed to pay Plaintiff this commission, and others, at termination. These unpaid commissions remain outstanding.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000355

AVB MSJ Appendix P. 387

63. As a result of Defendants' actions, Plaintiff has suffered, and continues to suffer, emotional distress, anxiety, depression, sleeplessness, stress, worry, and humiliation.

## FIRST CAUSE OF ACTION

### SEXUAL HARASSMENT v. All Defendants

### [Cal. Gov't Code § 12940(j)]

64. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

65. Plaintiff was at all times material hereto an employee covered by California Government Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

66. Defendants are, and at all times material hereto were, an employer and/or person within the meaning of the Fair Employment and Housing Act and, as such, barred from harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

67. Plaintiff was subjected to unwanted and harassing conduct on the basis of her sex, as set forth herein.

68. The harassing conduct was severe and pervasive.

69. A reasonable woman in Plaintiff's circumstances would have considered the work environment to be hostile or abusive, and Plaintiff did in fact consider the work environment to be hostile or abusive.

70. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

71. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered emotional distress, to her damage, in a sum to be established according to proof.

72. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000356

73.   In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

### SECOND CAUSE OF ACTION

### GENDER DISCRIMINATION v. Defendants AV BUILDER and RESTORCORP

### [Cal. Gov't Code § 12940(a)]

74.   Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in the proceeding paragraphs as though fully set forth herein.

75.   Plaintiff was at all times material hereto an employee covered by California Government Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

76.   Defendants are, and at all times material hereto were, employers and/or persons within the meaning of the Fair Employment and Housing Act and, as such, barred from harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

77.   Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment, as stated herein.

78.   Plaintiff believes and thereon alleges that her gender, female, was a motivating reason for Defendants' discrimination against her.

79.   Defendants' conduct of discriminating against Plaintiff on the basis of her gender violated Cal. Gov't Code § 12940(a).

80.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

81.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

82.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000357

AVB MSJ Appendix P. 389

1  Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

2  conduct.

3  83.  In addition to such other damages as may properly be recovered herein, Plaintiff is

4  entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

## THIRD CAUSE OF ACTION

### RETALIATION v. Defendants AV BUILDER and RESTORCORP

### [Cal. Gov't Code § 12940(h)]

8  84.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9  the preceding paragraphs as though fully set forth herein.

10  85.  At all times mentioned herein, Cal. Gov't Code § 12940(h) was in full force and effect

11  and was binding on Defendants. This section requires Defendants, as employers, to

12  refrain from retaliating against any employee who has opposed any practices forbidden

13  under Cal. Gov't Code § 12940, or because the employee has filed a complaint, testified,

14  or assisted in any proceeding under Cal. Gov't Code § 12940(h).

15  86.  Defendants, by and through its employees and agents, engaged in conduct that, taken as a

16  whole, materially and adversely affected the terms and conditions of Plaintiff's

17  employment, as stated herein, up to and including claiming Plaintiff verbally resigned;

18  directing Plaintiff to send false statements about herself to Pulaski; instructing Plaintiff to

19  delete all of her text messages and photos with MADUREIRA; informing Plaintiff that

20  Pulaski ordered her termination; and terminating Plaintiff's employment.

21  87.  Plaintiff believes and thereon alleges that her opposition to the sexual harassment

22  perpetuated by MADUREIRA was a motivating reason for Defendants engaging in

23  conduct that, taken as a whole, materially and adversely affected the terms and conditions

24  of Plaintiff's employment, as stated herein, up to and including, claiming Plaintiff

25  verbally resigned; directing Plaintiff to send false statements about herself to Pulaski;

26  instructing Plaintiff to delete all of her text messages and photos with MADUREIRA;

27  informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's

28  employment.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000358

88. Defendants' conduct of retaliating against Plaintiff in the terms, conditions, and privileges of her employment, as stated herein, up to and including claiming Plaintiff verbally resigned; directing Plaintiff to send false statements about herself to Pulaski; instructing Plaintiff to delete all of her text messages and photos with MADUREIRA; informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's employment, violates Cal. Gov't Code § 12940(h).

89. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

90. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

91. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

92. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

## FOURTH CAUSE OF ACTION

**FAILURE TO PREVENT HARASSMENT v. Defendants AV BUILDER and RESTORCORP**

**[Cal. Gov't Code § 12940(k)]**

93. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

94. Plaintiff was subjected to discriminatory and harassing conduct on the basis of her sex, as set forth herein. Plaintiff was also subjected to retaliation for opposing said

GRUENBERG LAW
215S FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000359

1    discrimination and/or harassment.

2    95.    Defendants failed to take reasonable steps to prevent the discrimination, harassment, and

3    retaliation, as described herein.

4    96.    As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

5    sustained and continues to sustain substantial losses in earnings, employment benefits,

6    employment opportunities, and Plaintiff has suffered other economic losses in an amount

7    to be determined at time of trial. Plaintiff has sought to mitigate these damages.

8    97.    As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff

9    has suffered and continues to suffer humiliation, emotional distress, loss of reputation,

10    and mental and physical pain and anguish, all to her damage in a sum to be established

11    according to proof.

12    98.    As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled

13    to recover punitive and exemplary damages in an amount commensurate with

14    Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

15    conduct.

16    99.    In addition to such other damages as may properly be recovered herein, Plaintiff is

17    entitled to recover attorney fees and costs pursuant Cal. Gov't. Code § 12965.

18    **FIFTH CAUSE OF ACTION**

19    **NEGLIGENT SUPERVISION v. Defendants AV BUILDER and RESTORCORP**

20    100.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in

21    the preceding paragraphs as though fully set forth herein.

22    101.    Plaintiff performed work for Defendants, as an employee, as stated herein.

23    102.    Defendants had a legal duty to supervise all employees.

24    103.    Defendants' employees or agents took part in unlawful discriminatory conduct, including

25    actions to harass Plaintiff on the basis of her sex in an effort to humiliate and embarrass

26    her, as stated herein.

27    104.    Defendants knew or should have known that its employees or agents were engaging in

28    unlawful discriminatory practices, as stated herein.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
15

HC000360

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  105.  Defendants failed to take reasonable steps necessary to prevent the unlawful

2        discriminatory conduct described herein.

3  106.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

4        sustained and continues to sustain substantial losses in earnings, employment benefits,

5        employment opportunities, and other economic losses in an amount to be determined at

6        time of trial. Plaintiff has sought to mitigate these damages.

7  107.  As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has

8        suffered and continues to suffer humiliation, emotional distress, and mental pain and

9        anguish, all to her damage in a sum to be established according to proof.

10            **SIXTH CAUSE OF ACTION**

11     **FAILURE TO PAY WAGES UPON TERMINATION v. Defendants**

12          **AV BUILDER and RESTORCORP**

13             **[Cal. Lab. Code § 201]**

14  108.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in

15        the preceding paragraphs as though fully set forth herein.

16  109.  At all times relevant herein, Plaintiff performed work for Defendants.

17  110.  California law considers commissions "wages under Labor Code § 200.

18  111.  Plaintiff was terminated from her employment with Defendants. Defendants failed to pay

19        Plaintiff all wages earned and owed to her at the time of her termination, as stated herein,

20        including but not limited to, bonuses, incentive payments, commissions, and overtime

21        pay, in violation of Cal. Labor Code § 201.

22  112.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

23        sustained, and continues to sustain, substantial economic damages.

24  113.  In addition to all other damages properly recoverable, Plaintiff is entitled to statutory

25        penalties pursuant to Cal. Labor Code § 203, an award of costs and attorney fees pursuant

26        to Cal. Labor Code § 218.5, and an award of interest pursuant to Cal. Labor Code §

27        218.6.

28  ///

HC000361

## SEVENTH CAUSE OF ACTION

### FAILURE TO PROVIDE ACCURATE ITEMIZED WAGE STATEMENTS

### v. Defendants AV BUILDER and RESTORCORP

### [Cal. Labor Code § 226]

114. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

115. At all times relevant herein, Plaintiff was an employee of Defendants.

116. California law considers commissions "wages" under Cal. Labor Code § 200.

117. Defendants knowingly and intentionally failed to provide Plaintiff with an accurate itemized wage statement displaying accurate and complete information as required under Cal. Labor Code § 226(a).

118. As a result, Plaintiff could not promptly and easily determine her gross and net earned wages, among other things, from the wage statement alone because Defendants failed to accurately calculate Plaintiff's earned commissions.

119. Plaintiff suffered injury as a result.

120. Plaintiff is therefore entitled to an award of costs, attorney fees, and penalties pursuant to Cal. Labor Code § 226(e), in an amount according to proof.

121. Plaintiff is entitled to recover the unpaid additional or premium wages, interest thereon, reasonable attorney fees, and costs of suit pursuant to Cal. Labor Code § 1194(a).

### EIGHTH CAUSE OF ACTION

### BREACH OF WRITTEN CONTRACT v. All Defendants

122. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

123. Plaintiff and Defendants entered into multiple written agreements, as stated herein.

124. In exchange for Plaintiff performing work for Defendants, Defendants made certain promises to Plaintiff, including but not limited to, promising Plaintiff a commission on the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

AVB MSJ Appendix P. 394

HC000362

of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus and an annual commission of 3% of RESTORCORP profits; and pledging to invest $400,000 in a joint venture.

125.   Plaintiff did all, or substantially all, of the things required of her under the contracts, or in the alternative, Plaintiff was excused from such performance.

126.   Defendants failed to perform on the contract by failing to provide Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; a commission of 0.005% of the total revenue received for any Irvine Company project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP profits; and a $400,000 investment in a joint venture.

127.   As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as stated herein, Plaintiff has been harmed in that she has suffered substantial economic losses, in an amount according to proof plus interest.

## NINTH CAUSE OF ACTION
### BREACH OF ORAL CONTRACT v. All Defendants

128.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

129.   Should the trier of fact find that any of the contracts listed above were not reduced to writing, Plaintiff alleges this claim in the alternative.

130.   Plaintiff and Defendants entered into multiple oral agreements, as stated herein.

131.   In exchange for Plaintiff performing work for Defendants, Defendants made certain promises to Plaintiff, including but not limited to, promising Plaintiff a commission on the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

AVB MSJ Appendix P. 395

HC000363

1    revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission

2    of 0.005% of the total revenue received for any Irvine Company project that AV

3    BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price

4    of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign

5    over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus

6    and an annual commission of 3% of RESTORCORP profits; and pledging to invest

7    $400,000 in a joint venture.

8    132.   Plaintiff did all, or substantially all, of the things required of her under the contracts, or in

9    the alternative, Plaintiff was excused from such performance.

10   133.   Defendants failed to perform on the contract by failing to provide Plaintiff a commission

11   of 0.005% of the total revenue on the prime contract for the Oak Glen project; a

12   commission of 0.005% of the total revenue on the prime contract for the Oak Glen

13   project; a commission of 0.005% of the total revenue received for any Irvine Company

14   project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the

15   title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP

16   profits; and a $400,000 investment in a joint venture.

17   134.   As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as

18   stated herein, Plaintiff has been harmed in that she has suffered substantial economic

19   losses, in an amount according to proof plus interest.

20                                **TENTH CAUSE OF ACTION**

21        **UNFAIR COMPETITION v. Defendants AV BUILDER and RESTORCORP**

22                       **[Cal. Bus. & Prof. Code § 17200 *et seq.*]**

23   135.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

24   the preceding and subsequent paragraphs as though fully set forth herein.

25   136.   California Business & Professions Code § 17200 *et seq.* prohibits the engagement of any

26   business acts or practices constituting unfair competition. Section 17200 defines "unfair

27   competition" to mean and include "...any unlawful, unfair or fraudulent business act or

28   practice."

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
19

HC000364

137.   Defendants have not provided all wages owed to Plaintiff in violation of California Labor Code §§ 201, 204, 216, and 510, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

138.   Defendants also failed to provide Plaintiff a signed copy of its commission and bonus policies and obtain a signed receipt of the same from Plaintiff, in violation of Cal. Labor Code § 2751, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

139.   Furthermore, Defendants' failure to pay Plaintiff pursuant to the terms of the contract, or alternatively, for the reasonable value of her services, constituted unfair business acts or practices in that such practices negatively affect Defendants' competitors who do pay according to the contracts to which they are parties or, in the alternative, pay the reasonable value of services rendered on their behalves, and properly provide their employees with signed copies of their commission and bonus policies.

140.   As a direct and proximate result of Defendants' unlawful and/or unfair business act or practices, Plaintiff has suffered an injury-in-fact and was deprived of money or property to which she has valid and cognizable claims.

141.   The harm to Plaintiff resulting from Defendants' unlawful and/or unfair business acts or practices, far outweighs whatever benefits, if any, such business practices have for Defendants.

142.   In addition to all other damages properly recoverable, Plaintiff is entitled to all restitution damages arising from Defendants' unlawful and/or unfair business acts or practices, in an amount to be established according to proof plus interest.

143.   Plaintiff is further entitled to cumulative damages pursuant to Cal. Bus. & Prof. Code § 17205, and an award of attorney fees pursuant to Cal. Code Civ. Proc. § 1021.5.

///
///
///
///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

AVB MSJ Appendix P. 397

HC000365

## ELEVENTH CAUSE OF ACTION

## INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

### v. All Defendants

144. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

145. Defendants' intentional conduct, as set forth herein, was extreme and outrageous.

146. Defendants intended to cause Plaintiff to suffer extreme emotional distress. Plaintiff suffered extreme emotional distress.

147. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to Plaintiff's damage in an amount according to proof at trial.

148. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively with the wrongful intention of injuring Plaintiff from an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover exemplary and punitive damages in amounts to be proven at trial.

///
///
///
///
///
///
///
///
///
///
///
///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000366

AVB MSJ Appendix P. 398

1    **WHEREFORE,** Plaintiff prays for the following relief:

2        1.    For compensatory damages, including loss of wages, promotional opportunities,

3              benefits, and other opportunities of employment, according to proof;

4        2.    For special damages in an amount according to proof;

5        3.    For mental and emotional distress damages;

6        4.    For back pay, front pay, and other monetary relief;

7        5.    For restitution and/or disgorgement;

8        6.    For penalties pursuant to Cal. Labor Code §§ 203 and 226;

9        7.    For cumulative damages, pursuant to Cal. Bus. & Prof. Code § 17205;

10       8.    For punitive damages in an amount necessary to make an example of, and to

11             punish, defendants, and to deter future similar misconduct;

12       9.    For costs of suit, including attorneys' fees as permitted by law, including those

13             available pursuant to Cal. Labor Code §§ 218.5 and 218.6, Cal. Code Civ. Proc. §

14             1021.5, and Cal. Gov't. Code § 12965(b);

15      10.    For an award of interest, including prejudgment interest, at the legal rate as

16             permitted by law, including those permitted by Cal. Gov't Code § 12965(b);

17      11.    For such other and further relief as the Court deems proper and just under all the

18             circumstances.

19    **PLAINTIFF LAURA DUSINA** demands a jury trial on all issues in this case.

20

21    DATED: September ___, 2018            **GRUENBERG LAW**

22

23                                    _____
                                    JOSH D. GRUENBERG

24                                    BENJAMIN S. SILVER

25                                    JESSE A. COLLMANN
                                    Attorneys for Plaintiff,

26                                    **LAURA DUSINA**

27

28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000367

1
2
3
4
5
6
7
8
9
10
11
12

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**EXHIBIT A**

(1)   PLAINTIFF'S CHARGE FILED WITH THE DEPARTMENT OF FAIR

EMPLOYMENT AND HOUSING (DFEH).

(2)   PLAINTIFF'S RIGHT TO SUE LETTERS FROM THE DFEH.

AVB MSJ Appendix P. 400

HC000368



# Exhibit 14



**GRUENBERG** LAW

gruenberglaw.com

_Via E-Mail and U.S. Mail_
_das@sscmlegal.com_

September 13, 2018

Dick Semerdjian, Esq.
Schwartz Semerdjian Cauley & Moot
101 West Broadway, Suite 810
San Diego CA 92101
P: 619.699.8326

Re:   **Dusina v. AV Builder Corp, Antonia Madureira, et al.**

Dear Mr. Semerdjian:

As you are aware, our office represents Laura Dusina with respect to her claims against AV Builder Corp, Antonia Madureira, and Restocorp. Enclosed please find a draft of Ms. Dusina's suit. As you can see, our client's claims are substantial. If you would like to take part in some form of alternative dispute resolution process, please let us know. If we do not hear from you within 15 days, we will assume your clients would prefer to resolve this matter in San Diego Superior Court.

Should you have any questions or concerns, please do not hesitate to contact us at (619) 230-1234.

Sincerely,

GRUENGERG LAW

JOSHUA D. GRUENBERG

2155 First Avenue · San Diego · California · 92101 · (619) 230-1234 · (619) 230-1074 fax

HC000345

Josh D. Gruenberg, Esq. SB #163281
Benjamin S. Silver, Esq. SB #284741
Jesse A. Collmann, Esq. SB #310664
**GRUENBERG LAW**
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013
TELEPHONE: (619) 230-1234
TELECOPIER: (619) 230-1074

Attorneys for Plaintiff,
**LAURA DUSINA**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN DIEGO, CENTRAL DIVISION**

| | |
|---|---|
| LAURA DUSINA, an individual, | ) Case No. |
| Plaintiff, | ) |
| | ) **PLAINTIFF'S COMPLAINT FOR:** |
| v. | ) |
| | ) 1. SEXUAL HARASSMENT [Cal. Gov't Code § 12940(j)]; |
| AV BUILDER CORP, a California corporation; RESTORCORP, a California corporation; ANTONIO MADUREIRA, an individual; and DOES 1 through 25, Inclusive, | ) 2. GENDER DISCRIMINATION [Cal. Gov't Code § 12940(a)]; |
| | ) 3. RETALIATION [Cal. Gov't Code § 12940(h)]; |
| Defendants. | ) 4. FAILURE TO PREVENT HARASSMENT AND/OR DISCRIMINATION [Cal. Gov't Code § 12940(k)]; |
| | ) 5. NEGLIGENT SUPERVISION; |
| | ) 6. FAILURE TO PAY WAGES UPON TERMINATION [Cal. Lab. Code § 201]; |
| | ) 7. FAILURE TO PROVIDE ACCURATE AND ITEMIZED WAGE STATEMENT [Cal. Lab. Code § 226]; |
| | ) 8. BREACH OF WRITTEN CONTRACT; |
| | ) 9. BREACH OF ORAL CONTRACT; |
| | ) 10. UNLAWFUL BUSINESS PRACTICES [Cal. Bus. & Prof. Code § 17200 *et seq.*]; |
| | ) 11. INENTIONAL INFLICTION OF EMOTIONAL DISTRESS. |
| | ) **[JURY TRIAL DEMANDED]** |

HC000346

AVB MSJ Appendix P. 403

COMES NOW THE PLAINTIFF, alleging against Defendants as follows:

**GENERAL ALLEGATIONS COMMON TO ALL CAUSES OF ACTION**

1.    Plaintiff, LAURA DUSINA, (hereinafter "Plaintiff" or "DUSINA") is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California.

2.    Plaintiff is informed and believes and thereon alleges that Defendant, AV BUILDER CORP (hereinafter "Defendant" or "AV BUILDER") is, and at all relevant times herein mentioned was, a California corporation authorized for, and engaging in, business in the State of California, County of San Diego.

3.    Plaintiff is informed and believes and thereon alleges that AV BUILDER is subject to suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"), Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San Diego and elsewhere.

4.    Plaintiff is informed and believes and thereon alleges that Defendant, RESTORCORP (hereinafter "Defendant" or "RESTORCORP") is, and at all relevant times herein mentioned was, a California corporation authorized for, and engaging in, business in the State of California, County of San Diego.

5.    Plaintiff is informed and believes and thereon alleges that RESTORCORP is subject to suit as an "employer" under the California Fair Employment and Housing Act ("FEHA"), Government Code § 12900 *et seq.*, as it employs in excess of five (5) employees in San Diego and elsewhere.

6.    Plaintiff believes and thereon alleges that at all relevant times herein mentioned Defendant, ANTONION MADUREIRA (hereinafter "Defendant" or "MADUREIRA"), is a natural person who is, and at all relevant times was, a resident of the United States and a domiciliary of the State of California, County of San Diego.

7.    Plaintiff is ignorant of the true names and capacities of the Defendants sued herein as DOES 1 to 25, and therefore sues these defendants by such fictitious names. Plaintiff will amend this Complaint to allege the true names and capacities when they are ascertained.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000347

AVB MSJ Appendix P. 404

8.    Plaintiff is informed and believes, and thereon alleges, that each fictitiously named Defendant is responsible in some manner for the occurrences herein alleged, and Plaintiff's injuries and damages as herein alleged are directly, proximately and/or legally caused by Defendants.

9.    Plaintiff is informed and believes and thereon alleges that the aforementioned DOES are somehow responsible for the acts alleged herein as the agents, employers, representatives or employees of other named Defendant, and in doing the acts herein alleged were acting within the scope of their agency, employment or representative capacity of said named Defendant.

10.   The tortious acts and omissions alleged to have occurred herein were performed by Defendants' management level employees. Defendants allowed and/or condoned a continuing pattern of unlawful practices, and have caused, and will continue to cause, Plaintiff economic damage in an amount to be proven at trial.

11.   Defendants had constructive knowledge of the tortious acts and/or omissions alleged herein as the result of participating in the wrongful acts or ratifying or affirming the acts once heard or known of.

12.   Defendants committed the acts alleged herein maliciously, fraudulently, oppressively, and with the wrongful intention of injuring Plaintiff, and acted with an improper and evil motive amounting to malice or despicable conduct. Alternatively, Defendants' wrongful conduct was carried out with a conscious disregard for Plaintiff's rights.

13.   Such tortious acts were authorized or ratified by upper-level managerial employees of Defendants. The actions of Defendants, and each of them, against the Plaintiff constitute unlawful practices in violation of California law, and have caused, and will continue to cause Plaintiff loss of earnings, loss of employment benefits, and other losses in amounts to be proven at trial.

14.   As a further proximate result of the unlawful actions of Defendants, and each of their agents, against Plaintiff as alleged herein, Plaintiff has been harmed in that she has suffered emotional pain, humiliation, mental anguish, loss of enjoyment of life, and

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

AVB MSJ Appendix P. 405

HC000348

1  emotional distress.

2  15.  Defendants' conduct warrants the assessment of punitive damages in an amount

3       sufficient to punish Defendants and deter others from engaging in similar conduct.

4  16.  Plaintiff filed a complaint with the Department of Fair Employment and Housing on

5       September XX, 2018 and on that same day received a Right-To-Sue Letter. The

6       Complaint and Letter are collectively attached hereto as "Exhibit A."[1]

7                        **SPECIFIC FACTUAL ALLEGATIONS**

8  17.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9       the preceding paragraphs as though fully set forth herein.

10 18.  On or about February 10, 2010, Plaintiff began her employment at AV BUILDER, in the

11      position of Temporary Receptionist/Office Manager. In exchange for her services as

12      Temporary Receptionist/Office Manager, AV BUILDER agreed to pay Plaintiff $13.00

13      per hour.

14 19.  AV BUILDER operates as a general contractor that primarily focuses on the

15      reconstruction of medium and large-scale multi-unit properties throughout the Southwest

16      United States.

17 20.  At all relevant times herein mentioned, Plaintiff performed her job in a competent and

18      diligent manner, as evidenced by the multiple promotions she received.

19 21.  From the outset of her employment, Plaintiff noticed that MADUREIRA, AV

20      BUILDER's President and Founder, took a keen interest in her.

21 22.  At the time Plaintiff began her employment, MADUREIRA was married.

22 23.  MADUREIRA invited Plaintiff out to lunch on her first day of employment. Plaintiff

23      learned later from her colleagues that this was not a customary practice. From that point

24      forward, MADUREIRA continued this nearly daily habit of taking Plaintiff out to lunch

25      throughout her eight-year career.

26 24.  On information and belief, MADUREIRA maintained a long-standing pattern and

27  ──────────────────────

28  [1] Plaintiff will file her claim with the DFEH prior to filing her lawsuit with the Superior
     Court of California, County of San Diego.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

practice of grooming female employees and business colleagues, whereby he desensitized them into tolerating his sexual harassment, then, using his position of power, pressured them into a sexual affair.

25. Over the first few months of her employment, Plaintiff experienced a similar process. MADUREIRA made efforts to ingratiate himself into Plaintiff's life, and the two became friends. At the same time, MADUREIRA's sexually-charged comments and behavior ensured that Plaintiff knew that her role as a female employee was a subservient one.

26. After approximately four months of lunches and grooming, MADUREIRA began a consensual sexual relationship with Plaintiff in June 2010.

27. MADUREIRA came to expect not only lunch with Plaintiff everyday, but sex as well.

28. Given that MADUREIRA was married, he requested that Plaintiff keep their relationship a secret from his family and their coworkers. Plaintiff acquiesced. The balance of their sexual relationship remained largely a secret.

29. For the remainder of 2010 through 2012, MADUREIRA and Plaintiff continued engaging in sexual relations on a regular basis. Plaintiff was expected to join MADUREIRA for lunch whenever he requested her presence.

30. In or around November 2011, AV BUILDER promoted Plaintiff to permanent Office Manager, which included a raise to $21.63 per hour.

31. In or around mid December 2012, MADUREIRA and his wife divorced. Although MADUREIRA was now single, he insisted on keeping his ongoing sexual relationship with Plaintiff a secret.

32. From that point on, MADUREIRA had approximately ten to fifteen "traditional" girlfriends. Despite MADUREIRA's girlfriends, his relationship with Plaintiff remained constant. At times, MADUREIRA would schedule his sexual encounters with Plaintiff around his other relationships. Plaintiff would be expected to meet MADUREIRA for sex on, for example, Wednesday, Friday, and Sunday. The other days, MADUREIRA met with whatever girlfriend he had at the time.

33. Additionally, throughout her employment with AV BUILDER, on occasions when

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    Plaintiff was too busy for lunch, MADUREIRA would stay in Plaintiff's office, pouting,

2    until Plaintiff relented and agreed to join him for lunch. MADUREIRA also continued

3    making sexual comments about Plaintiff in front of clients and coworkers. Plaintiff found

4    these comments offensive.

5  34.  In or around mid April 2012, AV BUILDER promoted Plaintiff again, adding the duties

6    and responsibilities of Marketing Director. This promotion came with a raise from $21.63

7    to $28.85 per hour.

8  35.  As Marketing Director, Plaintiff continued improving AV BUILDER's business. Her

9    duties grew to include travelling to multi-day conventions and events, where she would

10    represent AV BUILDER to colleagues in the industry and potential clients.

11  36.  Despite Plaintiff's integral role in the success of AV BUILDER, MADUREIRA

12    continued to demean Plaintiff by making inappropriate sexual comments about her in

13    front of her clients and coworkers. Plaintiff found these comments degrading and

14    embarrassing.

15  37.  In or around early 2013, MADUREIRA moved Plaintiff upstairs into a corner office. The

16    other employees on that floor left work everyday at approximately 3:00 p.m. After

17    relocating to the new office, MADUREIRA began directing Plaintiff to go on the internet

18    and search for women interested in having a threesome. This became a daily task for

19    Plaintiff. Once the upstairs employees left at around 3:00 p.m., Plaintiff was expected to

20    begin searching for potential women. MADUREIRA would come to Plaintiff's office

21    around 3:30 p.m. or 4:00 p.m., and review Plaintiff's research. MADUREIRA would then

22    watch and comment as Plaintiff continued her search. After approximately one hour of

23    searching, MADUREIRA would tell Plaintiff that "it is now time for [her] to real job of

24    entertaining [him]," or words to that effect. Plaintiff was then expected to give

25    MADUREIRA oral sex before he left work for the day.

26  38.  In or around May 2015, Plaintiff assumed the role of managing the Billing department of

27    RESTORCORP, an affiliate of AV BUILDER that provides Destructive Testing services.

28    This task was in addition to her other responsibilities. In exchange for performing these

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000351

AVB MSJ Appendix P. 408

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    additional duties, RESTORCORP agreed to pay Plaintiff a $15,000 bonus and an annual

2    commission of 3% of RESTORCORP profits. However, RESTORCORP failed to

3    provide Plaintiff a written commission structure, in violation of California law.

4  39.    When Plaintiff assumed her billing duties, RESTORCORP had significant filing issues

5    and approximately $1,000,000 in unbilled work. Over the coming months, Plaintiff

6    resolved RESTOCORP's billing and filing issues. Once that was complete, Plaintiff

7    continued managing RESTORCORP's Destructive Testing department, where she

8    handled all department contracts and billing.

9  40.    In or around the summer of 2017, Plaintiff took on even more responsibilities at AV

10    BUILDER. The company's Reconstruction department entered into multiple large

11    contracts. These additional projects required monthly billings in both California and

12    Arizona. Managing the billings was complex as they required detailed pay charts and

13    releases, subcontracts and sub pay charts, change orders, and inputting data for portal

14    payment applications. Despite the fact that these billings previously required two

15    dedicated employees, Plaintiff assumed these duties in addition to her other

16    responsibilities at AV BUILDER.

17  41.    On or about December 19, 2017, MADUREIRA contacted Plaintiff and notified her that

18    he and his then-girlfriend, Shila (last name unknown), had a "scare" regarding a potential

19    Sexually Transmitted Disease ("STD"). Although Plaintiff's subsequent tests came back

20    negative, she felt stunned and betrayed by MADUREIRA's reckless conduct, as it

21    potentially exposed her to a STD.

22  42.    After that experience, Plaintiff requested that she and MADUREIRA stop having sexual

23    relations. However, MADUREIRA continued to pursue Plaintiff, and before long, they

24    began engaging in sexual relations again. On one occasion, MADUREIRA explained that

25    he was a "sex addict," and Plaintiff was his "crack."

26  43.    Throughout this entire time, Plaintiff continued to perform her job more than

27    competently, as shown by MADUREIRA's continued praise and promotion of Plaintiff.

28  44.    In addition, MADUREIRA made various verbal promises to Plaintiff to ensure that she

PLAINTIFF'S COMPLAINT FOR DAMAGES

7

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1  stayed at AV BUILDER. These promises included, but were not limited to, the following:

2     a.  Stating that Plaintiff's job was "guaranteed for life," or words to that effect;

3     b.  Promising Plaintiff a commission on the Newport Bluffs project;

4     c.  Promising Plaintiff a commission of 0.005% of the total revenue on the prime

5        contract for the Oak Glen project;

6     d.  Promising Plaintiff a commission of 0.005% of the total revenue received for any

7        Irvine Company project that AV BUILDER performed;

8     e.  Assuring Plaintiff that she would receive a portion of the sale price of AV

9        BUILDER, which MADUREIRA planned to sell in 2021 or 2022;

10    f.  Agreeing to sign over the title of Plaintiff's company vehicle; and

11    g.  Pledging to invest $400,000 in a joint venture.

12 45.  Despite promising Plaintiff commissions on certain projects, AV BUILDER failed to put

13     the commission structure in writing and provide Plaintiff a copy, in violation of

14     California law.

15 46.  On or about February 2018, MADUREIRA began a relationship with a new girlfriend,

16     Noylan Pulaski. As before, MADUREIRA continued his sexual relationship with

17     Plaintiff in secret.

18 47.  On or about April 16, 2018, MADUREIRA contacted Plaintiff and informed her that

19     Pulaski was experiencing "female health issues," or words to that effect. Plaintiff

20     understood MADUREIRA's warning to mean that she should get tested for STDs.

21     Plaintiff did so, and the results came back negative.

22 48.  After experiencing yet another scare, Plaintiff decided to end her sexual relationship with

23     MADUREIRA. That same day, Plaintiff confronted MADUREIRA at the AV BUILDER

24     office. Plaintiff explained that she could no longer have a sexual relationship with

25     MADUREIRA given that he potentially exposed her to STDs on multiple occasions and

26     did not respect her enough to protect her sexual health. Plaintiff was adamant that all

27     sexual relations between them must cease immediately. MADUREIRA engaged Plaintiff

28     in an argument, but Plaintiff refused to budge on her decision. MADUREIRA's sexual

HC000353

AVB MSJ Appendix P. 410

1    relationship with Plaintiff ended that day.

2  49.   That same afternoon, MADUREIRA sent Plaintiff an email, entitled "Laura's

3      Resignation/Continuation Agreement." In the email, MADUREIRA stated that AV

4      BUILDER accepted Plaintiff's alleged "verbal resignation." In reality, Plaintiff did not

5      resign her position at AV BUILDER on April 16, 2018; she merely resigned from her

6      position as MADUREIRA's obligatory sexual partner.

7  50.   On or about April 17, 2018, Plaintiff went to work, just as she had consistently done for

8      the past eight years. Indeed, Plaintiff continued working at AV BUILDER over the

9      following months.

10  51.   From that point on, MADUREIRA embarked on a campaign of retaliation designed to

11      force Plaintiff out of her employment at AV BUILDER.

12  52.   Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship

13      was a substantial motivating factor in Defendants' decision retaliate against Plaintiff.

14  53.   Over the coming months, MADUREIRA's attempts to force Plaintiff out of AV

15      BUILDER became more desperate—even though Plaintiff continued to show up each

16      day and competently perform the work of multiple employees. MADUREIRA's

17      retaliatory conduct included, but was not limited to, the following:

18      a.  MADUREIRA stopped coming in to the office after Plaintiff ended their sexual

19         relationship, making it more difficult for Plaintiff to perform her job;

20      b.  MADUREIRA told Plaintiff that she was to blame for his girlfriend breaking up

21         with him twice;

22      c.  After his current girlfriend, Pulaski, found out about his sexual relationship with

23         Plaintiff, MADUREIRA directed Plaintiff to support the lies he told Pulaski in an

24         effort to get them back together. MADUREIRA drafted text messages and emails,

25         then had Plaintiff send them from her phone or email address, so it appeared that

26         they came from Plaintiff. In these messages, Plaintiff, ostensibly, admitted to

27         Pulaski that she was to blame for their failed relationship, her sexual relationship

28         with MADUREIRA was long ago and brief, she is a lesbian, and she is bipolar. In

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000354

AVB MSJ Appendix P. 411

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1      reality, these messages were lies written by MADUREIRA;

2      d.   MADUREIRA told Plaintiff that Pulaski ordered him to terminate Plaintiff's

3          employment;

4      e.   MADUREIRA instructed Plaintiff to delete all of the text messages and photos they

5          exchanged over the previous eight years.

6   54.   At the same time, MADUREIRA worked with his accountant and lawyer to draft an

7       agreement that would basically pay Plaintiff off for her silence. Plaintiff was involved in

8       these negotiations.

9   55.   Plaintiff suffered stress and anxiety due to MADUREIRA's retaliatory behavior and his

10      pressure to sign the Nondisclosure Agreement.

11   56.   On or about July 22, 2018, MADUREIRA effectively terminated Plaintiff's employment,

12      for the second time, via text message, stating, in part, "it's time to move on ... sadly [our]

13      chapter is over ... [you] will get [your] agreement on Tuesday."

14   57.   Plaintiff's opposition to MADUREIRA's insistence on a quid-pro-quo sexual relationship

15      was a substantial motivating factor in his decision to terminate Plaintiff's employment.

16   58.   Plaintiff's final day of employment at AV BUILDER was scheduled for August 3, 2018.

17   59.   In early August 2018, the negotiations regarding the Nondisclosure Agreement between

18      MADUREIRA and Plaintiff broke down. MADUREIRA presented Plaintiff with the

19      ultimatum that she either sign the latest proposed agreement within three days or receive

20      nothing. Plaintiff never signed MADUREIRA's proposed Nondisclosure Agreement.

21   60.   Despite planning on August 3, 2018 being her final day of employment, Plaintiff's true

22      final day was the following Monday, August 6, 2018.

23   61.   Defendants failed to provide Plaintiff her final paycheck and wage statement on her last

24      day of employment.

25   62.   In addition, prior to her termination, Plaintiff earned approximately $100,000 in

26      commissions for the work she performed on the Newport Bluffs project. AV BUILDER,

27      however, failed to pay Plaintiff this commission, and others, at termination. These unpaid

28      commissions remain outstanding.

HC000355

<div style="writing-mode: vertical">GRUENBERG LAW<br>2155 FIRST AVENUE<br>SAN DIEGO, CALIFORNIA 92101-2013</div>

1    63.   As a result of Defendants' actions, Plaintiff has suffered, and continues to suffer,

2          emotional distress, anxiety, depression, sleeplessness, stress, worry, and humiliation.

3                              **FIRST CAUSE OF ACTION**

4                        **SEXUAL HARASSMENT v. All Defendants**

5                             **[Cal. Gov't Code § 12940(j)]**

6    64.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

7          the preceding paragraphs as though fully set forth herein.

8    65.   Plaintiff was at all times material hereto an employee covered by California Government

9          Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

10   66.   Defendants are, and at all times material hereto were, an employer and/or person within

11         the meaning of the Fair Employment and Housing Act and, as such, barred from

12         harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

13   67.   Plaintiff was subjected to unwanted and harassing conduct on the basis of her sex, as set

14         forth herein.

15   68.   The harassing conduct was severe and pervasive.

16   69.   A reasonable woman in Plaintiff's circumstances would have considered the work

17         environment to be hostile or abusive, and Plaintiff did in fact consider the work

18         environment to be hostile or abusive.

19   70.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

20         sustained and continues to sustain substantial losses in earnings, employment benefits,

21         employment opportunities, and Plaintiff has suffered other economic losses in an amount

22         to be determined at time of trial. Plaintiff has sought to mitigate these damages.

23   71.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff suffered

24         emotional distress, to her damage, in a sum to be established according to proof.

25   72.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled

26         to recover punitive and exemplary damages in an amount commensurate with

27         Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

28         conduct.

HC000356

AVB MSJ Appendix P. 413

73. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

**SECOND CAUSE OF ACTION**

**GENDER DISCRIMINATION v. Defendants AV BUILDER and RESTORCORP**

**[Cal. Gov't Code § 12940(a)]**

74. Plaintiff re-alleges and incorporates herein by reference each and every allegation contained in the proceeding paragraphs as though fully set forth herein.

75. Plaintiff was at all times material hereto an employee covered by California Government Code §12940 *et seq.*, which prohibits harassment in employment on the basis of sex.

76. Defendants are, and at all times material hereto were, employers and/or persons within the meaning of the Fair Employment and Housing Act and, as such, barred from harassing Plaintiff on the basis of her sex, as set forth in Cal. Gov't Code § 12940(j).

77. Defendants discriminated against Plaintiff in the terms, conditions, and privileges of her employment, as stated herein.

78. Plaintiff believes and thereon alleges that her gender, female, was a motivating reason for Defendants' discrimination against her.

79. Defendants' conduct of discriminating against Plaintiff on the basis of her gender violated Cal. Gov't Code § 12940(a).

80. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and Plaintiff has suffered other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

81. As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

82. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000357

AVB MSJ Appendix P. 414

1    Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

2    conduct.

3    83.   In addition to such other damages as may properly be recovered herein, Plaintiff is

4          entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

5    ### THIRD CAUSE OF ACTION

6    ### RETALIATION v. Defendants AV BUILDER and RESTORCORP

7    ### [Cal. Gov't Code § 12940(h)]

8    84.   Plaintiff re-alleges and incorporates by reference each and every allegation contained in

9          the preceding paragraphs as though fully set forth herein.

10   85.   At all times mentioned herein, Cal. Gov't Code § 12940(h) was in full force and effect

11         and was binding on Defendants. This section requires Defendants, as employers, to

12         refrain from retaliating against any employee who has opposed any practices forbidden

13         under Cal. Gov't Code § 12940, or because the employee has filed a complaint, testified,

14         or assisted in any proceeding under Cal. Gov't Code § 12940(h).

15   86.   Defendants, by and through its employees and agents, engaged in conduct that, taken as a

16         whole, materially and adversely affected the terms and conditions of Plaintiff's

17         employment, as stated herein, up to and including claiming Plaintiff verbally resigned;

18         directing Plaintiff to send false statements about herself to Pulaski; instructing Plaintiff to

19         delete all of her text messages and photos with MADUREIRA; informing Plaintiff that

20         Pulaski ordered her termination; and terminating Plaintiff's employment.

21   87.   Plaintiff believes and thereon alleges that her opposition to the sexual harassment

22         perpetuated by MADUREIRA was a motivating reason for Defendants engaging in

23         conduct that, taken as a whole, materially and adversely affected the terms and conditions

24         of Plaintiff's employment, as stated herein, up to and including, claiming Plaintiff

25         verbally resigned; directing Plaintiff to send false statements about herself to Pulaski;

26         instructing Plaintiff to delete all of her text messages and photos with MADUREIRA;

27         informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's

28         employment.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000358

AVB MSJ Appendix P. 415

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

88. Defendants' conduct of retaliating against Plaintiff in the terms, conditions, and privileges of her employment, as stated herein, up to and including claiming Plaintiff verbally resigned; directing Plaintiff to send false statements about herself to Pulaski; instructing Plaintiff to delete all of her text messages and photos with MADUREIRA; informing Plaintiff that Pulaski ordered her termination; and terminating Plaintiff's employment, violates Cal. Gov't Code § 12940(h).

89. As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

90. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to her damage in a sum to be established according to proof.

91. As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled to recover punitive and exemplary damages in an amount commensurate with Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible conduct.

92. In addition to such other damages as may properly be recovered herein, Plaintiff is entitled to recover attorney fees and costs pursuant to Cal. Gov't. Code § 12965.

## FOURTH CAUSE OF ACTION

### FAILURE TO PREVENT HARASSMENT v. Defendants AV BUILDER and RESTORCORP

### [Cal. Gov't Code § 12940(k)]

93. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

94. Plaintiff was subjected to discriminatory and harassing conduct on the basis of her sex, as set forth herein. Plaintiff was also subjected to retaliation for opposing said

1    discrimination and/or harassment.

2    95.   Defendants failed to take reasonable steps to prevent the discrimination, harassment, and

3          retaliation, as described herein.

4    96.   As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has

5          sustained and continues to sustain substantial losses in earnings, employment benefits,

6          employment opportunities, and Plaintiff has suffered other economic losses in an amount

7          to be determined at time of trial. Plaintiff has sought to mitigate these damages.

8    97.   As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff

9          has suffered and continues to suffer humiliation, emotional distress, loss of reputation,

10         and mental and physical pain and anguish, all to her damage in a sum to be established

11         according to proof.

12   98.   As a result of Defendants' deliberate, outrageous, despicable conduct, Plaintiff is entitled

13         to recover punitive and exemplary damages in an amount commensurate with

14         Defendants' wrongful acts and sufficient to punish and deter future similar reprehensible

15         conduct.

16   99.   In addition to such other damages as may properly be recovered herein, Plaintiff is

17         entitled to recover attorney fees and costs pursuant Cal. Gov't. Code § 12965.

18                                **FIFTH CAUSE OF ACTION**

19   **NEGLIGENT SUPERVISION v. Defendants AV BUILDER and RESTORCORP**

20   100.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in

21         the preceding paragraphs as though fully set forth herein.

22   101.  Plaintiff performed work for Defendants, as an employee, as stated herein.

23   102.  Defendants had a legal duty to supervise all employees.

24   103.  Defendants' employees or agents took part in unlawful discriminatory conduct, including

25         actions to harass Plaintiff on the basis of her sex in an effort to humiliate and embarrass

26         her, as stated herein.

27   104.  Defendants knew or should have known that its employees or agents were engaging in

28         unlawful discriminatory practices, as stated herein.

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

PLAINTIFF'S COMPLAINT FOR DAMAGES
15

105.  Defendants failed to take reasonable steps necessary to prevent the unlawful discriminatory conduct described herein.

106.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to sustain substantial losses in earnings, employment benefits, employment opportunities, and other economic losses in an amount to be determined at time of trial. Plaintiff has sought to mitigate these damages.

107.  As a direct, foreseeable and proximate result of Defendants' conduct, Plaintiff has suffered and continues to suffer humiliation, emotional distress, and mental pain and anguish, all to her damage in a sum to be established according to proof.

<div align="center">

**SIXTH CAUSE OF ACTION**

**FAILURE TO PAY WAGES UPON TERMINATION v. Defendants**

**AV BUILDER and RESTORCORP**

**[Cal. Lab. Code § 201]**

</div>

108.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

109.  At all times relevant herein, Plaintiff performed work for Defendants.

110.  California law considers commissions "wages under Labor Code § 200.

111.  Plaintiff was terminated from her employment with Defendants. Defendants failed to pay Plaintiff all wages earned and owed to her at the time of her termination, as stated herein, including but not limited to, bonuses, incentive payments, commissions, and overtime pay, in violation of Cal. Labor Code § 201.

112.  As a direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained, and continues to sustain, substantial economic damages.

113.  In addition to all other damages properly recoverable, Plaintiff is entitled to statutory penalties pursuant to Cal. Labor Code § 203, an award of costs and attorney fees pursuant to Cal. Labor Code § 218.5, and an award of interest pursuant to Cal. Labor Code § 218.6.

///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

<div style="text-align:center">

**SEVENTH CAUSE OF ACTION**

**FAILURE TO PROVIDE ACCURATE ITEMIZED WAGE STATEMENTS**

**v. Defendants AV BUILDER and RESTORCORP**

**[Cal. Labor Code § 226]**

</div>

114. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

115. At all times relevant herein, Plaintiff was an employee of Defendants.

116. California law considers commissions "wages" under Cal. Labor Code § 200.

117. Defendants knowingly and intentionally failed to provide Plaintiff with an accurate itemized wage statement displaying accurate and complete information as required under Cal. Labor Code § 226(a).

118. As a result, Plaintiff could not promptly and easily determine her gross and net earned wages, among other things, from the wage statement alone because Defendants failed to accurately calculate Plaintiff's earned commissions.

119. Plaintiff suffered injury as a result.

120. Plaintiff is therefore entitled to an award of costs, attorney fees, and penalties pursuant to Cal. Labor Code § 226(e), in an amount according to proof.

121. Plaintiff is entitled to recover the unpaid additional or premium wages, interest thereon, reasonable attorney fees, and costs of suit pursuant to Cal. Labor Code § 1194(a).

<div style="text-align:center">

**EIGHTH CAUSE OF ACTION**

**BREACH OF WRITTEN CONTRACT v. All Defendants**

</div>

122. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

123. Plaintiff and Defendants entered into multiple written agreements, as stated herein.

124. In exchange for Plaintiff performing work for Defendants, Defendants made certain promises to Plaintiff, including but not limited to, promising Plaintiff a commission on the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

<div style="text-align:center">

PLAINTIFF'S COMPLAINT FOR DAMAGES

17

</div>

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1    of 0.005% of the total revenue received for any Irvine Company project that AV

2    BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price

3    of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign

4    over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus

5    and an annual commission of 3% of RESTORCORP profits; and pledging to invest

6    $400,000 in a joint venture.

7    125.    Plaintiff did all, or substantially all, of the things required of her under the contracts, or in

8    the alternative, Plaintiff was excused from such performance.

9    126.    Defendants failed to perform on the contract by failing to provide Plaintiff a commission

10    of 0.005% of the total revenue on the prime contract for the Oak Glen project; a

11    commission of 0.005% of the total revenue on the prime contract for the Oak Glen

12    project; a commission of 0.005% of the total revenue received for any Irvine Company

13    project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the

14    title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP

15    profits; and a $400,000 investment in a joint venture.

16    127.    As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as

17    stated herein, Plaintiff has been harmed in that she has suffered substantial economic

18    losses, in an amount according to proof plus interest.

19    <div align="center">**NINTH CAUSE OF ACTION**</div>

20    <div align="center">**BREACH OF ORAL CONTRACT v. All Defendants**</div>

21    128.    Plaintiff re-alleges and incorporates by reference each and every allegation contained in

22    the preceding paragraphs as though fully set forth herein.

23    129.    Should the trier of fact find that any of the contracts listed above were not reduced to

24    writing, Plaintiff alleges this claim in the alternative.

25    130.    Plaintiff and Defendants entered into multiple oral agreements, as stated herein.

26    131.    In exchange for Plaintiff performing work for Defendants, Defendants made certain

27    promises to Plaintiff, including but not limited to, promising Plaintiff a commission on

28    the Newport Bluffs project; promising Plaintiff a commission of 0.005% of the total

HC000363

AVB MSJ Appendix P. 420

1  revenue on the prime contract for the Oak Glen project; promising Plaintiff a commission

2  of 0.005% of the total revenue received for any Irvine Company project that AV

3  BUILDER performed; assuring Plaintiff that she would receive a portion of the sale price

4  of AV BUILDER, which MADUREIRA planned to sell in 2021 or 2022; agreeing to sign

5  over the title of Plaintiff's company vehicle; promising to pay Plaintiff a $15,000 bonus

6  and an annual commission of 3% of RESTORCORP profits; and pledging to invest

7  $400,000 in a joint venture.

8  132.  Plaintiff did all, or substantially all, of the things required of her under the contracts, or in

9  the alternative, Plaintiff was excused from such performance.

10  133.  Defendants failed to perform on the contract by failing to provide Plaintiff a commission

11  of 0.005% of the total revenue on the prime contract for the Oak Glen project; a

12  commission of 0.005% of the total revenue on the prime contract for the Oak Glen

13  project; a commission of 0.005% of the total revenue received for any Irvine Company

14  project that AV BUILDER performed; a portion of the sale price of AV BUILDER; the

15  title of Plaintiff's company vehicle; an annual commission of 3% of RESTORCORP

16  profits; and a $400,000 investment in a joint venture.

17  134.  As a direct and proximate result of Defendants' unlawful actions against Plaintiff, as

18  stated herein, Plaintiff has been harmed in that she has suffered substantial economic

19  losses, in an amount according to proof plus interest.

20  **TENTH CAUSE OF ACTION**

21  **UNFAIR COMPETITION v. Defendants AV BUILDER and RESTORCORP**

22  **[Cal. Bus. & Prof. Code § 17200 *et seq.*]**

23  135.  Plaintiff re-alleges and incorporates by reference each and every allegation contained in

24  the preceding and subsequent paragraphs as though fully set forth herein.

25  136.  California Business & Professions Code § 17200 *et seq.* prohibits the engagement of any

26  business acts or practices constituting unfair competition. Section 17200 defines "unfair

27  competition" to mean and include "...any unlawful, unfair or fraudulent business act or

28  practice."

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000364

AVB MSJ Appendix P. 421

137. Defendants have not provided all wages owed to Plaintiff in violation of California Labor Code §§ 201, 204, 216, and 510, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

138. Defendants also failed to provide Plaintiff a signed copy of its commission and bonus policies and obtain a signed receipt of the same from Plaintiff, in violation of Cal. Labor Code § 2751, and have therefore engaged in unlawful business acts or practices in violation of Cal. Bus. & Prof. Code § 17200 *et seq.*

139. Furthermore, Defendants' failure to pay Plaintiff pursuant to the terms of the contract, or alternatively, for the reasonable value of her services, constituted unfair business acts or practices in that such practices negatively affect Defendants' competitors who do pay according to the contracts to which they are parties or, in the alternative, pay the reasonable value of services rendered on their behalves, and properly provide their employees with signed copies of their commission and bonus policies.

140. As a direct and proximate result of Defendants' unlawful and/or unfair business act or practices, Plaintiff has suffered an injury-in-fact and was deprived of money or property to which she has valid and cognizable claims.

141. The harm to Plaintiff resulting from Defendants' unlawful and/or unfair business acts or practices, far outweighs whatever benefits, if any, such business practices have for Defendants.

142. In addition to all other damages properly recoverable, Plaintiff is entitled to all restitution damages arising from Defendants' unlawful and/or unfair business acts or practices, in an amount to be established according to proof plus interest.

143. Plaintiff is further entitled to cumulative damages pursuant to Cal. Bus. & Prof. Code § 17205, and an award of attorney fees pursuant to Cal. Code Civ. Proc. § 1021.5.

///
///
///
///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000365

AVB MSJ Appendix P. 422

### ELEVENTH CAUSE OF ACTION

### INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

#### v. All Defendants

144. Plaintiff re-alleges and incorporates by reference each and every allegation contained in the preceding paragraphs as though fully set forth herein.

145. Defendants' intentional conduct, as set forth herein, was extreme and outrageous.

146. Defendants intended to cause Plaintiff to suffer extreme emotional distress. Plaintiff suffered extreme emotional distress.

147. As a further direct, foreseeable, and proximate result of Defendants' conduct, Plaintiff has sustained and continues to suffer humiliation, emotional distress, loss of reputation, and mental and physical pain and anguish, all to Plaintiff's damage in an amount according to proof at trial.

148. Defendants committed the acts alleged herein maliciously, fraudulently, and oppressively with the wrongful intention of injuring Plaintiff from an improper and evil motive amounting to malice and in conscious disregard of Plaintiff's rights. Plaintiff is thus entitled to recover exemplary and punitive damages in amounts to be proven at trial.

///
///
///
///
///
///
///
///
///
///
///
///

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000366

AVB MSJ Appendix P. 423

1    **WHEREFORE**, Plaintiff prays for the following relief:

2      1.    For compensatory damages, including loss of wages, promotional opportunities,

3        benefits, and other opportunities of employment, according to proof;

4      2.    For special damages in an amount according to proof;

5      3.    For mental and emotional distress damages;

6      4.    For back pay, front pay, and other monetary relief;

7      5.    For restitution and/or disgorgement;

8      6.    For penalties pursuant to Cal. Labor Code §§ 203 and 226;

9      7.    For cumulative damages, pursuant to Cal. Bus. & Prof. Code § 17205;

10      8.    For punitive damages in an amount necessary to make an example of, and to

11        punish, defendants, and to deter future similar misconduct;

12      9.    For costs of suit, including attorneys' fees as permitted by law, including those

13        available pursuant to Cal. Labor Code §§ 218.5 and 218.6, Cal. Code Civ. Proc. §

14        1021.5, and Cal. Gov't. Code § 12965(b);

15      10.    For an award of interest, including prejudgment interest, at the legal rate as

16        permitted by law, including those permitted by Cal. Gov't Code § 12965(b);

17      11.    For such other and further relief as the Court deems proper and just under all the

18        circumstances.

19    **PLAINTIFF LAURA DUSINA** demands a jury trial on all issues in this case.

20

21    DATED: September ___, 2018          **GRUENBERG LAW**

22

23                      _____

                       JOSH D. GRUENBERG

24                        BENJAMIN S. SILVER

                       JESSE A. COLLMANN

25                        Attorneys for Plaintiff,

                       **LAURA DUSINA**

26

27

28

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

HC000367

AVB MSJ Appendix P. 424

GRUENBERG LAW
2155 FIRST AVENUE
SAN DIEGO, CALIFORNIA 92101-2013

1
2
3
4
5
6
7
8
9
10
11
12                          **EXHIBIT A**
13  (1)    PLAINTIFF'S CHARGE FILED WITH THE DEPARTMENT OF FAIR
14         EMPLOYMENT AND HOUSING (DFEH).
15  (2)    PLAINTIFF'S RIGHT TO SUE LETTERS FROM THE DFEH.
16
17
18
19
20
21
22
23
24
25
26
27
28

HC000368

AVB MSJ Appendix P. 425



# Exhibit 15

AVB-020 - Received via email / 02/10/2021
TLM

TROUTMAN PEPPER HAMILTON SANDERS LLP
Terrence R. McInnis, Bar No. 155416
terrence.mcinnis@troutman.com
Jenni Khuu Katzer, Bar No. 253684
jenni.katzer@troutman.com
5 Park Plaza, Suite 1400
Irvine, CA  92614-2545
Telephone: (949) 622-2700
Facsimile:  (949) 622-2739

Attorneys for Defendant
HOUSTON CASUALTY COMPANY

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| AV BUILDER CORP, a California corporation; RESTORCORP, a California corporation; and ANTONIO MADUREIRA, an individual,<br><br>            Plaintiffs,<br><br>    v.<br><br>HOUSTON CASUALTY COMPANY, a Texas corporation,<br><br>            Defendant. | Case No.  3:20-cv-01679-W-KSC<br><br>**DEFENDANT HOUSTON CASUALTY COMPANY'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES, SET ONE**<br><br>Judge:      Judge Thomas J. Whelan<br>Magistrate:  Judge Karen S. Crawford |

- 1 -

1    PROPOUNDING PARTY:        Plaintiff AV Builder Corp.

2    RESPONDING PARTY:         Defendant Houston Casualty Company

3    SET NO.:                  One (Supplemental Responses)

4         Defendant HOUSTON CASUALTY COMPANY ("HCC" or "HC" or

5    "Defendant") hereby supplements its responses to Plaintiff AV BUILDER CORP.'s

6    Special Interrogatories, Set One ("Interrogatories") as follows:

7                          **PRELIMINARY STATEMENT**

8         These responses are made solely for the purpose of and in relation to this

9    action.  HCC's responses are subject to the accompanying specific objections,

10   without waiving and expressly preserving all such objections.  HCC submits these

11   responses subject to, and without intending to waive, and expressly preserving: (a)

12   any objections as to relevancy, materiality, competency, privilege and admissibility

13   of any of the responses herein; and (b) the right to object to any other discovery

14   requests involving or relating to the subject matter of the Interrogatories responded

15   to herein.

16        In addition, the following responses are made on the basis of information that

17   is presently known and available to HCC and its attorneys, and may include hearsay

18   information and other information not admissible in evidence at trial, although it

19   may be discoverable.  HCC has not completed its factual and legal investigation,

20   discovery, or trial preparation.  As of the date of these responses, HCC has had an

21   insufficient opportunity to review all documents and otherwise obtain information

22   that may prove relevant in this case, including, without limitation, through

23   discovery of plaintiffs, defendants and/or third parties.  All responses contained

24   herein are based only upon such information and documents that are presently

25   available to and specifically known to HCC, and within its custody and control.  It

26   is anticipated that further discovery, independent investigations, and factual and

27   legal research and analyses will or may disclose additional information, which may

28   lead to additions to, changes, and variations from the responses set forth herein.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

Consequently, the following responses are given without prejudice to HCC's right, which HCC expressly reserves, to present at the time of trial subsequently discovered evidence relating to the proof of facts or evidence subsequently discovered to be material. HCC accordingly reserves the right to change any and all responses herein as additional information is ascertained and analyses are made, legal research is completed, and contentions are made. The responses contained herein are made in a good faith effort to supply as much information as is presently known but should in no way lead to the prejudice of HCC in relation to ongoing discovery, research, or analyses.

The whole and each part of this Preliminary Statement shall apply to each and every response given as hereinafter set forth, and shall be incorporated by reference as though fully set forth in each response.

## GENERAL OBJECTIONS

1.     HCC objects to the Interrogatories to the extent that they are vague and ambiguous. Where possible, HCC will make reasonable assumptions as to the meaning of such Interrogatories and will respond accordingly, while preserving its objections as to vagueness, ambiguity, and uncertainty.

2.     HCC objects to the Interrogatories to the extent that they seek to elicit information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and any other applicable privileges, doctrines, immunities or protections against disclosure of requested information or documents. HCC further objects to the Interrogatories to the extent they seek protected confidential information or proprietary commercial information otherwise protected from disclosure.

3.     HCC objects to the Interrogatories to the extent that they purport to request information in the possession, custody or control of persons or entities other than HCC.

/ / /

- 3 -

1      4.     All of the foregoing General Objections are incorporated herein by

2    reference and shall be deemed incorporated in full into each specific objection set

3    forth below.

4      Subject to, and without waiving, the foregoing Preliminary Statement or

5    General Objections, HCC responds to Propounding Party's Interrogatories as

6    follows:

7    **RESPONSES TO SPECIAL INTERROGATORIES**

8    **INTERROGATORY NO. 1:**

9      Identify the date and author the first written demand for damages made by

10   Laura Dusina against PLAINTIFFS that HCC relied upon in denying coverage to

11   PLAINTIFFS for claim number STD-17-07093.

12   **RESPONSE TO INTERROGATORY NO. 1:**

13      HCC objects to this Interrogatory on the grounds that it is vague and

14   ambiguous, and overly broad.  HCC further objects to this Interrogatory on the

15   grounds that it is unduly burdensome since it seeks information that is equally

16   available to both parties, and Plaintiffs can discern this information themselves.

17   HCC further objects to this Interrogatory to the extent it seeks information protected

18   by the attorney-client privilege and/or attorney work product doctrine.

19      Subject to and without waiving these specific objections, as well as all

20   objections set forth in the Preliminary Statement and the General Objections, HCC

21   states that in reaching its coverage determination, HCC considered the totality of the

22   information included and maintained in the non-privileged portion of the claim file

23   being produced in this litigation.  HCC considered, for example, the documents

24   identified in HCC's November 9, 2018 letter and November 15, 2018 email, and

25   Robert Cutbirth's letters of November 15, 2018, September 12, 2019, October 29,

26   2019, and May 28, 2020.  The burden of deriving or ascertaining the answer will be

27   substantially the same for Plaintiffs as it is for HCC.  *See* Fed. R. Civ. Proc. 33(d).

28   / / /

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA,
SUITE 1400
IRVINE, CA 92614-2545

- 4 -

1    <u>**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**</u>

2        HCC objects to this Interrogatory on the grounds that it is vague and

3 ambiguous, and overly broad. HCC further objects to this Interrogatory on the

4 grounds that it is unduly burdensome since it seeks information that is equally

5 available to both parties, and Plaintiffs can discern this information themselves.

6 HCC further objects to this Interrogatory to the extent it seeks information protected

7 by the attorney-client privilege and/or attorney work product doctrine.

8        Subject to and without waiving these specific objections, as well as all

9 objections set forth in the Preliminary Statement and the General Objections, HCC

10 states that in reaching its coverage determination, HCC considered the totality of the

11 information included and maintained in the non-privileged portion of the claim file

12 being produced in this litigation. Based on its review of this information, HCC finds

13 that the claim was first made before the Policy H717-917293 expired.

14        In the November 9, 2018 letter, HCC wrote that "[Plaintiffs'] law firm

15 advised that Claimant's personnel file could not be located" and only provided

16 "copies of email correspondences between claimant and Mr. Madureira beginning on

17 July 23, 2018." Moreover, HCC noted that because it has "requested, but not

18 received, all communications concerning this matter[,] HC reserves its right to

19 reevaluate the date that the 'claim' was first made. Based upon the information

20 received, the date that the 'claim' was first made appears to be earlier than July 23,

21 2018." This letter has been produced at HC000309, et seq., and the documents

22 upon which that statement was based are identified therein.

23        In the November 15, 2018 letter, Robert Cutbirth wrote that because the Final

24 Severance Agreement specifically confirmed in its recitals that the parties were

25 seeking to resolve a pending "dispute" over "workplace issues," "there was a 'claim,'

26 asserting multiple 'insured events' no later than August 7, 2018." This letter has

27 been produced at HC000532, et seq., and the documents upon which that statement

28 was based are identified therein.

- 5 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

AVB MSJ Appendix P. 431

In the September 12, 2019 letter, Robert Cutbirth wrote that, "no later than August 7, 2018 (and probably having a fixed date even earlier), Ms. Dusina asserted her 'claim' alleging multiple 'insured events.'"  Mr. Cutbirth goes on to explain the basis for this assessment.  This letter has been produced at HC000582, et seq., and the documents upon which that statement was based are identified therein.

In the May 28, 2020 letter, Robert Cutbirth wrote, "even if we took the latest date possible under this scenario (August 14, 2018), that date remained within the 2017 Policy Period."  This letter has been produced at HC000516, et seq., and the documents upon which that statement was based are identified therein.

HCC maintains that the burden of deriving or ascertaining the answer will be substantially the same for Plaintiffs as it is for HCC.  *See* Fed. R. Civ. Proc. 33(d).  As discovery is ongoing, HCC reserves the right to supplement this response.

**INTERROGATORY NO. 2:**

Identify by date and author the first written demand for damages made by Laura Dusina against PLAINTIFFS alleging harassment, discrimination, or inappropriate employment conduct, as these terms are defined in the HCC 2017 policy H717-917293, that HCC relied upon in denying coverage to PLAINTIFFS for claim number STD-17-07093.

**RESPONSE TO INTERROGATORY NO. 3:**

HCC objects to this Interrogatory on the grounds that it is vague and ambiguous, and overly broad.  HCC further objects to this Interrogatory on the grounds that it is unduly burdensome since it seeks information that is equally available to both parties, and Plaintiffs can discern this information themselves.  HCC further objects to this Interrogatory to the extent it seeks information protected by the attorney-client privilege and/or attorney work product doctrine.

Subject to and without waiving these specific objections, as well as all objections set forth in the Preliminary Statement and the General Objections, HCC

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  states that in reaching its coverage determination, HCC considered the totality of the

2  information included and maintained in the non-privileged portion of the claim file

3  being produced in this litigation.  HCC considered, for example, the documents

4  identified in HCC's November 9, 2018 letter and November 15, 2018 email, and

5  Robert Cutbirth's letters of November 15, 2018, September 12, 2019, October 29,

6  2019, and May 28, 2020.  The burden of deriving or ascertaining the answer will be

7  substantially the same for Plaintiffs as it is for HCC.  *See* Fed. R. Civ. Proc. 33(d).

8  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

9      HCC objects to this Interrogatory on the grounds that it is vague and

10  ambiguous, and overly broad.  HCC further objects to this Interrogatory on the

11  grounds that it is unduly burdensome since it seeks information that is equally

12  available to both parties, and Plaintiffs can discern this information themselves.

13  HCC further objects to this Interrogatory to the extent it seeks information protected

14  by the attorney-client privilege and/or attorney work product doctrine.

15      Subject to and without waiving these specific objections, as well as all

16  objections set forth in the Preliminary Statement and the General Objections, HCC

17  states that in reaching its coverage determination, HCC considered the totality of the

18  information included and maintained in the non-privileged portion of the claim file

19  being produced in this litigation.  Based on its review of this information, HCC finds

20  that the claim was first made before the Policy H717-917293 expired.

21      In the November 9, 2018 letter, HCC wrote that "[Plaintiffs'] law firm

22  advised that Claimant's personnel file could not be located" and only provided

23  "copies of email correspondences between claimant and Mr. Madureira beginning on

24  July 23, 2018."  Moreover, HCC noted that because it has "requested, but not

25  received, all communications concerning this matter[,] HC reserves its right to

26  reevaluate the date that the 'claim' was first made.  Based upon the information

27  received, the date that the 'claim' was first made appears to be earlier than July 23,

28  2018."  This letter has been produced at HC000309, et seq., and the documents

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

AVB MSJ Appendix P. 433

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1    upon which that statement was based are identified therein.

2         In the November 15, 2018 letter, Robert Cutbirth wrote that because the Final

3    Severance Agreement specifically confirmed in its recitals that the parties were

4    seeking to resolve a pending "dispute" over "workplace issues," "there was a 'claim,'

5    asserting multiple 'insured events' no later than August 7, 2018." This letter has

6    been produced at HC000532, et seq., and the documents upon which that statement

7    was based are identified therein.

8         In the September 12, 2019 letter, Robert Cutbirth wrote that, "no later than

9    August 7, 2018 (and probably having a fixed date even earlier), Ms. Dusina

10   asserted her 'claim' alleging multiple 'insured events.'" Mr. Cutbirth goes on to

11   explain the basis for this assessment. This letter has been produced at HC000582,

12   et seq., and the documents upon which that statement was based are identified

13   therein.

14        In the May 28, 2020 letter, Robert Cutbirth wrote, "even if we took the latest

15   date possible under this scenario (August 14, 2018), that date remained within the

16   2017 Policy Period." This letter has been produced at HC000516, et seq., and the

17   documents upon which that statement was based are identified therein.

18        HCC maintains that the burden of deriving or ascertaining the answer will be

19   substantially the same for Plaintiffs as it is for HCC. *See* Fed. R. Civ. Proc. 33(d).

20   As discovery is ongoing, HCC reserves the right to supplement this response.

21   **INTERROGATORY NO. 3:**

22        Identify by date and author/declarant each fact HCC:

23        (a)    relied upon in denying coverage to PLAINTIFFS for claim number

24   STD-18-07093;

25        (b)    contends constituted notice of a claim regarding claim number STD-

26   17-07093;

27        (c)    contends constituted notice of a claim to PLAINTIFFS regarding

28   harassment, as this term is defined in HCC policy H717-917293, for claim number

1  STD-17-07093;

2      (d)    contends constituted notice of a claim to PLAINTIFFS regarding

3  discrimination, as this term is defined in HCC policy H717-917293, for claim

4  number STD-17-07093;

5      (e)    contends constituted notice of a claim to PLAINTIFFS regarding

6  inappropriate employment conduct, as this term is defined in HCC policy H717-

7  917293, for claim number STD-17-07093.

8  **RESPONSE TO INTERROGATORY NO. 4:**

9      HCC objects to this Interrogatory on the grounds that it is vague and

10  ambiguous, and overly broad.  HCC further objects on the basis that this

11  Interrogatory is compound because it contains four discrete subparts, which count

12  against the 25 per party limit as stated in Federal Rules of Civil Procedure Rule

13  33(a)(1).  HCC further objects to this Interrogatory on the grounds that it is unduly

14  burdensome since it seeks information that is equally available to both parties, and

15  Plaintiffs can discern this information themselves.  HCC further objects to this

16  Interrogatory to the extent it seeks information protected by the attorney-client

17  privilege and/or attorney work product doctrine.

18      Subject to and without waiving these specific objections, as well as all

19  objections set forth in the Preliminary Statement and the General Objections, HCC

20  states that in reaching its coverage determination, HCC considered the totality of the

21  information included and maintained in the non-privileged portion of the claim file

22  being produced in this litigation.  HCC considered, for example, the documents

23  identified in HCC's November 9, 2018 letter and November 15, 2018 email, and

24  Robert Cutbirth's letters of November 15, 2018, September 12, 2019, October 29,

25  2019, and May 28, 2020.  The burden of deriving or ascertaining the answer will be

26  substantially the same for Plaintiffs as it is for HCC.  *See* Fed. R. Civ. Proc. 33(d).

27  / / /

28  / / /

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 9 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1   **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

2       HCC objects to this Interrogatory on the grounds that it is vague and

3   ambiguous, and overly broad.  HCC further objects on the basis that this

4   Interrogatory is compound because it contains four discrete subparts, which count

5   against the 25 per party limit as stated in Federal Rules of Civil Procedure Rule

6   33(a)(1).  HCC further objects to this Interrogatory on the grounds that it is unduly

7   burdensome since it seeks information that is equally available to both parties, and

8   Plaintiffs can discern this information themselves.  HCC further objects to this

9   Interrogatory to the extent it seeks information protected by the attorney-client

10  privilege and/or attorney work product doctrine.

11      Subject to and without waiving these specific objections, as well as all

12  objections set forth in the Preliminary Statement and the General Objections, HCC

13  states that in reaching its coverage determination, HCC considered the totality of the

14  information included and maintained in the non-privileged portion of the claim file

15  being produced in this litigation.  Based on its review of this information, HCC finds

16  that the claim was first made before the Policy H717-917293 expired.

17      In the November 9, 2018 letter, HCC wrote that "[Plaintiffs'] law firm

18  advised that Claimant's personnel file could not be located" and only provided

19  "copies of email correspondences between claimant and Mr. Madureira beginning on

20  July 23, 2018."  Moreover, HCC noted that because it has "requested, but not

21  received, all communications concerning this matter[,] HC reserves its right to

22  reevaluate the date that the 'claim' was first made.  Based upon the information

23  received, the date that the 'claim' was first made appears to be earlier than July 23,

24  2018."  This letter has been produced at HC000309, et seq., and the documents

25  upon which that statement was based are identified therein.

26      In the November 15, 2018 letter, Robert Cutbirth wrote that because the Final

27  Severance Agreement specifically confirmed in its recitals that the parties were

28  seeking to resolve a pending "dispute" over "workplace issues," "there was a 'claim,'

1  asserting multiple 'insured events' no later than August 7, 2018." This letter has

2  been produced at HC000532, et seq., and the documents upon which that statement

3  was based are identified therein.

4      In the September 12, 2019 letter, Robert Cutbirth wrote that, "no later than

5  August 7, 2018 (and probably having a fixed date even earlier), Ms. Dusina

6  asserted her 'claim' alleging multiple 'insured events.'" Mr. Cutbirth goes on to

7  explain the basis for this assessment. This letter has been produced at HC000582,

8  et seq., and the documents upon which that statement was based are identified

9  therein.

10      In the May 28, 2020 letter, Robert Cutbirth wrote, "even if we took the latest

11  date possible under this scenario (August 14, 2018), that date remained within the

12  2017 Policy Period." This letter has been produced at HC000516, et seq., and the

13  documents upon which that statement was based are identified therein.

14      HCC maintains that the burden of deriving or ascertaining the answer will be

15  substantially the same for Plaintiffs as it is for HCC. *See* Fed. R. Civ. Proc. 33(d).

16  As discovery is ongoing, HCC reserves the right to supplement this response.

17

18

19  Dated:  February 9, 2021            TROUTMAN PEPPER HAMILTON
                                     SANDERS LLP

20

21                       By: _____

22                          Terrence R. McInnis
                        Jenni Khuu Katzer

23                          Attorneys for Defendant

24                          HOUSTON CASUALTY
                        COMPANY

25

26

27

28

- 11 -

DEFENDANT HCC'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S
SPECIAL INTERROGATORIES; CASE NO. 3:20-CV-01679-W-KSC

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

<u>VERIFICATION</u>

I have read the foregoing **DEFENDANT HOUSTON CASUALTY COMPANY'S <u>SUPPLEMENTAL</u> RESPONSES TO PLAINTIFF'S FIRST SET OF SPECIAL INTERROGATORIES** and know its contents. I am a representative of Houston Casualty Company, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the foregoing document(s). I am informed and believe and, on that ground, allege that the matters stated in it are true. I declare under penalty of perjury under the laws of the United States and the State of California that the foregoing is true and correct. Executed at Mount Kisco, New York on February 9, 2021.

_Jill E. Daly_
Jill Daly

- 12 -

## PROOF OF SERVICE

I, Enia A. Castillo, declare:

I am a citizen of the United States and employed in Orange County, CA.  I am over the age of 18 and not a party to the within action; my business address is 5 Park Plaza, Suite 1400, Irvine, CA  92614-2545. My email is enia.castillo@troutman.com.

On **February 9, 2021**, I served the following document(s) described as:

**DEFENDANT HOUSTON CASUALTY COMPANY'S SUPPLEMENTAL RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES, SET ONE**

☒     **BY ELECTRONIC MAIL**: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses, as last given or submitted on any document which he or she has filed in the case, listed on the attached service list.

***SEE ATTACHED SERVICE LIST***

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **February 9, 2021**, at Orem, UT.

_____
/s/
Enia A. Castillo

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

- 13 -

DEFENDANT HOUSTON'S SUPPLEMENTAL RESPONSES TO PLAINTIFF'S
SPECIAL INTERROGATORIES; CASE NO.  3:20-CV-01679-W-KSC

## SERVICE LIST

| Peter J. Schulz, Esq.<br>Tommy U. Schroeder, Esq.<br>SHULZ BRICK & ROGASKI<br>600 West Broadway, Suite 960<br>San Diego, CA 92101<br>(619) 234-3660<br>FAX (619) 234-0626<br>EMAIL    pjs@sbrlawsd.com<br>        ts@sbrlawsd.com | Attorneys for Plaintiffs<br>AV BUILDER CORP,<br>RESTORCORP, and ANTONIO<br>MADUREIRA |
| --- | --- |

- 14 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

AVB MSJ Appendix P. 440

AVB-020 / Received via email / 02/10/2021
TLM

**2021-AV Builders v. Houston Casualty Company**
**Houston Casualty Company's Privilege Log**
**February 9, 2021**

| Bates Stamp | Date | Author/From | To | CC | Filename / Subject | Basis |
|---|---|---|---|---|---|---|
| HC000048 | | | | | Coverage Confirmation Binder, Employment Practices Liability Insurance for August 19, 2017 to August 19, 2018 policy period | Protected Commercial Information |
| HC000054 | 7/14/2017 | Wilke, Lauren | Beltran, Christina | | Renewal Quote | Protected Commercial Information |
| HC000070 | | | | | Renewal Information Sheet | Protected Commercial Information |
| HC000074 | 8/9/2017 | | Beltran, Christina | | Invoice | Protected Commercial Information |
| HC000171 | 8/10/2018 | Wilke, Lauren | DaValle, Mike | | Renewal Quote | Protected Commercial Information |
| HC000174 | | | | | Coverage Confirmation Binder, Employment Practices Liability Insurance for August 19, 2018 to August 19, 2019 policy period | Protected Commercial Information |
| HC000178 | 8/10/2018 | Wilke, Lauren | DaValle, Mike | | Renewal Quote | Protected Commercial Information |
| HC000182 | 6/20/2018 | Wilke, Lauren | DaValle, Mike | | Renewal Quote | Protected Commercial Information |
| HC000194 | | | | | Renewal Information Sheet | Protected Commercial Information |
| HC000200 | 7/31/2019 | | DaValle, Mike | | Credit Memo | Protected Commercial Information |
| HC000201 | 7/31/2019 | | DaValle, Mike | | Credit Memo | Protected Commercial Information |
| HC000202 | 8/13/2018 | | DaValle, Mike | | Invoice | Protected Commercial Information |
| HC000241 | 3/17/2020; 8/29/2019; 11/9/2018 | Daly, Jill; Sherman, Kate | | | Claim Notes | Attorney-Client Privileged Communications |
| HC000244 | 3/17/2020; 8/29/2019; 11/9/2018 | Daly, Jill; Sherman, Kate | | | Claim Notes | Attorney-Client Privileged Communications |
| HC000525 | 12/18/2019 | Cutbirth, Robert | Phillips, Christine; Daly, Jill | | FW: Laura Dusina v. AV Builder Corp, et al., -- HCC Claim No. STD-17-07093 / STD-18-07037 – Dec. 18, 2019 Letter to Insurer | Attorney-Client Privileged Communications/Protected Work Product |
| HC000542 | 11/15/2018 | Cutbirth, Robert | Phillips, Christine; Sherman, Kathryn; Daly, Jill | | FW: Dusina v. AV Builders – Supplemental Coverage Correspondence | Attorney-Client Privileged Communications/Protected Work Product |
| HC000544 | 8/28/2019 | Cutbirth, Robert | Phillips, Christine; Daly, Jill | | FW: Laura Dusina v. AV Builder Corp, et al., -- HCC Claim No. STD-17-07093 / STD-18-07037 – Aug. 27, 2019 Letter to Insurer | Attorney-Client Privileged Communications/Protected Work Product |
| HC000588 | 8/13/2012 | Wilke, Lauren | Washington, Akemi | | Renewal Quote | Protected Commercial Information |
| PRIV_0001 | 11/15/2018 | Cutbirth, Robert | Sherman, Kathryn; Phillips, Christine | | Dusina v. AV Builders - Supplemental Coverage CorrespondenceKS edit | Attorney-Client Privileged Communications/Protected Work Product |



# Exhibit 16

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  TROUTMAN PEPPER HAMILTON SANDERS LLP
   Terrence R. McInnis, Bar No. 155416
2  terrence.mcinnis@troutman.com
   Jenni Khuu Katzer, Bar No. 253684
3  jenni.katzer@troutman.com
   5 Park Plaza, Suite 1400
4  Irvine, CA  92614-2545
   Telephone: (949) 622-2700
5  Facsimile:  (949) 622-2739

6  Attorneys for Defendant
   HOUSTON CASUALTY COMPANY
7

8              UNITED STATES DISTRICT COURT

9            SOUTHERN DISTRICT OF CALIFORNIA

10

11  AV BUILDER CORP, a California          Case No.  3:20-cv-01679-W-KSC
    corporation; RESTORCORP, a
12  California corporation; and            **DEFENDANT HOUSTON
    ANTONIO MADUREIRA, an                  CASUALTY COMPANY'S
13  individual,                            RESPONSES TO PLAINTIFF'S
                                           SPECIAL INTERROGATORIES, SET
14              Plaintiffs,                TWO**

15       v.                               Judge:        Judge Thomas J. Whelan
                                          Magistrate:   Judge Karen S. Crawford
16  HOUSTON CASUALTY
    COMPANY,
17  a Texas corporation,

18              Defendant.

19

20

21

22

23

24

25

26

27

28
                              - 1 -

PROPOUNDING PARTY:     Plaintiff AV Builder Corp.

RESPONDING PARTY:      Defendant Houston Casualty Company

SET NO.:               Two

Defendant HOUSTON CASUALTY COMPANY ("HCC" or "Defendant") hereby responds to Plaintiff AV BUILDER CORP.'s Special Interrogatories, Set Two ("Interrogatories") as follows:

**PRELIMINARY STATEMENT**

These responses are made solely for the purpose of and in relation to this action.  HCC's responses are subject to the accompanying specific objections, without waiving and expressly preserving all such objections.  HCC submits these responses subject to, and without intending to waive, and expressly preserving: (a) any objections as to relevancy, materiality, competency, privilege and admissibility of any of the responses herein; and (b) the right to object to any other discovery requests involving or relating to the subject matter of the Interrogatories responded to herein.

In addition, the following responses are made on the basis of information that is presently known and available to HCC and its attorneys, and may include hearsay information and other information not admissible in evidence at trial, although it may be discoverable.  HCC has not completed its factual and legal investigation, discovery or trial preparation.  As of the date of these responses, HCC has had an insufficient opportunity to review all documents and otherwise obtain information that may prove relevant in this case, including, without limitation, through discovery of plaintiffs, defendants and/or third parties.  All responses contained herein are based only upon such information and documents that are presently available to and specifically known to HCC, and within its custody and control.  It is anticipated that further discovery, independent investigations, and factual and legal research and analyses will or may disclose additional information, which may lead to additions to, changes, and variations from the responses set forth herein.

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA  92614-2545

Consequently, the following responses are given without prejudice to HCC's right, which HCC expressly reserves, to present at the time of trial subsequently discovered evidence relating to the proof of facts or evidence subsequently discovered to be material.  HCC accordingly reserves the right to change any and all responses herein as additional information is ascertained and analyses are made, legal research is completed and contentions are made.  The responses contained herein are made in a good faith effort to supply as much information as is presently known, but should in no way lead to the prejudice of HCC in relation to ongoing discovery, research, or analyses.

The whole and each part of this Preliminary Statement shall apply to each and every response given as hereinafter set forth, and shall be incorporated by reference as though fully set forth in each response.

## GENERAL OBJECTIONS

HCC incorporates the following general objections ("General Objections"), which are set forth as follows to avoid excessive duplication, into the responses to each individual Interrogatory as though set forth in full therein.  HCC does not waive any General Objection in response to any Interrogatory, and its General Objections are not limited in any way by specific objections and responses to any Interrogatory.

1.    HCC objects to the Interrogatories to the extent that they are vague and ambiguous.  Where possible, HCC will make reasonable assumptions as to the meaning of such Interrogatories and will respond accordingly, while preserving its objections as to vagueness, ambiguity, and uncertainty.

2.    HCC objects to the Interrogatories to the extent that they seek to elicit information protected from disclosure by the attorney-client privilege, the attorney work-product doctrine, and any other applicable privileges, doctrines, immunities or protections against disclosure of requested information or documents.  HCC further objects to the Interrogatories to the extent they seek protected confidential

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

1  information or proprietary commercial information otherwise protected from

2  disclosure.  Inadvertent production of privileged information by HCC does not

3  constitute a waiver of any applicable privilege or immunity, nor should production

4  of any information be construed to waive any objection, including that of relevancy

5  of such information or its admissibility into evidence.

6      3.    HCC objects to the Interrogatories to the extent that they purport to

7  request information in the possession, custody or control of persons or entities other

8  than HCC.

9      4.    HCC objects to the Interrogatories to the extent that they seek

10  information that is not relevant to the subject matter or the issues involved in this

11  action or information not reasonably calculated to lead to the discovery of

12  admissible evidence.

13      5.    HCC objects to the Interrogatories to the extent that they are overly

14  broad, unduly burdensome and/or oppressive or harassing.

15      6.    HCC objects to the Interrogatories to the extent that they seek

16  information that, if disclosed, would violate third persons' privacy rights or

17  confidentiality rights and which XL may be prohibited from disclosing pursuant to

18  applicable law.

19      7.    HCC objects to the Interrogatories to the extent that they call for a

20  response to be made on the basis of a legal conclusion.  HCC's responses should

21  not be construed as providing a legal conclusion concerning the meaning or

22  application of any terms used in the Interrogatories.

23      8.    All of the foregoing General Objections are incorporated herein by

24  reference and shall be deemed incorporated in full into each specific objection set

25  forth below.

26      Subject to, and without waiving, the foregoing Preliminary Statement or

27  General Objections, HCC responds to Propounding Party's Interrogatories as

28  follows:

- 4 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA  92614-2545

DEFENDANT HOUSTON'S RESPONSES TO PLAINTIFF'S
SPECIAL INTERROGATORIES, SET TWO;
CASE NO.  3:20-CV-01679-W-KSC

## RESPONSES TO SPECIAL INTERROGATORIES

### INTERROGATORY NO. 14:

Please state the "effective date of the first Employment Practices Liability Insurance policy issued by [HCC] to the insured and continuously renewed and maintained in effect to the inception date of [the 2018 Policy No. H718-920263]" as that phrase is used in section I, paragraph 1.c.(4) of Policy No. H718-920263.

### RESPONSE TO INTERROGATORY NO. 14:

HCC objects to this Interrogatory on the grounds that it is unduly burdensome since it seeks information that is equally available to both parties, and Plaintiffs can discern this information themselves. HCC further objects to this Interrogatory on the grounds that it is not reasonably calculated to lead to the discovery of admissible evidence.

Subject to and without waiving the objections set forth in the Preliminary Statement and the General Objections, HCC states that, on information and belief, the effective date of the first policy HCC issued to AV Builder, Policy No. H703-91879, was August 19, 2003.

Dated:  February 22, 2021

TROUTMAN PEPPER HAMILTON SANDERS LLP

By: _____
Terrence R. McInnis
Jenny Khuu Katzer

Attorneys for Defendant
HOUSTON CASUALTY
COMPANY

- 5 -

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## <u>VERIFICATION</u>

I have read the foregoing **DEFENDANT HOUSTON CASUALTY COMPANY'S RESPONSES TO PLAINTIFFS' SPECIAL INTERROGATORIES, SET TWO** and know its contents. I am a representative of Houston Casualty Company, a party to this action, and am authorized to make this verification for and on its behalf, and I make this verification for that reason. I have read the foregoing document(s). I am informed and believe and, on that ground, allege that the matters stated in it are true. I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed at Mount Kisco, New York on February 22, 2021.


*Jill E. Daly*
Jill E. Daly

- 6 -

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

## PROOF OF SERVICE

I, Enia A. Castillo, declare:

I am a citizen of the United States and employed in Orange County, CA. I am over the age of 18 and not a party to the within action; my business address is 5 Park Plaza, Suite 1400, Irvine, CA 92614-2545.

**DEFENDANT HOUSTON CASUALTY COMPANY'S RESPONSES TO PLAINTIFF'S SPECIAL INTERROGATORIES, SET TWO**

☒ **BY ELECTRONIC MAIL**: Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addresses, as last given or submitted on any document which he or she has filed in the case, listed on the attached service list.

***SEE ATTACHED SERVICE LIST***

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **February 22, 2021**, at Orem, UT.

_____
/s/
Enia A. Castillo

- 7 -

DEFENDANT HOUSTON'S RESPONSES TO PLAINTIFF'S
SPECIAL INTERROGATORIES, SET TWO;
CASE NO. 3:20-CV-01679-W-KSC

## SERVICE LIST

| Peter J. Schulz, Esq.<br>Tommy U. Schroeder, Esq.<br>SHULZ BRICK & ROGASKI<br>600 West Broadway, Suite 960<br>San Diego, CA 92101<br>(619) 234-3660<br>FAX (619) 234-0626<br>EMAIL     pjs@sbrlawsd.com<br>           ts@sbrlawsd.com | Attorneys for Plaintiffs<br>AV BUILDER CORP,<br>RESTORCORP, and ANTONIO<br>MADUREIRA |
|---|---|

- 8 -

DEFENDANT HOUSTON'S RESPONSES TO PLAINTIFF'S
SPECIAL INTERROGATORIES, SET TWO;
CASE NO.  3:20-CV-01679-W-KSC

TROUTMAN PEPPER HAMILTON SANDERS LLP
5 PARK PLAZA
SUITE 1400
IRVINE, CA 92614-2545

113031254

AVB MSJ Appendix P. 450



# Exhibit 17



**TOKIO MARINE**
**HCC**

Professional Lines Group
37 Radio Circle Drive, Mount Kisco, NY 10549 USA
Tel: 914-241-8900

## PERSONAL & CONFIDENTIAL

November 9, 2018

**VIA CERTIFIED MAIL, R.R.R.,**
**& ELECTRONIC MAIL**

Dick A. Semerdjian, Esq.
Schwartz Semerdjian Cauley & Moot, LLP
101 West Broadway, Suite 810
San Diego, CA 92101

das@sscmlegal.com

| RE: | Insured: | *AV Builder Corporation; ReStorCorp* |
|-----|----------|--------------------------------------|
| | Claimant: | *Laura Dusina* |
| | Policy No.: | *H717-917293* |
| | Claim No.: | *STD-17-07093[1]* |

Dear Attorney Semerdjian:

Houston Casualty Company (hereinafter "HC" or "the Company") has requested and authorized Tokio Marine HCC – Professional Lines Group Claims Department to handle this matter on its behalf. This correspondence is directed to you in your capacity as an authorized representative of the above Insured for insurance coverage purposes. In the event you are no longer authorized to represent the Insured with respect to insurance matters, please direct a copy of this letter to the appropriate party and accordingly advise the undersigned.

On behalf of HC, we previously acknowledged receipt of electronic correspondence submitted on October 15, 2018, in connection with the above-referenced matter, including a copy of a Draft Complaint captioned, Laura Dusina v. AV Builder Corp., ReStorCorp, Antonio Madureira, and Does 1 through 25, inclusive, to be filed with the Superior Court of the State of California, County of San Diego (hereinafter, "Draft Complaint"). We further acknowledge receipt of various email correspondence between Antonio Madureira and Laura Dusina from July and August 2018 and a draft Severance Agreement and General Release (hereinafter, "Demand"), as well as electronic correspondence from Ms. Dusina's counsel sent to you (as the Insured's representative) on August 14, 2018. We have reviewed the information provided to us along with the terms and conditions of the above-referenced Policy and have completed our coverage investigation. **For the following reasons, HC has determined that it has no obligation under the Policy either to defend or indemnify AV Builder Corporation, ReStorCorp, Antonio Madureira, or any other Insured, person or entity in connection with this matter.**

---

[1] This matter was originally assigned claim number STD-18-07037. For administrative purposes, the matter has been reassigned claim number STD-17-07093.

A member of the Tokio Marine HCC group of companies

**AVB 000875**

Dick Semerdjian, Esq.
November 9, 2018
Page 2 of 10

## THE POLICY[2]

HC issued to AV Builder Corporation; ReStorCorp (hereinafter "AV Builder" or the "Insured") an Employment Practices Liability Insurance Policy, bearing Policy Number H717-917293 (hereinafter "the Policy"). The effective dates for coverage under the Policy are August 19, 2017 through August 19, 2018 (the "Policy Period"). **This is a claims made and reported policy and, as such, applies only to those otherwise covered "claims" that are first made against the Insured and reported to the Company, in writing, during the Policy Period or any Limited or Extended Reporting Period (if applicable).[3]** The Policy contains Limits of Insurance of $500,000 for each "claim" and in the aggregate for all "claims" subject to a $10,000 Retention for each "claim." Both the Limits of Insurance and the Retention include "defense costs"; further, the Company shall only be liable to make payment in excess of the Retention and subject to the Limit of Liability of the Policy.

## FACTS OF THE CLAIM

On the basis of the information and documents provided to the Company,[4] this matter initially arose from a Demand by Laura Dusina (hereinafter, "Ms. Dusina" or "Claimant") as communicated in email correspondence with the owner of AV Builder, Antonio Madureira. Mr. Madureira sent Claimant a draft severance agreement via email dated July 23, 2018. In response, Claimant disputed the amount set forth therein and stated, "[i]t was 475k (you pay all taxes and fees) you were paying medical bills, no its not ok that I can't talk to my coworkers. . . ." In a subsequent email sent to Mr. Madureira on the same date, Claimant stated, "[t]he amount isn't even correct why are we playing games." Mr. Madureira responded with a summary of the parties' negotiation history, to which Claimant responded, in relevant part: "For 9 years you got EVERYTHING you wanted out of me wife, nurse, mommy, best fuck buddy ever, best friend, supplier, DO OF YOUR DURTY [sic] DEEDS and #1 employee . . . . Are [sic] relationship was exactly what you wanted it to be, without fail to you personally or your company and you want me to accept that this is how my success ends. . . ." We also acknowledge receipt of an email from Claimant to Mr. Madureira dated August 1, 2018, wherein she stated, "All parties are aware

---

[2] We quote from certain portions of the Policy below. Certain quoted terms are the subject of definitions in the Policy. Our reference to these portions of the Policy does not mean that these are the only provisions relevant to this matter, or that these terms only appear in the Policy as they appear in this letter. We refer you to the entire Policy for a full listing of all Policy provisions and terms.

[3] Deleted and replaced by the CLAIMS MADE & REPORTED COVERAGE WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT (EP 530).

[4] Upon receipt of the Insured's submission, we requested copies of all communication between the Insured and Ms. Dusina pertaining to her allegations set forth in the Draft Complaint, including discussions regarding severance and a copy of any draft Severance Agreement, as well as Ms. Dusina's personnel file. Your law firm advised that Claimant's personnel file could not be located, and provided us with copies of email correspondence between Claimant and Mr. Madureira beginning on July 23, 2018. It does not appear that HC was provided with documents fully responsive to its request for information regarding this matter, including any correspondence regarding Ms. Dusina's separation of employment, and HC reserves all rights accordingly under the Policy and applicable law to the extent that this information is pertinent to our coverage investigation.

Dick Semerdjian, Esq.
November 9, 2018
Page 3 of 10

that this is not just an employment severance agreement. . . ." In an email dated August 2, 2018, Claimant further stated, ". . .to be more clear with your lawyer Noy is 100% in the 'know' that this is a Non-Disparagement/Non-Defamation agreement. . . resulting in my employment termination!" It is our understanding that Mr. Madureira does not dispute that he engaged in a consensual sexual relationship with the Claimant while she was employed by the Insured.

We also received a copy of an email communication from Josh Gruenberg, Claimant's counsel, addressed to you, as the Insured's counsel, dated August 14, 2018, advising that he was retained by Claimant "relative to her claims against Antonio Madureira and AV Builders." Claimant's counsel stated that Mr. Madureira should not contact Claimant and noted that he was in the process of preparing a lawsuit.

Thereafter, on September 13, 2018, Claimant's counsel sent you a copy of the Draft Complaint, which alleges the following: (1) sexual harassment; (2) gender discrimination; (3) retaliation; (4) failure to prevent harassment and/or discrimination; (5) negligent supervision; (6) failure to pay wages upon termination; (7) failure to provide accurate and itemized wage statements; (8) breach of written contract; (9) breach of oral contract; (10) unlawful business practices; and (11) intentional infliction of emotional distress. Claimant specifically alleges that she was hired as a receptionist/office manager for the Insured in February 2010. Mr. Madureira, who was married at that time, took an interest in Claimant and they began a consensual relationship in June 2010. The relationship continued through 2012, when Claimant was promoted to Office Manager. Mr. Madureira got divorced in 2012 but insisted on keeping his relationship with the Claimant secret, and Claimant was promoted to Marketing Director in April 2012. Claimant alleges that Mr. Madureira made inappropriate comments about Claimant in front of customers and coworkers and degraded her by demanding sexual acts. In addition, Claimant alleges that Mr. Madureira promised that her job was guaranteed for life, and promised her certain commissions. Mr. Madureira began a new relationship in February 2018, but continued his sexual relationship with Claimant. After he told Claimant that she may have contracted a sexually transmitted disease in April 2018, Claimant told Mr. Madureira that she wanted to end their relationship. Mr. Madureira then sent Claimant an email accepting her "resignation." Claimant alleges that she continued to show up to work and perform her job duties, and Mr. Madureira began retaliating against her.

Claimant contends that an agreement was prepared to pay Claimant for her silence, and on July 22, 2018, Mr. Madureira texted Claimant stating that they would be moving on and she would get her agreement. Claimant engaged in negotiations with the Insured and was scheduled to leave her employment with the Insured on August 3, 2018, but the negotiations broke down and she did not sign the agreement. Claimant alleges she was not paid her final check and is owed $100,000 in commissions. Claimant seeks compensatory damages including lost wages, promotional opportunities, benefits and opportunities, special damages, emotional distress damages, back pay, front pay and other relief, restitution, penalties under the Labor Code, damages under the B&P Code, punitive damages, attorneys' fees and costs, and interest.

HC was first notified of this matter in writing by the Insured on October 15, 2018.

Dick Semerdjian, Esq.
November 9, 2018
Page 4 of 10

<hr>

## BASES FOR DENIAL OF COVERAGE

Without intending to comment on the veracity of Claimant's allegations, we direct your attention to certain terms and conditions in the Policy of insurance issued by HC that support HC's denial of coverage for this matter. Please note that the following observations concerning coverage are based on the information presently available.

We first direct your attention to SECTION I. of the Policy, which provides coverage as follows:

### SECTION I - COVERAGE

1. **Insuring Agreement**

    a.   This Policy covers "discrimination," "harassment" and "inappropriate employment conduct" liability within the terms, conditions, limitations and exclusions set forth below. It has been issued in reliance upon statements made to us in the "application."

    b.   [The Company] will pay "loss" that the insured is legally obligated to pay because of an "insured event" to which this Policy applies. However, the amount [the Company] will pay is limited as described in the LIMITS OF INSURANCE (SECTION IV), and RETENTION (SECTION V) sections.

    c.   This Policy applies only if:

       (1)   a "claim" because of an "insured event" is first made against any insured in accordance with the WHEN COVERAGE IS PROVIDED (SECTION VII) (deleted and replaced by the CLAIMS MADE & REPORTED COVERAGE WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT (EP 530)) and COVERAGE TERRITORY (SECTION VIII) sections; and

                              *     *     *

       (3)   the "claim" is first reported in accordance with the WHEN COVERAGE IS PROVIDED (SECTION VII) (deleted and replaced by the CLAIMS MADE & REPORTED COVERAGE WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT (EP 530)) and COVERAGE TERRITORY (SECTION VIII) sections. . . .

Dick Semerdjian, Esq.
November 9, 2018
Page 5 of 10

<div align="center">*     *     *</div>

We next direct your attention to SECTION VII. - WHEN COVERAGE IS PROVIDED and SECTION VI.- CONDITIONS, which is deleted and replaced by the CLAIMS MADE & REPORTED COVERAGE WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT (EP 530). Specifically, SECTION VII., paragraph 1. and SECTION VI., paragraphs 2.a. and 2.b., are deleted in their entirety and replaced by Endorsement EP 530, which provides as follows:

### SECTION VII. – WHEN COVERAGE IS PROVIDED

1. **Claims Made and Reported Coverage.** This Policy applies only to "claims" first made or brought against you and reported to [the Company], in writing, within the Policy Period set forth on the Declarations page of this Policy or any Limited or Extended Reporting Period (if applicable).

   A "claim" will be considered first made or brought on the date we or **any insured receives a written "claim" whichever comes first.**

<div align="center">*     *     *</div>

### SECTION VI. - CONDITIONS

2. **Duties in the event of a "claim" or "suit".**

   a. You must see to it that we receive written notice of a "claim" as soon as practicable, **but in no event later than sixty (60) days after your actual notice or receipt of the "claim," or thirty (30) days after the expiration, termination, or cancellation of the Policy or any Extended Reporting Period, whichever comes first**. Notice should include:

      (1) The identity of the person(s) alleging "discrimination," "harassment" or "inappropriate employment conduct";

      (2) The identity of the insured(s) who allegedly committed the "discrimination" or "harassment" or "inappropriate employment conduct";

Dick Semerdjian, Esq.
November 9, 2018
Page 6 of 10

        (3) The identity of any witness to the alleged "discrimination," "harassment or "inappropriate employment conduct";

        (4) The date the "insured event" took place; and

        (5) The written charge, complaint or demand as applicable.

      b.  If a "suit" is brought against any insured, you must see to it that we receive written notice of such "suit," including the specifics of the "suit" and the date received, as soon as practicable, but in no event later than sixty (60) days after your actual notice or receipt of the "suit," or thirty (30) days after the expiration, termination, or cancellation of the Policy or any Extended Reporting Period, whichever comes first.

           (Emphasis added).

The term "claim" is defined at SECTION IX.2. of the Policy to mean "a written demand received by the insured alleging damages or the filing of a 'suit,' or any administrative proceeding including but not limited to the Equal Employment Opportunity Commission, or any other state or federal agency or authority with jurisdiction over [the Insured]."

HC issued to AV Builder an Employment Practices Liability Insurance Policy, bearing Policy Number H717-917293, with a Policy Period of August 19, 2018 through August 19, 2018. Based on the documents provided to HC, the Insured received correspondence from the Claimant wherein Claimant demanded damages arising from her separation of employment at the latest on July 23, 2018.  The Demand constitutes a "claim" as defined by Section IX.2. of the Policy and pursuant to applicable California law. Accordingly, the instant "claim" is deemed to have been first made on July 23, 2018,[5] which was within the Policy Period for Policy H717-917293 (August 19, 2017 through August 19, 2018).

Pursuant to SECTION VII. – WHEN COVERAGE IS PROVIDED,[6] "[t]his Policy applies only to 'claims' first made or brought against you and reported to [the Company], in writing, within

---

[5]  We again note that we have requested, but not received, all communications concerning this matter.  HC reserves its right to reevaluate the date that the "claim" was first made.  Based upon the information received, the date that the "claim" was first made appears to be earlier than July 23, 2018.

[6]  Deleted and replaced by the CLAIMS MADE & REPORTED COVERAGE WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT (EP 530).

AVB 000880

Dick Semerdjian, Esq.
November 9, 2018
Page 7 of 10

the Policy Period … or any Limited or Extended Reporting Period (if applicable)." SECTION VI.2., which is deleted and replaced by the CLAIMS MADE & REPORTED COVERAGE WITH SUPPLEMENTAL REPORTING PERIOD ENDORSEMENT (EP 530), provides, in relevant part, that: the Insured must notify the Company in writing "as soon as practicable" after a "claim" is made, **but in no event later than sixty (60) days after your actual notice or receipt of the "suit," or thirty (30) days after the expiration, termination, or cancellation of the Policy or any Extended Reporting Period, whichever comes first.** As noted above, this "claim" was first made when the Insured received the Demand on July 23, 2018. **However, the Insured did not notify HC of the "claim" until October 15, 2018, which is more than sixty (60) days after it first received the "claim" and more than thirty (30) days after the expiration of the applicable Policy.**

**In light of the foregoing, the Insured has failed to comply with Conditions Precedent set forth in SECTION VI.2. of the Policy and, therefore, coverage is not triggered under SECTION I. of the Policy.** We note that this notice requirement is strictly applied even if there has been no actual prejudice or harm to our interests. See Root v. American Equity Specialty Ins. Co., 130 Cal.App.4th 926, 929 (2005); Illinois Union Ins. Co. v. Brookstreet Securities Corp., 2009 WL 10671583 (CDCal., 2009). Even if you were previously unaware of these Policy requirements or failed to understand the significance of this requirement, no proof of prejudice would be required. See Jamestown Builders, Inc. v. General Star Indemnity Co., 77 Cal.App.4th 341 (1989); Pacific Employers Ins. Co. v. Superior Court, 221 Cal.App.3d 1348 (1990). **Notwithstanding, it is HC's position that the Insured's failure to timely report the "claim" and subsequent actions have resulted in material prejudice to HC. Under these facts and circumstances, because the timely notice requirements were not met, coverage has not been triggered under SECTION I. of the Policy.**

**Based upon the relevant facts and the Policy provisions cited herein, HC has no obligation to defend or indemnify AV Builder Corporation, ReStorCorp, Antonio Madureira or any other Insured, person or entity in connection with this matter, as coverage has not been triggered under SECTION I. of the Insuring Agreement.**

## OTHER APPLICABLE POLICY PROVISIONS

Notwithstanding the Company's position that coverage is not available under the Policy for the reasons outlined above, we call your attention to a number of other Policy provisions that may also serve to bar or limit coverage for this matter, and on which HC reserves its rights:

- The term "insured event" is defined at SECTION IX.9. to mean "actual or alleged acts of 'discrimination,' 'harassment' and/or 'inappropriate employment conduct' by an insured against an 'employee,' former 'employee,' or an applicant seeking employment with the Named Insured."

- The term "inappropriate employment conduct" is defined at SECTION IX.8.

- Section VI.2.d of the Policy provides, "[n]o insured will, except at their own cost, voluntarily make a payment, assume any obligation, or incur any

Dick Semerdjian, Esq.
November 9, 2018
Page 8 of 10

**expense without our consent.** Subsequent payments which are deemed by us as having been prejudiced by any such voluntary payment will also be your sole responsibility." (Emphasis added). Any amounts offered to the Claimant without the Company's consent, including the $400,000 offered to Claimant plus reimbursement for applicable taxes, as well as health care benefits, title to Claimant's company car, and a $200,000 payment already made to Claimant by Mr. Madureira, prior to the tender of this "claim," are considered voluntary payments and/or an assumption of an obligation that is the sole responsibility of AV Builder pursuant to Section VI.2.d., cited above. Accordingly, even if coverage were triggered for this matter, which it is not, the $200,000 previously paid to the Claimant, in addition to the $400,000 net payment and additional benefits and property offered to her without our consent, is the responsibility of the Insured pursuant to Section VI.2.d., and it is HC's position that these offers constitute material prejudice.

- SECTION IX.12. of the Policy provides that "Loss" means, in relevant part: "damages, judgments, settlements, statutory attorney fees and 'defense costs', including: a. prejudgment and post judgment interest awarded against an insured on that part of any judgment paid by [the Company] and b. back pay awards and front pay awards. However, **'loss' does not include: a. civil, criminal or administrative fines or penalties imposed by law that are not otherwise insurable, or b. non-monetary relief, or c. punitive or exemplary damages where such damages are not insurable because of state or federal law. . .; or . . . f. matters which may be deemed uninsurable according to the law under which this Policy is construed, or g. amounts owed under federal, state or local wage and hour laws, and/or earned commissions, bonuses,** stock options, profit sharing or benefits pursuant to a contract of employment." (Emphasis added).

- SECTION II. of the Policy, entitled EXCLUSIONS, as amended by the WAGE AND HOUR LAWS LEGAL DEFENSE COSTS ENDORSEMENT WITH INCREASED RETENTION (EP 526), cited in relevant part below:

  **11.    Wage and Hour Laws**

  a.    This Policy does not cover any "loss" based upon or arising out of any private, governmental or administrative "claim" alleging violations of federal, state or local wage and hour laws or regulations, including, but not limited to, any laws or regulations concerning monetary or non-monetary compensation or benefits that may be owed to a past or present "employee" based upon misclassification of their job status, title or duties.

  b.    However, we will pay "defense costs" up to, but in no event greater than $100,000 for each "claim" and in the aggregate for all

Dick Semerdjian, Esq.
November 9, 2018
Page 9 of 10

"claims" made during this Policy Period and excluded by a. above without any liability by us to pay such monetary portion that you shall become legally obligated to pay because of any damages, judgment or settlement, including punitive damages. The $100,000 "defense costs" provided under this Endorsement is part of and not in addition of the Limits of Liability stated in the Declarations.

\* \* \*

The coverage afforded by this Endorsement is subject to a separate retention of $25,000, which applies to any "claim(s)" for, based upon, arising out of or in any way involving one or more allegations of violations of federal, state or local wage and hour laws or regulations. The Retention set forth by this Endorsement applies even in the event that any portion of such "claim(s)" otherwise involves an "insured event."

\* \* \*

- We additionally note that Claimant alleges that Antonio Madureira, the owner of AV Builder, engaged in deliberate acts of misconduct (harassment, discrimination, retaliation, and infliction of emotional distress) intended to injure her. Again, while we assume Mr. Madureira denies any such actions or having such a wrongful intent, if these claims are factually and legally established, they would evidence misconduct barred from indemnification pursuant to California Insurance Code Section 533. This is because the Claimant would have established that the actions violated California public policy and that Mr. Madureira (as the senior managerial official) had knowledge of the improprieties and could have prevented them from occurring. E.g., *Brady v. Elixir Indus.* (1987) 196 Cal.App.3d 1299, 1306.

- In addition to the foregoing, HC specifically reserves its rights to take the position that this Policy is excess to any other insurance policies (see Section VI.4. "Other Insurance").

## DENIAL OF COVERAGE

**Based upon the foregoing, we advise you that HC denies coverage for this matter. HC will neither defend nor indemnify AV Builder Corporation, ReStorCorp, Antonio Madureira or any other Insured in connection with this matter. We advise you to continue to take whatever steps you deem necessary to protect the interests of the Insured in connection with this matter; however, such will be at the Insured's expense. We do urge you to provide us with any information you may have which might alter our decision to deny coverage at this time.**

Dick Semerdjian, Esq.
November 9, 2018
Page 10 of 10

This letter is based on the information supplied to HC as of this date. HC specifically reserves its rights to supplement and/or amend its position concerning coverage, as stated herein, in the future if facts and/or circumstances so warrant. It is not, and should not be construed as, a waiver or estoppel of HC's rights or any of the terms, conditions, and exclusions of the HC Policy, or of any other policy issued by HC or any of its affiliates. HC expressly reserves the right to assert any defenses or reservations of rights determined to exist and to have a court determine whether there is (or ever was) any coverage for this matter.

While we encourage you to first contact the undersigned with any questions or concerns you may have with regard to the positions taken in this letter, you are, should you wish, entitled to have this matter reviewed by the California Department of Insurance to the extent you disagree with any or all of the expressed positions. Inquiries should be directed as follows: California Department of Insurance, Claims Services Bureau - 11th Floor, 300 South Spring Street, Los Angeles, CA 90013, Telephone: 1-800-927-HELP [1-800-927-4357].

Should you have any questions or concerns regarding the Company's coverage position or anything stated herein, or if you have additional information which you believe may affect the Company's position, please do not hesitate to contact the undersigned at 914.864.3202 or ksherman@tmhcc.com.

Sincerely,
Tokio Marine HCC – Professional Lines Group

Kathryn A. Sherman, Esq.
Senior Claims Attorney

KS/ag

cc:     Tony Madureira
        (Via Email Only: av@avbuilder.com)

        Michael Davalle
        (Via Email Only: mdavalle@sociusinsurance.com)